# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

David Alcaly, an individual,

                  Plaintiffs,

vs.

Global Partners Group, Inc., a Florida
corporation, Global Partners Securities, Inc., a
Florida corporation, Marcos Konig, an
individual,

                  Defendants.

CASE NO.: **06-61363**

CIV-DIMITROULEAS

MAGISTRATE JUDGE

## NOTICE OF REMOVAL

The defendants Global Partners Group, Inc. (GPG), Global Partners Securities, Inc.(GPS), and Marcos Konig (Konig), under Federal Rule of Civil Procedure 81(c) and 28 U.S.C. § 1446(b) remove the plaintiff's Florida state lawsuit commenced in Palm Beach County, Florida. (*Alcaly v. Global Partners Group, Inc., et al.*, Case No. 05CA011966 AJ.) Specifically, this Court has removal jurisdiction over this matter under 28 U.S.C § 1441(b) and 28 U.S.C. § 1367(a). In support of this notice of removal, the defendants state the following:

### BACKGROUND

On December 22, 2005, the plaintiff commenced a civil suit in Palm Beach County, Florida against these defendants and others. *See* Compl., a copy of which is attached to this notice of removal as Exhibit 1. On March 2, 2006, the plaintiff amended his complaint, adding additional claims and supporting those allegations with additional exhibits (*see* 1st Am. Compl., a copy of which is attached to this notice of removal as Exhibit 2), and on March 17, 2006 the defendants moved to dismiss the amended complaint. *See* Mot. to Dismiss, a copy of which is attached to this notice of removal as Exhibit 3.



On August 20, 2006, the plaintiff served the defendants with his second amended complaint, alleging similar claims to the ones alleged in the two previous complaints.  *See* 2d Am. Compl., a copy of which is attached to this notice of removal as Exhibit 4.  But for the first time, the plaintiff added two new claims alleging securities fraud against defendants GPG and Konig.  *See* 2d Am. Compl. ¶¶ 96-109; 110-123.  Specifically, the plaintiff has alleged, among other things, that the defendants had represented that they complied with the net capital requirements under the Securities Exchange Act of 1934, Rule 15c3-1.  *See id.* at ¶¶ 23, 141, 2d Am. Compl. Ex. A. ¶ 3(b).

**STANDARDS GOVERNING REMOVAL**

Removal is proper for any civil action where the district court has original jurisdiction. *See* 28 U.S.C. § 1441(b).  District courts have original jurisdiction over all civil actions arising under the Constitution, laws, or treaties of the United States.  *See* 28 U.S.C. § 1331.  If the claims stated in the initial pleading are not removable, the defendant must file a notice of removal within thirty days after the plaintiff serves an amended pleading from which the defendant may first ascertain that the case is one which is removable.  *See* 28 U.S.C. § 1446(b).  Further, the artful pleading doctrine requires a federal court to read beyond the complaint's express allegations to determine whether a plaintiff has attempted to avoid removal by omitting allegations necessary to state the claim for relief under federal law.  *See Rivet v. Regions Bank of Louisiana*, 522 U.S. 470, 476 (1998).

A.   **The Defendants Have Timely Removed this Case from State Court to Federal Court.**

In the plaintiff's first two complaints, there were no allegations regarding securities fraud. *See* Compl., and 1st Am. Compl.  Instead, the original iterations of the complaint only contained

allegations relating to contract claims and state common law tort claims. In the second amended complaint, the plaintiff has alleged two claims for securities fraud. *See* 2d Am. Compl. ¶¶ 96-109; 110-123. The plaintiff has not alleged any statute under which he has brought these securities fraud allegations, only alleging that the defendants had misrepresented their compliance with the 1934 Act's net capital mandates. *See* 2d Am. Compl ¶¶ 23, 141. Because this is the first time in which the plaintiff has alleged in any way that federal law governs this dispute, the defendants were only able to remove this case under the procedures dictated in 28 U.S.C. § 1446(b). The defendants have therefore timely removed this case.

**B.     This Court Has Original Jurisdiction over the Securities Fraud Claims Alleged in the Second Amended Complaint.**

The plaintiff's suit is subject to removal for three reasons: (1) the federal courts have exclusive jurisdiction over actions for liability under the 1934 Act; (2) the plaintiff's artful pleading around the 1934 Act is unavailing because the plaintiff has alleged a claim that arises under federal law; and (3) the plaintiff's claims raise substantial federal questions, requiring the court to interpret and construct federal law.

**1.     This Court Has Exclusive Jurisdiction over the Plaintiff's Securities Fraud Claims.**

Federal district courts have exclusive jurisdiction over all actions at law brought to enforce any liability under the Securities Exchange Act of 1934, and the regulations promulgated under the 1934 Act. *See* 15 U.S.C. § 78aa. In those cases where the plaintiff alleges more than just a passing reference to federal law, the case is removable. *See Bacardi v. Bacardi Corp.*, 677 F. Supp 253, 256 (D. Del. 1988). More specifically, a case is removable where a complaint raises factual issues that will require interpreting and construing the 1934 Act. *See id.*

Here, the plaintiff has alleged securities fraud based on purported material misrepresentations regarding the defendants; the plaintiff had purportedly invested $400,000.00 into GPG and GPS. Specifically, the plaintiff has alleged, among other things, that the defendants had misrepresented their compliance with the 1934 Act's Rule 15c3-1. *See* 2d Am. Compl ¶¶ 23, 141, 2d Am. Compl. Ex. A. ¶ 3(b). Because these allegations relate to the 1934 Act – and not the 1933 Act – this Court has exclusive jurisdiction over the securities fraud claims alleged in this case. *See* 15 U.S.C. § 78aa; *see also Bacardi*, 677 F. Supp at 256. Simply put, the plaintiff's allegations require this Court interpret and construe the 1934 Act as it relates to the defendants' alleged conduct. Under the 1934 Act and *Bacardi*, these defendants may remove this case.

### 2. Although the Plaintiff Has Omitted Alleging a Statutory Basis for His Securities Fraud Claims, the Claims Arise under Federal Law.

The plaintiff has omitted any allegations regarding the statutory basis for asserting securities fraud, but the claims nevertheless arise under federal law. Specifically, under the artful pleading doctrine, a court may find a basis for removal if the claims alleged nevertheless arise under federal law. *See Rivet*, 522 U.S. at 476.

Removal here is proper because, even though the plaintiff has left out any allegations regarding the governing federal statute, it is clear that the relief sought stems from the 1934 Act. *See* 2d Am. Compl ¶¶ 23, 141, 2d Am. Compl. Ex. A. ¶ 3(b). Therefore, despite the conspicuously missing citation to any statutory basis for his securities fraud claims, the plaintiff's claims must fall under the 1934 Act section 10(b), and the rules and regulations promulgated in accordance with that statute. More specifically, the elements the plaintiff has

alleged are more akin to a securities fraud claim under 1934 Act section 10(b) then any other common law or statutory scheme. This Court therefore has jurisdiction over those claims.

### 3. This Plaintiff's Securities Fraud Claims Raise Substantial Questions of Federal Law.

Resolving the issues alleged by the plaintiff requires the court to answer substantial questions of federal law in dispute between the parties. *See Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for So. Cal.*, 463 U.S. 1, 13 (1983). Where the complaint raises factual and legal issues that require the court to interpret and construct various provisions of the 1934 Act, the claim arises under federal law. *Bacardi*, 677 F. Supp at 256 (citing *Gully v. First Nat'l Bank*, 299 U.S. 109, 117 (1936)). In cases where the plaintiff has alleged a substantial federal question, the federal court should ignore whether the plaintiff intended to state a federal claim because the complaint's express allegations govern. *See id.*

The plaintiff's complaint in this case raises substantial federal questions. For example, the plaintiff has alleged that the defendants failed to comply with 1934 Act's Rule 15c3-1, which is a federal question that the plaintiff has alleged gives rise to liability for securities fraud. *See* 2d Am. Compl ¶¶ 23, 141. Moreover, the complaint includes factual allegations that require this Court to interpret and construe various provisions of the 1934 Act. The plaintiff's claims therefore arise under Federal law. Accordingly, this Court has original jurisdiction over the federal questions raised by the second amended complaint, and removal is proper.

### C. This Court Has Supplemental Jurisdiction over the Remaining State Law Claims Alleged in the Second Amended Complaint.

In those cases where the federal district court has original jurisdiction over a civil claim, that court also has supplemental jurisdiction over all other claims that are so related to claims in the action that they form part of the same case or controversy under the United States

Constitution, Article III.  *See* 28 U.S.C. § 1367.  Under the supplemental jurisdiction statute, a district court has jurisdiction over a plaintiff's state law claims when the federal and state claims involve a common set of operative facts.  *See United Mine Worker v.* Gibbs, 383 U.S. 715, 725 (1966).  Moreover, where the state claims involve the identical factual background as the federal claim, supplemental jurisdiction exists.  *See Bacardi*, 677 F. Supp at 256.

Here, the remaining state law claims alleged by the plaintiff rely upon the identical factual allegations that support the federal securities fraud claims.  For instance, the plaintiff has alleged the following 7 other common law claims: (1) that GPG breached its contract with the plaintiff (2d Am. Compl ¶¶ 48-56), (2) that GPG fraudulently induced the plaintiff (2d Am. Compl ¶¶ 57-69), (3) that Konig as an office and director fraudulently induced the plaintiff (2d Am. Compl ¶¶ 70-84), (4) that Konig as an individual fraudulently induced the plaintiff (2d Am. Compl ¶¶ 85-95), (5) that Konig beached hit fiduciary duty (2d Am. Compl ¶¶ 124-135), (6) that GPG breached its representations and warranties (2d Am. Compl ¶¶ 136-143), and (7) that GPS aided and abetted GPG and Konig (2d Am. Compl ¶¶ 144-149).  Each of these claims relies on the same purported conduc0:  the statements the defendants allegedly made that purportedly misrepresented the status of the company, allegedly leading the plaintiff to invest in a company he would not have otherwise done.  *See* 2d Am. Compl. ¶¶ 8-47.

Under section 1367, the supplemental jurisdiction statute, this Court has jurisdiction over the plaintiff's state law claims because those claims involve a common set of operative facts with the federal law claims.  *See Gibbs*, 383 U.S. at 725.  Because the plaintiff's state law and federal law claims involve, and depend upon, the same factual background – *i.e.*, the defendants' purported misrepresentations – this court has supplemental jurisdiction over all the plaintiff's

claims. *See Bacardi*, 677 F. Supp at 256. This Court therefore has jurisdiction over the entire action.

**CONCLUSION**

The defendants have timely removed the state court case, and this Court has subject matter jurisdiction over all the claims the plaintiff has alleged in the second amended complaint. Removal is therefore proper.

Respectfully submitted,

Wasserstrom Weinreb & Wealcatch, P.L.
1909 Tyler Street, Penthouse
Hollywood, FL 33020
(954) 922-3240 (T)
(954) 922-3431 (F)

By: _____
　　 Jon Polenberg (FBN 0653306)
　　 Jude C. Cooper (FBN 0366160)

Attorneys for the defendants

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing was furnished via U.S. Mail on September 8, 2006 to Allen H. Libow, Esquire, counsel for Plaintiff, 3351 NW Boca Raton Boulevard, Boca Raton, Florida 33431

_____
Jon Polenberg

# EXHIBIT 1

IN AND FOR THE CIRCUIT COURT FOR
THE FIFTEENTH JUDICIAL CURCUIT
PALM BEACH COUNTY FLORIDA

DAVID ALCALAY,

     Plaintiff,

vs.

GLOBAL PARTNERS GROUP, INC., a
Florida corporation, GLOBAL PARTNERS
SECURITIES, INC., a Florida corporation,
MARCOS KONIG, an individual
VFINANCE, INC., a Florida corporation,
VFINANCE INVESTMENTS HOLDINGS,
INC., a Florida corporation; and SHAVELL &
COMPANY, P.A., a Florida professional association.

     Defendants.

_____/

CASE NO:

50 2005CA 011966 XXXX MB
A W

COPY
RECEIVED FOR FILING
DEC 2 2 2005
SHARON R. BOCK
CLERK & COMPTROLLER
CIRCUIT CIVIL DIVISION

## COMPLAINT

    Plaintiff, DAVID ALCALAY ("PLAINTIFF"), an individual, by and through his undersigned counsel, hereby files this Complaint against Defendants, GLOBAL PARTNERS GROUP, INC. ("GPG"), a Florida corporation, GLOBAL PARTNERS SECURITIES, INC. ("GPS"), a Florida corporation, MARCOS KONIG ("KONIG"), VFINANCE, INC. ("VFINANCE"), a Florida corporation, VFINANCE INVESTMENTS HOLDINGS, INC. ("VFINANCE INVESTMENTS"), a Florida corporation, and SHAVELL & COMPANY, P.A. ("SHAVELL"), a Florida Professional Association (hereinafter collectively referred to as "DEFENDANTS"), and alleges as follows:

### JURISDICTION, VENUE & THE PARTIES

    1.    This is an action for damages wherein the amount in controversy exceeds $15,000.00, exclusive of costs, interest and attorneys' fees, and is therefore within the jurisdiction of this Court.

2.    At all times material hereto, Plaintiff was and is an individual over the age of eighteen (18) years, is otherwise *sui juris*, and is a resident of Palm Beach County, Florida.

3.    At all times material hereto, GPG was a Florida corporation with its principal place of business in Broward County, Florida.

4.    At all times material hereto, GPS was a subsidiary of GPG and was a Florida corporation with its principal place of business in Broward County, Florida.

5.    At all times material hereto, KONIG was and is an individual over the age of eighteen (18) years and is a resident of Broward County, Florida.

6.    At all times material hereto, VFINANCE was and is a Florida corporation with its principal place of business in Palm Beach County, Florida.

7.    At all times material hereto, VFINANCE INVESTMENTS was and is a subsidiary of VFINANCE and a Florida corporation with its principal place of business in Palm Beach County, Florida.

8.    At all times material hereto, SHAVELL & COMPANY, P.A., was and is a Florida Professional Association with its principal place of business in Palm Beach County, Florida

9.    All conditions precedent to the bringing of the various claims set forth herein have been satisfied, discharged or waived.

10.    Plaintiff is entitled to recover reasonable attorney's fees and the costs associated with the prosecution of this action pursuant to Florida Statute and the contract between the parties.

## GENERAL ALLEGATIONS

11.    In or about 2004, Plaintiff was approached by KONIG, the President of GPG, to invest monies in GPG as an investment opportunity.

2

12.     KONIG provided Plaintiff with a Confidential Private Placement Memorandum ("Private Placement Memo") prepared by SHAVELL which included information on GPG's financial current status and events and predictions relating to GPG's future financial performance

13.     Based upon Plaintiff's review of the Private Placement Memo, on or about June 17, 2004, Plaintiff entered into a Preferred Stock Subscription Agreement with KONIG, on behalf of GPG, for the purchase of stock (the "Subscription Agreement").   A copy of said Subscription Agreement is attached hereto and incorporated herein as Exhibit "A."

14.     Pursuant to the Subscription Agreement, Plaintiff invested Four Hundred Thousand Dollars ($400,000.00) and in return acquired Eighty Thousand (80,000) shares of GPG's convertible variable rate participating preferred stock (the "Stock") at a price of Five Dollars ($5.00) per share. See Exhibit "A."

15.     At the time Plaintiff entered into the Subscription Agreement with GPG, KONIG, on behalf of GPG, represented to Plaintiff that GPG intended to use Plaintiff's investment to increase the net capital of GPG and GPS and to expand principal trading opportunities at the then-dissolved North American Institution Brokers, Inc. ("NAIB"), a subsidiary of GPG.

16.     In addition to the oral representations made by KONIG, the Subscription Agreement addresses the purported use of the funds invested by Plaintiff.  It states, in relevant part:

> **Use of Proceeds:  GPG** intends to use the proceeds to increase the net capital of its Global Partners Securities, Inc. ("GPSI") subsidiary and to expand principal trading opportunities at GPSI's NAIB division. See Exhibit "A."

17.     In or about July of 2004, Plaintiff wire-transferred the monies due to GPG under the Subscription Agreement.

18.     Unbeknownst to Plaintiff at the time of his investment, GPG was litigating a proceeding filed against NAIB by a former employee for alleged failure to pay commissions (the

3

"Lawsuit").

19.     On or about August 27, 2004, a Final Judgment was entered in the Lawsuit in favor of the Plaintiff in that case.

20.     GPG appealed same on behalf of NAIB and, upon information and belief, NAIB used Two Hundred Seventy Three Thousand One Hundred Dollars ($273,100.00) from Plaintiff's investment to place a bond for purposes of said appeal ("Appeal Bond").

21.     NAIB contracted with Accredited Surety and Casualty Company, Inc. to post the Appeal Bond on NAIB's behalf.

22.     Upon information and belief, the remaining One Hundred Twenty Six Thousand Nine Hundred Dollars ($126,900.00) of Plaintiff's investment was utilized for debt service of GPG.

23.     Thereafter, on or about September 29, 2004, a public news article was released detailing the purchase of GPG by VFINANCE INVESTMENTS, a subsidiary of VFINANCE, a financial services firm.

24.     On or about November 2, 2004, VFINANCE INVESTMENTS completed its acquisition of GPG, thereby assuming the liabilities of GPG & GPS.

25.     Plaintiff was never informed of said sale and purchase of GPG by KONIG, GPG, VFINANCE or VFINANCE INVESTMENTS.

26.     Plaintiff has not received a return of his investment nor any stock in VFINANCE or VFINANCE INVESTMENTS.

### COUNT I:  BREACH OF CONTRACT AS TO DEFENDANT GPG

27.     Plaintiff realleges and reavers the allegations set forth in paragraphs one (1) through twenty-six (26) as if fully set forth herein.

28.     On or about June 17, 2004, Plaintiff entered into the Subscription Agreement with

4

KONIG, on behalf of GPG, for the purchase of stock. See Exhibit "A."

29.    At the time the parties entered into said Subscription Agreement, KONIG, on behalf of GPG, represented to Plaintiff that GPG intended to use the proceeds of Plaintiff's investment to increase the net capital of GPG and to expand principal trading opportunities at NAIB.

30.    Pursuant to the Subscription Agreement, Plaintiff invested Four Hundred Thousand Dollars ($400,000.00) and acquired Eighty Thousand (80,000) shares of the Stock in return. See Exhibit "A."

31.    GPG breached the Subscription Agreement by utilizing the monies for other purposes and by failing to reimburse and/or distribute any monies or stock to Plaintiff.

32.    As a direct result of said breach, Plaintiff has been damaged in the amount of $400,000.00, loss of interest, costs and attorney's fees.

WHEREFORE, Plaintiff demands judgment against GPG for damages, interest, costs, attorney's fees pursuant to the Subscription Agreement and any further relief this Court deems just and proper.

## COUNT II:  BREACH OF FIDUCIARY DUTY AS TO DEFENDANT KONIG

33.    Plaintiff realleges and reavers the allegations set forth in paragraphs one (1) through twenty-six (26) as if fully set forth herein.

34.    On or about June 17, 2004, Plaintiff entered into the Subscription Agreement with KONIG, on behalf of GPG, for the purchase of stock. See Exhibit "A."

35.    As a result of said investment, Plaintiff became a shareholder of GPG and as such, entered into a fiduciary relationship with KONIG.

36.    On or about November 2, 2004, VFINANCE INVESTMENTS acquired GPG.

37.    KONIG breached his fiduciary duty to Plaintiff by failing to inform Plaintiff that

5

GPG was in the process of being acquired by VFINANCE.

38.     KONIG breached his fiduciary duty to Plaintiff by failing to inform Plaintiff of said sale and purchase by VFINANCE subsequent to the completion of the acquisition.

39.     KONIG breached his fiduciary duty to Plaintiff by utilizing monies invested by Plaintiff for other purposes than designated in the Subscription Agreement and by failing to reimburse and/or distribute any monies or stock to Plaintiff.

40.     As a direct and proximate result of KONIG's breach of fiduciary duty, Plaintiff has been damaged.

WHEREFORE, Plaintiff demands judgment against KONIG for damages, costs of this action, interest, attorney's fees pursuant to Florida Statutes and any further relief this Court deems just and proper.  Further, Plaintiff reserves the right to move this Court, pursuant to Chapter 768, Florida Statutes, for leave to amend this complaint by adding a claim for punitive damages.

### COUNT III: FRAUD IN THE INDUCEMENT AS TO DEFENDANTS KONIG, GPG

41.     Plaintiff realleges and reavers the allegations set forth in paragraphs one (1) through twenty-six (26) as if fully set forth herein.

42.     On or about June 17, 2004, Plaintiff entered into the Subscription Agreement with KONIG and GPG for the purchase of stock.  See Exhibit "A."

43.     Prior to entering into said Subscription Agreement, KONIG represented to Plaintiff that GPG intended to use the proceeds of Plaintiff's investment to increase the net capital of GPG and to expand principal trading opportunities at NAIB.

44.     In making said representations to Plaintiff, KONIG, on behalf of GPG, knew that his representations were false and that he would use said funds for other purposes.

45.     KONIG materially misrepresented GPG's intended use of Plaintiff's investment

funds in an effort to induce Plaintiff to rely on same and invest in GPG.

46.     Further, KONIG, on behalf of GPG, knew that said representation was false due to the impending Lawsuit and debt status of GPG.

47.     Plaintiff relied on said representation and, as a result, Plaintiff has been damaged.

WHEREFORE, Plaintiff demands judgment against GPG & KONIG for damages, costs of this action, interest, attorney's fees pursuant to Florida Statutes § 57.105 and any further relief this Court deems just and proper.  Further, Plaintiff reserves the right to move this Court, pursuant to Chapter 768, Florida Statutes, for leave to amend this complaint by adding a claim for punitive damages.

## COUNT IV:  MONIES LENT AS TO DEFENDANTS GPG, GPS, VFINANCE & VFINANCE INVESTMENTS

48.     Plaintiff realleges and reavers the allegations set forth in paragraphs one (1) through twenty-six (26) as if fully set forth herein.

49.     On or about June 17, 2004, Plaintiff entered into the Subscription Agreement with KONIG, on behalf of GPG, for the purchase of stock.  See Exhibit "A."

50.     Pursuant to the Subscription Agreement, Plaintiff invested Four Hundred Thousand Dollars ($400,000.00) and acquired Eighty Thousand (80,000) shares of the Stock.

51.     GPG, GPS, VFINANCE and VFINANCE INVESTTMENTS owe Plaintiff $400,000.00 that has been due with interest since June 17, 2004, for money lent by Plaintiff to Defendants.

WHEREFORE, Plaintiff demands judgment against GPG, GPS, VFINANCE and VFINANCE INVESTTMENTS for damages, costs of this action, interest, attorney's fees pursuant to Florida Statutes § 57.105 and any further relief this Court deems just and proper.

7

## COUNT V:  CONVERSION AS TO DEFENDANTS KONIG, GPG, GPS, VFINANCE & VFINANCE INVESTMENTS

52.    Plaintiff realleges and reavers the allegations set forth in paragraphs one (1) through twenty-six (26) as if fully set forth herein.

53.    On or about June 17, 2004, Plaintiff entered into the Subscription Agreement with KONIG, on behalf of GPG, for the purchase of the Stock.

54.    Pursuant to the Subscription Agreement, Plaintiff invested Four Hundred Thousand Dollars ($400,000.00) in return for the Stock.  See Exhibit "A."

55.    Thereafter, on or about September 10, 2004, the Defendants converted to their own use Plaintiff's investment monies of the value of Four Hundred Thousand Dollars ($400,000.00).

56.    Plaintiff has been damaged as a result thereof.

WHEREFORE, Plaintiff demands judgment against KONIG, GPG, GPS, VFINANCE AND VFINANCE INVESTMENTS for damages, costs of this action, interest, attorney's fees pursuant to Florida Statutes § 57.105 and any further relief this Court deems just and proper.

## COUNT VI –DAMAGES AGAINST DEFENDANTS VFINANCE & VFINANCE INVESTMENTS

57.    Plaintiff realleges and reavers the allegations set forth in paragraphs one (1) through twenty-six (26) as if fully set forth herein.

58.    VFINANCE INVESTMENTS and VFINANCE, as the parent of VFINANCE INVESTMENTS, received from GPG and GPS all of its assets, including the benefit of the Plaintiff's investment.

59.    To the extent VFINANCE INVESTMENTS and VFINANCE received the benefit from GPG and GPS, it is a fraudulent transferee, having received a transfer of value from GPG and GPS, without giving consideration or fair value in return, being under control of the

principals, and acting with the actual intent to defraud the creditors of GPG and GPS, including the Plaintiff.

60.     VFINANCE INVESTMENTS and VFINANCE are successor entities liable for the debts of GPG and GPS, having assumed GPG and GPS's liabilities, including Plaintiff's investment as described herein.   As a liable successor of GPG and GPS, VFINANCE INVESTMENTS and VFINANCE are responsible for GPG and GPS's liability to Plaintiff.

WHEREFORE, Plaintiff demands judgment against VFINANCE AND VFINANCE INVESTMENTS for damages, costs of this action, interest, attorney's fees pursuant to Florida Statutes and as provided for in the Stock Subscription Agreement and any further relief this Court deems just and proper.

## COUNT VII –CONSPIRACY AGAINST DEFENDANTS KONIG, GPG, GPS & SHAVELL

61.     Plaintiff realleges and reavers the allegations set forth in paragraphs one (1) through twenty-six (26) as if fully set forth herein.

62.     In or about 2004, Plaintiff was approached by KONIG, the President of GPG, to invest monies in GPG as an investment opportunity.

63.     KONIG provided Plaintiff with a Private Placement Memo prepared by SHAVELL which included information on GPG's financial picture and events and predictions relating to GPG's future financial performance.

64.     The Private Placement Memo contained falsified information and was drafted for the purposes of defrauding Plaintiff.

65.     Based upon Plaintiff's review of the Private Placement Memo, on or about June 17, 2004, Plaintiff entered into the Subscription Agreement.

66.     As a result of the conspiracy perpetrated by KONIG, GPG, GPS and SHAVELL,

Plaintiff has suffered significant damages.

WHEREFORE, Plaintiff demands judgment against KONIG, GPG, GPS & SHAVELL for damages, costs of this action, interest, attorney's fees pursuant to Florida Statutes § 57.105 and any further relief this Court deems just and proper.  Further, Plaintiff reserves the right to move this Court, pursuant to Chapter 768, Florida Statutes, for leave to amend this complaint by adding a claim for punitive damages.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury against all Defendants on all issues so triable.

Dated this _21_ day of December, 2005.

                                        LIBOW & SHAHEEN LLP

                              By:       _____
                                        CHAD R. LAING
                                        Florida Bar No.: 381100
                                        Attorneys for Plaintiff
                                        3351 NW Boca Raton Boulevard
                                        Boca Raton, Florida 33431
                                        Phone: (561) 367-7300
                                        Fax:    (561) 391-2566

<u>**PREFERRED STOCK SUBSCRIPTION AGREEMENT**</u>

June 17, 2004,
2004

Global Partners Group, Inc.
2101 West Commercial Blvd.
Suite 3500
Ft. Lauderdale, Florida 33309

Ladies and Gentlemen:

Global Partners Group, Inc., a Florida corporation (the "Company"), desires to sell to David Alcalay ("Subscriber") 80,000 shares (the "Shares") of its Convertible Variable Rate Participating Preferred Stock (the "Preferred Stock") at a price of $5.00 per share, subject to adjustment, and Subscriber desires to purchase the Shares on terms set forth in this Preferred Stock Subscription Agreement (this "Agreement"). The rights, preferences, powers and other terms of the Preferred Stock are set forth on Exhibit A attached hereto. Accordingly, the Company and the Subscriber agree as follows:

1.    **Sale and Purchase.**    Subject to the terms and conditions set forth in the Agreement, the Company hereby sells the Shares to Subscriber and Subscriber hereby purchases the Shares tenders $400,000 to the Company for the purchase price of the Shares.

2.    **Representation, Warranties, and Agreements of Subscriber.**    In connection with his subscription, Subscriber hereby makes the following representations, warranties and agreements and confirms the following understandings:

(a)    **Investment Purpose.**    Subscriber is acquiring the Shares and the shares of the Company's common stock issuable up on conversion of the Shares (collectively, the "Securities") for Subscriber's own account and for investment purposes only with no intent to distribute.

(b)    **Information Regarding the Company.**    Subscriber is familiar with the Company's present and proposed operations. Subscriber acknowledges that Subscriber has conducted, or been afforded the opportunity to conduct an investigation of the Company and has been offered the opportunity to ask representatives of the Company questions about the Company's present and proposed business. Representatives of the Company have answered all inquiries that Subscriber has put to them concerning the Company and its present and proposed business, and the offering and sale of the Shares.

(c)    **Risks.**    Subscriber recognizes that the purchase of the Shares involves a high degree of risk, and is suitable only for persons of adequate financial means who have no need for liquidity in this investment in that (i) Subscriber may not be able to liquidate the investment in the event of an emergency; (ii) transferability is extremely limited; and (iii) in the event of a disposition, Subscriber could sustain a complete loss of the entire investment.





(d)     **Accreditor Investor Status.**     Subscriber represents that he is an "accredited investor" as such term is defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933, amended (the "Securities Act").   Specifically, Subscriber is an individual having an individual net worth or joint net worth with spouse in excess of $1,000,000.

(e)     **Subscriber's Financial Experience.**     Subscriber is sufficiently experienced in financial and business matters to be capable of evaluating the merits and risks of an investment in the Company.

(f)     **Suitability of Investment.**  Subscriber has evaluated the merits and risks of Subscriber's proposed investment in the Company, including those risks particular to Subscriber's situation, and has determined that this investment is suitable for Subscriber. Subscriber has adequate financial resources for an investment of this character, and at this time Subscriber can bear a complete loss of Subscriber's investment.   Further, Subscriber will continue to have, after making an investment in the Company, adequate means of providing for its current needs, the needs of those dependent on it, and possible personal contingencies.

(g)     **Exempt Offering.**  Subscriber understands that the sale of the Securities is not being registered on the basis that this issuance is exempt from registration under the Securities Act and the applicable state securities laws, and the rules and regulations promulgated thereunder, and that reliance on such exemptions is predicated, in part, on Subscriber's representations and warranties contained in this Agreement.   In the view of the Securities and Exchange Commission (the "SEC") and various state securities regulatory commissions, the statutory basis for the exemptions claimed by the Company in connection with the offering would not be present if, notwithstanding Subscriber's representations and warranties, Subscriber has the intention of acquiring the Securities for distribution upon the occurrence or non-occurrence of some predetermined event.

(h)     **Limitations on Disposition.**     Subscriber understands that there are substantial restrictions on the transferability of the Securities pursuant to the Securities Act and applicable state securities laws; the Securities will not be, and Subscriber has no rights to require that the Securities be registered under the Securities Act or any applicable state securities laws; and, accordingly, Subscriber may have to hold the Securities for an indefinite period of time. Subscriber represents that Subscriber can afford to hold the Securities for an indefinite period of time.  In particular, the Subscriber agrees that no sale, assignment or transfer of any Securities shall be valid or effective, and the Company shall not be required to give any effect to such sale, assignment or transfer, unless (i) such sale, assignment or transfer is registered under the Securities Act and applicable state securities laws, (ii) such Securities are sold, assigned or transferred in accordance with all the requirements and limitations of Rule 144 under the Securities Act, it being understood that Rule 144 is not available at the present time and is not expected to be available in the future for the sale of the Securities, or (iii) such sale, assignment or transfer is otherwise exempt from the registration under the Securities Act applicable. Subscriber further understands that an opinion of counsel and other documents may be required to transfer the Securities.  Subscriber acknowledges that the certificates evidencing the Securities shall bear the following, or a substantially similar legend, or such other legend as may appear on the forms of the Securities, and such other legends as may be required by applicable state securities laws:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS AND NEITHER SUCH SECURITIES NOR ANY INTEREST THEREIN MAY BE OFFERED, SOLD, PLEDGED, ASSIGNED OR OTHERWISE TRANSFERRED UNLESS (1) A REGISTRATION STATEMENT WITH RESPECT THERETO IS EFFECTIVE UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS, OR (2) THE COMPANY RECEIVES AN OPINION OF COUNSEL TO THE HOLDER OF SUCH SECURITIES, WHICH COUNSEL AND OPINION ARE REASONABLY SATISFACTORY TO THE COMPANY, THAT SUCH SECURITIES MAY BE OFFERED, SOLD, PLEDGED, ASSIGNED OR TRANSFERRED IN THE MANNER CONTEMPLATED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR APPLICABLE STATE SECURITIES LAWS.

(i)     **Absence of Official Evaluation.**  Subscriber understands that no federal or state agency has made any finding or determination as to the fairness of the terms of an investment in the Company, nor any recommendation for or endorsement of the Shares offered hereby.

(j)     **Additional Financing.**  Subscriber acknowledges that nothing hereunder shall preclude the Company from seeking and/or procuring additional equity and/or debt financing, Subscriber further acknowledges that the Company may offer additional shares of the Preferred Stock or other securities of the Company to third parties on similar or different terms.

(k)     **Nonreliance.**   Subscriber is not relying on the Company or any representation contained herein or in the documents referred to herein with respect to the tax and economic effect of Subscriber's investment in the Company.

(l)     **Prohibitions    on    Cancellation,    Termination,    Revocation, Transferability, and Assignment.**  Subscriber hereby acknowledges and agrees that, except as may be specifically provided herein or by applicable law, Subscriber is not entitled to cancel, terminate, or revoke this Agreement, and this Agreement shall survive Subscriber's death or disability or any assignment of the Shares.  Subscriber further agrees that Subscriber may not transfer or assign Subscriber's rights under this Agreement, and Subscriber understands that, if Subscriber's subscription is accepted, the transferability of the Securities will be restricted.

(m)     **Authority to Enter into Agreement.**  Subscriber has full right, power, and authority to execute and deliver this Agreement and perform Subscriber's obligations hereunder.

(n)     **Obligation.**  This Agreement constitutes a valid and legally binding obligation of Subscriber and neither the execution of this Agreement nor the consummation of the transactions contemplated hereby, will constitute a violation of or default under, or conflict with, any judgment, decree, statute or regulation of any governmental authority applicable to Subscriber or any contract, commitment, agreement or restriction of any kind to which

Subscriber is a party or by which its assets are bound. The execution and delivery of this Agreement does not, and the consummation of the transactions described herein will not, violate applicable law, or any mortgage, lien, agreement, indenture, lease or understanding (whether oral or written) of any kind outstanding relative to Subscriber.

(o)     **Approvals Required.** No approval, authorization, consent, order or other action of, or filing with, any person, firm or corporation or any court, administrative agency or other governmental authority is required in connection with the execution and delivery of this Agreement by Subscriber or the consummation of the transactions described herein.

(p)     **No General Solicitation.** Subscriber is not subscribing for the Shares because of or following any advertisement, article, notice or other communication published in any newspaper, magazine or similar media or broadcast over television or radio, or presented at any seminar, or any solicitation or a subscription by a person other than representative of the Company.

3.     **Representations, Warranties and Agreements of the Company.** In connection with this subscription, the Company makes the following representations, warranties and agreements and confirms the following understandings:

(a)     **Company's Good Standing.** The Company is a corporation organized and validly existing under the laws of the State of Florida, and it has all corporate authority and power to conduct its business and to own its properties.

(b)     **Compliance with Net Capital Requirements.** Each of the Company's two broker-dealer subsidiaries, Global Partners Securities, Inc. and EquityStation, Inc., was in compliance with net capital requirements of Rule 15c3-1 under the Securities Exchange Act of 1934 at its most recent reporting date.

(c)     **Authorization; Conflict; Valid and Binding Obligation.** This Agreement and the transactions contemplated hereby have been duly and validly authorized by all requisite corporate action of the Company. The Company has full right, power and capacity to execute, deliver and perform its obligations under this Agreement. No governmental license, permit or authorization and no registration or filings with any court, governmental authority or regulatory agency is required in connection with the Company's execution, delivery and/or performance of this Agreement, other than any filings required by applicable Federal and state securities laws. The execution, delivery and performance of this Agreement, the consummation of the transactions herein contemplated and the compliance with the terms of this Agreement by the Company will not violate or conflict with any provision of the Articles of Incorporation or By-laws of the Company, or any agreement, instrument, law or regulation to which the Company is a party or by which the Company may be bound. This Agreement, upon execution and delivery by the Company, will represent the valid and binding obligation of the Company enforceable in accordance with its terms.

(d)     **Upstream Dividends.** The Company will receive from its subsidiary, Global Partners Securities, Inc. distributions to the extent necessary to meet its required dividend payments under the terms of the Preferred Stock.



4.     **Survival of Representations, Warranties, Agreements and Acknowledgments.** The representations, warranties, agreements and acknowledgments of the Company and Subscriber shall survive the offering and purchase of the Shares.

5.     **Right of First Refusal.** In consideration of the Company agreeing to sell Subscriber the Shares, Subscriber agrees to grant the Company or any entity or person designated by the Company ("Designee") a right of first refusal to purchase the Shares now or hereafter owned by Subscriber in the event of any desired or attempted transfer of the Shares by Subscriber (including but not limited to the sale, assignment, transfer, exchange, conveyance, encumbrance, hypothecation, pledge, or other disposition, by operation of law, or otherwise) (collectively, a "Transfer"). Notwithstanding the foregoing, during Subscriber's lifetime or upon Subscriber's death, Subscriber may Transfer any or all of the Shares now or hereafter legally or beneficially owned by Subscriber to any spouse, child, or grandchild, or any trust created for the benefit of any of such persons, provided that: (a) such person or entity agrees, in writing prior to such Transfer, to comply with the terms and conditions of this Section; (b) the Transfer to such person or entity will not adversely effect the status of any subsidiary of the Company as a registered broker-dealer or investment advisor with any federal, state, or self-regulatory authority; and (c) such Transfer is in compliance with all applicable federal and state securities laws.

Before making any Transfer of any or all of the Shares in connection with a bona fide third party offer, Subscriber (or Subscriber's personal representative or any person or entity acting in a similar capacity) shall immediately upon receipt thereof give written notice of any such proposed Transfer to the Company at the address set forth above or any other address as may later be provided by the Company to Subscriber. The Company or Designee shall have the later of: (i) 30 days from its receipt of such written notice or (ii) such period of time as set forth in such bona fide third party offer, to exercise its right of first refusal and/or to cause any other person(s) or entities(s) to purchase such number of Shares being offered on the terms and conditions (other than the time period if (i) is applicable) set forth in such bona fide third party offer. If the Company fails or refuses to exercise such right of first refusal within the time period set forth above, Subscriber may then effect such Transfer on the terms and conditions set forth in such bona fide third party offer, provided such Transfer and the transferee complies with the conditions set forth in (a) through (c) above in the preceding paragraph.

6.     **Blue Sky Notices.**

(a)     THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OR THE SECURITIES LAWS OF ANY STATE AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS. THE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SEC, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THE OFFERING OR THE ACCURACY OR ADEQUACY OF THE OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

(b)     THE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTE UNDER THE SECURITIES ACT, AND APPLICABLE STATE SECURITIES LAW, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. SUBSCRIBERS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

7.     **Miscellaneous.**

(a)     **Entire Agreement.**  This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof.  This Agreement supersedes all prior negotiations, letters and understandings relating to the subject matter hereof.

(b)     **Amendment.**  This Agreement may not be amended, supplemented or modified in whole or in part except by an instrument in writing signed by the party or parties against whom enforcement of any such amendment, supplement or modification is sought.

(c)     **Choice of Law.**  This Agreement will be interpreted, construed and enforced in accordance with the laws of the State of Florida, without giving effect to the application of the principles pertaining to conflicts of laws.

(d)     **Effect of Waiver.**  The failure of any party at any time or times to require performance of any provision of this Agreement will in no manner affect the right to enforce the same.  The waiver by any party of any breach of any provision of this Agreement will not be construed to be a waiver by any such party of any succeeding breach of that provision or a waiver by such party of any breach of any other provision.

(e)     **Severability.**  The invalidity, illegality or unenforceability of any provision or provisions of this Agreement will not affect any other provision of this Agreement, which will remain in full force and effect, nor will the invalidity, illegality or unenforceability of a portion of any provision of this Agreement affect the balance of such provision.  In the event that any one or more of the provisions contained in this Agreement or any portion thereof shall for any reason be held to be invalid, illegal or unenforceable in any respect, this Agreement shall be reformed, construed and enforced as if such invalid, illegal or unenforceable provision had never been contained herein.

(f)     **Enforcement.**  Should it become necessary for any party to institute legal action to enforce the terms and conditions of this Agreement, the successful party will be awarded reasonable attorneys' fees at all trial and appellate levels, expenses and costs.

(g)     **Binding Nature.**  This Agreement will be binding upon and will inure to the benefit of any successor or successors of the parties hereto.

(h)     **Counterparts.**  This Agreement may be executed in one or more counterparts, each of which will be deemed an original and all of which together will constitute one and the same instrument.



**IN WITNESS WHEREOF,** Subscriber has caused this Agreement to be executed as of the date written on the first page of this Agreement.

SUBSCRIBER:

David Alcalay

COMPANY:

By:

Name: MARCOS KONIG

Title: PRESIDENT

## Exhibit A

## SUMMARY OF PREFERRED STOCK TERMS

**Issuer:**      **Global Partners Group, Inc.,** a Florida corporation ("**GPG**" or the "Company")

**Investor:**      David Alcalay ("Alcalay" or the "Investor")

**Security:**      Convertible Variable Rate Participating Preferred Stock ("Preferred Stock")

**Principal Amount:**      $400,000 (80,000 shares at $5.00 per share)

**Voting Rights:**      The Preferred Stock will have no voting rights.

**Use of Proceeds:**      **GPG** intends to use the proceeds to increase the net capital of its Global Partners Securities, Inc. ("GPSI") subsidiary and to expand principal trading opportunities at GPSI's NAIB division.

**Dividends:**      The Investor in the Preferred Stock will be entitled to receive Variable Rate Participating Preferred Dividends ("VRPP Dividends") calculated based on the Dividend Payment Formula as hereinafter defined. In each month during which the Preferred Stock is outstanding and NAIB's trading revenues in connection with its principal trading business exceed $175,000, the Investor will receive VRPP Dividends equal to the amount of revenues in the given month minus $175,000 (the "Initial Excess Amount"), up to an Initial Excess Amount of $225,000, less a series of five (5) sequential Tiered Reductions as shown below ("Tiered Reductions"), where each reduction reduces the Initial Excess Amount by the percentage associated with the category of reduction (the "Dividend Payment Formula").

Although the Maximum VRPP that can be paid to the Investor on a *monthly* basis is $31,556.25 according to the limitations associated with the Initial Excess Amount, at the end of every 12 month period following issuance of the Preferred Stock, VRPP Dividends for the preceding 12 months will be recalculated for the entire period as if the cap on the Initial Excess Amount did not exist. If there are any months in which the Initial Excess Amount *exceeds* $225,000, the amount by which the Initial Excess Amount exceeds $225,000 (the "Secondary Excess Amount") will be identified.[1] Similarly, for months in which the Initial Excess Amount is *below* $225,000, the amount by which the Initial Excess Amount is below $225,000 (the "Below Cap Amount") will be identified, and then all such amount summed.[2] The sum of monthly Below Cap Amounts for the year will be termed the "Annual Below Cap Amount." In recalculating the VRRP Dividends for the prior 12 months, the Company

---

[1] For example, for any one month if the Initial Excess Amount is $250,000, then the Secondary Excess Amount for the month would equal $25,000.

[2] For example, for any one month if the Initial Excess Amount is $175,000, then the Below Cap Amount for the month would equal $50,000.

 

will be obligated to reapply the Dividend Payment Formula for each month in which a Secondary Excess Amount exists to the Secondary Excess Amount instead of the Initial Excess Amount up to the point where the sum of Secondary Excess Amounts equals 100% of the Annual Below Cap Amount.

Notwithstanding anything to the contrary contained herein, the Investor will receive a guaranteed minimum 10% annual cash return on the principal amount outstanding at the end of each calendar quarter (the "Minimum Dividend Amount"). The 10% annual Minimum Dividend Amount will be paid in cash on a monthly basis, beginning 120 days after the initial investment is made.  In months where no VRPP Dividends are generated, the Company will accrue the Minimum Dividend Amount.

Tiered Reductions

| | |
|---|---|
| Clearing | 15% |
| Trader + Supervisor Split | 45% |
| Trading Support | 20% |
| Overhead | 25% |
| Company / Investor Split | 50% |

Example

Initial Excess Amount above $175,000 $      100,000

| | Beginning Amt. | Fee or Split | Ending Amt. |
|---|---|---|---|
| Clearing Fees | $   100,000 | $   15,000 | $   85,000 |
| Trader + Supervisor Split | $     85,000 | $   38,250 | $   46,750 |
| Trading Support Fee | $     46,750 | $     9,350 | $   37,400 |
| Overhead Expense | $     37,400 | $     9,350 | $   28,050 |
| Company / Investor Split | $     28,050 | $   14,025 | $   14,025 |

For each month where a VRPP Dividend is due to the Investor (i.e., for which NAIB's principal trading revenue exceeds $175,000), the Investor will receive the VRPP Dividend and/or pro-rata Minimum Dividend Amount within fifteen (15) days following the end of the relevant month.

**Optional Redemption:**  Following issuance, the Company may redeem the Preferred Stock in whole or in increments of $100,000 at any time by paying the Investor an amount equal to the principal balance of Preferred Stock then outstanding if redeemed in its entirety, or an amount that is a multiple of $100,000 but less than $400,000 if in part, plus any unpaid VRPP Dividends. Moreover, the redemption price of the Preferred Stock will be $5.00 per share.  This redemption will not affect in any way the dividend distribution requirements stated above.

 

| | |
|---|---|
| **Pre-Payment Penalty:** | If the Company redeems the Preferred Stock prior to the two year anniversary date after issuance, the Investor's Minimum Dividend Amount will be increased so that the Investor will receive a minimum 20% annual cash return on the principal amount outstanding at the end of each calendar quarter during which there is still Preferred Stock outstanding (the "Increased Minimum Dividend Amount"). All VRPP Dividends or Minimum Dividend Amounts paid to Investor prior to the redemption of the Preferred Stock by the Company will be credited toward the Increased Minimum Dividend Amount. |
| **Put Right:** | After the one (1) year anniversary date of the issuance of the Preferred Stock, the Investor may put the Preferred Stock to the Company in whole or in increments of $100,000 at any time, plus any unpaid VRPP Dividends (the "Put Right"). If the Investor exercises the Put Right, the Company will be obligated to redeem the amount of Preferred Stock put to it, subject to a minimum of 180 days notice (the "Notice Period"). Following the one (1) year anniversary date of the issuance of the Preferred Stock, the Put Right shall only be exercisable during the first fifteen (15) days of each ensuing three (3) month interval (the "Put Window"). Notwithstanding the foregoing, after the one (1) year anniversary date of the issuance of the Preferred Stock, if no VRPP Dividends are due to the Investor for any period of consecutive three (3) months, the Investor can exercise its Put Right without regard to any Put Window restrictions. Moreover, the redemption price of the Preferred Stock will be $5.00 per share. |
| **Liquidation Preference:** | In the event of any Liquidation Event (as defined below) prior to the redemption of the Preferred Stock referenced above, the Investor will be entitled to receive in preference to the holders of Common Stock an amount equal to the aggregate initial issuance amount of his Preferred Stock, plus all accrued and unpaid dividends on such Preferred Stock. Thereafter, the Company will distribute ratably all of its remaining funds and assets legally available for distribution to the holders of **GPG** Common Stock. For these purposes, "Liquidation Event" means any liquidation, dissolution or winding-up of the Company's business. |
| **Preferred Stock Purchase Agreement:** | The investment will be made pursuant to a Preferred Stock Purchase Agreement between the Investor and the Company. This agreement will contain, among other things, customary appropriate representations and warranties, indemnities, covenants reflecting the provisions set forth herein, and appropriate conditions of closing. |
| **Transfer Restriction:** | In addition to restrictions on transfer arising from state or federal securities laws, the Investor will agree not to sell his Preferred Stock without prior written approval of the Company. |
| **Right of First Refusal:** | In the event that the Investor wants to sell the Preferred Stock, the Company shall have a right of first refusal to purchase the Preferred Stock from the Investor at a price of $5.00 per share. |

 

**Convertibility:** In the event that the Company raises capital through the issuance of Common Stock or Convertible Preferred Stock to outside investors in an amount exceeding $1,000,000 within any three month period, the Investor will have the right to convert his Preferred Stock to Common Stock at a 10.0% discount to the price of the of Common Stock or Common Stock equivalent in such financing round, or $5.00 per share, whichever is less.

**Broker's Fee:** Neither the Company nor the Investor has done anything to incur any liability to any party for any broker's fee or the like in connection with the sale or issuance of the Preferred Stock.

Agreed: _David Alcalay_
DAVID ALCALAY

Agreed: Global Partners Group.

by _____
Name: MARCOS KONIG
PRESIDENT.



NUMBER
1

SHARES
*80,000*

**Certificate**

SEE LEGEND ON REVERSE

## Global Partners Group, Inc.

Florida Corporation
500,000 Shares of Preferred Stock Authorized • Par value $.001 per share
80,000 Shares of Convertible Variable Rate Participating Preferred Stock

**This Certifies that** DAVID ALCALAY

is hereby issued EIGHTY THOUSAND CONVERTIBLE VARIABLE RATE PARTICIPATING PREFERRED fully paid and non-assessable Shares of the Capital Stock of the above named Corporation transferable only on the books of the Corporation by the holder hereof in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed.

**In Witness Whereof,** this Corporation has caused this Certificate to be signed by its duly authorized officer(s) this 12th day of August , 2004

President Marcos Konig

Secretary

This Document Contains Security Features See back For Details

GFASTKIT

# EXHIBIT 2

IN AND FOR THE CIRCUIT COURT FOR
THE FIFTEENTH JUDICIAL CURCUIT
PALM BEACH COUNTY FLORIDA

DAVID ALCALAY,                                    CASE NO:  05CA011966 AJ

      Plaintiff,

vs.

GLOBAL PARTNERS GROUP, INC., a
Florida corporation, GLOBAL PARTNERS
SECURITIES, INC., a Florida corporation,
MARCOS KONIG,  an individual
VFINANCE, INC., a Florida corporation,
VFINANCE INVESTMENTS HOLDINGS,
INC., a Florida corporation; and SHAVELL &
COMPANY, P.A., a Florida  professional association.

      Defendants.

_____/

## AMENDED COMPLAINT

Plaintiff, DAVID ALCALAY ("PLAINTIFF"), an individual, by and through his undersigned counsel, hereby files this Complaint against Defendants, GLOBAL PARTNERS GROUP, INC. ("GPG"), a Florida corporation, GLOBAL PARTNERS SECURITIES, INC. ("GPS"), a Florida corporation, MARCOS KONIG ("KONIG"), VFINANCE, INC. ("VFINANCE"), a Florida corporation, VFINANCE INVESTMENTS HOLDINGS, INC. ("VFINANCE INVESTMENTS"), a Florida corporation, and SHAVELL & COMPANY, P.A. ("SHAVELL"), a Florida Professional Association (hereinafter collectively referred to as "DEFENDANTS"), and alleges as follows:

### JURISDICTION, VENUE & THE PARTIES

1.      This is an action for damages wherein the amount in controversy exceeds $15,000.00, exclusive of costs, interest and attorneys' fees, and is therefore within the jurisdiction of this Court.

2.      At all times material hereto, Plaintiff was and is an individual over the age of eighteen (18) years, is otherwise *sui juris*, and is a resident of Palm Beach County, Florida.

3.      At all times material hereto, GPG was a Florida corporation with its principal place of business in Broward County, Florida.

4.      At all times material hereto, GPS was a subsidiary of GPG and was a Florida corporation with its principal place of business in Broward County, Florida.

5.      At all times material hereto, KONIG was and is an individual over the age of eighteen (18) years and is a resident of Broward County, Florida.

6.      At all times material hereto, VFINANCE was and is a Florida corporation with its principal place of business in Palm Beach County, Florida.

7.      At all times material hereto, VFINANCE INVESTMENTS was and is a subsidiary of VFINANCE and a Florida corporation with its principal place of business in Palm Beach County, Florida.

8.      At all times material hereto, SHAVELL & COMPANY, P.A., was and is a Florida Professional Association with its principal place of business in Palm Beach County, Florida

9.      All conditions precedent to the bringing of the various claims set forth herein have been satisfied, discharged or waived.

10.     Plaintiff is entitled to recover reasonable attorney's fees and the costs associated with the prosecution of this action pursuant to Florida Statute and the contract between the parties.

## GENERAL ALLEGATIONS

11.     In or about 2004, Plaintiff was approached by KONIG, the President of GPG, to invest monies in GPG and GPS as an investment opportunity.

2

12.     GPG, through its subsidiaries, including GPS, operates an integrated securities business.

13.     KONIG provided Plaintiff with a Confidential Private Placement Memorandum ("Private Placement Memo"), which contained Financial Statements prepared by SHAVELL, which included information on GPG and GPS's financial status at the time Plaintiff loaned to or otherwise invested with them.  See Private Placement Memorandum attached hereto as Exhibit "A."

14.     Based upon Plaintiff's review of the Private Placement Memo and Financial Statements, on or about June 17, 2004, Plaintiff entered into a Preferred Stock Subscription Agreement with KONIG, on behalf of GPG, for the purchase of stock (the "Subscription Agreement").  A copy of said Subscription Agreement is attached hereto and incorporated herein as Exhibit "B."

15.     Pursuant to the Subscription Agreement, Plaintiff loaned or otherwise invested Four Hundred Thousand Dollars ($400,000.00) with GPG and in return Plaintiff received Eighty Thousand (80,000) shares of GPG's convertible variable rate participating preferred stock (the "Stock") where the stock's price was held out by Defendant's to be Five Dollars ($5.00) per share.  See Exhibit "B."

16.     At the time Plaintiff entered into the Subscription Agreement with GPG, KONIG, on behalf of GPG, represented to Plaintiff that GPG intended to use Plaintiff's monies to increase the net capital of GPG and, in effect, GPS and, in effect, to expand principal trading opportunities at the then-dissolved North American Institution Brokers, Inc. ("NAIB"), a division of GPS.

17.     In addition to the oral representations made by KONIG, the Subscription Agreement addresses the purported use of the funds invested by Plaintiff.  It states, in relevant

3

part:

> **Use of Proceeds: GPG** intends to use the proceeds to increase the net capital of its Global Partners Securities, Inc. ("GPSI") subsidiary and to expand principal trading opportunities at GPSI's NAIB division. See Exhibit "B."

18.    In or about July of 2004, Plaintiff wire-transferred GPG the monies requested to GPG under the Subscription Agreement.

19.    Unbeknownst to Plaintiff at the time he transferred funds to GPG, GPG was defending a lawsuit filed against NAIB by a former employee for alleged failure to pay commissions (the "Lawsuit").

20.    On or about August 27, 2004, a Final Judgment was entered in the Lawsuit in favor of the Plaintiff in that case.

21.    GPG appealed same on behalf of NAIB and, upon information and belief, NAIB used Two Hundred Seventy Three Thousand One Hundred Dollars ($273,100.00) of Plaintiff's monies to place a bond for purposes of said appeal ("Appeal Bond").

22.    NAIB, a division of GPG, contracted with Accredited Surety and Casualty Company, Inc. to post the Appeal Bond on NAIB's behalf.

23.    Upon information and belief, the remaining One Hundred Twenty Six Thousand Nine Hundred Dollars ($126,900.00) of Plaintiff's investment was utilized for debt service of GPG and its subsidiaries.

24.    Thereafter, on or about September 29, 2004, a public news article was released detailing the purchase of GPS by VFINANCE INVESTMENTS, a subsidiary of VFINANCE, a financial services firm.

25.    On or about November 2, 2004, VFINANCE INVESTMENTS completed its acquisition of GPS.

26.    KONIG, GPG, VFINANCE and VFINANCE INVESTMENTS concealed said

4

sale and purchase of GPS from Plaintiff.

27.     Plaintiff has not received a return of his investment nor any stock in VFINANCE or VFINANCE INVESTMENTS.

### COUNT I:  BREACH OF CONTRACT AS TO DEFENDANT GPG

28.     Plaintiff realleges and reavers the allegations set forth in paragraphs one (1) through twenty-seven (27) as if fully set forth herein.

29.     On or about June 17, 2004, Plaintiff entered into the Subscription Agreement with KONIG, on behalf of GPG, for the purchase of stock.  See Exhibit "B."

30.     At the time the parties entered into said Subscription Agreement, KONIG, on behalf of GPG, represented to Plaintiff that GPG intended to use the proceeds of Plaintiff's investment to increase the net capital of GPG and to expand principal trading opportunities at NAIB.

31.     Pursuant to the Subscription Agreement, Plaintiff invested/loaned Four Hundred Thousand Dollars ($400,000.00) and acquired Eighty Thousand (80,000) shares of the Stock in return.  See Exhibit "B."

32.     GPG breached the Subscription Agreement by utilizing the monies for other purposes and by failing to reimburse and/or distribute any monies, dividends or stock to Plaintiff.

33.     As a direct result of said breach, Plaintiff has been damaged in the amount of $400,000.00, loss of interest, costs and attorney's fees.

WHEREFORE, Plaintiff demands judgment against GPG for damages, interest, costs, attorney's fees pursuant to the Subscription Agreement and any further relief this Court deems just and proper.

### COUNT II:  BREACH OF FIDUCIARY DUTY AS TO DEFENDANT KONIG

34.     Plaintiff realleges and reavers the allegations set forth in paragraphs one (1)

5

through twenty-seven (27) as if fully set forth herein.

35. On or about June 17, 2004, Plaintiff entered into the Subscription Agreement with KONIG, on behalf of GPG, for the purchase of stock. See Exhibit "B."

36. As a result of said investment, Plaintiff became a shareholder of GPG and as such, entered into a fiduciary relationship with KONIG.

37. On or about November 2, 2004, VFINANCE INVESTMENTS acquired GPS.

38. KONIG breached his fiduciary duty to Plaintiff by failing to inform or otherwise conceal from Plaintiff that GPS was in the process of being acquired by VFINANCE.

39. KONIG breached his fiduciary duty to Plaintiff by failing to inform Plaintiff of said sale and purchase by VFINANCE subsequent to the completion of the acquisition.

40. KONIG breached his fiduciary duty to Plaintiff by utilizing monies invested by Plaintiff for other purposes than those designated in the Subscription Agreement and by failing to reimburse and/or distribute any monies or stock to Plaintiff upon Plaintiff's demand.

41. As a direct and proximate result of KONIG's breach of fiduciary duty, Plaintiff has been damaged.

WHEREFORE, Plaintiff demands judgment against KONIG for damages, costs of this action, interest, attorney's fees pursuant to Florida Statutes and any further relief this Court deems just and proper. Further, Plaintiff reserves the right to move this Court, pursuant to Chapter 768, Florida Statutes, for leave to amend this complaint by adding a claim for punitive damages.

## COUNT III:  FRAUD IN THE INDUCEMENT AS TO DEFENDANTS KONIG, GPG

42. Plaintiff realleges and reavers the allegations set forth in paragraphs one (1) through twenty-seven (27) as if fully set forth herein.

43. On or about June 17, 2004, Plaintiff entered into the Subscription Agreement with

6

KONIG and GPG for the purchase of stock. See Exhibit "B."

44.     Prior to entering into said Subscription Agreement, KONIG represented to Plaintiff that GPG intended to use the proceeds of Plaintiff's investment to increase the net capital of GPG and to expand principal trading opportunities at NAIB.

45.     In making said representations to Plaintiff, KONIG, on behalf of GPG, knew that his representations were false and that he would use said funds for other purposes.

46.     KONIG materially misrepresented GPG's intended use of Plaintiff's investment funds in an effort to induce Plaintiff to rely on same and invest in GPG.

47.     Further, KONIG, on behalf of GPG, knew that said representation was false due to the impending Lawsuit and debt status of GPG and its subsidiaries.

48.     Plaintiff relied on said representation and, as a result, Plaintiff has been damaged.

WHEREFORE, Plaintiff demands judgment against GPG & KONIG for damages, costs of this action, interest, attorney's fees pursuant to Florida Statutes § 57.105 and any further relief this Court deems just and proper.   Further, Plaintiff reserves the right to move this Court, pursuant to Chapter 768, Florida Statutes, for leave to amend this complaint by adding a claim for punitive damages.

## COUNT IV:  FRAUD AS TO DEFENDANTS KONIG, GPG, SHAVELL

49.     Plaintiff realleges and reavers the allegations set forth in paragraphs one (1) through twenty-seven (27) as if fully set forth herein.

50.     On or about June 17, 2004, Plaintiff entered into the Subscription Agreement with KONIG and GPG for the purchase of stock or to otherwise loan monies to GPG. See Exhibit "B."

51.     KONIG provided Plaintiff with a Private Placement Memo, which included Financial Statements prepared by SHAVELL.  The Financial Statements contained information

7

on GPS's financial picture and events and predictions relating to GPG's future financial performance.

52.    KONIG, GPG & SHAVELL knew that the information contained in the Financial Statements was false, or that certain material legal and or financial information was omitted.

53.    KONIG, GPG & SHAVELL materially misrepresented GPS's financial picture in an effort to induce Plaintiff to rely on same and invest in GPG.

54.    Plaintiff relied on said representation and, as a result, Plaintiff has been damaged

WHEREFORE, Plaintiff demands judgment against KONIG, GPG and SHAVELL for damages, costs of this action, interest, attorney's fees pursuant to Florida Statutes § 57.105 and any further relief this Court deems just and proper.  Further, Plaintiff reserves the right to move this Court, pursuant to Chapter 768, Florida Statutes, for leave to amend this complaint by adding a claim for punitive damages.

## COUNT V:  MONIES LENT AS TO DEFENDANTS GPG & GPS

55.    Plaintiff realleges and reavers the allegations set forth in paragraphs one (1) through twenty-seven (27) as if fully set forth herein.

56.    On or about June 17, 2004, Plaintiff entered into the Subscription Agreement with KONIG, on behalf of GPG, for the purchase of stock.  See Exhibit "B."

57.    Pursuant to the Subscription Agreement, Plaintiff invested Four Hundred Thousand Dollars ($400,000.00) and acquired Eighty Thousand (80,000) shares of the Stock.

58.    GPG and GPS owe Plaintiff $400,000.00 that has been due with interest since June 17, 2004, for money lent by Plaintiff to Defendants.

WHEREFORE, Plaintiff demands judgment against GPG and GPS for damages, costs of this action, interest, attorney's fees pursuant to Florida Statutes § 57.105 and any further relief this Court deems just and proper.

### COUNT VI:  CONVERSION AS TO DEFENDANTS KONIG, GPG & GPS

59.     Plaintiff realleges and reavers the allegations set forth in paragraphs one (1) through twenty-seven (27) as if fully set forth herein.

60.     On or about June 17, 2004, Plaintiff entered into the Subscription Agreement with KONIG, on behalf of GPG, for the purchase of the Stock or to otherwise obtain capital by loan.

61.     Pursuant to the Subscription Agreement, Plaintiff transferred Four Hundred Thousand Dollars ($400,000.00) to GPG for the benefit of GPG in return for the Stock.  See Exhibit "B."

62.     Thereafter, on or about September 10, 2004, the Defendants converted to their own use Plaintiff's investment monies of the value of Four Hundred Thousand Dollars ($400,000.00).

63.     Plaintiff has been damaged as a result thereof.

WHEREFORE, Plaintiff demands judgment against KONIG, GPG, GPS for damages, costs of this action, interest, attorney's fees pursuant to Florida Statutes § 57.105 and any further relief this Court deems just and proper.

### COUNT VII –DAMAGES AGAINST DEFENDANTS VFINANCE & VFINANCE INVESTMENTS

64.     Plaintiff realleges and reavers the allegations set forth in paragraphs one (1) through twenty-seven (27) as if fully set forth herein.

65.     VFINANCE INVESTMENTS and VFINANCE, as the parent of VFINANCE INVESTMENTS, received from GPG and GPS all of its assets, including the benefit of the Plaintiff's investment.

66.     To the extent VFINANCE INVESTMENTS and VFINANCE received the benefit

9

from GPG and GPS, it is a fraudulent transferee, having received a transfer of value from GPG and GPS, without giving consideration or fair value in return, being under control of the principals, and acting with the actual intent to defraud the creditors of GPG and GPS, including the Plaintiff.

67.     As a liable successor of GPG and GPS, VFINANCE INVESTMENTS and VFINANCE are responsible for GPG and GPS's liability to Plaintiff.

WHEREFORE, Plaintiff demands judgment against VFINANCE AND VFINANCE INVESTMENTS for damages, costs of this action, interest, attorney's fees pursuant to Florida Statutes and as provided for in the Stock Subscription Agreement and any further relief this Court deems just and proper.

## COUNT VIII –AIDING AND ABETTING AGAINST DEFENDANTS VFINANCE AND VFINANCE INVESTMENTS

68.     Plaintiff realleges and reavers the allegations set forth in paragraphs one (1) through twenty-seven (27) as if fully set forth herein.

69.     VFINANCE INVESTMENTS and VFINANCE, as the parent of VFINANCE INVESTMENTS, received from GPS all of its assets, including the benefit of the Plaintiff's investment.

70.     Defendants, VFINANCE INVESTMENTS AND VFINANCE, counseled, caused, procured, encouraged, assisted, aided and abetted GPS to fraudulently transfer funds to the detriment of Plaintiff.

71.     As a direct and proximate result of the Defendants, VFINANCE AND VFINANCE INVESTMENTS, actions in aiding an abetting the fraud against the Plaintiff, the Plaintiff has been damaged.

WHEREFORE, Plaintiff demands judgment against VFINANCE AND VFINANCE

INVESTMENTS for damages, costs of this action, interest, attorney's fees pursuant to Florida

Statutes and any further relief this Court deems just and proper.

## COUNT IX –CONSPIRACY AGAINST DEFENDANTS KONIG, GPG, GPS & SHAVELL

72.     Plaintiff realleges and reavers the allegations set forth in paragraphs one (1)

through twenty-seven (27) as if fully set forth herein.

73.     In or about 2004, Plaintiff was approached by KONIG, the President of GPG, to

invest monies in GPG, and ultimately GPS, as an investment opportunity.

74.     KONIG provided Plaintiff with a Private Placement Memo, which included

Financial Statements prepared by SHAVELL.  The Financial Statements contained information

on GPS's financial picture and events and predictions relating to GPG's future financial

performance.

75.     The Private Placement Memo and Financial Statements contained falsified

information and was drafted for the purposes of defrauding Plaintiff.

76.     Based upon Plaintiff's review of the Private Placement Memo and Financial

Statements, on or about June 17, 2004, Plaintiff entered into the Subscription Agreement.

77.     As a result of the conspiracy perpetrated by KONIG, GPG, GPS and SHAVELL,

Plaintiff has suffered significant damages.

WHEREFORE, Plaintiff demands judgment against KONIG, GPG, GPS & SHAVELL

for damages, costs of this action, interest, attorney's fees pursuant to Florida Statutes § 57.105

and any further relief this Court deems just and proper.  Further, Plaintiff reserves the right to

move this Court, pursuant to Chapter 768, Florida Statutes, for leave to amend this complaint by

adding a claim for punitive damages.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury against all Defendants on all issues so triable.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the above and foregoing has been provided via US Mail to: Deborah P. Fitzgerald, Esq., 110 E. Broward Boulevard, Suite 2000, Fort Lauderdale, FL  33301,Jon Polenberg, Esq., Wachovia Center – Penthouse, 1909 Tyler Street, Hollywood, FL  33021 and  Gary A. Woodfield, Esq., One North Clematis Street Suite 400, West Palm Beach, FL  33401 on  March 2, 2006.

LIBOW & SHAHEEN LLP

By: _____

ALLEN H. LIBOW
Florida Bar No.  899135
CHAD R. LAING
Florida Bar No.: 381100
Attorneys for Plaintiff
3351 NW Boca Raton Boulevard
Boca Raton, Florida 33431
Phone: (561) 367-7300
Fax:    (561) 391-2566

Memorandum Number_____                         Issued to _____

# Global Partners Group, Inc.



**DRAFT**

GLOBAL PARTNERS
GROUP

### Fort Lauderdale, Florida

### $1,000,000 Minimum
### $3,000,000 Maximum

### 7.0% Cumulative Convertible
### Redeemable Preferred Stock

## CONFIDENTIAL PRIVATE PLACEMENT
## MEMORANDUM

## July 2004



**Global Partners Group, Inc.**

---

## THESE ARE SPECULATIVE SECURITIES AND
## INVOLVE A HIGH DEGREE OF RISK.
## SEE "RISK FACTORS."

AN INVESTMENT IN OUR SECURITIES (THE "SECURITIES") IS SPECULATIVE, INVOLVES A HIGH DEGREE OF RISK AND SIGNIFICANT RESTRICTIONS ON TRANSFER, AND SHOULD BE CONSIDERED ONLY BY SOPHISTICATED INVESTORS WHO ARE ABLE TO BEAR THE ECONOMIC RISKS OF THEIR INVESTMENT FOR AN INDEFINITE PERIOD OF TIME AND WHO CAN AFFORD TO SUSTAIN A TOTAL LOSS OF THEIR INVESTMENT. SEE "RISK FACTORS" FOR A DISCUSSION OF CERTAIN FACTORS THAT SHOULD BE CONSIDERED IN CONNECTION WITH THE PURCHASE OF THE SECURITIES. IN MAKING AN INVESTMENT DECISION WITH RESPECT TO SECURITIES AND THE COMPANY, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE COMPANY AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED.

THE SECURITIES HAVE NOT BEEN REGISTERED WITH OR APPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE SECURITIES COMMISSION, NOR HAS THE SEC OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR THE ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE OFFER AND SALE OF THE SECURITIES IS BEING MADE PURSUANT TO EXEMPTIONS FROM REGISTRATION PROVIDED BY SECTION 4(2) OF THE SECURITIES ACT AND REGULATION D PROMULGATED THEREUNDER, AND SIMILAR EXEMPTIONS FROM REGISTRATION PROVIDED BY CERTAIN STATE SECURITIES LAWS. THE SECURITIES ARE BEING OFFERED ONLY TO ACCREDITED INVESTORS WHO HAVE THE QUALIFICATIONS NECESSARY TO PERMIT THE SECURITIES TO BE OFFERED AND SOLD IN RELIANCE UPON SUCH EXEMPTIONS AND WHO MEET THE SUITABILITY STANDARDS SET FORTH BELOW IN "INVESTOR SUITABILITY." THE SECURITIES MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF WITHOUT SATISFACTION OF CERTAIN CONDITIONS, INCLUDING REGISTRATION UNDER OR THE AVAILABILITY OF AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT.

THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL SECURITIES TO, NOR A SOLICITATION OF AN OFFER TO BUY SECURITIES FROM, ANYONE IN ANY COUNTRY OR JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION IS NOT AUTHORIZED. NO ACTION HAS BEEN TAKEN BY THE COMPANY THAT WOULD, OR IS INTENDED TO, PERMIT A PUBLIC OFFER OF THE SECURITIES IN ANY COUNTRY OR JURISDICTION WHERE ANY SUCH ACTION FOR THAT

**Global Partners Group, Inc.**

PURPOSE IS REQUIRED. ACCORDINGLY, THE SECURITIES MAY NOT BE OFFERED OR SOLD, DIRECTLY OR INDIRECTLY, AND NEITHER THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM NOR ANY OTHER INFORMATION MEMORANDUM, PROSPECTUS, FORM OF APPLICATION, ADVERTISEMENT OR OTHER DOCUMENT OR INFORMATION MAY BE DISTRIBUTED OR PUBLISHED IN ANY COUNTRY OR JURISDICTION EXCEPT UNDER CIRCUMSTANCES THAT WILL RESULT IN COMPLIANCE WITH ANY APPLICABLE LAWS AND REGULATIONS.

THE SALE OF THE SECURITIES IS SUBJECT TO THE PROVISIONS OF, AND EACH OF THE INVESTORS PURCHASING THE SECURITIES WILL BE REQUIRED TO EXECUTE, A SECURITIES PURCHASE AGREEMENT. ANY PURCHASE OF THE SECURITIES SHOULD BE MADE ONLY AFTER A COMPLETE AND THOROUGH REVIEW OF THE PROVISIONS OF SUCH AGREEMENT. IN THE EVENT THAT ANY OF THE TERMS, CONDITIONS OR OTHER PROVISIONS OF SUCH AGREEMENT ARE INCONSISTENT WITH OR CONTRARY TO THE DESCRIPTION OR TERMS IN THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM, SUCH AGREEMENT WILL CONTROL.

THE COMPANY RESERVES THE RIGHT, IN ITS SOLE DISCRETION AND FOR ANY REASON WHATSOEVER, TO MODIFY, AMEND AND/OR WITHDRAW ALL OR A PORTION OF THE OFFERING AND/OR TO ACCEPT OR REJECT IN WHOLE OR IN PART ANY PROSPECTIVE INVESTMENT IN THE SECURITIES OR TO ALLOT TO ANY PROSPECTIVE INVESTOR LESS THAN THE AMOUNT OF THE SECURITIES SUCH INVESTOR DESIRES TO PURCHASE. THE COMPANY SHALL HAVE NO LIABILITY WHATSOEVER TO ANY OFFEREE AND/OR INVESTOR IN THE EVENT THAT ANY OF THE FOREGOING SHALL OCCUR.

THIS PRIVATE PLACEMENT MEMORANDUM INCLUDES FINANCIAL PROJECTIONS AND OTHER FORWARD-LOOKING INFORMATION. SUCH PROJECTIONS AND INFORMATION ARE BASED ON ASSUMPTIONS AS TO FUTURE EVENTS THAT ARE INHERENTLY UNCERTAIN AND SUBJECTIVE. THE COMPANY MAKES NO REPRESENTATION OR WARRANTY AS TO THE ATTAINABILITY OF SUCH ASSUMPTIONS OR AS TO WHETHER FUTURE RESULTS WILL OCCUR AS PROJECTED. IT MUST BE RECOGNIZED THAT THE PROJECTIONS OF THE COMPANY'S FUTURE PERFORMANCE ARE NECESSARILY SUBJECT TO A HIGH DEGREE OF UNCERTAINTY, THAT ACTUAL RESULTS CAN BE EXPECTED TO VARY FROM THE RESULTS PROJECTED AND THAT SUCH VARIANCES MAY BE MATERIAL AND ADVERSE. PROSPECTIVE INVESTORS ARE EXPECTED TO CONDUCT THEIR OWN INVESTIGATION WITH REGARD TO THE COMPANY AND ITS PROSPECTS.

EXCEPT AS OTHERWISE INDICATED, THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM SPEAKS AS OF THE DATE HEREOF. NEITHER

**Global Partners Group, Inc.**

THE DELIVERY OF THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM NOR ANY SALE MADE PURSUANT HERETO SHALL CREATE, UNDER ANY CIRCUMSTANCE, ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE COMPANY AND OTHER INFORMATION CONTAINED HEREIN SINCE THE DATE HEREOF.

CERTAIN PROVISIONS OF VARIOUS AGREEMENTS OR OTHER DOCUMENTS ARE SUMMARIZED IN THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM, BUT PROSPECTIVE INVESTORS SHOULD NOT ASSUME THAT THE SUMMARIES ARE COMPLETE. SUCH SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE TEXT OF THE ORIGINAL DOCUMENTS, WHICH WILL BE MADE AVAILABLE TO PROSPECTIVE INVESTORS BY THE COMPANY UPON WRITTEN REQUEST.

PROSPECTIVE INVESTORS SHOULD NOT CONSTRUE THE CONTENTS OF THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM OR ANY PRIOR OR SUBSEQUENT COMMUNICATIONS FROM OR WITH THE COMPANY, OR ANY PROFESSIONAL ASSOCIATED WITH THE OFFERING, AS LEGAL OR PROFESSIONAL TAX ADVICE. THE OFFEREE AUTHORIZED TO RECEIVE THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM SHOULD CONSULT HIS, HER, OR ITS OWN COUNSEL, ACCOUNTANT OR BUSINESS ADVISOR, RESPECTIVELY, AS TO LEGAL, TAX AND OTHER MATTERS CONCERNING THE PURCHASE OF THE SECURITIES.

THE COMPANY WILL MAKE AVAILABLE TO ANY PROSPECTIVE INVESTOR, PRIOR TO THE PURCHASE OF SECURITIES BY SUCH PROSPECTIVE INVESTOR, THE OPPORTUNITY TO ASK QUESTIONS OF AND TO RECEIVE ANSWERS FROM, REPRESENTATIVES OF THE COMPANY CONCERNING ITS AFFAIRS AND THE TERMS AND CONDITIONS OF THE OFFERING AND TO OBTAIN ANY ADDITIONAL RELEVANT INFORMATION TO THE EXTENT THE COMPANY POSSESSES SUCH INFORMATION OR CAN OBTAIN IT WITHOUT UNREASONABLE EFFORT OR EXPENSE. EXCEPT FOR SUCH INFORMATION THAT IS PROVIDED BY THE COMPANY IN RESPONSE TO REQUESTS FROM PROSPECTIVE INVESTORS OR THEIR ADVISORS, NO PERSON HAS BEEN AUTHORIZED IN CONNECTION WITH THE OFFER OR SALE OF THE SECURITIES TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION NOT CONTAINED IN THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MUST NOT BE RELIED UPON. PROSPECTIVE INVESTORS SHOULD NOT RELY UPON INFORMATION NOT CONTAINED IN THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM UNLESS IT IS PROVIDED BY THE COMPANY AS INDICATED ABOVE.

THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM HAS BEEN PREPARED FOR INFORMATIONAL PURPOSES ONLY IN ORDER TO ASSIST PROSPECTIVE INVESTORS IN EVALUATING AN INVESTMENT IN THE

**Global Partners Group, Inc.**

COMPANY. BY ACCEPTING DELIVERY OF THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM OR ANY OTHER MATERIAL IN CONNECTION WITH THIS OFFERING, THE OFFEREE AGREES (I) TO KEEP STRICTLY CONFIDENTIAL THE CONTENTS OF THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM AND SUCH OTHER MATERIAL AND TO NOT DISCLOSE SUCH CONTENTS TO ANY THIRD PARTY OR OTHERWISE USE THE CONTENTS FOR ANY PURPOSE OTHER THAN AN EVALUATION BY SUCH OFFEREE OF AN INVESTMENT IN THE SECURITIES; (II) NOT TO COPY ALL OR ANY PORTION OF THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM OR ANY SUCH OTHER MATERIAL; AND (III) TO RETURN THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM AND ALL SUCH OTHER MATERIAL TO THE COMPANY IF (a) THE OFFEREE DOES NOT PURCHASE ANY SECURITIES, (b) THE OFFEREE'S OFFER TO PURCHASE SECURITIES IS NOT ACCEPTED OR (c) THIS OFFERING IS TERMINATED OR WITHDRAWN.

## JURISDICTIONAL NOTICES

**FOR RESIDENTS OF ALL STATES:**

IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

**Global Partners Group, Inc.**

## FLORIDA RESIDENTS:

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT IN RELIANCE UPON EXEMPTIVE PROVISIONS CONTAINED THEREIN. SECTION 517.061(11)(a)(5) OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT (THE "FLORIDA ACT") PROVIDES WHEN SALES ARE MADE TO FIVE OR MORE PURCHASERS IN THIS STATE THAT ANY PURCHASER OF SECURITIES IN FLORIDA WHICH ARE EXEMPTED FROM REGISTRATION UNDER SECTION 517.061(11) OF THE FLORIDA ACT MAY WITHDRAW HIS SUBSCRIPTION AGREEMENT AND RECEIVE A FULL REFUND OF ALL MONIES PAID, WITHIN THREE DAYS AFTER THE LATER OF (i) THE DATE HE TENDERS CONSIDERATION FOR SUCH SECURITIES AND (ii) THE DATE THIS STATUTORY RIGHT OF RESCISSION IS COMMUNICATED TO HIM. ANY FLORIDA RESIDENT WHO PURCHASES SECURITIES IS ENTITLED TO EXERCISE THE FOREGOING STATUTORY RESCISSION RIGHT BY TELEPHONE, TELEGRAM OR LETTER NOTICE TO THE COMPANY. ANY TELEGRAM OR LETTER SHOULD BE SENT OR POSTMARKED PRIOR TO THE END OF THE THIRD BUSINESS DAY. A LETTER SHOULD BE MAILED BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ENSURE ITS RECEIPT AND TO EVIDENCE THE TIME OF MAILING. ANY ORAL REQUESTS SHOULD BE CONFIRMED IN WRITING.

ADDITIONAL INQUIRIES AND REQUESTS FOR ADDITIONAL INFORMATION SHOULD BE DIRECTED TO THE FOLLOWING:

Marcos Konig
Chief Executive Officer
Global Partners Group, LLC
2101 W. Commercial Blvd.
Suite 3500
Fort Lauderdale, FL  33309
Phone:  (954) 484-2618, ext. 204
Fax:  (954) 484-9365
E-Mail:  mkonig@naib.com

**Global Partners Group, Inc.**

---

## FORWARD-LOOKING STATEMENTS

This Confidential Private Placement Memorandum contains forward-looking statements in the **"EXECUTIVE SUMMARY," "RISK FACTORS," AND "BUSINESS"** sections and elsewhere. These statements relate to future events or future predictions, including events or predictions relating to **GPG's** future financial performance, and are generally identifiable by use of the words "may," "will," "should," "expect," "plan," "anticipate," believe," "feel," "confident," "estimate," "predict," "potential" or "continue" or the negative of such terms or other variations on these words or comparable terminology. These statements are only predictions and involve known and unknown risks, uncertainties and other factors, including the risks outlined under **"RISK FACTORS,"** that may cause **GPG's** or its industry's actual results, levels of activity, performance or achievements to be materially different from any future results, levels of activity, performance or achievements expressed or implied by such forward-looking statements.

Although **GPG** believes that the expectations reflected in the forward-looking statements are reasonable, **GPG** cannot guarantee future results, levels of activity, performance or achievements. Moreover, neither **GPG** nor any other person assumes responsibility for the accuracy and completeness of such statements. **GPG** does not undertake any duty to update any of the forward-looking statements after the date of this Confidential Private Placement Memorandum to conform such statements to actual results.

---

**GPG's** trademarks and logos and certain titles and logos of **GPG's** products mentioned in this document are service marks and trademarks. Each brand name and trademark appearing in this document is the property of its holder.

**Global Partners Group, Inc.**

---

## TABLE OF CONTENTS

---

SECTION                                                                  PAGE

EXECUTIVE SUMMARY ................................................................1
SUMMARY OF THE OFFERING TERMS .................................................13
RISK FACTORS ...................................................................17
USE OF PROCEEDS ................................................................22
SUMMARY HISTORICAL AND PRO FORMA BALANCE SHEET
    INFORMATION..............................................................23
CAPITALIZATION .................................................................24
BUSINESS.......................................................................25
    PRODUCTS AND SERVICES .....................................................25
    BUSINESS DEVELOPMENT STRATEGY ............................................35
    COMPETITION ...............................................................36
    REGULATION................................................................37
    EMPLOYEES AND PROPERTIES .................................................38
    LEGAL PROCEEDINGS ........................................................38
ORGANIZATION AND MANAGEMENT....................................................40
SECURITY OWNERSHIP TABLE.......................................................44
DESCRIPTION OF SECURITIES......................................................45
INVESTOR SUITABILITY ..........................................................49

APPENDICES

APPENDIX A    Selected Industry Articles

APPENDIX B    March 31, 2004 Unaudited Financial Statements and
                 December 31, 2003 Unaudited Financial Statements for
                 Global Partners Group, Inc.

                 December 31, 2003 Audited Financial Statements for
                 Global Partners Securities, Inc. and EquityStation, Inc.

APPENDIX C    Summary of 2004 – 2008 Projected Financial Statements

APPENDIX D    Preferred Stock Subscription Agreement and Investor Questionnaire

**Global Partners Group, Inc.**

### EXECUTIVE SUMMARY

**Global Partners Group, Inc.** ("**GPG**" or the "**Company**"), through its subsidiaries, operates an integrated securities business that provides services in the following areas: institutional and online trading and order execution of equities and equity options, hedge fund management and distribution, and emerging market debt trading. This is depicted in the chart below.

| **Institutional and Direct Access (Online) Equity Trading**<br><br>**GPG subsidiary or division:** <u>NAIB</u> and <u>EquityStation</u> | **Hedge Fund Management and Distribution**<br><br>**GPG subsidiary or division:** <u>GP Funds</u> and <u>GP Asset Management</u> | **Emerging Market Debt Trading**<br><br>**GPG subsidiary or division:** <u>Global Partners Emerging Markets ("GPEM") Division of Global Partners Securities, Inc.</u> |
|---|---|---|
| <u>**NAIB**</u>: Provides wholesale market-making in selected equities for institutional clients, staffed by experienced trading professionals.<br><br><u>**EquityStation**</u>: Provides direct-access equity trading platforms to institutional and individual clients. | <u>**GP Funds**</u>: Preferred wholesale distributor for offshore investors for *Market Wizards Funds* (fund of hedge funds).<br><br><u>**GP Asset Management**</u>: A newly formed investment management firm that creates carefully-selected alternative investment products. | <u>**GPEM**</u>: consists of a small cadre of seasoned traders and one research analyst who execute trades in the sovereign debt of Latin American and Caribbean countries on behalf of institutional and individual clients. |

**GPG** was formed in August 2003 as a Florida company, following the merger in 2002 between North American Institutional Brokers, Inc. ("NAIB") and Global Partners Securities, Inc. ("GPSI"), formerly Westfalia Investments ("Westfalia").

The Company utilizes market knowledge, experience and technology to provide high-end securities trading solutions to small to mid-size institutional investors, hedge funds, broker-dealers, banks and professional traders located primarily in the United States, Canada, and Latin America. In addition, **GPG** creates, manages, and distributes new alternative investment products for high net worth individuals and tax-exempt and institutional investors, and manages a <u>Hedge Fund Incubation and Capital Introduction Program</u> (the "HFICI Program"). Through the HFICI Program, the Company identifies, evaluates, and introduces top emerging hedge fund managers and successful traders to new

**Global Partners Group, Inc.**

sources of outside investment capital. For exceptional managers, the Company may create a seeded fund vehicle where it owns an equity stake in the given hedge fund.

As an integral component of **GPG's** business, its GP Asset Management subsidiary recently formed a new a hedge fund with Ibbotson Associates, one of the leading asset allocation consultancies in the world, and Magnum Fund Management Ltd., a Bahamian-based investment management firm which manages ten offshore funds of funds with total assets of approximately $300.0 million. GP Asset Management serves as co-manager of this new hedge fund.

**GPG** and its principals have gained considerable industry recognition over the past nine months, and have been profiled or featured prominently in the following publications during this period: *Business Week, Hispanic Business, Active Trader, Asia Times Online, Ticker – The Art of Money Management,* and *Fundfire.* (Please see Appendix A for a copy of selected industry articles.)

As U.S. equity markets changed in the mid to late 1990's with the proliferation of Electronic Communications Networks ("ECN's"), the impact of decimalization and the introduction of the SEC's new order handling rule in 1997 – which caused the NASDAQ system to migrate from a negotiated, quote-driven market to more of an order-driven market – the principals of **GPG** developed a deliberate strategic plan to keep in step with changing marketplace demands. **As a result, the Company transitioned from operating primarily as a market making firm to become a service-oriented provider of liquidity and capital, also offering top tier hedge fund management and distribution services.**

Accordingly, the Company believes that it is now positioned to rapidly increase trading revenues and recurring asset-based fees through its primary business units. These units include the following:

*Niche Institutional Trading*

NAIB has expertise in executing trades in the illiquid over-the-counter bulletin board stocks ("OTCBB" stocks) and pink sheet stocks, a niche dropped by the major wire houses, and American Depositary Receipts (ADR's). In addition, NAIB executes orders for institutional clients in listed NASDAQ national market and small cap stocks, as well as NYSE and AMEX stocks.

In a difficult market environment, NAIB has been successful in retaining its core client base of smaller U.S. and international institutional investors, and offshore brokerage firms that rely on its expertise to execute orders for their own institutional and retail clients that buy and sell U.S. equities. During calendar year 2003, NAIB traded 1,946,442,461 shares. During the first quarter of 2004, NAIB traded 753,102,981 shares.

**Global Partners Group, Inc.**

### Direct Access Online Trading

EquityStation, Inc. ("EquityStation") provides direct access online trading for institutional investors and professional traders. Application software for clients is available at the online address www.equitystation.com. The Company designed and launched the first generation of equitystation.com on a test basis in early 1999, and has introduced a number of important changes to the Web site since that time. As of March 31, 2004, approximately $2.0 million had been invested in EquityStation. In contrast to many consumer-oriented direct access online trading companies, EquityStation gives professional traders access to sophisticated information services that includes: Level 2 trading data, real time charting, streaming news, direct access capabilities through ECN's and market makers for NASDAQ and OTC stocks, as well as DOT and ISI access to the NYSE and AMEX markets, and SAGE and ADP access to trade equity and index options. As of March 31, 2004, EquityStation had 358 clients, 196 of whom the Company considered active, with trading volume of 31,347,425 shares during the first quarter of the year. During calendar year 2003, EquityStation traded 35,986,939 shares.

The keys to EquityStation's future growth are the involvement of its "International Associates" who secure offshore institutional investors and professional traders as new clients, primarily in Latin America; the on-line promotion of its services on leading search engines through the placement of selected "keywords"; and further development and implementation of the Company's Hedge Fund Incubation and Capital Introduction Program in the U.S. and internationally to attract new clients. This Program, which was launched by **GPG** in early 2004, seeks to match top emerging hedge fund managers and successful traders with investment capital from selected funds of funds. In rolling out this Program more aggressively during the foreseeable future, **GPG** is positioned to drive increased trading volume to EquityStation and NAIB as a result of its clients having more investment capital under management, and to attract new clients that want to be considered for additional investment capital.

### Hedge Fund Management and Distribution

Since October 2001, GP Funds has been the preferred wholesale distributor to offshore investors for all of the Market Wizards Funds (the "MW Funds")[1] product offerings. In this case, GP Funds's designation as a *preferred* distributor means that its portion of management and incentive fees for its distribution activities is well above what

---

[1] The Market Wizards Funds is composed of a set of two offshore funds of hedge funds and one U.S. fund of hedge funds that are managed by London-based Fortune Asset Management ("FAM"). The Funds are co-advised by FAM's affiliated research company, Global Fund Analysis Ltd. and Jack Schwager. The primary hedge fund (i.e., the Market Wizards Plus Fund) generated a positive adjusted return on investment of 24.77% from its inception in November 2001 through March 2004 – with one of the highest Sharpe ratios in the industry. This performance is in contrast to a positive return of 6.40% for the S&P 500 during this same period and 17.98% for the HFRI FoF Index.

**Global Partners Group, Inc.**

constitutes the industry standard. GP Funds represents the MW Funds directly to investors and by establishing new sales channels through brokerages and other asset management firms. In addition, GP Funds may offer interests in the MW Funds directly or indirectly to tax-exempt U.S. investors.

GP Funds generates recurring asset-based revenues with high, predictable margins. As of May 31, 2004, GP Funds had raised approximately $10.1 million for the MW Funds, net of redemptions, with annualized revenues of roughly $125,000, assuming 10% capital appreciation in net asset value per annum. In total MW Funds managed about $230.0 million at that date, including roughly $115.0 million in leverage.

In March 2004, GP Asset Management entered into an agreement with Ibbotson Associates ("Ibbotson") and Magnum Fund Management Ltd. ("Magnum") to form a new hedge fund of funds, the Magnum Optimized Portfolio Fund (the "Magnum OP Fund"). The Magnum OP Fund is jointly owned and managed by Magnum and GP Asset Management, and advised by Ibbotson. Magnum, which has sponsored several single manager hedge funds, currently manages ten offshore funds of funds, and through its affiliates, advises and builds customized funds of funds for third parties and manages two funds of funds for U.S. investors. Ibbotson, one of the leading consultancies in the world in asset allocation, was founded in 1977 by Roger Ibbotson, a Professor in the practice of finance at Yale University's School of Management, and co-author of *Stocks, Bonds, Bills and Inflation*, the standard reference for information on investment market returns.

**GPG** commenced its Hedge Fund Incubation and Capital Introduction Program (the "HFICI Program") in August 2003 to identify and mentor talented emerging hedge fund managers. Of the roughly one hundred candidates who approached **GPG** through its HFICI Program during the first five months of 2004 seeking capital, as of June 1, 2004, it had twelve managers that qualified for consideration for incubation. Of these twelve, two are in the process of being seeded by one of a number of capital providers with whom **GPG** has a strategic relationship. Through the seeding process, **GPG** is a joint and equal equity partner with the capital provider in the newly-created hedge fund vehicle and participates in a proportionate manner in sharing fees associated with the fund. Although being a client of **GPG** is not a prerequisite for emerging managers to qualify for capital introduction or hedge fund incubation, a significant number of managers who approach the Company through its HFICI Program become clients of EquityStation, NAIB, or both.

### Emerging Markets Debt Group

The emerging markets debt group consists of a small cadre of seasoned traders and one research analyst who specialize in the sovereign debt of Latin American and Caribbean countries. This business unit has traditionally generated consistent revenue with minimal investment required, and is poised for steady growth as its client base expands through the Company's cross-promotional efforts.

4

**Global Partners Group, Inc.**

## Summary Financial Highlights

Prior to the merger described herein, NAIB operated profitably each year from 1990 to 1999. After experiencing declining revenues and net losses from 2000 through the first quarter of 2003, due to the implementation of new business strategies, **GPG's** revenues began to increase considerably beginning in the second quarter of 2003, and continuing through the first quarter of 2004. At the current run rate for the first quarter of 2004,[2] *without any external financing*, **GPG's** revenues for the full year 2004 would be approximately $7.3 million. (Notwithstanding the foregoing, revenues for the second quarter of the year for the Company have historically been lower than for the first quarter.) The chart below illustrates the Company's revenue growth over the past twelve months.

**GPG Monthly Revenues from April 2003
to March 2004 (unaudited)**



## Market

Few industries in the U.S. have undergone the dramatic changes experienced by the securities industry over the past five years. These changes include market fragmentation due to the proliferation of ECN's, the introduction of the SEC's new order handling rule,

---

[2] **GPG** had revenues during the first quarter of 2004 of $1,843,144, and a net loss of $98,573.

**Global Partners Group, Inc.**

the emergence of decimalization in price quotation, industry consolidation, the heightened underwriting and trading activity associated with the birth of the "new economy" and the subsequent decline in securities prices several years later, and the increasingly important role played by the Internet and other technology-related advancements in the marketplace. In response to changes in market structure, competition and market conditions, there has been an industry shift from market makers trading securities chiefly as principal to executing trades on a riskless principal or agency basis. As declining spreads have reduced profits for principal trading, so too have they resulted in institutions paying smaller commissions to market makers.

In 2003, total industry revenues were roughly $144.5 billion, down considerably from the all time high in 2000 of $245.2 billion.[3] Industry revenues from commissions on trading of U.S. equities totaled an estimated $16.1 billion in 2003, also down from the all time high in 2000 of $20.0 billion, according to the Securities Industry Association ("SIA").[4] Notwithstanding the foregoing, industry pre-tax net income climbed from $6.9 billion in 2002 to $16.7 billion in 2003, its second most profitable year in history.[5]

According to TASS Research™, the research unit of Tremont Capital Management, Inc., total hedge fund assets rose by $72.2 billion in 2003, amounting to approximately $750.0 billion at year end.[6] Moreover, the SIA expects the number of hedge funds to grow to 8,500 in 2004 and projects that hedge fund assets will grow to $900.0 billion in 2004. Furthermore, hedge funds with less than $100.0 million in assets comprise 77% of the total number of funds, and those with between $100.0 million and $500.0 million in assets comprise 17% of the total number of funds.[7] GPG's target market for trading opportunities is hedge funds with under $500.0 million in assets.

### Technology and Trade Execution

In order to distinguish itself in the marketplace, and to maintain its competitive edge in client trading activity, **GPG** balances the embrace of technology with the reasoned judgment of its professional team members, who confer with clients on individual trades as needed. In furtherance of its technology objectives, in 2002 **GPG** entered into a unique licensing agreement with Investment Technology Group, Inc. ("ITG"), a publicly-traded technology firm that provides high end trading solutions to the largest investment management firms and selected brokerage firms in the U.S. This licensing agreement not only differentiates **GPG** from its competitors, but more importantly, allows **GPG** to execute orders for its clients in a more efficient and cost effective manner.

---

[3] Accessed at http://www.sia.com/research/other/qrt_res.xls.
[4] Ibid.
[5] Ibid.
[6] Accessed at http://www.tassresearch.com/news_flows_2_19_04.html.
[7] Accessed at http://www.sia.com/research/.

**Global Partners Group, Inc.**

Through its agreement with ITG, **GPG** is, to its knowledge, the only licensee in the world with international rights to use and resell ITG's trading solutions to its own client base. ITG's technologies have been demonstrated to help investors maximize their liquidity options, make better trading decisions, and minimize transaction costs, thereby making more money per trade than by using conventional trading technologies. In contrast to other technology-driven trading systems that lack a critical mass of clients for whom to match orders, ITG's Posit® service processed trades accounting for roughly 6.4 billion shares in 2003, ensuring **GPG** clients sufficient buy-side and sell-side liquidity.

From August 2003 to April 2004, NAIB conducted a series of real time trials using ITG's trading platform to ensure that it was fully integrated with the clearing and settlement operations of Jefferies and could properly account for all aspects of each equity trade. In early May 2004, ITG's trading software was ready for full-scale use by NAIB, and by mid-May, NAIB had successfully installed ITG's software on two multi-billion dollar asset managers' desks with full functionality.

**GPG's** trading efficiency is supported by strong order execution, provided by securities clearing arrangements with Jefferies & Co, Inc. ("Jefferies") and ABN Amro Inc. ("ABN Amro"),[8] which clear trades originated by its NAIB and EquityStation business units, respectively. **GPG** believes that both Jefferies and ABN Amro are well-regarded for their clearing, custody, and settlement capabilities, and that both firms have performed on a reliable, timely, and cost-efficient basis to date on behalf of **GPG's** clients.

## Company Strategy

The Company's goal is to become one of the leading trading-based securities firms serving the United States, Canada, and Latin America. To achieve this goal, the Company's key strategies are as follows:

- Utilize relationships, market knowledge, client service, and licensed technology to maintain competitive strengths.
- Focus on small to mid-sized institutional firms and professional traders, which provide the largest opportunity for growth.
- Hire experienced institutional sales personnel with existing revenue production.
- Attract and retain "International Associates" to develop new accounts for EquityStation and to be positioned to cross-sell all of **GPG's** products.
- Match emerging hedge fund talent with investment capital through the Hedge Fund Incubation and Capital Introduction Program, uniting key aspects of **GPG's** resources, and leading to increased trading volumes and market recognition.

---

[8] In January 2004, Merrill Lynch & Co., Inc. announced that it will purchase the U.S. equities and options execution and clearing unit of ABN AMRO, with closing expected during the second quarter of the year.

**Global Partners Group, Inc.**

---

## Organization and Management

The Company believes that it has built a lean, entrepreneurial organization without sacrificing depth. **GPG** is led by an accomplished management team of securities industry professionals, with over 100 years of collective industry experience. Members of **GPG's** management team have significant and highly relevant experience in the areas of securities trading and operations, product development, sales and marketing, hedge fund management, management information systems, finance and administration, and customer service. Salomon Konig, in particular, has considerable experience in the hedge fund field, and is a member of the Board of Directors of the Hedge Fund Association, an international not-for-profit association of hedge fund managers, service providers, and investors. At May 31, 2004, **GPG** had 35 full time employees.

## Proposed Financing and Use of Proceeds

In order to fulfill its growth objectives, the Company intends to raise $3.0 million in 7.0% Cumulative Convertible Preferred Stock ("Preferred Stock") financing from institutional and selected accredited investors. This will represent a 24.8% ownership interest of **GPG** on a fully-diluted, as converted basis. (As of March 31, 2004, **GPG** had approximately $8.3 million in invested capital, including $7.3 million in equity and $1.0 million in current and long term debt, excluding accounts payable and accrued expenses.)[9]

**GPG** intends to use the net proceeds of the Offering to increase deposits on hand at its clearing firms in order to register as a market maker in significantly more OTC equity securities; for expansion of the Company's sales and marketing activities in connection with its NAIB, EquityStation, GP Funds, and GP Asset Management business operations; for capital expenditures; for scheduled debt reduction; and to increase its working capital reserve, from which it will finance other general and administrative expenses.

## Summary Projected Financial Highlights

Based on the completion of the Maximum Offering, **GPG's** projected revenue, EBITDA, and net income for the period from 2004 through 2008 are shown in the chart at the top of the following page.[10] If less than the Maximum Offering is raised, the projections may vary materially from those shown below.

---

[9] Please see Appendix B for the Company's unaudited consolidated March 31, 2004 and December 31, 2003 financial statements, as well as audited December 31, 2003 financial statements for its Global Partners Securities, Inc. and EquityStation, Inc. subsidiaries.

[10] Please see Appendix C for a summary of the Company's financial projections for 2004 through 2008.

**Global Partners Group, Inc.**

### GPG Financial Projections ($ in millions)

|  | Actual 2003[11] | Proj. 2004 | Proj. 2005 | Proj. 2006 | Proj. 2007 | Proj. 2008 |
|---|---|---|---|---|---|---|
| Revenues |  |  |  |  |  |  |
| Equity Station | $0.9 | $2.9 | $5.4 | $8.1 | $10.5 | $13.7 |
| GP Funds & GPAM | 0.1 | 0.3 | 0.9 | 2.5 | 5.1 | 8.7 |
| NAIB | 1.7 | 2.6 | 5.2 | 8.2 | 13.1 | 17.9 |
| Emerging Markets | 1.6 | 1.8 | 2.2 | 2.4 | 2.7 | 3.0 |
| **Total Revenues** | **4.3** | **7.6** | **13.6** | **21.2** | **31.5** | **43.2** |
|  |  |  |  |  |  |  |
| Gross Profit | 1.0 | 2.5 | 5.1 | 7.9 | 11.3 | 15.5 |
| *Gross Profit %* | *23.0%* | *32.6%* | *37.3%* | *37.3%* | *36.0%* | *35.9%* |
|  |  |  |  |  |  |  |
| **EBITDA** | **(1.8)** | **(0.5)** | **1.6** | **3.8** | **6.6** | **9.7** |
| *EBITDA %* | *NA* | *NA* | *11.4%* | *17.7%* | *21.0%* | *22.2%* |
|  |  |  |  |  |  |  |
| Net Income to Common Shareholders | ($2.1) | ($0.7) | $1.3 | $3.6 | $5.0 | $6.2 |

## Investment Considerations

The following are a few of the key factors that **GPG** believes makes it well-positioned to succeed:

> ### Experienced Management Team

**GPG** is led by an experienced management team whose members collectively have spent over 100 years in the securities business in senior operating roles. Together, this team has considerable experience in all key facets of **GPG's** business, including areas of anticipated growth.

> ### Large Market Poised for Expansion

The general securities industry experienced a strong comeback in profitability in 2003 after disappointing earnings in 2002. While industry revenues were $144.5 billion in 2003, down notably from the all time high of $245.2 billion in 2000, industry pre-tax net income climbed from $6.9 billion in 2002 to $16.7 billion in 2003, its second most profitable year in history. Moreover, average daily share volume, although down 3.0% on the New York Stock Exchange ("NYSE") from 2002 to 2003, and down 3.8% on NASDAQ during this same period, rebounded during the first quarter of 2004, to all time highs of 1.5 billion shares on NYSE and 2.0 billion shares on NASDAQ.[12]

---

[11] Consolidated financial statements for GPG for 2003 were prepared on an unaudited basis.
[12] Accessed at http://www.sia.com/research/html/key_industry_trends_.html#sharevolume.

**Global Partners Group, Inc.**

---

The hedge fund industry, another key market segment for **GPG's** success, has seen remarkable growth in the total number of hedge funds, registering three fold growth over the past decade with an estimated 8,600 hedge funds in existence as of the second quarter of 2004. [13] Of these, an estimated 6,800 are located in the U.S.[14] In addition, total hedge fund assets under management are approximately ten times greater than a decade ago, with an estimated $750.0 billion under management at year end 2003.[15]

➢ **Niche Concentration, Balanced by Diversification**

Unlike securities firms that provide a full range of services to institutional and private clients, but who may lose money in several business units in order to provide this degree of breadth, **GPG** intends to focus only on its areas of core expertise. This focus not only reinforces **GPG's** unique identity in the marketplace, but also ensures that it does not stray from its principal mission. Notwithstanding this, **GPG** believes that it will benefit in the future from reasonable diversification of its business lines.

➢ **Modest, Predictable Cost Structure**

While many securities firms suffer from a high fixed cost structure, which results in operating losses in down years, the Company has historically had relatively low costs compared to its competitors. Moreover, **GPG** has recently rationalized its cost structure to eliminate unnecessary recurring expenditures and ensure that its compensation package to key employees is largely based on performance.

➢ **License with ITG**

The Company's license with ITG is the first license with worldwide rights granted to a broker-dealer by ITG, and the third license of its kind granted by ITG overall. **GPG** believes that its ability to use ITG's trading solutions for its own client base will differentiate, to a considerable degree, its own services in the marketplace.

➢ **International Associate Program**

In order to secure new customer accounts for its EquityStation business unit, GP Funds, GP Asset Management, and Emerging Market Group businesses outside the U.S., the Company devised a marketing program to attract *International Associates*. The Company's *International Associates* are third party independent agents who work on behalf of the Company to generate new business, and they are compensated solely based on performance. **GPG** believes its International Associate Program provides a

---

[13] Accessed at http://www.thestreet.com/markets/willswarts/10159153.html.
[14] Ibid.
[15] Accessed at http://www.tassresearch.com/news_flows_2_19_04.html.

**Global Partners Group, Inc.**

---

cost efficient means to ensure future international growth, and that its *International Associates* will be well-positioned in the future to sell other Company services and products. Each *International Associate* is registered with the appropriate Company division or subsidiary as a "Foreign Associate" as such term is defined by the National Association of Securities Dealers, Inc. ("NASD").

➢ **Cross-Selling Opportunities**

**GPG** believes that its combination of businesses provides significant opportunities for cross-sale of services. The Company believes that the HFICI Program in particular generates meaningful new relationships with money managers who become leading candidates to use its trading services and products. In addition, through the Company's *International Associate* Program, an International Associate who begins a client relationship with the Company through an introduction to EquityStation may find that the client later needs execution services for emerging market debt instruments or for equities that are not traded on direct access systems, such as shares that trade on the OTC Bulletin Board or Pink Sheets.

➢ **Availability of Net Operating Loss Carryforward**

As of December 31, 2003, the Company estimates that it had available to offset future federal and state taxable income a net operating loss carryforward of approximately $7.0 million, expiring in 2022. Realization of future tax benefits is dependent upon the Company's ability to generate taxable income within the net operating loss carryforward period and may be subject to the nature of the investment made in the Company pursuant to this Offering and the applicable tax restrictions and limitations arising therefrom.

**About the Offering**

**GPG** is offering to sell 600,000 shares of Preferred Stock with mandatory redemption in 2011 (the "Preferred Stock") at a price of $5.00 per share (the "Offering"). The Preferred Stock is being offered on a "best efforts, all or none basis" as to the first $1.0 million of Securities offered (the "Minimum Offering") and on a "best efforts basis" for the remaining Securities. The Maximum Offering is $3.0 million (the "Maximum Offering"). The Preferred Stock is being offered by **GPG**, through its officers and directors. The minimum investment in the Preferred Stock through the Offering is $50,000, which would require the purchase of 10,000 shares, although **GPG** reserves the right to accept subscriptions for less than such amount. For more details on the Offering, please see the section herein titled "**SUMMARY OF THE OFFERING TERMS.**"

**Global Partners Group, Inc.**

## About GPG

**GPG** was formed in August 2003 as a Florida company, and merged into Global Partners Securities Holding Corp. ("GPS"), with **GPG** being the survivor. GPS, which was a Delaware corporation, was formed in 1992, and was previously known as Westfalia Corp. ("Westfalia"). At May 31, 2004, the Company had ten shareholders. There are no shares of Preferred Stock presently outstanding. See the section titled "**SECURITY OWNERSHIP TABLE**" contained herein for a list of current shareholders and their ownership positions in the Company.

In November 2001, in anticipation of the February 2002 merger between North American Institutional Brokers, Inc. ("NAIB") and an acquisition subsidiary of Westfalia, Westfalia changed its name to Global Partners Securities Holdings Corp. Also in November 2001, Westfalia's operating subsidiary, Westfalia Investments, changed its name to Global Partners Securities, Inc. ("GPSI"). In the second stage of the merger, in September 2002, NAIB merged into GPSI, then dissolved as an operating company, becoming a GPSI division. In July 2002, GP Funds, Inc. ("GPFI"), a Panamanian company, issued founders' shares to **GPG**.

Today, **GPG** operates through its wholly owned subsidiaries GPFI, Global Partners Asset Management, LLC, and GPSI, as well as GPSI's subsidiaries and divisions. This is depicted in the chart below.

### GPG Subsidiaries and Divisions



**Global Partners Group, Inc.**

---

### SUMMARY OF THE OFFERING TERMS

| | |
|---|---|
| **Issuer:** | **Global Partners Group, Inc.**, a Florida corporation ("GPG" or the "Company") |
| **Security:** | 7.0% Convertible Redeemable Preferred Stock with mandatory redemption in 2011 ("Preferred Stock") |
| **Mandatory Redemption Date:** | _____, 2011, which is 7th anniversary of the date of the final closing of the Offering. |
| **Principal Amount:** | $1,000,000 minimum<br>$3,000,000 maximum |
| **Denominations:** | $5.00 per share {Minimum purchase requirement of 10,000 shares} |
| **Pro Forma Capitalization:** | See "**CAPITALIZATION**" on Page 24. |
| **Use of Proceeds:** | GPG intends to use the net proceeds of this Offering for expansion of the Company's sales and marketing activities in connection with its NAIB, EquityStation, and GP Funds business operations, to increase deposits on hand at its clearing firms, for capital expenditures, and to increase its working capital reserve, from which it will finance other general and administrative expenses. |
| **Dividends:** | Holders of the Preferred Stock will be entitled to receive cumulative dividends of 7.0% per annum on the principal amount of Preferred Stock outstanding, payable semi-annually in arrears. Dividends will be paid to the extent legally permitted.  During the initial two-year period after the Preferred Stock is issued, at the option of the Investor, the Investor may receive dividends in the form of either cash or additional Preferred Stock. Provided that 100% of the Preferred Stock is issued and each Investor elects to receive dividends in the form of additional Preferred Stock in lieu of cash during the first two years following issuance, total dividends paid on the Preferred Stock to Investors in Year 1 will be $213,675 in the form of additional Preferred Stock (i.e., 42,735.0 shares), and total dividends paid on the Preferred Stock to Investors in Year 2 will be $228,894 in the form of additional Preferred Stock (i.e., 45,778.8) shares following the second anniversary of the issuance of the Preferred Stock, holders of the Preferred Stock will be entitled to receive cash dividends of 7.0% per annum of the principal amount of the Preferred Stock outstanding, payable semi-annually in arrears. |
| **Dividend Disbursement Account** | Contemporaneous with the closing of the Offering, the Company will set aside an amount in cash equal to 7.0% of the issued amount of the Preferred Stock in a special purpose bank account established by the escrow agent (the "Dividend Disbursement Account"). Monies in the Dividend Disbursement Account will be used to make dividend payments in cash to those Investors |

**Global Partners Group, Inc.**

and other holders of the Preferred Stock who elect to receive such payments in cash during the first year following closing. Because not all Investors are expected to receive dividend payments in cash during the first year following issuance of the Preferred Stock, any remaining amount in the Dividend Disbursement Account at the end of Year 1 will be used to pay dividends in cash in Year 2 and subsequent years, if applicable.

| | |
|---|---|
| **Optional Conversion:** | Each share of Preferred Stock ($5.00 principal amount at issuance) may be converted into 1.0 share of Common Stock in **GPG** at any time prior to redemption at the option of the holder. |
| **Automatic Conversion:** | Each share of Preferred Stock will be automatically converted into 1.0 share of Common Stock upon the earlier to occur of the following events: (i) immediately prior to the closing of either (A) a firm commitment underwritten public offering of shares of **GPG** common stock for an aggregate offering amount of not less than $15.0 million, or (B) an offering of equity securities in the Company for an aggregate offering amount of not less than $5.0 million that reflects a valuation for the Company based on such investment of greater than $15.0 million, after giving effect to the Offering; and (ii) the merger, consolidation or sale of all or substantially all of the Company's assets that will result in owners of the Company's Common Stock and owners of its Preferred Stock on an as-converted basis immediately prior to such transaction not holding at least 50% of the voting power of the surviving, continuing or purchasing entity. |
| **Liquidation Preference:** | In the event of any Liquidation Event (as defined below) prior to the conversion or redemption of Preferred Stock referenced above, Investors will be entitled to receive in preference to the holders of Common Stock an amount equal to the aggregate initial issuance amount of their Preferred Stock, plus all accrued and unpaid dividends on such Preferred Stock. Thereafter, the Company will distribute ratably all of its remaining funds and assets legally available for distribution to the holders of **GPG** Common Stock (including those shares of Common Stock issued upon conversion of the Preferred Stock). For these purposes, "Liquidation Event" means any liquidation, dissolution or winding-up of the Company's business. |
| **Protective Provisions:** | Without the affirmative vote of the holders of a majority of the shares of outstanding Preferred Stock, the Company will not purchase, redeem or otherwise acquire for value (or pay into or set aside as a sinking fund for such purpose) any of the Common Stock or Preferred Stock; provided, that this provision will not apply to the purchase of Common Stock or Preferred Stock from the Company's directors, officers, employees, consultants or advisers pursuant to agreements under which the Company has the option to repurchase upon the occurrence of certain events, including termination of employment by or service to the Company. |
| **Financial Information Rights:** | Following completion of this Offering, the Company will deliver to the Investors on a regular basis audited annual and unaudited quarterly financial statements. These financial information rights will terminate with respect to |

14

**Global Partners Group, Inc.**

the unaudited quarterly financial statements upon conversion of the Preferred Stock into Common Stock. Such information rights will be transferable only to a transferee that **GPG** does not reasonably believe to be a competitor and with which **GPG** agrees in writing to non-disclosure provisions with respect to such information.

**Right to Maintain Percentage Ownership:** The initial purchasers of the Preferred Stock will have the right, in the event the Company proposes to offer Preferred Stock, Common Stock, or another new class of equity securities to any person (other than issuances of Common Stock, options or warrants to employees, consultants, directors, or advisors, or the issuance of Common Stock upon conversion of the Preferred Stock), to purchase their pro rata portion of such equity securities based on their ownership of Common Stock or, in the event their Preferred Stock has not yet been converted into Common Stock, based on their deemed ownership assuming that all outstanding equity securities of the Company have been converted into Common Stock. The purchasers will have five business days to exercise such right. This right will terminate upon (and shall not apply to) (i) an underwritten public offering of **GPG** securities and (ii) such time as the Company has a class of equity securities that is publicly-traded.

**Registration Rights:** (1) <u>Registrable Securities</u>: **GPG** Common Stock issuable upon conversion of the Preferred Stock into Common Stock, and the occurrence of an initial public offering of **GPG** Common Stock.

(2) <u>Demand Rights</u>: At any time after 180 days following (i) an initial public offering or (ii) when the Company has a class of equity securities that is publicly traded, the holders of at least 66-2/3% of the then outstanding registrable securities may request that the Company register for sale under the Securities Act all or any portion of the registrable securities held by those holders. The Company will use its best efforts to cause such shares to be registered. The Company will not be obligated to effect more than two demand registrations. The Company may defer action for 180 days, but only once during any twelve month period.

(3) <u>Piggy-Back Rights</u>: Holders of registrable securities will be entitled to unlimited "piggy-back" registration rights on registrations for the account of the Company, except for the initial public offering; provided, however, that the Company and its underwriters will be entitled to reduce or exclude the number of registrable securities proposed to be registered in view of market conditions and may give preference to the registration of shares being issued on behalf of the Company.

(5) <u>Market Stand-Off</u>: The Investor shall agree to enter into an agreement proving that, if reasonably requested by the managing underwriter and the Company, no holder of outstanding registrable securities will sell its shares (other than those included in the registration, if any) for a period of 180 days following the effective date of an underwritten public offering of shares of **GPG** Common Stock.

**Global Partners Group, Inc.**

(6) <u>Amendments and Waivers</u>: The agreement regarding registration rights may only be amended and any waivers thereunder may only be made with the Company's written consent and the approval of the holders of at least a majority of the then outstanding registrable securities.

(7) <u>Termination of Registration Rights</u>. Registration rights under the agreement will terminate with respect to a holder thereof at such time as the holder is eligible to sell all of the holder's registrable securities in a single three-month period in compliance with Rule 144.  In any event, registration rights under the agreement will terminate no later than the third anniversary of the Company's initial public offering.

(8) <u>Other Provisions</u>: The agreement regarding registration rights will also include such other customary provisions as are reasonable, including cross indemnification, the period of time in which any registration statement shall be kept effective and underwriting arrangements.

| | |
|---|---|
| **Preferred Stock Purchase Agreement:** | The investment will be made pursuant to a Preferred Stock Purchase Agreement between Investors and the Company.  This agreement will contain, among other things, customary appropriate representations and warranties, indemnities, covenants reflecting the provisions set forth herein, and appropriate conditions of closing. |
| **Transfer Restriction:** | In addition to restrictions on transfer arising from state or federal securities laws, Investors will agree not to sell their Preferred Stock, or Common Stock, if converted, to any person considered by the Company to be a competitor. |
| **Right of First Refusal:** | The Company shall have a right of first refusal to purchase Preferred Stock and Common Stock into which the Preferred Stock is convertible from Investors and other holders of the Company's equity securities until the Company shall have completed an initial public offering or the Company has a class of equity securities that is publicly-traded. |

**Global Partners Group, Inc.**

## RISK FACTORS

*AN INVESTMENT IN THE PREFERRED STOCK AND IN **GPG** GENERALLY IS HIGHLY SPECULATIVE AND INVOLVES SIGNIFICANT RISKS, INCLUDING, THE RISK OF LOSS OF THE ENTIRE INVESTMENT. IT IS NOT POSSIBLE TO FORESEE AND DESCRIBE ALL OF THE BUSINESS, ECONOMIC AND FINANCIAL RISKS WHICH MAY AFFECT **GPG**. YOU SHOULD CAREFULLY CONSIDER THE RISKS AND UNCERTAINTIES DESCRIBED BELOW IN MAKING AN INVESTMENT DECISION WITH RESPECT TO THE PREFERRED STOCK. HOWEVER, THE RISKS SET FORTH BELOW ARE NOT PRESENTED IN ANY PARTICULAR ORDER, ARE ILLUSTRATIVE ONLY AND ARE NOT TO BE CONSIDERED OR DEEMED EXHAUSTIVE OR DEFINITIVE OF ALL OF THE MATERIAL RISKS INVOLVED IN THE PURCHASE OF THE PREFERRED STOCK OR AN INVESTMENT IN **GPG**.*

### Highly Competitive Industry

The securities industry is highly competitive and consists of numerous participants in different facets of the business, including money management, corporate finance, mergers and acquisitions advisory, securities trading, and order execution, among others. Competition can come from existing participants or new entrants. Although a division of the Company has enjoyed a good reputation as a regional market making firm, the Company, as yet, has little name recognition in the U.S. or internationally. Failure to make early and high-impact headway into the markets the Company addresses could adversely affect the Company's long-term growth objectives.

### Securities Industry Environment

The Company's growth is dependent to some degree on the health of the securities industry at large. From 2000 to 2002, as negative economic indicators adversely affected firms in the securities business, the industry experienced a shakeout of considerable size. Moreover, the securities industry in general is highly regulated in the U.S. and internationally and requires adherence to numerous federal, state, provincial, and local regulations. The Company's success in the future may, in part, depend on the health of the economy in general, which is often reflected in the price of equity securities in selected markets.

### Management of Growth

**GPG's** planned growth requires, among other things: (1) significant development and expansion of the Company's institutional client base, (2) recruitment and management of qualified salespeople; (3) upgrading its management information systems, and (4) training existing and new staff in use of the ITG products and services. Rapid growth may place a strain on the Company's management, operations and other resources.

**Global Partners Group, Inc.**

Accordingly, failure to properly manage expected growth could have a material adverse effect on the Company's business.

## Future Capital Needs

The Company believes that the $3.0 million raised in this Offering will be sufficient capital for its planned growth over the twelve months following the completion of this Offering. Following this financing, **GPG** may need to raise additional capital at a later date. If this follow-on financing is not available in the amount required or at all, or is not available on commercially acceptable terms, this may have a material adverse effect on the Company's business.

## Limited Operating History of Certain Business Units

Although the Company's Global Partners Securities, Inc. subsidiary and its Global Partners Emerging Markets and NAIB divisions each have an operating history of approximately 17 years, its GP Asset Management, LLC, GP Funds, Inc., and EquityStation, Inc. subsidiaries have limited operating histories. Due to the limited operating history of these businesses, it is difficult to accurately predict their future revenues or results of operations.

## Dependence on Management Team

The success of the Company will be largely dependent on the efforts of Marcos Konig and Peter Rajsingh and the other members of the management team that the Company currently employs or may employ in the future. There can be no assurance that any of these individuals or any current management-level employee or prospective management-level employee once employed, will continue his or her employment with the Company. The loss of the services of either of the individuals named above or other key personnel would have a material adverse effect on the Company's ability to develop its business and could result in the loss of the Investor's entire investment.

## Reliance on Third Parties

The operations of several of **GPG's** business lines are dependent on key strategic relationships with, and the performance of, third parties. Two of **GPG's** business units have licensed ITG products and services; the Company's trading operations rely on Jefferies and ABN Amro for clearing functions, and; the Company's hedge fund management and sales operations are dependent on its principals' ongoing relationship with David Friedland and Ezra Zask of the Magnum OP Fund, and Jack Schwager of the Market Wizards Funds. Although the Company believes its strategic relationships are built on firm foundations and continue to be appropriately managed, there is no assurance of longevity to these relationships. Furthermore, any disruption in the operations of, or the

**Global Partners Group, Inc.**

Company's relationship with, ITG, Jefferies, ABN Amro, David Friedland, Ezra Zask, or Jack Schwager could have a material adverse effect on **GPG's** business, financial condition and results of operations.

## Risks of Dealing with Foreign Market Securities

One of **GPG's** business lines involves providing advice to clients with respect to trading the sovereign debt of emerging market countries in Latin America. The provision of advice with respect to these securities occasionally necessitates travel to these foreign markets on the part of **GPG's** employees, where **GPG** may encounter the risks typically associated with operating abroad, including, but not limited to, the laws and regulations of those jurisdictions in which **GPG** operates, foreign taxes and duties, and labor laws. **GPG's** failure to adequately identify and address the risks of doing business in the foreign jurisdictions in which it operates could have a material adverse effect on **GPG's** business, financial condition and results of operations.

## Adherence to U.S. Patriot Act of 2001

The U.S. Patriot Act of 2001, enacted in response to the terrorist attacks on September 11, 2001, contains anti-money laundering and financial transparency laws and mandates the implementation of various new regulations applicable to broker-dealers and other financial services companies, including standards for verifying client identification at account opening, and obligations to monitor client transactions and report suspicious activities. The increased obligations of financial institutions to identify their customers, watch for and report suspicious transactions, respond to requests for information by regulatory authorities and law enforcement agencies, and to share information with other financial institutions, requires the implementation and maintenance of internal practices, procedures and controls which will increase **GPG's** costs and may subject the Company to regulatory inquiries, claims or penalties.

## No Guaranteed Return on Investment

No assurance can be given that the Investors will realize a return on their investment in the Company (including the payment of any cash dividend amounts payable pursuant to the terms of the Preferred Stock) or that they will not lose their entire investment. For this reason, each prospective Investor should read this Confidential Private Placement Memorandum and all exhibits hereto and thereto carefully, and should consult with his, her, or its own personal attorneys, accountants and business advisors prior to making any investment decision.

**Global Partners Group, Inc.**

## No Liquidity

There is no public or private trading market for **GPG** Common Stock or the Preferred Stock being offered through this Offering and there is no assurance that any such trading market will develop for the Common Stock or the Preferred Stock. Accordingly, an investment in the Preferred Stock may be illiquid and purchasers may be required to bear the economic risks of the investment for an indefinite period of time. Prospective Investors should consider the potentially long-term nature of their investment. The Preferred Stock offered hereby has not been registered under the Securities Act. The Company will place a legend on the certificates evidencing the Preferred Stock (and any Common Stock issued upon conversion of the Preferred Stock) stating that the Preferred Stock and Common Stock issued upon conversion of the Preferred Stock has not been registered under the Securities Act. A notation will also be made in the Company's records that the Preferred Stock and Common Stock issued upon conversion of the Preferred Stock may not be sold without a written opinion from the holder's counsel that the Preferred Stock (or Common Stock issued upon conversion of the Preferred Stock) to be sold or transferred have been registered under the Securities Act or are exempt therefrom, and that such written opinion shall be in a form acceptable to counsel to the Company. Consequently, a holder of Preferred Stock (or Common Stock issued upon conversion of the Preferred Stock) may not be able to liquidate his, her or its investment in the event of an emergency or for any other reason.

## Lack of Control by the Investors

All decisions with respect to the operation of the Company will be made exclusively by management, which is appointed by the Company's Board of Directors. While holders of Common Stock, including holders of Common Stock issued upon conversion of Preferred Stock, will have the right under the Company's Articles of Incorporation and By-laws to one vote for each share on all matters submitted to shareholders, the number of shares of Common Stock of **GPG** held by members of the Konig family and former principals of Westfalia will constitute a majority of the shares of Common Stock entitled to vote on any matter brought before the holders of the Common Stock following completion of the Offering.

## Litigation

The Company is subject to litigation in the ordinary course of business. As is customary of NASD-registered firms, most claims lodged by or against the Company are settled through binding arbitration.

The Company is presently party to two pending actions, and has recently appealed an award made by an arbitration panel against the Company in October 2003. In the

**Global Partners Group, Inc.**

opinion of management, there are no material actual or threatened legal proceedings against the Company which if adversely decided, would have a material effect on the financial condition or prospects of the Company, but there can be no assurance that this will be the case.  See "**BUSINESS – LEGAL PROCEEDINGS.**"

## Dilution

The price at which the Company is selling the shares of Preferred Stock, on an as-converted basis into shares of Common Stock, is substantially higher than the fully-diluted pro forma net tangible book value per share of Common Stock immediately after the Offering.  Consequently, an Investor will suffer an immediate and substantial dilution in the price paid per share of Common Stock on an as-converted basis versus the net tangible book value per share of Common Stock.  In addition, **GPG** will likely issue and sell additional equity securities in the future and there can be no assurance of the price and terms on which such equity securities in the Company may be sold.  A sale of shares of Common Stock at a price lower than the price at which the shares of Preferred Stock offered hereby may be converted into shares of Common Stock could cause further dilution to Investors.  Further dilution may also occur upon the exercise of equity options, rights, and warrants to purchase shares of Common Stock that are currently outstanding or that may be issued in the future.

## Offering Price Arbitrarily Determined

The price at which the shares of Preferred Stock are offered hereby and the dividend rate, conversion rate and the other material terms and conditions of the Preferred Stock have been arbitrarily determined.  The offering price per share of Preferred Stock on an as-converted basis into shares of Common Stock does not bear any relationship to **GPG's** asset value, net worth, book value, earnings or any other established criteria of value and should not be considered to be an indication of the actual value of **GPG** or of its Common Stock or of any future market price of its Common Stock.

**Global Partners Group, Inc.**

---

## USE OF PROCEEDS

**GPG** is distributing this Confidential Private Placement Memorandum in conjunction with its effort to raise $3,000,000 through the issuance of the Preferred Stock during the third quarter of 2004. (The accompanying financial projections contained in Appendix B contemplate a closing of the Offering on August 31, 2004.) After deducting the expenses of the Offering, net proceeds are expected to be approximately $2,733,000. The Company intends to use the net proceeds of the Offering to increase deposits on hand at its clearing firms in order to register as a market maker in significantly more OTC equity securities, for expansion of the Company's sales and marketing activities in connection with its NAIB, EquityStation, GP Asset Management, and GP Funds business operations, for capital expenditures, for scheduled debt reduction, to establish a dividend reserve account, and to increase its working capital reserve, from which it will finance other general and administrative expenses. Pending such application of funds, the Company intends to invest the proceeds of the Offering in short-term, interest-bearing securities.

| | Purpose | Maximum Amount |
|---|---|---|
| (i.) | Deposits on Hand at Clearing Firms | $800,000 |
| (ii.) | Sales and Marketing Expenditures | 500,000 |
| (iii.) | Capital Expenditures | 300,000 |
| (iv.) | Scheduled Debt Reduction | 230,000 |
| (v.) | Dividend Disbursement Account | 210,000 |
| (vi.) | Addition to Working Capital Reserve | 693,000 |
| | **Total Net Proceeds** | **$2,733,000** |
| | Plus: Offering Costs and Fees[16] | 267,000 |
| | Total Gross Proceeds | $3,000,000 |

If the Company raises the Minimum Amount called for in this Offering, it would use the net proceeds, estimated to be roughly $860,000 after deducting Offering expenses of $140,000, as follows: approximately $320,000 would be spent on expansion of the Company's sales and marketing activities, $300,000 would be used to increase deposits on hand at its clearing firms, $100,000 would be used for capital expenditures, $75,000 would be used to increase its working capital reserve, and $70,000 would be placed in a dividend reserve account. The foregoing purposes and amounts are based on current projections. Future events or circumstances may cause the Company to, and the Company may, in its sole discretion, as it deems necessary or advisable, allocate the proceeds from this Offering for purposes or in amounts different than those set forth above.

---

[16] Offering costs and fees are estimated at an aggregate of 8.9% of gross proceeds for the Maximum Offering.

**Global Partners Group, Inc.**

---

## SUMMARY HISTORICAL AND PRO FORMA
## BALANCE SHEET INFORMATION

|  | Actual at March 31, 2004 (unaudited) | As Adjusted at March 31, 2004 to Reflect the Issuance of 500,000 Shares of Preferred Stock to Investors[17],[18] |
|---|---|---|
| Total Assets | $1,810,253 | $4,810,253 |
| Total Debt[19] | $1,048,889 | $1,048,889 |
| Total Preferred Stock, Shareholders' Equity | $151,908 | $3,151,908 |
| Total Liabilities, Preferred Stock, and Shareholders' Equity | $1,810,253 | $4,810,253 |

---

[17] Shares of Preferred Stock are convertible into shares of common stock at a ratio of 1:1.

[18] Excludes Convertible VRPP Stock issued in June 2004.  (See **DESCRIPTION OF SECURITIES** contained herein.)

[19] Includes $291,889 in notes payable to the U.S. Small Business Administration, $157,000 in loans payable to Company principals, and $600,000 in subordinated notes payable to a Company principal.

**Global Partners Group, Inc.**

## CAPITALIZATION

The following table sets forth **GPG's** capitalization (i) on an actual (unaudited) basis as of March 31, 2004, (ii) on a pro forma basis, as adjusted to reflect the sale of 600,000 shares of Preferred Stock in the Offering, and (iii) on a pro forma basis, as adjusted to reflect the sale of 600,000 shares of Preferred Stock in the Offering, and the conversion of the Preferred Stock to Common Stock.

| | (i)<br>Actual as of March 31, 2004 (unaudited) | (ii)<br>As Adjusted at March 31, 2004 to Reflect the Issuance of 600,000 Shares of Preferred Stock to Investors[20,21] | (iii)<br>As Adjusted at March 31, 2004 to Reflect the Issuance of 600,000 Shares of Preferred Stock to Investors and the Conversion of Preferred Stock into Common Stock[22] |
|---|---|---|---|
| Total Debt | $1,048,889 | $1,048,889 | $1,048,889 |
| Preferred Stock | ---------- | $3,000,000 | ---------- |
| Total Stock | $1,510 | $1,510 | $2,110 |
| Additional Paid-in Capital | $7,316,244 | $7,316,244 | $10,315,644 |
| Accumulated Deficit | ($7,165,846) | ($7,165,846) | ($7,165,846) |
| Total (Common) Shareholders' Equity | $151,908 | $151,908 | $3,151,908 |
| Total Capitalization | $1,200,797 | $4,200,797 | $4,200,797 |

---

[20] Shares of Preferred Stock are convertible into shares of common stock at a ratio of 1:1.
[21] Excludes Convertible VRPP Stock issued in June 2004. (See **DESCRIPTION OF SECURITIES** contained herein.)
[22] Excludes Convertible VRPP Stock issued in June 2004. (See **DESCRIPTION OF SECURITIES** contained herein.)

**Global Partners Group, Inc.**

---

## BUSINESS

## PRODUCTS AND SERVICES

*NAIB*

### Overview

NAIB generates revenues from commissions, markups, and markdowns earned on trade executions made on behalf of its clients. These clients include domestic and international broker-dealers, hedge funds, mutual funds, pension funds, investment advisors, other asset managers, and commercial banks and savings and loan institutions. In cases where NAIB buys or sells securities directly on behalf of its clients and runs these trades through the firm's inventory account before repurchasing or reselling them, it designates this as *riskless principal activity*.

In order to provide its clients with a superior trading technology, during 2002, NAIB entered into a unique licensing agreement with Investment Technology Group, Inc. ("ITG"), a publicly-traded technology firm that provides high end trading solutions to the largest investment management firms and selected brokerage firms in the U.S., Canada, Europe, Asia, Israel, and Australia. Through its agreement with ITG, **GPG's** NAIB subsidiary is the only licensee in the world with international rights to use ITG's trading solutions for its own client base. NAIB derives a gross execution profit for each transaction using ITG trading software based on the difference in the price charged to its clients from the price paid to ITG and associated trader compensation. Revenues generated for each trade are typically calculated based on the number of shares bought or sold per order.

From August 2003 to April 2004, NAIB conducted a series of real time trials using ITG's trading platform to ensure that it was fully integrated with the clearing and settlement operations of Jefferies and could properly account for all aspects of each equity trade. In early May 2004, ITG's trading software was ready for full-scale use by NAIB, and by mid-May, NAIB had successfully installed ITG's software on two multi-billion dollar asset managers' desks with full functionality.

The Company believes that ITG's technologies have been demonstrated in a quantitative way to help investors maximize their liquidity options, make better trading decisions, and minimize transaction costs, thereby making more money per trade than by using conventional trading technologies. Based in New York City, ITG currently has 10 locations worldwide, including financial center coverage in North America, Europe, Hong Kong, Israel and Australia. In contrast to other technology-driven trading systems that lack a critical mass of clients for whom to match orders, ITG's Posit® service processed

**Global Partners Group, Inc.**

trades accounting for roughly 6.4 billion shares in 2003, ensuring **GPG** clients sufficient buy-side and sell-side liquidity.

### Marketing and Sales

NAIB's marketing efforts include attendance of relevant trade shows and seminars in the U.S. and abroad, the use of targeted mailings and e-mail messaging, direct sales calls, advertising campaigns on strategically selected Web sites and other media, and promotion of NAIB's Web site, which is discussed below. Sales calls are typically made by NAIB's dedicated institutional business development manager, members of NAIB's trading desk, or senior management.

**GPG** has a corporate marketing staff of five people that are responsible for designing each business unit's marketing strategy and promoting this strategy to prospective customers and business partners.

### NAIB Web Site

The Company believes that NAIB has an informative and well-organized Web site that includes relevant information on its background, services, personnel, and employment opportunities.

At any given time, NAIB is able to publish comprehensive reports about its online Web traffic activities. These reports provide statistics on key performance metrics such as total number of unique visitors per any increment of time, amount of traffic derived from search engines, and the most popular Web pages viewed; taken together, these metrics assist the Company's management in evaluating the effectiveness of NAIB's Internet strategy.

*EquityStation*

### Overview

Similar to NAIB, EquityStation generates revenues from commissions earned on trades made on behalf of its clients. While NAIB offers clients the opportunity to interact with its traders directly via telephone or electronically, EquityStation's business model is based solely on direct access online trading. Accordingly, EquityStation gives professional traders direct access to Level 2 trading, real time charting, streaming news, and order routing capabilities. In executing trades, EquityStation offers ES2Direct, a Level 2 trading platform developed by Direct Access Financial Corp. From August 2003 to April 2004, EquityStation conducted a series of real time trials using ITG's trading platform, with whom it has a license separate from NAIB's. At May 1, 2004, ITG's trading software was ready for full scale use by EquityStation.

**Global Partners Group, Inc.**

The Company designed and launched the first generation of equitystation.com on a test basis in early 1999, and has introduced a number of important changes to the Web site since that time. As of March 31, 2004, approximately $2.0 million had been invested in EquityStation primarily for the development of its Web site, the establishment of a small corporate infrastructure, registration and compliance with federal and state securities commissions and related organizations, and coordination of outside marketing efforts. A portion of this investment in EquityStation was made prior to its incorporation. EquityStation suspended its market test in early 2002 when its clearing firm at that time imposed a new policy on many of its clients which barred them from opening new international customer accounts in key countries where the Company had meaningful business opportunities. As a consequence, EquityStation established a new relationship with ABN Amro during late 2002, which has resulted in ABN Amro clearing trades on behalf of EquityStation since spring 2003.[23] Monthly revenues have increased steadily for EquityStation since the beginning of 2003, and continuing through the first quarter of 2004.

Among other business initiatives, EquityStation has developed an *International Associate* program to secure new customer accounts for its equitystation.com business outside the U.S. These *International Associates* are third party independent agents who work on behalf of the Company to generate new business and provide follow-on support. The *International Associates* are compensated solely based on performance. At May 31, 2004, EquityStation had *International Associates* in the following countries whom it considered to be active: Brazil, Chile, Colombia, Costa Rica, France, Peru, Russia, Spain, and United Arab Emirates.

In August 2003 **GPG** introduced its HFICI Program, which gained momentum in early 2004, and led to increased trading business for EquityStation and NAIB during this period. There is no requirement that candidates for capital introduction or hedge fund incubation become clients of the Company; however, many fund managers in the HFICI Program have chosen to become clients of either EquityStation or NAIB or both. Through this program, **GPG** introduces selected investment fund managers to prospective sources of investment capital that can increase their fund size and help them implement their financial strategies. The HFICI Program also provides these managers with access to investment research reports and back office support.

While total trading volume of U.S. equities rose from 2000 to 2002, from an estimated 759 billion shares traded in 2000 to an estimated 906 billion shares traded in 2002,[24] the volume of online trading in U.S. equities by non-professional "day-traders" declined dramatically during this same period. This gave EquityStation an opportunity to

---

[23] In January 2004, Merrill Lynch & Co., Inc. announced that it will purchase the U.S. equities and options execution and clearing unit of ABN AMRO, with closing expected during the second quarter of the year.
[24] Accessed at http://www.sia.com/publications/html/trends_during_1990s.html.

**Global Partners Group, Inc.**

more closely focus its business model prior to its full-scale launch to concentrate on institutional and professional traders. Accordingly, these groups constitute EquityStation's customer emphasis.

### Marketing and Sales

EquityStation uses the internal resources of the corporate marketing team to oversee its divisional marketing strategy. Although most of EquityStation's customer leads have historically been generated through its Web site, EquityStation supplements these efforts through direct sales calls made by four in-house sales associates. Beginning in summer 2004, EquityStation intends to use targeted mailings and e-mail messaging to generate new customer accounts, particularly in the U.S. and Canada. Internationally, EquityStation's marketing efforts are led by its team of *International Associates*, who are overseen by EquityStation's sales management group in the U.S.

### EquityStation Web Site

EquityStation relies heavily on use of the Internet to promote its products and services, purchasing online placement of advertisements on a cost-per-click (CPC), cost-per-acquisition (CPA) and cost-per-thousand (CPM) basis. Prior to placing keywords or advertisements online, EquityStation's marketing team evaluates projected results of each purchase, which it then compares to actual results. During its test period, EquityStation promoted its products and services by running a number of online campaigns on leading Internet search engines, including goto.com and briefing.com, among others. Below is a chart which summarizes the number of visitors and product registrations on the equitystation.com Web site during calendar years 2000, 2001, 2002, 2003, and the first quarter of 2004, as well as the number of clients at the end of each period.

**EquityStation.com Visitors, Registrations, and Clients**
**from January 1, 2000 to March 31, 2004**

|                            | 2000   | 2001    | 2002    | 2003    | 1st Q 2004 |
|----------------------------|--------|---------|---------|---------|------------|
| **Visitors**               | 75,355 | 187,919 | 201,332 | 207,482 | 69,967     |
| **Registrations**[25]      | 1,734  | 2,879   | 1,541   | 1,182   | 334        |
| **Clients at End of Period**[26] | 97 | 89      | 69      | 295     | 358        |

A graphic image of the Home Page and selected additional pages of EquityStation's Web site are shown on the pages which follow.

---

[25] In late 2002, EquityStation changed its registration process in order to screen prospective clients more thoroughly, with a view toward securing as clients only those who meet its pre-established selection criteria.
[26] Of EquityStation's 358 clients at March 31, 2004, the Company considered 196 of them to be active.

**Global Partners Group, Inc.**





**Global Partners Group, Inc.**



**Global Partners Group, Inc.**

*GP Funds and GP Asset Management*

### Overview

In order to provide its institutional clients with access to a fast growing class of alternative investments, in October 2001, two of **GPG's** subsidiaries entered into an agreement with London-based Fortune Asset Management ("FAM").   Through this agreement with FAM, **GPG's** GP Funds subsidiary has become a *wholesale distributor* of investment units for offshore investors and U.S. tax-exempt investors in the Market Wizards Funds (the "MW Funds")[27] hedge fund product offerings.  The Company uses the term *wholesale distributor* to describe the process by which GP Funds enlists other securities firms and insurance firms to sell investment units in the MW Funds to their own clients, splitting the sales commission and additional compensation with these firms.  The MW Funds are co-advised by FAM's affiliated research company, Global Fund Analysis Ltd. ("GFA"), and Jack Schwager.  Mr. Schwager, an acknowledged leader in the hedge fund industry, is the author of the well-known **Market Wizards** series of books that describe what gives leading investment managers their edge, along with a number of classic text books on trading.

GP Funds generates recurring asset-based revenues with high, predictable margins. As of May 31, 2004, GP Funds had raised approximately $10.1 million for the MW Funds, net of redemptions, with annualized revenues of roughly $125,000, assuming 10% capital appreciation in net asset value per annum.  In total MW Funds managed roughly $230.0 million at that date, net of redemptions, including approximately $115.0 million in leverage.

In March 2004, GP Asset Management entered into an agreement with Ibbotson Associates ("Ibbotson") and Magnum Fund Management Ltd. ("Magnum") to form a new hedge fund of funds, the Magnum Optimized Portfolio Fund (the "Magnum OP Fund"). The Magnum OP Fund is jointly managed by Magnum and GP Asset Management, and advised by Ibbotson.  Magnum, which has sponsored several single manager hedge funds, currently manages ten offshore funds of funds, and through its affiliates, advises and builds customized funds of funds for third parties and manages two funds of funds for U.S. investors.  Ibbotson, one of the leading consultancies in the world in asset allocation, was founded in 1977 by Roger Ibbotson, a Professor in the practice of finance at Yale University's School of Management, and co-author of *Stocks, Bonds, Bills and Inflation*, the standard reference for information on investment market returns.[28]

---

[27] The Market Wizards Funds is composed of a set of two offshore funds of hedge funds and one U.S. fund of hedge funds.  The primary hedge fund (i.e., the Market Wizards Plus Fund) generated a positive adjusted return on investment of 24.77% from its inception in November 2001 through March 2004 ~ with one of the highest Sharpe ratios in the industry.  This performance is in contrast to a positive return of 6.40% for the S&P 500 during this same period and 17.98% for the HFRI FoF Index.

[28] The Ibbotson Associates Web site provides the following background on Professor Ibbotson: "Roger Ibbotson has directly managed bond portfolios, traded equity securities, and managed asset allocation

**Global Partners Group, Inc.**

With offices in Chicago, New York and Japan, Ibbotson provides asset allocation advice, investment management services, analytical and wealth forecasting software, educational services and a widely used line of NASD-reviewed presentation materials to a range of clients – including Brokerage Firms, Mutual Fund Companies, Commercial Banks, Insurance Companies, Retirement Plan Sponsors, and Investment Managers, as well as Individual Financial Planners and Individual Financial Consultants.

Given the fact that many institutions are beginning to acknowledge a potentially recurring problem with balancing future liabilities against return on investments, hedge funds, with their promise of absolute returns across varying market conditions, have become increasingly attractive as investment vehicles. Accordingly, this niche of the securities industry has experienced growing appeal over the past several years, with some investment analysts suggesting that hedge funds may begin to displace mutual funds in total assets under management in the not too distant future. According to TASS Research™, the research unit of Tremont Capital Management, Inc., total hedge fund assets rose by $72.2 billion in 2003, amounting to approximately $750.0 billion at year end.[29] Moreover, the SIA expects the number of hedge funds to grow to 8,500 in 2004 and projects that hedge fund assets will grow to $900.0 billion in 2004. Furthermore, hedge funds with less than $100.0 million in assets comprise 77% of the total number of funds, and those with between $100.0 million and $500.0 million in assets comprise 17% of the total number of funds.[30] **GPG**'s target market for trading opportunities is hedge funds under $500.0 million in assets.

In a setting of falling investment returns from conventional asset classes, recent articles in the financial press have confirmed that several large pension funds and endowments plan to allocate a larger portion of their assets under management to hedge funds during the coming year. This decision is supported by a number of recent studies, such as *Global Investment Review 2003*, issued in December 2002 by the benefits consulting firm Watson Wyatt.[31]

---

accounts. He serves on many boards, including Dimensional Fund Advisors, BIRR Portfolio Analysis, and the Commonfund Healthcare Council. Professor Ibbotson frequently lectures at universities, academic and business conferences, as well as other forums. Professor Ibbotson conducts research on a broad range of financial topics including investment returns, mutual funds, international markets, portfolio management and valuation. He is a regular contributor and editorial board member to both trade and academic journals. He has received several awards, including the Review of Financial Studies Award (Best paper in 1992), Graham and Dodd Scrolls in 1980, 1982, 1985, and 2001, AIMR James R. Vertin Award (2001) and the Indiana University Academy of Alumni Fellows. Professor Ibbotson received his bachelor's degree in mathematics from Purdue University, his MBA from Indiana University, and his PhD from the University of Chicago, where he taught for more than 10 years and served as executive director of the Center for Research in Security Prices.

[29] Accessed at http://www.tassresearch.com/news_flows_2_19_04.html.
[30] Accessed at http://www.sia.com/research/.
[31] "Tumultuous Markets Force Pension Funds to Diversify, Watason Wyatt Says" by Susan L. Barreto, Hedgeworld Daily News, December 16, 2002, accessed at http://www.afponline.org/ohc/122402/186_article_5 /186 _article_5.html.

**Global Partners Group, Inc.**

The considerable room for future growth in the allocation of assets to hedge funds is further supported by numerous recent analyses and surveys of investor behavior, including a survey of pension fund and other tax-exempt investors conducted by Goldman Sachs and Russell Investment Group, in which respondents for North America indicated what percentage of total assets are projected to be allocated to hedge funds in comparison to allocations in recent years.[32]  This is shown in the following chart, which appeared in the survey cited.[33]



Respondents' median strategic allocation grew significantly from 2.5% in 2001 to 5.0% in 2003. Median allocation is expected to grow further to 7.5% by 2005.

While hedge fund managers earn revenues through a multi-tiered structure, including management fees, which can range from 1.0% to 4.0% of investments under management, performance incentives generally reward positive returns above a certain threshold, or in comparison to market indices.  Such performance incentives may equal or exceed 20.0% of any annual increase in net asset value.

As a *wholesale distributor* of the MW Funds, GP Funds derives revenues based on the sale of hedge fund interests to customers of its wholesale clients, and, to a lesser degree, based on the performance of the MW Funds.  As *co-manager* of the Magnum OP Fund, however, GP Asset Management has the potential to receive a significantly larger participation in Fund profits as the Magnum OP Fund grows in size and value.

**<u>Marketing and Sales</u>**

GP Funds relies on **GPG's** corporate marketing staff to work closely with Mr. Schwager in developing appropriate marketing material to gain new sub-distributors and investors for the MW Funds.  In addition, the Company's marketing staff consistently develops new sub-distributor leads among other securities and insurance firms; once these leads have been successfully qualified, GP Funds either contacts prospective sub-

---

[32] *Alternative Investing Report 2003*, Goldman Sachs International and Russell Investment Group, p. 17.
[33] Ibid, p. 17.

**Global Partners Group, Inc.**

distributors directly, or, for international prospects, refers them to its network of *International Associates*. GP Funds has six dedicated sales associates.

## GP Funds Web Site

GP Funds has built a Web site for the MW Funds offerings that highlights significant features of the funds, their investment advisors, and other background information on hedge funds as a general asset class. The Company's marketing group has recently begun to use search engine optimization techniques to position GP Funds' Web site more prominently among Internet surfers seeking hedge fund information or hedge fund investment products. Internationally, GP Funds has also used its Web site to advertise to investors and institutions, as well as to prospective *International Associates* that may represent the MW Funds as distributors.

During the period from inception (March 2002) through December 31, 2002, traffic on GP Funds' Web site averaged 583 weekly visitors. During 2003, traffic on GP Funds' Web site averaged 882 weekly visitors, a significant increase over the prior year statistics. Through the first quarter of 2004, traffic averaged roughly 1,400 weekly visitors.

### *Emerging Markets Debt Group*

## Overview

The Company's Emerging Markets Debt Group offers clients trading strategy and execution relating to the sovereign debt of selected Latin American and Caribbean countries. Clients include U.S. and international commercial banks and thrifts, arbitrageurs, investment partnerships, and hedge fund managers, among others. The Emerging Market Debt Group is composed of a small cadre of individuals, each with over 20 years of experience with emerging markets fixed income products in Central America, South American, and Caribbean countries.

The market for trading Latin American and Caribbean sovereign debt is highly volatile and influenced by economic downturns experienced periodically in countries in the regions over the past few decades. While many securities firms have exited this business in recent years, **GPG**'s predecessor has consistently been able to generate profitable revenue in this area acting as an agent, even with deteriorating currency values.

During late spring 2004, in light of continued high unemployment in selected markets and uncertainty about the tenor of future relations with the U.S., several prospective issuers of sovereign debt in Latin America had difficulty in placing new securities, regardless of the strength of their credit rating. After a roughly nine-month period of price increases in sovereign debt through March 2004, recent price trends for

**Global Partners Group, Inc.**

many issuers have been downward as many buyers have sought more stable yields in U.S Treasuries, among other financial instruments.

**GPG** charges its Emerging Markets Debt Group with developing innovative financing and yield enhancement opportunities for its clients in the area of fixed income products for Latin American and Caribbean sovereign debt. This group's goal is to provide consistent and accurate market and product analysis, thus enabling its clients to implement investment strategies using a range of financial products. In certain situations, this Group may provide advisory services on a fee basis in addition to its trading capabilities.

The Company's Emerging Markets Debt Group derives revenues from commissions or mark-ups included in the price on each buy or sell transaction. The commission schedule for this Group is highly competitive, and based on key factors such as order lot size, bond maturity, bond ratings, service level and the level of difficulty in finding a buyer or seller for the security to be sold.

## Marketing and Sales

While the Company projects rapid growth for its other business lines, its Emerging Markets Debt Group is forecast to grow at a slower pace than its other business units due to this Group's relative maturity. In addition, recent events in several Latin American countries, including Costa Rica, El Salvador, Guatemala, Panama, and the Dominican Republic, may serve to dampen demand for affected sovereign debt during the third quarter of 2004. Notwithstanding the foregoing, it is anticipated that the Company's Emerging Markets Debt Group will benefit from cross-sales opportunities generated by NAIB, EquityStation, and GP Funds. During the foreseeable future, the Group's chief marketing tool is expected to remain the periodic publication and distribution of research reports highlighting investment prospects associated with the debt of selected country issuers. During summer 2004, the Company intends to introduce a Web site promoting its sovereign debt trading business.

## BUSINESS DEVELOPMENT STRATEGY

**GPG** seeks to keep in step with changes in the marketplace by monitoring events closely that affect domestic and worldwide securities markets, providing leadership and on-going training to its personnel, and adopting technological trading solutions that benefit its clients. The Company emphasizes its expertise in selected areas of the securities business to its clients, including trading of U.S. equities and emerging market sovereign debt. In addition to its expertise in these areas, **GPG** looks favorably upon opportunities to leverage its constructive relationships with industry professionals in other securities business segments, as indicated by its recent entry into the hedge fund field.

35

**Global Partners Group, Inc.**

The Company believes its HFICI Program has significant potential to stimulate its trading business through the establishment of new relationships with emerging hedge fund managers. In addition, **GPG** believes its International Associate Program provides an effective and cost efficient means to ensure its future growth in selected international markets, and that its *International Associates* will be well-positioned in the future to sell other Company services and products as they are added.

## COMPETITION

The market for the Company's services is intensely competitive and rapidly evolving. **GPG** competes with other firms in the securities industry that trade equities on behalf of their clients and as principals, that provide direct access online trading, that distribute hedge fund products on a wholesale basis, and that provide trading strategies and execution with respect to sovereign debt of issuers in emerging markets. **GPG** competes based on its personal relationship with clients, utilization of best-in-class technology, unique International Associates Program, trade execution, and pricing.

While many firms offer securities trading and market making services on an agency basis, NAIB believes that its closest competitors are the following firms:

- o   Domestic Securities
- o   GVR Company LLC
- o   Hill Thompson
- o   Knight Trading Group

Although many firms offer direct access online trading, EquityStation believes that its closest competitors are the following firms:

| | |
|---|---|
| o   A.B. Watley, Inc. | o   AmeriTrade |
| o   Andover Trading | o   Carlin Equities |
| o   CyberTrader | o   Equity Trading |
| o   E*Trade Pro | o   FireFly Trading |
| o   Hold Brothers | o   Inter Active Brokers |
| o   MB Trading | o   Shoreline Trading Group |
| o   SpeedTrader | o   Spear, Leeds & Kellogg |
| o   Stock Trade Network | o   Terranova Trading |
| o   TradeStation | o   Trade Wall Street |
| o   TrendTrader | o   Wien Securities |

**Global Partners Group, Inc.**

The Company's wholesale hedge fund distribution business competes against other hedge fund wholesalers that sell funds-of-funds. This group includes the following participants, among others:

- o   Attica Global Sector Fund
- o   Dinvest Total Return
- o   GAM Trading Fund
- o   J.P. Morgan Diversified Holdings
- o   Permal Investment Holdings, N.V.

The Company's Emerging Markets Debt Group considers the following firms to be its chief competitors:

- o   Refco in Miami, Florida
- o   International Bank of Miami, Florida
- o   Prudential Securities' Miami, Florida office
- o   Bear Stearns' Atlanta, Georgia and Boston, Massachusetts offices
- o   Lehman Brothers' Miami, Florida office.

## REGULATION

The Company's broker-dealer subsidiaries are subject to various securities and capital adequacy requirements promulgated by the regulatory and self-regulatory authorities in the United States, as well as other countries in which they operate. Both GPSI and EquityStation are broker-dealers registered with the Securities and Exchange Commission ("SEC") and the National Association of Securities Dealers, Inc. ("NASD"). As U.S. registered broker-dealers, GPSI and Equity Station are subject to the net capital requirements of Rule 15c3-1 under the Securities Exchange Act of 1934. Net capital requirements are influenced by the number of companies in which the respective broker-dealer makes a market, and therefore may fluctuate over time. As such, and based upon the nature of the business of GPSI and EquityStation, at March 31, 2004, they were required to maintain minimum net capital of up to 120% of $350,000 and $100,000, respectively. The broker-dealers are also required to file with the SEC and NASD unaudited focus reports, as well as an audited annual report.

In addition to being registered with the SEC, both GPSI and EquityStation are registered with various state securities commissions. Due to the nature of its business, in which it deals primarily with smaller U.S. and international institutional investors, offshore brokerage firms, and other domestic broker-dealers, GPSI is registered in 19 U.S. states. Because EquityStation deals directly with retail customers, it is registered in all 50 U.S. states.

Persons affiliated with the broker-dealers ("Associated Persons") are required to be licensed by NASD.  Licensure is subject to passing an examination and a background review.  Persons, however, who are deemed "foreign associates," although subject to background reviews, are not required to take an examination provided (i) they live outside of the U.S. and (ii) all of their clients are non-U.S. customers.

The broker-dealers, as well as the Associated Persons, are also subject to examinations and inspections by the SEC and NASD.  Under certain circumstances, the results of such examinations and inspections may give rise to disciplinary proceedings and/or sanctions.  Sanctions may include fines and/or suspension or revocation of the license of the broker-dealer, or persons associated with the broker-dealer.

## EMPLOYEES AND PROPERTIES

At May 31, 2004, **GPG** had 35 full-time employees.  **GPG** considers its relations with its employees to be good.  None of **GPG's** employees are represented by labor unions.  **GPG** leases two offices – its principal office in Ft. Lauderdale, Florida, and a satellite office in New York City.  The Company's Ft. Lauderdale office, which is located at 2101 West Commercial Blvd., is approximately 11,500 square feet, with a monthly rent of roughly $21,500.  This lease terminates in May 2005.  The Company's office in New York City, which is located at 546 Fifth Avenue, is approximately 2,400 square feet, with a monthly rent of roughly $9,000.  This lease terminates in September 2005.

## LEGAL PROCEEDINGS

The Company is subject to litigation in the ordinary course of business.  As is customary of NASD-registered firms, most claims lodged by or against the Company are settled through binding arbitration.  The Company is presently party to two pending actions, has recently appealed an award made by an arbitration panel against it rendered in October 2003, and has entered into a Forbearance Agreement with the Small Business Administration relating to a default under the terms of a Loan Agrement.  Each of these proceedings is described below.

In June 2002, one month prior to the six year statute of limitations, Mary and Richard Schiebel, former brokerage clients of Westfalia, filed a complaint against Westfalia with the NASD alleging churning of their brokerage account during 1996 by the assigned registered representative and lack of supervision by Westfalia.  The plaintiffs in this action, who gave the registered representative discretionary power over their account, which was designated by them as "speculative," are seeking $2.0 million in damages.  The Company believes that the plaintiffs' claims are without merit, and is vigorously defending itself against this action.  The arbitration is in the discovery phase and a hearing date has been set for August 2, 2004.

**Global Partners Group, Inc.**

The Company is a defendant in an action filed in New York State Court in August 2003 by an employment agency, Lori Davis & Associates, in connection with the hiring of a Company employee in April 2003. In the complaint, the plaintiff alleges breach of contract, and seeks $50,000 in damages and other relief. In December 2003, the Company answered the complaint and filed a counterclaim. The case is in the discovery phase and no hearing date has yet been set.

On or about April 2001, D. Paul Cohen, a former employee, initiated a compensation-related action against the Company for alleged underpayment of brokerage commissions amounting to roughly $140,000, excluding attorneys' and court fees. In October 2003, an arbitration panel concluded in favor of Mr. Cohen, and the Company reserved $248,704 for a possible award to Mr. Cohen and related costs. The Company believes that Mr. Cohen's claims are without merit, and has appealed the arbitration panel's decision. In early May 2004, the presiding appellate judge in the case requested that a written transcription of the entire hearing which took place in 2003 be prepared and submitted to him in order for him to evaluate the Company's appeal. As of May 15, 2004, he had not rendered a final decision with regard to the Company's appeal. For GAAP accounting purposes, in October 2003 the Company took a pre-tax charge of $248,704 in connection with the arbitration award, excluding NASA dispute resolution fees of $13,463. However, as of May 31, 2004, the Company had not paid the plaintiff any monies.

The Company is the borrower pursuant to a Loan Agreement with the Small Business Administration ("SBA") in the original amount of $293,900. The loan bears interest at 8% per annum, and matures in December 2004. At March 31, 2004, the Company was in default with respect to one or more provisions of the Loan Agreement. On June 10, 2004, the Company entered into a Forbearance Agreement with the SBA which requires the Company to make principal reduction payments in the amount of $35,000 by June 18, 2004 and $15,000 by July 20, 2004, and to make three consecutive principal and interest payments of $13,741 by July 7, 2004, August 7, 2004, and September 7, 2004 to cure its default under the Agreement. On June 14, 2004, the Company made the first of these payments and was in compliance with the terms of the Forbearance Agreement.

**Global Partners Group, Inc.**

## ORGANIZATION AND MANAGEMENT

### Corporate Management

GPG is led by a strong management team, with over 100 years of collective experience in the securities industry. Members of the Company's management team are profiled below.

*Marcos Konig, Chairman and Chief Executive Officer.* Mr. Konig, who has over 25 years of experience in the financial services industry, has served as Chairman and Chief Executive Officer of **GPG** since the merger. Prior to this, he served as President of NAIB, which he founded in 1987, from its inception until its merger with GPGI. In addition to his role at **GPG**, Mr. Konig serves as President of EquityStation.

Mr. Konig began his career in Financial Services in the late-1970's, acting as Managing Director of Inversiones y Valores in Caracas, Venezuela. Prior to founding NAIB and during its early years, from 1983 to 1991, Mr. Konig served as President of KAES, a multinational Foreign Exchange services company that provided currency exchange risk management services for clients with exposure in Latin American markets. Mr. Konig received his Bachelor of Business Administration degree from Louisiana State University and his Bachelor of Science degree in Textile Engineering from the Philadelphia College of Textiles & Science. He holds the following licenses from NASD: General Securities License #7, General Principal License #24, Registered Options Principal License #4, Financial and Operations Principal License #27, Equity Trading License #55, and Uniform State Securities License #63.

*Peter Rajsingh, Senior Vice President.* Mr. Rajsingh joined **GPG** as Senior Vice President in March 2004. In this capacity, he directs business development in the areas of Capital Introduction and Hedge Fund Incubation, and works in asset management activities with a particular focus on manager selection and fund allocations for institutions. Prior to joining **GPG**, from 2002 to 2003, Mr. Rajsingh was Managing Director at Apache Capital Management, a fixed income hedge fund based in New York City. From 1999 to 2001, he was employed by Morgan Stanley in New York City. In addition to his duties at **GPG**, Mr. Rajsingh serves an adjunct professor at Reims Business School in Champagne, France, where he has taught since 1996, and at New York University, where he has taught since 1991 at the Stern School and in the College of Arts and Sciences. He holds a Ph.D. degree from City University of New York and a B.A. degree with honors from the University of Auckland, New Zealand.

*Salomon Konig, Senior Advisor.* Mr. Konig has served as Senior Advisor at **GPG** since 2002. In addition, Mr. Konig serves as President of GP Funds, Inc. Prior to these positions, he was a private investor and Senior Advisor to NAIB from 1997 to 2002. Mr.

**Global Partners Group, Inc.**

Konig, who began his professional career in the mid-1970's in Caracas, Venezuela as an entrepreneur in the real estate, hospitality, and information technologies industries, has been a private investor since 1977, when he started a family fund at the Merrill Lynch office in Caracas, Venezuela trading options. In addition to his role at **GPG**, Mr. Konig is a member of the Board of Directors of the Hedge Fund Association, an international not-for-profit association of hedge fund managers, service providers, and investors.

From 1977 to 1994, Mr. Konig traded securities privately or as the principal of several investment funds. Beginning in 1979, Mr. Konig's trading strategies resulted in trading partnerships with a series of well-known securities industry professionals. These trading partnerships traded foreign exchange, government securities, and commodities, among other financial products. During this same period, Mr. Konig became a distributor and advisor to several hedge funds. Mr. Konig received a Bachelor of Science degree in Textile Engineering from the Philadelphia College of Textiles & Science. In addition, he attended the Universidad Simon Bolivar in Caracas, Venezuela, where he studied mathematics in the graduate school.

*__Harry Konig, Senior Vice President of Business Development.__* Mr. Konig has served as Senior Vice President of Business Development at **GPG** since the merger. In addition to this position, he serves as Managing Director of EquityStation, Inc., where he oversees domestic and international sales, marketing, customer service and operations. Mr. Konig joined NAIB as Vice President of International Business Development in 1998, and co-founded EquityStation the following year. From 1994 to 1998, Mr. Konig was the Executive Vice President of a Foreign Exchange Trading company specializing in Latin-American currencies. Prior to 1994, Mr. Konig traded precious metals, commodities, exotic currencies, and ADR's for several family-owned firms from 1983 to 1994. Mr. Konig received a Bachelor of Science degree in Business Administration from Philadelphia University, previously known as the Philadelphia College of Textiles & Science. Mr. Konig holds the following licenses from NASD: General Securities License #7 and General Principal License #24.

*__Tom Chapman, Senior Vice President of Marketing.__* Prior to joining **GPG** as Senior Vice President in December 2002, Mr. Chapman served as President and CEO of Net Content Creations, Inc. ("NCC") from 1995 to 2002. NCC successfully developed and launched more than 250 Web sites with relational databases and sophisticated applications. In addition to his role at **GPG**, Mr. Chapman serves as President and CEO of VeriSecure Systems, Inc., which provides cryptographic verification systems for important documents.

Prior to founding NCC, Mr. Chapman was founder, President and CEO Medical Audit Services, Inc. ("MAS") from 1981 to 1994. MAS provided managed health care-related services to a variety of insurance companies, third party administrators, and self-insured employers. In 1989 MAS was acquired by Kemper National Insurance Companies, which changed MAS's name to Kemper National Services, Inc.

**Global Partners Group, Inc.**

Contemporaneous with the early years of operating MAS, Mr. Chapman served as President and CEO of The Corporate Interviewing Network, Inc., a professional employment interviewing service, and Bay Leaf Builders, a general contractor. Mr. Chapman received his Bachelor of Business Administration degree with honors from Nova Southeastern University, where he is presently a candidate in the Master of Business Administration degree program.

*Kathryn Sealey, Controller.* Ms. Sealey has served as Financial and Operations Principal and Controller of **GPG** since the merger. Prior to this, she was Financial and Operations Principal of NAIB from 1992 to 2002, and Controller of NAIB from February 2001 to September 2002. Ms. Sealey has over 26 years experience in the financial services area, 15 of which are in the securities industry. Ms. Sealey began her career in Financial Services in 1976 at Royal Bank of Trinidad and Tobago as a bank clerk, progressing through financial positions of increasing responsibility. Ms. Sealey holds the following licenses from the NASD: General Securities License #7 and General Securities Financial and Operations Principal License #27.

**Board of Directors**

Directors are elected at the Company's annual meeting of shareholders and serve a term of one year or until their successors are elected or qualified. The Company presently has three Directors, Marcos Konig, Harry Konig, and Merrill Ring, each of whom was elected in June 2004. The Company recently began interviewing candidates to fill two vacant Board seats.

**Non-Executive Director**

*Merrill Ring, Director.* Merrill Ring is the President and Chief Executive Officer of Ring McAfee & Co. Inc. ("RMC"), an investment banking firm headquartered in New York City whose principal activities focus on management consulting, project finance, public finance, and investment advisory services. Prior to co-founding RMC in 1991, Mr. Ring was Executive Vice President of New York-based Private Capital Partners, Inc. ("PCPI"), a private equity firm specializing in commercial banking and real estate. Mr. Ring joined PCPI in 1986 after 22 years at Bank of America in San Francisco, where he was Senior Vice President and Executive Director of the Public Finance Department as well as a Director of the Bank's Capital Markets Group.

Mr. Ring currently serves as a Director of R.W. Beck, Inc., a consulting engineering firm based in Seattle, Washington, and Alchemix Corp., a technology development firm based in Phoenix, Arizona, where he is also Chairman of the Executive Committee. Mr. Ring holds a B.A. degree from Columbia College, and M.A. and Ph.D. degrees from Columbia University. Before entering finance, Mr. Ring was a Senior Editor of the Random House Dictionary of the English Language.

**Global Partners Group, Inc.**

## Employment Agreements

Contemporaneous with the closing of the Offering described herein, **GPG** intends to enter into employment agreements with each of Messrs. Marcos, Harry, and Salomon Konig. Such agreements are anticipated to provide for annual cash compensation of $145,000 plus bonuses commencing sixty days after closing of the Offering. The Company would be pleased to describe the terms of each of these employment agreements with interested parties.

**Global Partners Group, Inc.**

## SECURITY OWNERSHIP TABLE

The following table sets forth certain information concerning the beneficial ownership of **GPG** Common Stock as of May 31, 2004 (i) prior to the Offering, and (ii) on an adjusted basis, assuming the completion of the Maximum and Minimum Offering, respectively. **(Please note that the following table excludes Common Stock equivalents of Convertible VRPP Stock issued in June 2004.  See the section herein labeled "DESCRIPTION OF SECURITIES.")**  Shares of Preferred Stock are convertible into shares of Common Stock at a conversion rate of 1.0 share of Common Stock for each share of Preferred Stock.  The table assumes that each of the shareholders listed below possesses sole voting and investment power with respect to its shares, subject to community property laws where applicable.

### Outstanding Common Shares and Share Equivalents

| Name of Beneficial Owner | # of Shares Prior to Offering[34] | % Ownership Prior to Offering | # of Shares After Maximum Offering[35] | % Ownership After Maximum Offering | # of Shares After Minimum Offering[36] | % Ownership After Minimum Offering |
|---|---|---|---|---|---|---|
| Marcos Konig[37] | 379,922 | 20.9% | 379,922 | 15.7% | 379,922 | 18.8% |
| Salomon Konig[38] | 379,922 | 20.9% | 379,922 | 15.7% | 379,922 | 18.8% |
| Harry Konig[39] | 379,922 | 20.9% | 379,922 | 15.7% | 379,922 | 18.8% |
| Westfalia S.A.[40] | 490,000 | 26.9% | 490,000 | 20.2% | 490,000 | 24.2% |
| Andora Investments L.P. | 33,333 | 1.8% | 33,333 | 1.4% | 33,333 | 1.6% |
| Croft Investments L.P. | 16,667 | 0.9% | 16,667 | 0.7% | 16,667 | 0.8% |
| Scott J. Saunders | 13,333 | 0.7% | 13,333 | 0.6% | 13,333 | 0.7% |
| Gustavo Hernandez | 10,000 | 0.5% | 10,000 | 0.4% | 10,000 | 0.5% |
| Moris Beracha | 10,000 | 0.5% | 10,000 | 0.4% | 10,000 | 0.5% |
| Don Kurz | 33,333 | 1.8% | 33,333 | 1.4% | 33,333 | 1.6% |
| Management[41] | 75,000 | 4.1% | 75,000 | 3.1% | 50,000 | 3.7% |
| New Investors | -- | -- | 600,000 | 24.8% | 200,000 | 9.9% |
| **Total** | **1,821,432** | **100.0%** | **2,421,432** | **100.0%** | **2,021,432** | **100.0%** |

---

[34] Contemporaneous with the closing of this private placement, the Company will put in place a stock option plan for management, including Marcos, Salomon, and Harry Konig.  These stock options will vest ratably over a period of 4 years for each member of management.
[35] Assumes conversion of 100% of the Preferred Stock into common stock.
[36] Assumes conversion of 100% of the Preferred Stock into common stock.
[37] Includes options to acquire 30,000 shares of the Company's common stock.
[38] Includes options to acquire 30,000 shares of the Company's common stock.
[39] Includes options to acquire 30,000 shares of the Company's common stock.
[40] Westfalia, S.A. is an investment firm owned by Moris Beracha, Gustavo Hernandez, and Antonio DeVita.
[41] Includes options to acquire 75,000 shares of the Company's common stock.

**Global Partners Group, Inc.**

## DESCRIPTION OF SECURITIES

Pursuant to this Offering, the Company intends to sell between 200,000 shares and 600,000 shares of 7.0% Cumulative Convertible Redeemable Preferred Stock (the "Preferred Stock") at a price of $5.00 per share (the "Offering").

**Common Stock**

The Company has 3,500,000 authorized shares of Common Stock, par value $0.001 per share, of which 1,656,432 shares were issued and outstanding at May 31, 2004. After giving effect to the conversion of 100.0% of the shares of Convertible Variable Rate Participating Preferred Stock (the "Convertible VRPP Stock") described below into Common Stock, the Company would have 1,745,321 shares of Common Stock outstanding at May 31, 2004, prior to the sale of Preferred Stock in connection with the Offering, and the conversion of such Preferred Stock into Common Stock.

Each outstanding share of Common Stock is entitled to one vote, either in person or by proxy, in all matters that can be voted upon thereof at meetings of shareholders. The holders of the Company's Common Stock (i) have equal ratable rights to dividends from funds legally available therefore when, and if declared by the Company's board of directors; (ii) are entitled to share ratably in all of the Company's assets available for distribution to holders of Common Stock upon the Company's liquidation, dissolution or winding up of the Company's affairs; (iii) do not have preemptive, subscription or conversion rights, or redemption or sinking fund provisions applicable thereto; and (iv) are entitled to one non-cumulative vote per share in all matters on which shareholders may vote at all meetings of shareholders. All shares of Common Stock into which the Preferred Stock issued pursuant to this Offering may be converted, when issued, will be legally issued, fully paid and non-assessable. The holders of shares of the Company's Common Stock do not have cumulative voting rights, which means that the holders of more than 50% of such outstanding shares can elect all of the Company's directors if they so choose and, in such event, the holders of the remaining shares will not be able to elect any of the directors.

**Preferred Stock**

The Company has 500,000 shares of authorized preferred stock, par value $.001 per share. The Company's Articles of Incorporation authorize the Company's Board of Directors to establish series of preferred stock and to determine, with respect to any series of preferred stock, the voting powers such as full, limited or no voting powers, and such designations, preferences and relative, participating, optional or other special rights and such qualifications, limitations or restrictions thereof, as are stated in the resolution of the Board providing for such series.

**Global Partners Group, Inc.**

On June 17, 2004, the Company entered into an agreement with a private investor to issue 80,000 shares of Convertible VRPP Stock to the investor at a price of $5.00 per share. Pursuant this agreement, the Company received $400,000 from the investor on June 24, 2004.

The Convertible VRPP Stock gives the investor certain rights with respect to dividends, redemption, and convertibility into Common Stock, among other features. The terms of the Convertible VRPP Stock call for monthly dividends to the investor, subject to year-end recalculation, based on a formula relating to the principal trading volume of GPSI's NAIB division. The Convertible VRPP Stock carries a minimum dividend payment of 10.0% per annum and may be redeemed by the Company at any time. The maximum dividend rate is 94.7% per annum. If redeemed by the Company prior to the second anniversary date of its issuance, the Convertible VRPP Stock calls for a pre-payment penalty resulting in the investor receiving a minimum dividend of 20.0% per annum. Following the one year anniversary date of the issuance of the Convertible VRPP Stock, the investor may put the Convertible VRPP Stock back to the Company at par value at any time, subject to providing the Company with six months' notice, and subject to put window restrictions every three months unless the Company has not paid the investor dividends for any period of three consecutive months.

Each outstanding share of Convertible VRPP Stock is convertible into one share of Common Stock at a 10.0% discount to the price of the of Common Stock or Common Stock equivalent in the event that the Company raises capital through the issuance of Common Stock or convertible Preferred Stock to outside investors in an amount exceeding $1,000,000 within any three month period while the Convertible VRPP Stock is outstanding, or $5.00 per share, whichever is less. The Convertible VRPP Stock does not carry any voting rights.

**Anti-Takeover Provisions of Florida Law**

As a Florida corporation, the Company is subject to the anti-takeover provisions of Section 607.0901 of the Florida Business Corporation Act (the "Affiliated Transactions Statute"). In general, the Affiliated Transaction Statute requires the approval of the holders of two-thirds of the voting shares of a corporation, other than shares owned by an "interested shareholder," in order to effect an "affiliated transaction," such as a merger, sale of assets, or sale of shares, between a corporation and an interested shareholder. An "interested shareholder" is defined as a beneficial owner of 10% or more of the outstanding voting securities of the corporation. Such approval is not required where: (i) the affiliated transaction is approved by a majority of the disinterested directors; (ii) the interested shareholder owns 90% or more of the corporation's outstanding voting stock, or has owned 80% or more for five years; or (iii) the consideration paid in connection with the affiliated transaction satisfies the statutory "fair price" formula and the transaction meets certain other requirements. A corporation may elect, by the vote of a majority of the outstanding

**Global Partners Group, Inc.**

voting securities of the corporation (not including shares held by an interested shareholder), or by amendment to the articles or by-laws of the corporation, not to be subject to the provisions of the Affiliated Transaction Statute. The election will not be effective until 18 months after it is made, and will not apply to any affiliated transaction between the corporation and someone who was an interested shareholder prior to the effective date of the election. The Company may also be subject to the provisions of Section 607.0902 of the Florida Business Corporation Act (the "Control-Share Acquisitions Statute"). Under such statute, "control shares" of certain corporations acquired in a "control share acquisition," with certain exceptions, have no voting rights unless such rights are granted pursuant to a vote of the holders of a majority of the corporation's voting securities (excluding all "interested shares"). "Control shares" are shares that, when added to all other shares which a person owns or has the power to vote, would give that person any of the following grants of voting power: (i) one-fifth or more but less than one-third of the voting power; (ii) one-third or more but less than a majority of the voting power; and (iii) more than a majority of the voting power. A "control share acquisition" is the acquisition of ownership of, or the power to vote, outstanding control shares. Shares acquired within 90 days, or as part of a plan to effect a control share acquisition, are deemed to have been acquired in the same transaction. "Interested shares" include shares held by the person attempting to effect the control share acquisition, and shares held by employee-directors or officers of the corporation. A corporation may elect not to be subject to the Affiliated Transactions Statute and/or Control Share Acquisition Statute by amendment to its articles or by-laws. The Company has not adopted any such amendment, and therefore is subject to the Affiliate Transactions Statute and the Control Share Acquisition Statute.

**Indemnification**

The Florida Business Corporation Act permits a corporation to indemnify any person who was, or is a party to any proceeding by reason of the fact that he is or was a director, officer, employee or agent of the corporation, against liability incurred in connection with such proceeding if he acted in good faith and in a manner he reasonably believed to be in, or not opposed to the best interests of the corporation and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. In the case of proceedings instituted by or on behalf of the corporation against such person, indemnification may be granted for expenses of litigation, but in no event shall indemnification be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable unless and only to the extent that the court in which such proceeding was brought or any other court of competent jurisdiction shall determine upon application that, despite the adjudication of liability, and in view of all circumstances of the case, such person is fairly and reasonably entitled to indemnification for such expenses which the court shall deem proper. Notwithstanding the above, no director shall be personally liable for monetary damages to the corporation or any other person for any statement, vote, decision or failure to act, regarding corporate management

47

**Global Partners Group, Inc.**

or policy unless (1) the director breached or failed to perform his duties as a director, and (2) the breach or failure to perform constitutes (i) a violation of criminal law, unless such director had reasonable cause to believe his conduct was lawful or had no reasonable cause to believe his conduct was unlawful, (ii) a transaction from which the director derived an improper personal benefit, either directly or indirectly, (iii) a circumstance under which a director approves an unlawful distribution to its shareholders, (iv) in a proceeding by, or on behalf of the corporation to procure a judgment in its favor or on behalf of a shareholder for the conscious disregard for the best interests of the corporation or willful misconduct; or (v) in a proceeding by, or on behalf of someone other than the corporation or a shareholder for recklessness or an act of omission which was committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety or property.

The Company's By-Laws permit it to indemnify its directors and officers to the fullest extent permitted by Florida law.  Insofar as indemnification for liabilities arising under the Securities Act of 1933, as amended, may be permitted to the Company's directors, officers and controlling persons, the Company has been informed that in the opinion of the SEC, such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable.

**Global Partners Group, Inc.**

## INVESTOR SUITABILITY

The Preferred Stock will be offered only to "accredited investors," as that term is defined under Rule 501(a) of Regulation D under the Securities Act. Prior to purchasing Preferred Stock in this Offering, each Investor will be required to represent that, among other things, the Investor has reviewed this Confidential Private Placement Memorandum and that he has had an opportunity to ask questions of and receive answers from the representatives of **GPG** with respect to this Offering. Each Investor will be required further to represent that he is an accredited investor and has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Preferred Stock in **GPG**, including a complete loss of the investment.

Each Investor will agree that he may not sell or otherwise transfer his Preferred Stock, or Common Stock of **GPG** upon conversion of his Preferred Stock, unless such sale or other transfer is registered under the Securities Act and applicable state securities laws or unless the sale or other transfer is exempt from the registration requirements under the Securities Act and such other state securities laws. Each Investor will also agree that **GPG** may require the Investor to furnish an opinion of counsel satisfactory to **GPG** that any such sale or transfer is so exempt. Each Investor must also represent that he is acquiring the Preferred Stock only for his own account for investment and not with a view toward distribution within the meaning of the Securities Act. Certificates representing the Preferred Stock will bear a legend relating to such restrictions on transfer. Because each Investor will be subject to these restrictions on the sale, transfer or disposition of his Preferred Stock, and the Common Stock to be issued upon conversion of the Preferred Stock, and because there is no public market for the Preferred Stock or Common Stock of **GPG**, a purchaser of the Preferred Stock must be prepared to bear the economic risk of his investment in **GPG** for an indefinite period of time.

**GPG** may, in its discretion, reject an offer by any prospective Investor to purchase the Preferred Stock or limit the number of shares of Preferred Stock to be purchased by any Investor. **GPG** reserves the right to amend, modify and/or withdraw all or a portion of the Offering. The minimum aggregate value of an investment in the Preferred Stock through the Offering is $50,000.

All purchases of the Preferred Stock must be made by the execution and delivery of a Preferred Stock Purchase Agreement in the form attached to this Confidential Private Placement Memorandum. By executing the Preferred Stock Purchase Agreement, each purchaser will represent, among other things, that (a) he is acquiring the Preferred Stock being purchased by him for his own account, for investment purposes and not with a view towards resale or distribution, and (b) immediately prior to his purchase, such purchaser satisfies the eligibility requirements set forth in this Confidential Private Placement

**Global Partners Group, Inc.**

Memorandum.   Notwithstanding the foregoing representations, **GPG** has the right to revoke the offer made herein and to refuse to sell the Preferred Stock to a particular Investor if the Investor does not promptly supply all information requested by **GPG** or **GPG**, in its sole discretion, disapproves the sale.

Offers to purchase the Preferred Stock are not binding on **GPG** until accepted by **GPG**.  In order to purchase Preferred Stock, a prospective Investor must deliver the following documents to **GPG**:

1.     One executed copy of the Preferred Stock Purchase Agreement and Investor Questionnaire (included with this Confidential Private Placement Memorandum), and

2.     A check payable to "HSBC Bank USA" as Escrow Agent for Global Partners Group, Inc." in the full amount of the subscription.

**Global Partners Group, Inc.**

---

## APPENDIX A

### Selected Industry Articles

# Business Week®

SEPTEMBER 30, 2003

http://www.businessweek.com/technology/content/sep2003/tc20030930_4253_tc131.htm

# SPECIAL REPORT: THE TECHNOLOGY OF FINANCE

### The Street's Slickest Number-Crunchers - "Quants" use ever-more complex algorithms to execute arcane trading strategies, a good approach during times of market turmoil

Only a few years ago, using a computer program to pick stocks was the ultimate in investing sophistication. Any portfolio manager who used a stock screen to, say, identify large-cap companies with low price-earnings ratios could justifiably claim to be a "quant" -- shorthand for investors who use quantitative research and trading strategies.

Now that most professional investors use a stock screen to narrow their choices, being a true quant means a lot more. It requires using computer models based on complex algorithms to implement arcane trading strategies that typically require a PhD to understand.

And it may mean taking humans out of the stock-buying decision altogether, as John Montgomery, founder of Houston-based Bridgeway Funds, has done with his mutual-fund company. "There are a dozen different ways emotion gets in the way and systematically causes people to make the wrong decision at just the wrong time," says Montgomery, who calls his company "a pure quant shop."

**"SOMETHING OF A FAD."**  Quantitative strategies have proliferated recently, thanks to the fact that they were about the only thing that worked during the three-year bear market that ended last March. "If you're on an uphill growth path, similar to the heyday of the dot-com era, fundamental analysis always wins out," says Sang Lee, manager of the securities and investments group at Celent Communications, a Boston-based financial services technology research firm. "Quant shops do better when markets are flat or unstable."

Today, more than 300 investment firms use quantitative research or trading techniques (up from fewer than 100 some 15 years ago), estimates Lee in a September report that reviews developments in quantitative research and trading. Those firms

have more than $4 trillion in assets under management, or about 17% of the U.S. market. Lee expects quantitative research and trading activity to grow an additional 40% in the next three to four years, even though his report calls this trend "something of a fad."

The quant world breaks down roughly into two camps for which quantitative trading has both strengths and drawbacks. In one camp are the portfolio managers who use computer models to pick stocks and other investments to buy. These models are mostly used by mutual-fund families like Bridgway, ICON, or Hennessy, and their models range widely in complexity and success.

**FAST-CHANGE ARTISTS.**  The biggest problem with quant strategies in managing mutual funds is that the best ones don't last long: Models that work in one market environment tend to fail in the next. To run a quant fund "requires constant reconsideration of the model," says Jeffrey Ptak, an analyst at fund research firm Morningstar.

The most successful quant mutual funds today are those that have several models working in conjunction with each other, known as "multivariant" or "multifactor" funds. The idea is that they can switch quickly between sectors and investment styles to take advantage of a shifting market.

Montgomery uses five models in Bridgeway Aggressive Investor (BRAGX ), which has a stunning 27% five-year average annual return. The different models (one finds stocks with strong momentum, another identifies stocks that are cheap) are designed to offset each other, which should reduce volatility in the fund. "If each model is doing its part," says Montgomery, "when there's one style in favor that model should be kicking in and something else lagging."

*- Continued*

# Business Week

SEPTEMBER 30, 2003
http://www.businessweek.com/technology/content/sep2003/tc20030930_4253_tc131.htm

**TINY INEFFICIENCIES.** The other main quant camp is in the hedge-fund world, where selling stocks short (a way to bet that their price will fall), piling on complex derivatives, and borrowing lots of money (so you can put more cash behind each bet and therefore magnify returns) are permitted. (Federal regulations prohibit ordinary mutual funds from engaging in such risky strategies, but hedge funds, which only wealthy people have enough money to participate in, are almost entirely unregulated.)

"Quant methods is where a lot of the sophistication in investing is going," says Salomon Konig, president of GP Funds, which distributes hedge funds made up of other hedge funds (known as "funds of funds").

Quantitative hedge funds typically use esoteric trading strategies, often employing derivatives, options, and futures to achieve returns that are entirely divorced from stock market returns. Many of the strategies are designed to take advantage of tiny inefficiencies in the market. A hedge-fund manager might design an arbitrage play to take advantage of a slight, temporary difference in price between a stock index and the underlying securities that make up the index.

**NEVER-ENDING SEARCH.** Some of these hedge funds have been wildly successful, including those run by Jim Simons of Rennaissance Technologies, who manages the Medallian Fund, and Steve Cohan, of SAC Capital Advisors (see BW Cover Story, 7/21/03, "The Most Powerful Trader on Wall Street You've Never Heard Of"). But when the use of leverage to magnify returns goes wrong, as it did in the famed case of Long Term Capital Management in 1998, the losses can be disastrous.

Another foible of quantitative hedge funds is that once traders discover an inefficiency in the market to exploit, their own trading activity eventually eliminates the opportunity. "Many of the market imperfections can only be revealed by computers and quantitative methods," explains Konig. "Once some of those imperfections are taken out of the market, you need more quantitative methods and more automated tools to get at arbitrage opportunities."

Despite their complexity and apparent sophistication, most quantitative strategies probably don't add much value for investors. Nassim Nicholas Taleb is an experienced options trader, hedge-fund manager, math professor -- and author of the book Fooled by Randomness. He believes that all successful investors, including Warren Buffett, are mainly just lucky.

Nonetheless, a case can be made that taking emotion out of the investing process can help boost returns and reduce risk. "I can't tell you how big a deal I think that is," says Montgomery. Of course, if you produced returns like his, you might feel the same way.

# Hispanic**Business**®

## Hedging Its Bets - October 2003, Hispanic Business Magazine

Derek Reveron

Global Partners Group (GPG), an investment management company based in Fort Lauderdale, Florida, is a rarity in the finance industry. GPG is a Hispanic-owned firm that seeks to develop hedge fund managers and connect them with institutions that provide seed capital to launch new funds.

"It's like a matchmaking service," says chairman and CEO Marcos Konig, a native of Venezuela. "We take people who have talent in trading, give them the tools and infrastructure they need to develop, and match them with the appropriate hedge fund capital providers."

GPG has offered a range of financial products and services to institutional and private investors since Mr. Konig founded the company as North American Institutional Brokers in 1987. He and his two brothers, senior advisor Salomon and senior vice-president Harry, together own 51 percent of GPG. The firm has 31 employees in the United States and 25 representatives in 14 countries, mostly in Latin America.

GPG posted revenue of $8.5 million in 2000, during the height of the bull stock market. That same year, the company acquired New Jersey-based Westfalia Investments in return for 49 percent of GPG. As the market fizzled, GPG's revenue dropped to $4.6 million in 2001 and $4.2 million in 2002.

Looking to profit from the growing popularity of hedge funds, last year GPG launched efforts to develop or train hedge fund managers. The company recruits individual traders who manage their own portfolios of at least $250,000. GPG provides research, administrative assistance, and technology to make trades. The firm tracks and evaluates portfolio returns and strategies. Top performers will get seed capital from GPG and its financial partners to create boutique hedge funds.

Hedge funds are controversial and high-risk investments. Like mutual funds, hedge funds consist of pools of money from investors. But hedge funds can make a much wider variety of moves. They can take long or short positions (betting values will rise or fall). They can trade stocks, options, bonds, derivatives, currencies, and commodities. And they can use arbitrage and buy and sell undervalued securities. Many funds hedge against downturns in the market, but there are dozens of investment strategies, and they can vary greatly.

Hedge funds are a mystery to most people, including most Hispanics, who tend to have fewer investments in stocks and mutual funds than the general population, according to polls and financial experts (see the Hispanic Asset Portfolio report on page 14 of this issue).

"Hispanics are 10 steps behind in understanding what investments are in general, so it will take a while for them to understand hedge funds and invest in them," Mr. Konig says.

For the most part, Hispanics have not been among the higher-income individuals who have traditionally invested in hedge funds. But that could change. Hedge funds have become more popular during the stock market downturn of the last few years. Institutions are starting to market hedge fund investments to small investors for as little as $500.

There are more than 6,000 hedge funds in the United States, and the assets they manage have doubled over the last five years to $665 billion, according to Chicago-based Hedge Fund Research. Analysts predict that figure could reach $2 trillion by 2010.

Because of that growth, the demand for fund managers threatens to exceed supply. More than $7.5 billion in hedge fund seed capital is in need of managers, according to InvestHedge, an industry publication. Analysts point to the need for hedge fund "intermediaries" like GPG because there are no industry standards for training and evaluating hedge fund managers, and poorly trained managers can threaten fund performance.

"Increasing asset flows into hedge funds and growing institutional interest are putting pressure on industry participants to continue to deliver on the true promise of this asset class," states the investment consulting group Hawthorn, a unit of PNC Financial Services Group.

*Continued*

# Hispanic&Business®

The Konig brothers hope to build their hedge fund business by helping institutional investors expand and improve their hedge fund operations, and by teaming up with hedge fund seed capital providers to invest in the creation of funds run by managers provided by GPG. So far, the company has agreements with four financial institutions, including the global banking group ABN AMRO, to groom hedge fund managers, Mr. Konig says.

GPG has not debuted or hired any hedge fund managers yet but expects to do so soon.

The company is evaluating three traders as potential overseers. "Some of them look good and have sound strategies. One has had very good months but some bad months," Mr. Konig says. It can take several months to a few years to produce a hedge fund manager, he adds. GPG is recruiting more candidates.

Developing hedge fund managers is a low-overhead proposition for GPG. The company doesn't pay the traders, who use GPG's electronic trading system at a cost of up to 1.25 cents per order. "It's a win-win situation. We get access to traders that trade frequently and generate revenue. And they can get capital they wouldn't ordinarily have," Mr. Konig explains.

GPG targets independent traders with their own portfolios largely because it's less expensive and time-consuming than recruiting traders and money managers who work for financial institutions. Also, the industry will need entrepreneurial traders to help fill the need for managers.

Companies like GPG can develop hedge fund traders with pretty much a free hand because the industry lacks consistent standards for grooming managers, analysts say. However, GPG evaluates potential managers according to its own criteria for measuring financial returns and investment strategies, Mr. Konig says.

"We have many indicators that show whether a person is successful or not. A trader must sustain an amount of money over a specific period of time and grow it," he says.

If anyone can judge trading talent, Mr. Konig emphasizes, it's him and his brothers. Before launching GPG, Mr. Konig was managing director of an investment firm in Caracas and president of a U.S. company that provides currency exchange risk management services. Salomon Konig previously traded securities for investment companies and advised several hedge funds. Harry Konig traded currencies, commodities, and

precious metals for several companies.

The Konig brothers are working to create hedge fund managers amid growing controversy about the industry's practices. The Securities and Exchange Commission began investigating hedge funds early last year after the number of fraud cases increased to 12 in 2002 from two in 1999.

In a recent high-profile case, the SEC alleged that South Florida-based Lancer Management Group defrauded investors with false performance and net asset figures. A Florida judge froze the assets of the company, which once claimed to have $1 billion under management.

One problem is that there are few barriers to starting and operating hedge funds. Registration with the SEC is not required, and the funds are not subject to many of the federal and state laws that require other investments to disclose information.

Hedge fund managers are notoriously secretive about their strategies. Returns have dropped recently, and many institutional investors that lost millions have directed their anger at managers who refuse to explain how it happened. The SEC also has expressed concerns about the trend to sell hedge funds

to small investors and is considering proposing new rules and laws to regulate the industry.

But that shouldn't hurt the business of firms like GPG, Mr. Konig says. Hedge funds will inevitably grow, become a more common investment, and require more managers created by firms like GPG, he says.



*Desperately seeking hedge funds managers*

# Firm bridges gap between talent, money

November 2003 - Active Trader Magazine

A few years ago, hedge funds were the domain of the ultra-wealthy. Managers, such as Julian Robertson, were often brilliant stock-pickers who relied on fundamental approaches to deliver huge gains to their investors (and themselves).

The hedge fund world has changed significantly since then. While hedge funds have become more accessible and available, many traders have taken the extra step and started their own hedge funds.

According to Bigdough.com, a financial information web site, hedge funds manage almost $500 billion in U.S. assets. That's twice the amount of five years ago. And, many high-profile mutual fund managers have left their jobs to start their own hedge funds. For that group, the payoffs are better and the 14-hour days are no longer necessary.

The increase in interest among traders has also piqued the interest of financial services firms and wealthy individuals, who are interested in providing some or all of the money for a hedge fund but don't have the experience or ability to run it. However, this has led to a problem.

"Right now, we have too much money out there and not enough qualified managers," says Chuck Provini, senior

vice president of Global Partners Group, a financial services company.

To that end, Provini and his partners in GPG have created the Capital Introduction and Emerging Managers Program. The program is designed to seek out those who have the necessary skills to run a hedge fund and provide them with additional capital and enhanced support. GPG thinks experienced active traders could meet its qualifications.

"Traders are one of our primary sources," Provini says. "In most cases, they already understand the principles behind risk management and other concepts necessary to be successful at running a hedge fund."

Provini says that traders - particularly those who are using direct-access software - have been effectively running a "mini hedge fund," because they have the ability to electronically access various liquidity pools and are adept at executing various strategies.

GPG also gets potential clients from proprietary traders, money managers, brokers, financial analysts and mutual fund managers. Once a prospect is chosen, an evaluation process is used to determine if he or she is ready for the next step.

"We evaluate several things," Provini says. "We'll look at how consistent their profits have been during their trading career, and we are especially interested in how big their drawdowns get and how often they occur. How much risk they are willing to take, and how they handle it, is very important to us."

Provini says that when the program first started, GPG had to do all the recruiting. Now, as the program has gained some publicity, prospective managers are making themselves known to the firm.

However, that has created a small problem for GPG. The firm has had inquiries from many traders who have "theoretical" returns. GPG will not consider candidates unless they have actual, verifiable trading experience and are already putting their own money at risk.

"We are looking for people who have consistently produced winning returns," Provini says.

If the candidate makes it through the selection process and is chosen to be a hedge fund manager, GPG provides that person with access to additional capital. GPG has connections to intermediary banks, family trusts, endowment offices, fund of fund companies and other corporations. One firm GPG is working

*Continued*

# *ACTIVE* Trader

closely with is Jack Schwager's Market Wizards fund of funds.

The amount of capital provided to a new hedge fund manager is determined partly by how much money the manager has to begin with. Some lower-level managers who are already trading $100,000 of their own money will be given access to a few hundred thousand more, while managers who enter the program with assets in the neighborhood of $1 million can get access to several hundred thousand more.

Of course, there is a trade-off. Since hedge fund managers earn a fee based on a percentage of the total assets they have under management, and additional fees for fund performance, GPG gets a percentage of the fees earned by the manager - anywhere from 20 percent to 60 percent.

Typically, the riskier the strategy of the manager and the greater the potential for drawdown, the greater chunk GPG is going to take.

Besides capital, GPG also gives managers availability to prime brokerage services, performance evaluation services, advanced execution platforms and personal support.

The structure of the Emerging Managers Program is similar to that of a proprietary trading firm - traders get access to additional capital while the providing firm gets a percentage of profits. However, there are important differences - most notably, hedge fund managers are completely in control of their trading decisions, while proprietary traders are sometimes restricted by the trading firm.

Also, proprietary traders are often required to be licensed, while hedge fund managers have no such restrictions. And, while proprietary traders have access to a large capital pool, their earnings are based on the amount they actually trade. A fund manager's fee is based on all capital under management, regardless of how much of the manager's money is actually at risk.

For more information on forming hedge funds, see The Business of Trading, p.84.



**ASIA TIMES** *Online*

## South Asia
# India trims hedge funds

By Indrajit Basu

KOLKATA - The much-hyped controversy over hedge funds investing in Indian stock markets through participatory notes may be over. India's market regulatory authority, the Securities and Exchange Board of India (SEBI), has announced that with effect from February 3, overseas derivative instruments such as participatory notes against underlying Indian shares can be issued only to regulated entities - investors who are registered in India or their country of origin. Hedge funds, therefore, which are almost always unregulated investors the world over, cannot invest in India after February 3, because participatory notes (PN) are the only instruments available to them for investing here.

In order to plug the nearly US$1.5 billion of hedge fund money already invested in the markets from flowing out in a hurry, thereby leaving Indian stock markets in a lurch, SEBI has tried to soften the blow a bit by allowing existing PNs to expire gradually. "Derivative instruments already issued and outstanding against unregulated entities need not be terminated immediately," said SEBI, adding: "These contracts will be permitted to expire on maturity, or within a period of five years, whichever is earlier."

For exercising absolute control of the flow of foreign investments into the country, India does not allow foreigners or non-resident Indians to invest directly in the Indian stock market. Such investors are only allowed to invest through a foreign institutional investor (FII) because 1), FIIs have to be registered with SEBI, and 2), all FIIs are always registered and regulated by the respective overseas regulators in their home countries.

Currently, over 510 institutional investors are registered as FIIs with SEBI. Out of these, 2 FIIs are said to have issued participatory notes. Sources say that the total value of underlying investments in equity represented by PNs are about 25 percent of the total investment in equities by the FIIs in year 2003.

Participatory notes are offshore derivative instruments issued by foreign institutional investors and their sub-accounts against underlying Indian securities. Foreign funds and investors who are not registered with the SEBI but are interested in taking exposure in Indian securities are particularly fond of using the PN route, because the ultimate beneficiary of transactions carried out using PNs is never known to the market regulator and the tax authorities, thereby allowing investors privacy and confidentiality.

 Global Partners Group

**ASIA TIMES** *Online*

According to the Reserve Bank of India (central bank) , FIIs pumped in over $6 billion into Indian equities in 2003, of which about $1.5 billion is represented by PNs, which brokers say are mostly hedge funds' money.

Some of the FIIs have been reluctant to share complete information about the ultimate investors. SEBI's investigations had shown that there were layers of investors in the PNs in a large number of FII accounts. A few FIIs, however, had pleaded that they were unable to identify the investor beyond a certain level. This, says SEBI, has made the regulators adopt the drastic step of banning the issue of PNs to unregulated investors.

Indian investors and SEBI are worried that since hedge funds make their money by identifying imperfections around the globe in the price of financial assets - equities, bonds or currencies - they are hot money and tend to desert a country at the slightest instance of weakness. SEBI is also worried that since the ultimate beneficiary of PNs is unknown; many Indians with money hidden from Indian tax authorities use PNs as a conduit for investing cash from dubious sources. Many company founders, suspects SEBI, are also using PNs to jack up their share prices in the bourses.

But despite SEBI's clampdown, a few hedge funds are still willing to dance to the regulator's tune. "In the necessary interest of the efficacy of the market," SEBI has said that PNs can nevertheless be issued if foreign investors, who are not allowed to invest directly, are willing to be regulated by SEBI by providing full information of their investments.

These hedge funds believe that it will be worth playing along with SEBI on disclosures, so that they are able to cash in on the India story. "The lure of the India story is so strong that hedge funds are willing to play along with SEBI's demand for regulation and disclosures," said Peter Rajsingh, vice president of institutional hedge fund products at Global Partners Asset Management. "I don't think disclosures and regulations should be a problem. One of the big stories in investment is China and India, among other emerging markets. So investors looking out for performance will have to sacrifice something."

In fact, he feels that the move towards greater transparency and regulation is something that will be ultimately positive for the Indian market, since it would generate more confidence and promote greater capital inflows. Rajsingh also feels that it is not necessary that all investments in the Indian market have to be in the form of PNs.

However, Rajsingh cautions that not all hedge funds will be willing to abide by SEBI dictates in the long run. "Full transparency tends to correlate with mediocre returns. When hedge fund managers beat

 Global Partners Group



the market, it is associated with some arbitrage opportunity that the managers don't want to reveal to investors or regulatory authorities."

According to other FIIs, the reluctance to commit too much in India lies with the deficiencies within the country. "The desire to participate in India is limited to just a few stocks," said a FII chief wishing to remain anonymous. "Most [FII] investors look at only the top stocks; perhaps just 15-20. They don't want to go through the hassle of setting up entire offices and incurring running costs."

The other reason is confidentiality. Each time a large FII places a buy order with Indian brokers, the news leaks and prices start rising. And finally, the tax regime; most economies do not impose capital gains tax on short-term trading of shares - for instance Sri Lanka and Taiwan do not. Singapore and Hong Kong treat gains from short-term trading just like any other income, and that is charged as per the income tax rules in that country - 22 percent and 16 percent respectively, whereas in India, a foreign investor or FII (not registered through Mauritius, which has a double taxation treaty with India) thus ends up paying a tax of 30 percent.

"If he takes it back to the US, he will lose another 21 percent of his gains. So today, if you want low levels of taxation, quick entry into the markets and confidentiality, you end up using the P-note route," says the FII chief.



# Funds Spotlight - The Ins and Outs of Large Cap

Author: Jana Tchinkova
September 2003, Ticker

Obscure and controversial as they are, hedge funds still continue to attract investor assets and show steady expansion. In their attempt to ease the apprehension that hedge fund investing brings, many investors have jumped on the bandwagon of portfolios with larger asset sizes. But are they really more secure there?

Hedge funds continue to attract investment capital. Although in the fourth quarter of 2002, hedge funds posted a loss in net assets of $696 million, in the first three months of 2003 investors reversed course. They poured $6.98 billion in hedge fund strategies during that period, according to Tremont Advisers' TASS Research. For the entire year of 2002, the hedge fund industry registered a net gain of $16.28 billion.

As they seek to allocate money into hedge funds, however, investors and their advisors inevitably bump into walls. First, they find out how limited access to information is in this convoluted landscape. Then, they discover that even having the data doesn't help much as it is so technical that often times makes it unfeasible for the average advisor to decode all the details. Being more intuitive and straightforward, a fund's historic track record and size have become two critical decision-making pointers.

## Calling the Shots

At hedge funds with a large asset base where assets are usually in excess of $150 million, investors benefit from a clearly established portfolio with many and solid participants. One considerable advantage that large funds offer is that they usually have an advanced technological and trading infrastructure at their disposal, which also translates into efficiency in brokerage activities.

Enhanced efficiency also results from the fact that larger funds have better access to companies and investments as well as more bargaining power with broker/dealers. Larger funds are also associated with well-defined risk-control measures and

hence many times they deliver more stable performance than smaller funds. Because of their ample resources and their perceived stability, these portfolios have traditionally been able to find and retain the more talented investment managers and analysts.

With sizable assets, however, certain strategic issues come into play. In some cases, as the asset base becomes hard to allocate, managers choose to stray from the original portfolio strategy just to keep the fund fully invested. Other times they decide to hold larger cash positions at the fund.

As a hedge fund grows and starts reaching its capacity limits, the need emerges to outsource some of the manager's responsibilities to sub-managers. Alternatively, the lead manager may have to do more administrative work and have less time to focus on the day-to-day running of the portfolio.

In terms of investment choices, typically the larger the asset base, the more concentration of money occurs in a single position. In this case, the manager doesn't want to take such risk; he may have to resort to investments that aren't exactly first-choice in order to maintain the diversification and resilience in the portfolio.

"When Tiger Management was at its apex with some $20 billion of capital under management, the only equities they could look at were stocks where they could buy or sell $200 million," said James R. Hedges, president and CEO of LJH Global Investments. "So, effectively what had been a small, nimble organization until the early to mid-nineties, the Cayman organization became so large that its sample set of investment opportunities was only stocks that they could buy or sell $200 million of equity in."

## Capacity Limits

A recent study done by the Naples, Fla.-based hedge fund advisory firm and based on a sample of 268 funds found out

# TICKER
#### THE ART OF MONEY MANAGEMENT

that size is in fact an enemy of performance. Looking at the risk-adjusted rates of return and volatility of six different strategies, a pattern emerged where the risk-adjusted returns of medium-size and large funds were consistently lower than those of funds with $50 million in assets or less. One notable exception was portfolios following a global macro strategy. Global macro portfolios with $150 million or more under management had considerably better performance than those with a smaller asset size.

Resting on years of professional experience Salomon Konig, president of GP Funds and senior advisor to Global Partners Group in Fort Lauderdale, Fla. who has been advisor to several hedge funds since 1977, concurs with this finding in general but believes strategy type has a lot to do with the magnitude of asset size impact.

"For directional funds sometimes it might even help to be bigger because they move the market in the direction that they want sometimes by the sheer size that they have," Konig told Ticker. "If you are a directional fund, a fund that has some correlation with the markets or global macro, they can have great returns but they also have great volatility."

On the flip side, if an investor is looking for low volatility, Konig recommends going for the arbitrage style funds. According to his observations, however, those funds get extremely affected by the amount of money that is coming into the market and so as they grow their returns become lower and lower, making it more difficult to get high gains.

At Strategic Financial Solutions in Memphis, Tenn. data collected from more than 600 hedge funds actually indicated that large funds, or those with $250 million or more under management, performed consistently better than smaller funds with assets of $50 million or less. Also, among small funds there were a lot more portfolios with negative returns for the sample time periods.

The interesting finding, however, came up from the breakdown of the top 10 performing hedge funds. An overwhelming part of the top 10 performers were in fact small portfolios.

"Even though the returns of large funds may not be knocking the lights out, more of them have consistent performance," said Meredith Jones, director of market research at Strategic Financial Solutions. "So, the first thing investors need to do is get in touch with their own risk-reward tolerance."

Jones says for aggressive investors who are willing to take the additional risks inherent in smaller funds - that there may be more volatility and more operational risk - they may be a better bet. If selected carefully, smaller funds have the ability to achieve more impressive returns. However, investors who are more conservative and seek a more institutional profile of returns and a well-established organization with very good operational systems perhaps need to look at larger funds.

"One thing that determines capacity is strategy," echoes Jones. "Different strategies have different capacities at different times. For example, for merger arbitrage funds the capacity right now is not as great as it was in 1999 or 2000 because deal flow is less. Distressed managers have a lot of deal flow, therefore capacity is higher than it was in 1999."

An investor needs to look at the strategy, the recent and forecasted trends in the strategy as well as the particular organization to determine capacity. A manager who's running $25 million may only have 20 clients, so it's not so difficult to get the monthly statements out with him and one other person. But if that same manager had $100 million and 90 clients they may not be able to handle it. In the end, one has to look both at the capacity of the strategy and the capacity of the organization to get a wholesome view of size impact.

### Who Dies First?

Mortality rates in the various size categories also brought to light a surprising fact. Interestingly enough, LJH's research found that small fund managers did not come out with the highest mortality rate as one might have expected. It was in fact, the medium mangers.

As far as patterns of mortality are concerned, large funds actually stayed ahead starting off with very low levels of



mortality in their first years of existence and leveling off at 3.57% from the fourth year on. Small funds logged in a steadily growing death rate. Probably the most critical point in their business cycle was the second year when the mortality rate more than doubled to 8.45% from 3.48% in the first year.

Mid-size portfolios, or those with assets between $50 and $150 million, had the steepest mortality curve. While only 3.79% of mid-size hedge funds closed their doors in their first year, that number shot up to the astounding rate of 66% of portfolios by the seventh year.

"We believe that this is attributable to 'a mid-life crisis' because small funds are heavily reliant on outsourcing open-architecture, third-party service providers and prime brokers," Hedges said. "As the organizations deepen, staff increases, they internalize more services, they internalize more processes and inevitably that transition often times doesn't go so well."

In this context, for investors and their advisors it might be a good idea not to eliminate small hedge funds altogether from the whole array of possible choices. According to LJH's and other similar studies, size does correlate to returns. As some point out, the influence of assets size is in varying degrees among the different strategies, but overall smaller asset bases lead to more flexibility and better chances for performance in investing.

So, maybe it's time for investors to consider allocating some capital away from the larger institutionalized managers and not just focus on the largest 5% of the funds in the universe. However, as mortality rates indicate, smaller size often goes hand in hand with more uncertainty and instability. Thus, investors more concerned with longevity rather than the ability to outperform may still want to go with the relative safety of a larger asset base.

# FUND*fire*

*Institutional and High Net Worth Competitive Intelligence*

Article published on January 22, 2004

# Pension Money May Dull Hedge Fund Edge

By Tom Stabile

Institutional money is poised to make a big move into hedge funds -- and may well transform the sector's investment character. The upped stake of pension cash should balloon the amount of managed assets, swell the number of managers, and push down fees through competition. But it could also corral the swashbuckling style that has largely defined the hedge fund community.

There's no doubt plans are eyeing hedge funds as a way to spread out their allocations. "My feeling is that following absolute return strategies is inevitable for the pension fund industry," says Howard Schwartz. He led the brokerage Lynch, Jones & Ryan, and after selling it to Instinet, now heads his own strategic consulting practice and serves as an adviser and board member for the hedge fund complex StoneHedge Partners.

It's ironic that a desire to smooth out overall performance volatility through absolute returns may push plan sponsors toward hedge funds, which have a reputation for being more volatile investments. But the deeper irony may be that when enough plan sponsors get in, hedge funds could evolve into a less volatile sector -- tempering the potential advantage. The question is whether the shift will be across the entire spectrum, or just at the high-asset end.

For now, nearly everyone on the inside is bracing for more assets, says Peter Rajsingh, v.p. of institutional hedge fund products for GP Asset Management, an arm of Global Partners Group. "The potential inflows are huge," he says.

Others agree, pointing out that the industry is gearing up for the opportunity. James Hedges, president and CIO of LJH Global Investments, a hedge fund advisory firm, predicted during a teleconference last week that 2,000 new hedge funds would start up within the next 18 months, boosting the existing universe of funds by nearly a third.

Moves by plan sponsors in the last year could signal the first trickles of an asset flood. Both the $27 billion Massachusetts Pension Reserves Investment Management Board (MassPRIM) and the $4 billion Philadelphia Public Employees Retirement System set aside 5% of their portfolios for hedge funds last year. A white paper published this month by strategic consultant Infovest 21 entitled The Changing Funds of Funds Landscape names several other big plan sponsor hedge fund moves last year, including the University of Texas Investment Management Co. allocating $715 million through Protégé Partners.

One overarching issue at the outset is capacity. Rajsingh says the hedge fund marketplace isn't ready. Indeed, he warns that if an institutional asset boom brings an immediate increase in product, it could foster an increase in blowups as well.

Likewise, Schwartz suggests a sticking point for many hedge fund managers is a lack of infrastructure. "I don't think that the hedge fund community is up to marketing to the plan sponsor community yet," he says.

But many are taking the first moves to get to that stage. Hedge funds are more willing to build infrastructure, says Michael Martinolich, managing director at Cromwell Partners, a recruiting firm. "North of $300 million, they're interested in bringing on marketing professionals who have strong institutional experience," he says.

Getting and keeping those assets could be the factor that redefines the industry. Most institutions, despite wanting to follow an absolute return credo, still won't be able to accept high risk. Schwartz says that may lead firms trying to lasso those institutional assets into less aggressive postures. "The strategies will evolve, the capacities will evolve, the marketing will evolve," he says. "Everyone is going to want a piece of that pie."

 Global Partners Group

# FUND*fire*

*Institutional and High Net Worth Competitive Intelligence*

Another reason the area might become less volatile is the likelihood that hedge funds will bulk up in assets. "As the funds grow in size, they become more conservative, because they can't move as fast," Schwartz says. Similarly, Rajsingh says that moves by funds that are very large can shift the market, lessening the advantage of some hedge strategies.

But Rajsingh says not all hedge funds – and investors – will take the safer path. "The issue becomes to what extent a fund is willing to sacrifice performance," he says. "There are other institutions that are willing to stomach the risk."

Lois Peltz, president and CEO of Infovest 21, likewise, sees a "bifurcation" coming in the marketplace – with some managers staying the course with current styles but others tamping down volatility to attract and retain those institutional assets. "If you just want to just grow, grow, grow your assets, you'll do whatever the client wants," she says. "But there's something to be said for not relying on one big client."

Many agree whatever the breakout of strategies, the long run promises a general lowering of fees in the industry. Schwartz predicts it will come in two forms – one in pressure to lower the typical fees of 1.5% on assets and 20% on returns. "The pension funds will by their sheer purchasing power end up driving those down," he says.

Rajsingh concurs that hedge funds seeking institutional assets will go out of their way to provide "incentives," whether they come in the form of fee discounts, better liquidity terms, customized products, or other concessions. "There are some funds that refuse to give anything away," he says. "But if somebody comes to you with a sizeable investment, it's a real strategic decision."

The other pricing trend, Schwartz predicts, is a turn away from the diversified funds-of-funds option, which constitutes another layer of management fees. Schwartz says investors will seek better returns by turning to consultants to choose hedge fund products directly. Rajsingh also sees that move occurring over a longer timeframe. "Paying a double layer of fees tends to be a consideration," he says.

But Peltz disagrees, saying that funds-of-funds will remain the main point of entry for institutions. She says plan sponsors would turn to direct investing after "getting their feet wet." But she believes the institutional assets will spur "supermarket" size funds-of-funds catering to big investors, with an eventual consolidation of that marketplace. To that end, some funds-of-funds are already lowering fees to attract institutions, she says.

 Global Partners Group

# FUND*fire*

*Institutional and High Net Worth Competitive Intelligence*

Article published on February 17, 2004

# Corporate Plans Hold Back On Alts

By Mark Bruno

Corporate plans have not embraced alternative investments the way other institutional investors, like foundations and endowments, have to date. But although some question whether corporates will ever take to alternative investments, marketers are not giving up on them yet.

Figures recently released from Russell/Mellon Analytical Services shows that as of the end of 2003, corporate plans had the lowest average percentage of assets allocated to alternatives among all institutional investors. The group of 282 corporate plans had an average of 3% of their total assets dedicated to alternatives like hedge funds and private equity - and that figure is down from 4% at the end of the first quarter of last year. Conversely, foundations and endowments saw an uptick in their overall alternative allocations, jumping to an average allocation of 19% in the fourth quarter, up from 15% in the first.

Such figures are leading some to say that corporate plans will never take a wholesale jump into alternatives - while those in the alternatives industry say that such low allocations indicate that there is still plenty of opportunity to grab corporate plan's assets.

"In theory there is supposed to be tons of institutional money chasing hedge funds," says Daniel Strachman, managing partner at Answers & Co., a New York-based money management and marketing firm. "The reality is that the ones who are really doing it, like the Harvards and the Yales, have been for years and they know what they're doing. Corporate plans have been looking at putting new assets into hedge funds over the past few years, but now they may be thinking that there is less of a need after a year of strong equity performance."

Strachman added that in election years, equity markets tend to be strong, another reason corporate pension plans may stick to a more conventional investment mix of mostly of

stocks and bonds. According to the Russell/Mellon data, corporate plans had average allocations of 60% to equities, and 29% for fixed income.

But alternatives marketers are not writing off corporate plans just yet. "We would by no means focus on strictly foundations or endowments," says Peter Rajsingh, v.p. of institutional hedge fund products at New York-based alternatives shop GP Asset Management. "Our approach is that we'd like to cast the net as wide as possible and there are plenty of opportunities with corporate plans."

Rajsingh and other alternatives experts say that with corporate plans, it's an issue of timing and many plan sponsors are just at the outset of educating themselves with investment vehicles like hedge funds.

"We're starting to see the allocations inch forward a bit and corporate plans are just moving cautiously," says Frank Minard. He is the chairman of InvestorForce, and CEO of the Acartha Group, a firm recently formed to provide hedge fund and alternative products, as well as back-office management and technology services. "Corporate plans, after the so-called perfect storm, have realized that 60/40 won't work anymore."

Minard likens plans sponsors' movement towards hedge funds to their reaction to real estate in the 1970s. Many plans, he says, were reluctant to get into real estate at first but eventually began investing in commingled funds. Minard says plans soon realized that they did not need the extra layers of a commingled fund and they began directly investing in real estate when they became more comfortable with asset class. He anticipates the same happening with hedge funds-of-funds.

But still, some say that while there will be corporate plans that invest 15%-20% of their assets in alternatives, there will be a fair number that will never make any such investments.

 Global Partners Group

**FUND**_fire_

_Institutional and High Net Worth Competitive Intelligence_

Barry McInerney, the national practice head of Mercer Investment Consulting, says that if corporate plans have an average of 3% of assets in alternatives, that figure shows that some plans are still at zero percent. Corporate plans, he says, tend to invest in hedge funds for example, in increments of 5%.

"Pension plans are showing an increased interest in alternatives but there is more effort required with these assets classes," McInerney says. Finding quality managers, examining risk tolerance, and the costs associated with alternatives are factors that require plans to devote more effort to the asset class than others.

"There are some plans that will soon begin investing in alternatives for the first time," he says. "But there are lots of 'zeroes' out there who will remain 'zeroes.'"

# FUND*fire*

*Institutional and High Net Worth Competitive Intelligence*

Apr. 12, 2004

# SEC's Donaldson Defends Hedge Fund Plans

By Tom Stabile

Securities and Exchange Commission chairman William Donaldson has once again voiced his aim to regulate hedge funds. His comments come as opponents continue their efforts to thwart increased oversight.

The SEC has kept the hedge fund industry on its toes in recent months awaiting news of whether it will require managers to fall under the agency's adviser registration rules. It remains unclear how fast that train toward regulation is moving -- and whether it still could be derailed.

Donaldson, the commission's chairman, last week spoke at length about hedge funds in testimony before the U.S. Senate Committee on Banking, Housing, and Urban Affairs, which is conducting hearings about the mutual fund industry. Donaldson made clear that he has asked SEC staff to draft a proposal permitting the commission to have far greater oversight over hedge funds. His written comments cited specifically the "ability to prevent, detect and deter abusive, fraudulent conduct."

Donaldson has spoken in favor of regulating hedge funds several times since the SEC staff issued a much-anticipated 117-page report on hedge funds last September. That document recommended requiring hedge fund managers to register with the SEC as investment advisers, subjecting them to extensive commission audits and inspections. Industry opinion has largely split on the potential impact of such a rule, with some decrying it as unnecessary and harmful to the industry's creative strengths and others saying it can only help increase credibility among investors about a sector that is sometimes regarded as freewheeling.

In his written testimony, Donaldson says he hopes the draft proposal he has requested will create an oversight regimen "specifically tailored to the unique dynamics of these types of managers" that would nonetheless allow the SEC to root out fraud and corruption. His testimony cites the types of questions the SEC would want answered, including: "How are hedge fund managers pricing the securities in their portfolios? What practices are in place regarding hedge funds' use of and access to inside information? What prevents hedge funds from front-running mutual funds or other large investors?" A strong strain in his broader comments to the panel noted that his interest stems in part from the notorious role that some hedge funds played in the market-timing mutual fund scandals that broke last year.

"It troubles me that the Commission, under the current rules, is limited in its ability to gather information that could provide answers to these questions, and could help protect millions of investors," his testimony read. "I fundamentally believe that the Commission has a legitimate interest in obtaining the information, and imposing appropriate recordkeeping and other regulatory requirements, if needed, to protect investors receiving advisory services from hedge fund managers."

Donaldson's comments only help to raise the temperature on an issue near boil, says Peter Rajsingh, v.p. of institutional hedge fund products for GP Asset Management, a unit of Global Partners Group. "It's very much still on our radar screen, I would say, particularly as the industry gears up to manage more pension plan assets," he says, citing last week's news that the Massachusetts Pension Reserves Investment Management Board (MassPRIM) has placed $1.6 billion into hedge funds. "The open question is when. [Registration is] still expected, by some with trepidation, by others with the notion that with increased transparency and scrutiny, it might make the investments more appetizing."

One of the biggest opponents of SEC registration, the Managed Funds Association (MFA), has lobbied intensely over the last two years, and has renewed those efforts in anticipation of SEC action. John Gaine, the trade group's president, says his organization has emptied its quiver in efforts to educate regulators, legislators, and other players


Global Partners Group



**FUND***fire*

*Institutional and High Net Worth Competitive Intelligence*

about the ills of SEC registration. "We're going to continue," he says. "We think we have a very sound case that there are some real difficulties with registration."

Gaine says there have been strong signs that sentiment for registering hedge funds, while strong at the commission, is not so across the financial world. He cites in particular the comments from several months ago by Alan Greenspan, chairman of the board of governors for the Federal Reserve Board, that hedge funds in their current state play a key role in providing liquidity for the nation's economic activity.

Gaine says he senses little enthusiasm overall among the greater public, meanwhile, for taking on hedge funds. "With the mutual fund industry scandals impacting 95 million investors, with New York stock exchange specialist problems, with securities industry issues as a whole, I don't think the interest of wealthy individuals and institutional investors is a burning issue," he says. "And there is no constituency of irate hedge fund investors."

Despite those arguments, most observers expect the commission to at least put forward a recommendation to register hedge funds some time this year. The process would involve the commission putting a staff-drafted recommendation for the rule on a public meeting agenda. At that point, the commission could vote to "publish" the rulemaking proposal in the Federal Register, which would trigger a 60- to 90-day comment period. At the close, the staff would gather comments and provide an analysis, and the commission would then meet to adopt, revise, amend, or reject the rule. Past practice suggests that were it approved, an implementation date could be up to six months or more past such a vote.

Gaine says the MFA would reiterate its arguments against SEC registration during any comment period. "Much of it has already been said," he says. "We would vigorously oppose the rule if they voted to publish it."

But Rajsingh says others may wait to see what the commission proposal says. "There might be a mild version, a soft version, or a hard version," he says. "At this point, no one knows."



**Global Partners Group, Inc.**

## APPENDIX B

**March 31, 2004 Unaudited Financial Statements and December 31, 2003 Unaudited Financial Statements for Global Partners Group, Inc.**

**December 31, 2003 Audited Financial Statements for Global Partners Securities, Inc. and EquityStation, Inc.**

**Global Partners Group, Inc.**

## GLOBAL PARTNERS GROUP, INC.
### & SUBSIDIARIES
### STATEMENT OF FINANCIAL CONDITION
### MARCH 31, 2004
### ASSETS

| | | |
|---|---|---:|
| **ASSETS** | | |
| Current Assets | | |
| Cash | $ | 565,961 |
| Receivable from Clearing Organizations | | 469,520 |
| tock Subscriptions Receivable | | 165,000 |
| Securities Owned: | | |
|     Marketable Securities, at Market Value | | 59,385 |
| Prepaid Expenses | | 1,165 |
| Advances to Employees | | 21,716 |
| | | |
| Total Current Assets | | 1,282,747 |
| | | |
| **PROPERTY AND EQUIPMENT** | | |
| Furniture and Fixtures | | $ 70,148 |
| Computers and Office Equipment | | 381,424 |
| | | |
| Total Property and Equipment | | 451,572 |
|     Less:  Accumulated Depreciation | | (425,270) |
| | | |
| Property and Equipment, Net | | 27,362 |
| | | |
| **OTHER ASSETS** | | |
| Clearing Firm Deposits | | 457,246 |
| Securities Owned: | | |
|     Not Readily Marketable, at Estimated Fair Value | | 23,400 |
| Security Deposits | | 19,498 |
| | | |
| Total Other Assets | | 500,144 |
| | | |
| TOTAL ASSETS | $ | 1,809,193 |

The Accompanying Notes are an Integral Part of These Financial Statements.

**Global Partners Group, Inc.**

---

### GLOBAL PARTNERS GROUP, INC.
### & SUBSIDIARIES
### STATEMENT OF FINANCIAL CONDITION
### MARCH 31, 2004
### LIABILITIES AND STOCKHOLDERS' EQUITY

LIABILITIES
Current Liabilities

| | | |
|---|---|---|
| Accounts Payable | $ | 358,832 |
| Accrued Liabilities | | 33,647 |
| Commissions Payable | | 209,873 |
| Securities Sold, Not Yet Purchased, At Market | | 7,104 |
| Loan Payable | | 291,889 |
| Total Current Liabilities | | 901,345 |

Long – Term Liabilities

| | | |
|---|---|---|
| Loans Payable, Stockholders | | 157,000 |

Commitments and Contingencies

| | | |
|---|---|---|
| Subordinated Loans | | 600,000 |
| TOTAL LIABILITIES | | 1,658,345 |

STOCKHOLDERS' EQUITY

| | | |
|---|---|---|
| Common Stock, .001 Par Value; Authorized 3 Million Shares; Issued and Outstanding 1,543,100 Shares | | 1,543 |
| Additional Paid-in Capital | | 7,316,211 |
| Accumulated Deficit | | (7,166,906) |
| | | 150,848 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $ | 1,809,193 |

The Accompanying Notes are an Integral Part of These Financial Statements.

4

**Global Partners Group, Inc.**

---

**GLOBAL PARTNERS GROUP, INC.
& SUBSIDIARIES
STATEMENT OF OPERATIONS
FOR THE THREE MONTHS ENDED MARCH 31, 2004**

REVENUE

| | |
|---|---|
| Commission Income and Trading Fees | $1,722,144 |
| Interest Income | 2,714 |
| Other Income | 118,286 |
| | 1,843,144 |

EXPENSES

Direct Costs

| | |
|---|---|
| Employee Compensation and Benefits | 731,571 |
| Clearance Fees and Floor Brokerage | 474,951 |
| Communications and Data Processing | 38,947 |
| | 1,245,469 |

| | |
|---|---|
| Gross Profit | 597,675 |

General and Administrative Costs

| | |
|---|---|
| Employee Compensation and Benefits | 413,668 |
| Occupancy | 106,633 |
| Supplies and Office | 33,492 |
| Advertising and Marketing | 29,799 |
| Travel and Entertainment | 34,733 |
| Interest | 24,129 |
| Depreciation | 5,661 |
| Other Expenses | 44,722 |
| | 692,837 |

| | |
|---|---|
| Net Operating Loss | (95,162) |

Other Expense

| | |
|---|---|
| Arbitration Award | 3,411 |
| Net Loss | $(98,573) |

The Accompanying Notes are an Integral Part of These Financial Statements.

**Global Partners Group, Inc.**

### GLOBAL PARTNERS GROUP, INC.
### & SUBSIDIARIES
### STATEMENT OF CHANGES IN STOCKHOLDER'S EQUITY
### MARCH 31, 2004

|  | Common Stock |  | Additional Paid-In Capital | Accumulated Deficit |  | Total |
|---|---|---|---|---|---|---|
| Balance, December 31, 2003 | $1,510 | $ | 7,266,244 $ | (7,067,273) | $ | 200,481 |
| Net Loss |  |  |  | (98,573) |  | (98,573) |
| Contributions | 33 |  | 49,967 |  |  | 50,000 |
| Balance, March 31, 2004 | $1,543 | $ | 7,316,211 $ | (7,165,846) | $ | 151,908 |

The Accompanying Notes are an Integral Part of These Financial Statements.

6

**Global Partners Group, Inc.**

---

**GLOBAL PARTNERS GROUP, INC.**
**& SUBSIDIARIES**
**NOTES TO THE FINANCIAL STATEMENTS**

**NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

<u>Nature of Business</u>

This is a consolidated financial statement of Global Partners Group, Inc. The subsidiaries included in this statement are Global Partners Securities Inc., Level2.com, Inc., EquityStation, Inc., GP Funds, Inc., and GP Asset Management LLC.

Global Partners Group, Inc. is a Florida Corporation. It is a holding corporation which is the Parent of Global Partners Securities, Inc., GP Funds, Inc., and GP Asset Management LLC. In turn, Global Partners Securities, Inc., a New York Corporation, owns 80.38% of Level2.com, Inc. Level2.com, Inc. is a Florida Corporation which acts as a holding company for its 100% owned subsidiary EquityStation, Inc., another Florida Corporation. In addition, Global Partners Group, Inc. directly owns 19.42% of Level2.com, Inc., which gives the holding corporation 99.80% control of Level2.com, Inc.

Global Partners Securities, Inc. and EquityStation, Inc. are broker-dealers in securities registered with the Securities and Exchange Commission (SEC) and a member of the National Association of Securities Dealers (NASD).

In connection with its activities as a broker-dealer, the Companies do not hold customer funds or securities, and promptly transmits all customer funds received to its clearing firms. Although the Companies' clearing firms maintain all of the accounts of such customers and preserve all required and customary records, the Companies remain contingently liable for losses incurred on these accounts.

<u>Securities Transactions</u>

Proprietary securities transactions in regular-way trades are recorded on the trade date, as if they had settled. Profit and loss arising from all securities transactions entered into for the account and risk of the Company are recorded on a trade date basis. Customers' securities transactions are reported on a settlement date basis with related commission income and expenses reported on a trade date basis.

Amounts receivable and payable for securities transactions that have not reached their contractual settlement date are recorded net on the statement of financial condition.

Marketable securities are valued at market value. Securities not readily marketable are valued by management based on their experience in the industry.

7

Global Partners Group, Inc.

---

## GLOBAL PARTNERS GROUP, INC.
### & SUBSIDIARIES
### NOTES TO THE FINANCIAL STATEMENTS

### NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

#### Clearing Expenses

Clearing expenses are recorded on a trade-date basis as securities transactions occur.

#### Cash and Cash Equivalents

The Company considers all highly liquid debt instruments purchased with a maturity of three months or less to be cash equivalents.

#### Property and Equipment

Property and Equipment is stated at cost. Depreciation is computed primarily using accelerated methods over the estimated useful life of the respective assets, generally five to seven years.

#### Use of Estimates

The presentation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

#### Securities Owned and Sold, Not Yet Purchased

Securities owned and securities sold, not yet purchased are carried at quoted market value. The increase or decrease in net unrealized appreciation or depreciation of securities owned and sold, not yet purchased is credited or charged to operations and is included in trading gains and (losses) in the statement of operations.

#### Advertising and Marketing

Costs of advertising and marketing are expensed as incurred.

#### Receivable from Clearing Organization

Broker Receivables represent amounts due from the clearing organizations related to monies earning interest at the clearing broker from settled and unsettled transactions.

Global Partners Group, Inc.

GLOBAL PARTNERS GROUP, INC.
& SUBSIDIARIES
NOTES TO THE FINANCIAL STATEMENTS

## NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

### Income Taxes

The Company files federal and state corporate income tax returns. The Company has not accrued any federal or state income tax liability for the period ended March 31, 2004.

### Income Taxes (continued)

The Company accounts for deferred income taxes using Statement of Financial Accounting Standards No. 109, "Accounting for Income Taxes," (SFAS 109). The statement requires that deferred income taxes reflect the tax consequences on future years of differences between the tax basis of assets and liabilities and their basis for financial reporting purposes. In addition, SFAS 109 requires the recognition of future tax benefits, such as net operating loss carryforwards, to the extent that realization of such benefits are more likely than not.

## NOTE 2: SECURITIES OWNED AND SOLD, NOT YET PURCHASED

Marketable securities owned and sold, not yet purchased, consist of trading securities at market values as follows:

|  | Owned | Sold, not yet Purchased |
| --- | --- | --- |
| Corporate Stocks | $ 59,385 | $ 7,104 |

Securities not readily marketable include investment securities that cannot be offered or sold because of restrictions or conditions applicable to the securities and consist of:

| | |
| --- | --- |
| Warrants | $ 23,400 |

## NOTE 3: DEPOSITS

Other Assets contain two different deposits on the financial statements, clearing firm deposits and security deposits.

**Global Partners Group, Inc.**

---

### GLOBAL PARTNERS GROUP, INC.
### & SUBSIDIARIES
### NOTES TO THE FINANCIAL STATEMENTS

**NOTE 3: DEPOSITS (CONTINUED)**

Clearing firm deposits are security deposits that are required by all clearing organizations in the normal course of broker/dealer business. They serve as a form of indemnification in case the client defaults and customer losses cannot be covered.

The security deposits include a rent deposit of $15,000, $ 1,071 for equipment leased and $3,427 for NASD.

**NOTE 4: CONTRACTUAL COMMITMENTS**

The Company is obligated under non-cancelable operating leases for approximately 11,500 square feet of office space in Fort Lauderdale, Florida that expires on May 31, 2005 and for approximately 2,400 square feet of office space in New York, New York that expires on September 30, 2005. The leases provide for monthly rentals of approximately $12,153 and $9,000 respectively.

In addition, the Company is obligated under various automobile and equipment leases with monthly rentals totaling $2,018 expiring from February, 2004 to May, 2005.

**NOTE 5: LOAN PAYABLE**

Loan payable consists of a Small Business Association (SBA) note payable in the original amount of $293,900.  The note bears interest at 8% per annum, maturing December 7, 2004.  At March 31, 2004, the Company was in default on the SBA note for non-payment of certain scheduled principal and interest payments.  (See Note 11: Subsequent Events.)

**NOTE 6: SUBORDINATED BORROWINGS**

Borrowings under subordination agreements at March 31, 2004, are as follows:

| | | |
|---|---|---|
| Subordinated Loan. | Interest at prime plus 2%, or 10%, whichever is higher | $ 300,000 |
| Subordinated Loan, | Interest at prime plus 2%, or 10%, whichever is higher | 300,000 |
| | | $ 600,000 |

The subordinated borrowings are available in computing net capital under the SEC's uniform net capital rule. To the extent that such borrowings are required for the Company's continued compliance with minimum net capital requirements, they may not be repaid.

10

Global Partners Group, Inc.

GLOBAL PARTNERS GROUP, INC.
& SUBSIDIARIES
NOTES TO THE FINANCIAL STATEMENTS

## NOTE 7: INCOME TAXES

The Company has available at December 31, 2003, approximately $7,000,000 of unused operating loss carryforwards that may be applied against future taxable income and that expire in 2022. Based upon these carryforwards, there is no current income tax liability at March 31, 2004.

The deferred portion of the income tax benefit included in the statement of operations net of a valuation allowance is $0 at March 31, 2004.

## NOTE 8: RELATED PARTY TRANSACTIONS

The company has loans due to shareholder totaling $157,000. These loans bear interest at 5% per year.

The company has stock subscription receivables due from the stockholders for capital stock purchases.

## NOTE 9: MERGER

Global Partners Group, Inc., a Florida Corporation, was formed in August 2003, and was merged into Global Partners Securities Holding Corp. with Global Partners Group, Inc. being the surviving corporation

## NOTE 10: OFF-BALANCE-SHEET RISK

The Company's customers' securities transactions are introduced on a fully-disclosed basis with its clearing broker/dealers. The clearing broker/dealer is responsible for collection of and payment of funds, and receipt and delivery of securities relative to customer transactions. Off-balance-sheet risk exists with respect to these transactions due to the possibility that customers may be unable to fulfill their contractual commitments wherein the clearing broker/dealer may charge any losses it incurs to the Company. The Company seeks to minimize this risk through procedures designed to monitor the creditworthiness of its customers and proper executions of customer transactions by the clearing broker/dealer.

## NOTE 11: SUBSEQUENT EVENTS

On June 10, 2004, the Company entered into a Forbearance Agreement with the SBA which requires the Company to make principal reduction payments in the amount of $35,000 by June 18, 2004 and $15,000 by July 20, 2004, and to make three consecutive principal and interest payments of $13,741 by July 7, 2004, August 7, 2004, and September 7, 2004 to cure its default under the note.   On June 14, 2004, the Company made the first of these payments.

**Global Partners Group, Inc.**

## GLOBAL PARTNERS GROUP, INC.
### & SUBSIDIARIES
### STATEMENT OF FINANCIAL CONDITION
### DECEMBER 31, 2003
### ASSETS

| | | |
|---|---|---:|
| ASSETS | | |
| Current Assets | | |
| Cash | $ | 338,283 |
| Receivable from Clearing Organizations | | 674,980 |
| Stock Subscriptions Receivable | | 250,000 |
| Securities Owned: | | |
|    Marketable Securities, at Market Value | | 114,244 |
| Prepaid Expenses | | 4,336 |
| Advances to Employees | | 22,216 |
| | | |
| Total Current Assets | | 1,404,059 |
| | | |
| | | |
| PROPERTY AND EQUIPMENT | | |
| Furniture and Fixtures | | $ 70,148 |
| Computers and Office Equipment | | 381,424 |
| | | |
| Total Property and Equipment | | 451,572 |
|    Less:  Accumulated Depreciation | | (419,609) |
| | | |
| Property and Equipment, Net | | 31,963 |
| | | |
| | | |
| OTHER ASSETS | | |
| Clearing Firm Deposits | | 456,911 |
| Securities Owned: | | |
|    Not Readily Marketable, at Estimated Fair Value | | 23,400 |
| Security Deposits | | 19,779 |
| | | |
| Total Other  Assets | | 500,090 |
| | | |
| TOTAL ASSETS | $ | 1,936,112 |

The Accompanying Notes are an Integral Part of These Financial Statements.

Global Partners Group, Inc.

GLOBAL PARTNERS GROUP, INC.
& SUBSIDIARIES
STATEMENT OF FINANCIAL CONDITION
DECEMBER 31, 2003
LIABILITIES AND STOCKHOLDERS' EQUITY

LIABILITIES
Current Liabilities

| | | |
|---|---|---|
| Accounts Payable | $ | 391,893 |
| Accrued Liabilities | | 33,405 |
| Commissions Payable | | 236,005 |
| Securities Sold, Not Yet Purchased, At Market | | 25,439 |
| Loan Payable | | 291,889 |
| Total Current Liabilities | | 978,631 |
| Long – Term Liabilities | | |
| Loans Payable, Stockholders | | 157,000 |
| Commitments and Contingencies | | |
| Subordinated Loans | | 600,000 |
| TOTAL LIABILITIES | | 1,735,631 |

STOCKHOLDERS' EQUITY

| | | |
|---|---|---|
| Common Stock, .001 Par Value; Authorized 3 Million Shares; Issued and Outstanding 1,509,767 Shares | | 1,510 |
| Additional Paid-in Capital | | 7,266,244 |
| Accumulated Deficit | | (7,067,273) |
| | | 200,481 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $ | 1,936,112 |

The Accompanying Notes are an Integral Part of These Financial Statements.

13

**Global Partners Group, Inc.**

---

### GLOBAL PARTNERS GROUP, INC.
### & SUBSIDIARIES
### STATEMENT OF OPERATIONS
### FOR THE YEAR ENDED DECEMBER 31, 2003

| | |
|---|---:|
| **REVENUE** | |
| Commission Income and Trading Fees | $4,152,912 |
| Interest Income | 27,712 |
| Other Income | 147,821 |
| | 4.328.445 |
| **EXPENSES** | |
| Direct Costs | |
| Employee Compensation and Benefits | 2,078,352 |
| Clearance Fees and Floor Brokerage | 1,093,896 |
| Communications and Data Processing | 160,849 |
| | 3,333,097 |
| Gross Profit | 995,348 |
| General and Administrative Costs | |
| Employee Compensation and Benefits | 1,554,842 |
| Occupancy | 409,019 |
| Supplies and Office | 140,969 |
| Advertising and Marketing | 157,113 |
| Travel and Entertainment | 115,888 |
| Interest | 98,429 |
| Depreciation | 22,645 |
| Other Expenses | 368,837 |
| | 2,867,742 |
| Net Operating Loss | (1,872,394) |
| Other Expense | |
| Arbitration Award | 248,704 |
| Net Loss | $    (2,121,098) |

The Accompanying Notes are an Integral Part of These Financial Statements.

14

**Global Partners Group, Inc.**

### GLOBAL PARTNERS GROUP, INC.
### & SUBSIDIARIES
### STATEMENT OF CHANGES IN STOCKHOLDER'S EQUITY
### DECEMBER 31, 2003

| | Common Stock | | Additional Paid-In Capital | | Accumulated Deficit | | Total |
|---|---|---|---|---|---|---|---|
| Balance, December 31, 2002 | $100 | $ | 5,763,113 | $ | (4,866,175) | $ | 897,038 |
| Prior Year Adjustment | | | | | (80,000) | | (80,000) |
| Net Loss | | | | | (2,121,098) | | (2,121,098) |
| Contributions | 1,410 | | 1,503,131 | | | | 1,504,541 |
| Balance, December 31, 2003 | $1,510 | $ | 7,266,244 | $ | (7,067,273) | $ | 200,481 |

The Accompanying Notes are an Integral Part of These Financial Statements.

15

Global Partners Group, Inc.

# GLOBAL PARTNERS GROUP, INC.
## & SUBSIDIARIES
## NOTES TO THE FINANCIAL STATEMENTS

## NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Nature of Business

This is a consolidated financial statement of Global Partners Group, Inc. The subsidiaries included in this statement are Global Partners Securities Inc., Level2.com, Inc., EquityStation, Inc., and GP Funds, Inc.

Global Partners Group, Inc. is a Florida Corporation. It is a holding corporation which is the Parent of Global Partners Securities, Inc. and GP Funds, Inc. In turn, Global Partners Securities, Inc., a New York Corporation, owns 80.38% of Level2.com, Inc. Level2.com, Inc. is a Florida Corporation which acts as a holding company for its 100% owned subsidiary EquityStation, Inc., another Florida Corporation. In addition, Global Partners Group, Inc. directly owns 19.42% of Level2.com, Inc., which gives the holding corporation 99.80% control of Level2.com, Inc.

Global Partners Securities, Inc. and EquityStation, Inc. are broker-dealers in securities registered with the Securities and Exchange Commission (SEC) and a member of the National Association of Securities Dealers (NASD).

In connection with its activities as a broker-dealer, the Companies do not hold customer funds or securities, and promptly transmits all customer funds received to its clearing firms. Although the Companies' clearing firms maintain all of the accounts of such customers and preserve all required and customary records, the Companies remain contingently liable for losses incurred on these accounts.

### Securities Transactions

Proprietary securities transactions in regular-way trades are recorded on the trade date, as if they had settled. Profit and loss arising from all securities transactions entered into for the account and risk of the Company are recorded on a trade date basis. Customers' securities transactions are reported on a settlement date basis with related commission income and expenses reported on a trade date basis.

Amounts receivable and payable for securities transactions that have not reached their contractual settlement date are recorded net on the statement of financial condition.

Marketable securities are valued at market value. Securities not readily marketable are valued by management based on their experience in the industry.

### Clearing Expenses

Clearing expenses are recorded on a trade-date basis as securities transactions occur.

16

**Global Partners Group, Inc.**

---

### GLOBAL PARTNERS GROUP, INC.
### & SUBSIDIARIES
### NOTES TO THE FINANCIAL STATEMENTS

**NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)**

<u>**Cash and Cash Equivalents**</u>

The Company considers all highly liquid debt instruments purchased with a maturity of three months or less to be cash equivalents.

<u>**Property and Equipment**</u>

Property and Equipment is stated at cost. Depreciation is computed primarily using accelerated methods over the estimated useful life of the respective assets, generally five to seven years.

<u>**Use of Estimates**</u>

The presentation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

<u>**Securities Owned and Sold, Not Yet Purchased**</u>

Securities owned and securities sold, not yet purchased are carried at quoted market value. The increase or decrease in net unrealized appreciation or depreciation of securities owned and sold, not yet purchased is credited or charged to operations and is included in trading gains and (losses) in the statement of operations.

<u>**Advertising and Marketing**</u>

Costs of advertising and marketing are expensed as incurred.

<u>**Receivable from Clearing Organization**</u>

Broker Receivables represent amounts due from the clearing organizations related to monies earning interest at the clearing broker from settled and unsettled transactions.

<u>**Income Taxes**</u>

The Company files federal and state corporate income tax returns. The Company has not accrued any federal or state income tax liability for the year ended December 31, 2003.

**Global Partners Group, Inc.**

---

### GLOBAL PARTNERS GROUP, INC.
### & SUBSIDIARIES
### NOTES TO THE FINANCIAL STATEMENTS

#### NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

#### Income Taxes (continued)

The Company accounts for deferred income taxes using Statement of Financial Accounting Standards No. 109, "Accounting for Income Taxes," (SFAS 109). The statement requires that deferred income taxes reflect the tax consequences on future years of differences between the tax basis of assets and liabilities and their basis for financial reporting purposes. In addition, SFAS 109 requires the recognition of future tax benefits, such as net operating loss carryforwards, to the extent that realization of such benefits are more likely than not.

#### NOTE 2: SECURITIES OWNED AND SOLD, NOT YET PURCHASED

Marketable securities owned and sold, not yet purchased, consist of trading securities at market values as follows:

|  | Owned | Sold, not yet Purchased |
|---|---|---|
| Corporate Stocks | $ 114,244 | $ 25,439 |

Securities not readily marketable include investment securities that cannot be offered or sold because of restrictions or conditions applicable to the securities and consist of:

| | | |
|---|---|---|
| Warrants | $ | 23,400 |

#### NOTE 3: DEPOSITS

Other Assets contain two different deposits on the financial statements, clearing firm deposits and security deposits.

Clearing firm deposits are security deposits that are required by all clearing organizations in the normal course of broker/dealer business. They serve as a form of indemnification in case the client defaults and customer losses cannot be covered.

The security deposits include a rent deposit of $15,000, $ 1,071 for equipment leased and $3,708 for NASD.

18

Global Partners Group, Inc.

GLOBAL PARTNERS GROUP, INC.
& SUBSIDIARIES
NOTES TO THE FINANCIAL STATEMENTS

## NOTE 4: CONTRACTUAL COMMITMENTS

The Company is obligated under non-cancelable operating leases for approximately 11,500 square feet of office space in Fort Lauderdale, Florida that expires on May 31, 2005 and for approximately 2,400 square feet of office space in New York, New York that expires on September 30, 2005. The leases provide for monthly rentals of approximately $12,153 and $9,000 respectively.

In addition, the Company is obligated under various automobile and equipment leases with monthly rentals totaling $2,018 expiring from February, 2004 to May, 2005.

## NOTE 5: LOAN PAYABLE

Loan payable consists of a Small Business Association (SBA) note payable in the original amount of $293,900. The note bears interest at 8% per annum, maturing December in 2004. At March 31, 2004, the Company was in default on the SBA note for non-payment of certain scheduled principal and interest payments. (See Note 11: Subsequent Events.)

## NOTE 6: SUBORDINATED BORROWINGS

Borrowings under subordination agreements at December 31, 2003, are as follows:

| | | |
|---|---|---|
| Subordinated Loan. | Interest at prime plus 2%, or 10%, whichever is higher | $ 300,000 |
| Subordinated Loan, | Interest at prime plus 2%, or 10%, whichever is higher | 300,000 |
| | | $ 600,000 |

The subordinated borrowings are available in computing net capital under the SEC's uniform net capital rule. To the extent that such borrowings are required for the Company's continued compliance with minimum net capital requirements, they may not be repaid.

## NOTE 7: INCOME TAXES

The Company has available at December 31, 2003, approximately $7,000,000 of unused operating loss carryforwards that may be applied against future taxable income and that expire in 2022. Based upon these carryforwards, there is no current income tax liability at December 31, 2003.

The deferred portion of the income tax benefit included in the statement of operations net of a valuation allowance is $0 at December 31, 2003.

Global Partners Group, Inc.

GLOBAL PARTNERS GROUP, INC.
& SUBSIDIARIES
NOTES TO THE FINANCIAL STATEMENTS

**NOTE 8: RELATED PARTY TRANSACTIONS**

The company has loans due to shareholder totaling $ 157,000. These loans bear interest at 5% per year.

The company has stock subscription receivables due from the stockholders for capital stock purchases.

**NOTE 9: MERGER**

Global Partners Group, Inc., a Florida Corporation, was formed in August 2003, and was merged into Global Partners Securities Holding Corp. with Global Partners Group, Inc. being the surviving corporation

**NOTE 10: OFF-BALANCE-SHEET RISK**

The Company's customers' securities transactions are introduced on a fully-disclosed basis with its clearing broker/dealers. The clearing broker/dealer is responsible for collection of and payment of funds, and receipt and delivery of securities relative to customer transactions. Off-balance-sheet risk exists with respect to these transactions due to the possibility that customers may be unable to fulfill their contractual commitments wherein the clearing broker/dealer may charge any losses it incurs to the Company. The Company seeks to minimize this risk through procedures designed to monitor the creditworthiness of its customers and proper executions of customer transactions by the clearing broker/dealer.

**NOTE 11: SUBSEQUENT EVENTS**

On June 10, 2004, the Company entered into a Forbearance Agreement with the SBA which requires the Company to make principal reduction payments in the amount of $35,000 by June 18, 2004 and $15,000 by July 20, 2004, and to make three consecutive principal and interest payments of $13,741 by July 7, 2004, August 7, 2004, and September 7, 2004 to cure its default under the note. On June 14, 2004, the Company made the first of these payments.

# GLOBAL PARTNERS SECURITIES, INC

## FINANCIAL STATEMENTS

### December 31, 2003

**GLOBAL PARTNERS SECURITIES, INC.**
**TABLE OF CONTENTS**
**DECEMBER 31, 2003**

|  | PAGE |
|---|---|
| INDEPENDENT AUDITOR'S REPORT | F-1 |
| Statement of Financial Condition | F-2 |
| Statement of Operations | F-3 |
| Statement of Changes in Stockholder's Equity | F-4 |
| Statement of Cash Flows | F-5 |
| Notes to the Financial Statements | F-6 – F-12 |
| INDEPENDENT AUDITOR'S REPORT ON THE SUPPLEMENTARY INFORMATION | F-13 |
| SUPPLEMENTARY INFORMATION: | |
| Computation of Aggregate Indebtedness and Net Capital Under Rule 15c3-1 | F-14 |
| Statement Pursuant to Rule 17a-5(d)(4) | F-15 |
| Statement of Changes in Liabilities Subordinated to Claims of General Creditors | F-15 |
| Statement Pursuant to Exemptive Provision Under Rule 15c3-3 | F-15 |

# SHAVELL & COMPANY, P.A.

Certified Public Accountants and Consultants

7700 Congress Avenue, Suite 3105, Boca Raton, FL 33487
Ph (561) 997-7242  Fax (561) 997-7262
info@shavell.net

F-1

### INDEPENDENT AUDITOR'S REPORT

To the Stockholder
Global Partners Securities, Inc.
Fort Lauderdale, Florida 33309

We have audited the accompanying statement of financial condition of Global Partners Securities, Inc. as of December 31, 2003, and the related statements of operations, changes in stockholder's equity, and cash flows for the year then ended, that you are filing pursuant to Rule 17a-5 under the Securities Exchange Act of 1934. These financial statements are the responsibility of the Company's management.  Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America.  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements.  An audit also includes assessing the accounting principles used  and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Global Partners Securities, Inc. as of December 31, 2003, and the results of its operations and its cash flows for the year then ended, in conformity with accounting principles generally accepted in the United States of America.

SHAVELL & COMPANY, P.A.

*Shavell + Company, P.A.*

Boca Raton, Florida
February 20, 2004

F-2

GLOBAL PARTNERS SECURITIES, INC.
STATEMENT OF FINANCIAL CONDITION
DECEMBER 31, 2003

## ASSETS

| | | |
|---|---|---:|
| Cash | $ | 306,518 |
| Receivable from clearing organizations | | 923,426 |
| Due from Related Parties | | 671,951 |
| Securities Owned: | | |
|     Marketable Securities, at Market Value | | 114,244 |
|     Not Readily Marketable, at Estimated Fair Value | | 24,400 |
| Deposits | | 17,262 |
| Prepaid Expenses | | 1,165 |
| Advances to Employees | | 19,716 |
| Property and Equipment, net | | 31,963 |
| | $ | 2,110,645 |

## LIABILITIES AND STOCKHOLDER'S EQUITY

| | | |
|---|---|---:|
| LIABILITIES | | |
|     Accounts Payable | $ | 368,658 |
|     Accrued Liabilities | | 29,405 |
|     Commissions Payable | | 197,358 |
|     Securities Sold, Not Yet Purchased, At Market | | 25,439 |
|     Loan Payable | | 291,889 |
| | | 912,749 |
| COMMITMENTS AND CONTINGENCIES | | |
|     Subordinated Loans | | 600,000 |
| STOCKHOLDER'S EQUITY | | |
|     Common Stock, No Par Value; Authorized | | |
|       10,000 Shares; Issued and Outstanding 269 Shares | | 134,500 |
|     Additional Paid-in Capital | | 6,500,155 |
|     Accumulated Deficit | | (6,036,759) |
| | | 597,896 |
| | $ | 2,110,645 |

The Accompanying Notes are an Integral Part of These Financial Statements

F-3

**GLOBAL PARTNERS SECURITIES, INC.**
**STATEMENT OF OPERATIONS**
**DECEMBER 31, 2003**

| | | |
|---|---|---:|
| REVENUE | | |
| Commissions | $ | 239,523 |
| Principal Transactions | | 2,973,115 |
| Interest and Dividends | | 18,568 |
| Other Income | | 60,454 |
| | | 3,291,660 |
| | | |
| EXPENSES | | |
| Employee Compensation and Benefits | | 2,889,413 |
| Clearance Fees | | 306,186 |
| Communications and Data Processing | | 656,179 |
| Interest | | 89,963 |
| Occupancy | | 385,019 |
| Other Expenses | | 779,292 |
| | | 5,106,052 |
| Net Loss | $ | (1,814,392) |

The Accompanying Notes are an Integral Part of These Financial Statements

**GLOBAL PARTNERS SECURITIES, INC.**
**STATEMENT OF CHANGES IN STOCKHOLDER'S EQUITY**
**DECEMBER 31, 2003**

F-4

| | Common Stock | | Additional Paid-In Capital | | Accumulated Deficit | | Total |
|---|---|---|---|---|---|---|---|
| Balance, December 31, 2002 | $ | 134,500 | $ | 5,181,614 | $ | (4,222,367) | $ 1,093,747 |
| Net Loss | | | | | | (1,814,392) | (1,814,392) |
| Capital Contributed | | | | 1,318,541 | | | 1,318,541 |
| Balance, December 31, 2003 | $ | 134,500 | $ | 6,500,155 | $ | (6,036,759) | $ 597,896 |

The Accompanying Notes are an Integral Part of These Financial Statements

F-5

**GLOBAL PARTNERS SECURITIES, INC.**
**STATEMENT OF CASH FLOWS**
**DECEMBER 31, 2003**

| | | |
|---|---|---:|
| CASH FLOWS FROM OPERATING ACTIVITIES | | |
| Net Loss | $ | (1,814,392) |
| Adjustments to Reconcile Net Loss to Net Cash | | |
| Provided By Operating Activities: | | |
| Depreciation | | 22,646 |
| Change in Assets and Liabilities: | | |
| Decrease (Increase) In: | | |
| Receivable from clearing organizations | | (15,283) |
| Marketable Securities, at market value | | (23,751) |
| Prepaid Expenses | | 16,521 |
| Advances to Employees | | 34,559 |
| Increase (Decrease) In: | | |
| Accounts Payable | | 211,444 |
| Accrued Liabilities | | 16,248 |
| Payable to clearing organizations | | (5,000) |
| Commissions Payable | | 96,094 |
| Securities Sold, Not Yet Purchased, at market | | 18,625 |
| Net Cash Used in Operating Activities | | (1,442,289) |
| CASH FLOWS FROM INVESTING ACTIVITIES | | |
| Increase in Deposits and Other | | (464) |
| Net Cash Used in Investing Activities | | (464) |
| CASH FLOWS FROM FINANCING ACTIVITIES | | |
| Capital Contributed from Parent Company | | 1,318,541 |
| Advances on Related Party Loans | | (346,629) |
| Repayments on Related Party Loans | | 620,826 |
| Repayments on Loan Payable | | (11,782) |
| Net Cash Provided By Financing Activities | | 1,580,956 |
| Increase in Cash | | 138,203 |
| Cash: | | |
| Beginning | | 168,315 |
| Ending | $ | 306,518 |
| SUPPLEMENTARY DISCLOSURES OF CASH FLOW INFORMATION | | |
| Cash Payments for Interest | $ | 79,486 |

The Accompanying Notes are an Integral Part of These Financial Statements

F-6

**GLOBAL PARTNERS SECURITIES, INC.**
**NOTES TO THE FINANCIAL STATEMENTS**

## NOTE 1:   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Nature of Business

Global Partners Securities, Inc. (the "Company") is a broker-dealer in securities registered with the Securities and Exchange Commission (SEC) and a member of the National Association of Securities Dealers (NASD). The company operates one main office in Fort Lauderdale, Florida and a smaller office in New York. The Company is a wholly owned subsidiary of Global Partners Group, Inc. (the "Parent").

In connection with its activities as a broker-dealer, the Company does not hold customer funds or securities, and promptly transmits all customer funds received to its clearing firms. Although the Company's clearing firms maintain all of the accounts of such customers and preserve all required and customary records, the Company remains contingently liable for losses incurred on these accounts.

### Securities Transactions

Proprietary securities transactions in regular-way trades are recorded on the trade date, as if they had settled. Profit and loss arising from all securities transactions entered into for the account and risk of the Company are recorded on a trade date basis. Customers' securities transactions are reported on a settlement date basis with related commission income and expenses reported on a trade date basis.

Amounts receivable and payable for securities transactions that have not reached their contractual settlement date are recorded net on the statement of financial condition.

Marketable securities are valued at market value. Securities not readily marketable are valued by management based on their experience in the industry.

### Clearing Expenses

Clearing expenses are recorded on a trade-date basis as securities transactions occur.

### Cash and Cash Equivalents

The Company considers all highly liquid debt instruments purchased with a maturity of three months or less to be cash equivalents.

F-7

**GLOBAL PARTNERS SECURITIES, INC.**
**NOTES TO THE FINANCIAL STATEMENTS**

NOTE 1:    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

**Property and Equipment**

Property and Equipment is stated at cost.  Depreciation is computed primarily using accelerated methods over the estimated useful life of the respective assets, generally five to seven years.

Long-lived assets are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount may not be recoverable.  If the sum of the expected future undiscounted cash flows is less than the carrying amount of the asset, a loss is recognized for the difference between the fair value and the carrying value of the asset.

**Use of Estimates**

The presentation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period.  Actual results could differ from those estimates.

**Concentration of Credit Risk**

The Company at times has cash in excess of Federal Deposit Insurance Corporation ("FDIC") insurance limits.  The Company places its temporary cash investments with high credit quality financial institutions.  Cash held by these financial institutions in excess of FDIC limits amounted to approximately $134,254 at December 31, 2003.

**Securities Owned and Sold, Not Yet Purchased**

Securities owned and securities sold, not yet purchased are carried at quoted market value.  The increase or decrease in net unrealized appreciation or depreciation of securities owned and sold, not yet purchased is credited or charged to operations and is included in trading gains and (losses) in the statement of operations.

**Advertising**

Costs of advertising are expensed as incurred and amounted to $57,278 for the year ended December 31, 2003.

**Receivable from Clearing Organization**

Broker Receivables represent amounts due from the clearing organizations related to monies earning interest at the clearing broker from settled and unsettled transactions.

F-8

**GLOBAL PARTNERS SECURITIES, INC.**
**NOTES TO THE FINANCIAL STATEMENTS**

**NOTE 1:     SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)**

**Income Taxes**

The Company files federal and state corporate income tax returns.  The Company has not accrued any federal or state income tax liability for the year ended December 31, 2003.

The Company accounts for deferred income taxes using Statement of Financial Accounting Standards No. 109, "Accounting for Income Taxes." (SFAS 109).  The statement requires that deferred income taxes reflect the tax consequences on future years of differences between the tax basis of assets and liabilities and their basis for financial reporting purposes.  In addition, SFAS 109 requires the recognition of future tax benefits, such as net operating loss carryforwards, to the extent that realization of such benefits are more likely than not.

**NOTE 2:     SECURITIES OWNED AND SOLD, NOT YET PURCHASED**

Marketable securities owned and sold, not yet purchased, consist of trading securities at market values as follows:

|  | Owned | Sold, not yet Purchased |
|---|---|---|
| Corporate Stocks | $  114,244 | $  24,439 |

Securities not readily marketable include investment securities that cannot be offered or sold because of restrictions or conditions applicable to the securities and consist of:

|  | Owned |
|---|---|
| Corporate Stocks | $     1,000 |
| Warrants | $   23,400 |
|  | $   24,400 |

**NOTE 3:  PROPERTY AND EQUIPMENT**

Property and Equipment, net consists of the following:

| | |
|---|---|
| Furniture and Fixtures | $     70,148 |
| Computer and Office Equipment | 381,424 |
| | $   451,572 |
| Less:  Accumulated Depreciation | 419,609 |
| | $     31,963 |

F-9

**GLOBAL PARTNERS SECURITIES, INC.**
**NOTES TO THE FINANCIAL STATEMENTS**

NOTE 4:    CONTRACTUAL COMMITMENTS

The Company is obligated under non-cancelable operating leases for approximately 11,500 square feet of office space in Fort Lauderdale, Florida that expires on May 31, 2005 and for approximately 2,400 square feet of office space in New York, New York that expires on September 30, 2005. The leases provide for monthly rentals of approximately $22,000 and $9,700 respectively.

In addition, the Company is obligated under various automobile and equipment leases with monthly rentals totaling $2,018 expiring from February, 2004 to May, 2005.

The future minimum annual rental payments for non-cancelable leases are approximately as follows:

| | | |
|---|---|---:|
| 2004 | | 269,391 |
| 2005 | | 146,960 |
| | $ | 416,351 |

Rental expense for the year ended December 31, 2003 was $385,019.


NOTE 5:  NOTE PAYABLE

Note Payable consists of an SBA guaranteed loan due in monthly installments of $13,741 including interest at 8% per annum, maturing December, 2004. This loan was in default as of December 31, 2003 due to nonpayment


NOTE 6:    SUBORDINATED BORROWINGS

Borrowings under subordination agreements at December 31, 2003, are as follows:

| | | |
|---|---|---:|
| Subordinated Loan, interest at 10% annually, due September, 2005 | $ | 300,000 |
| Subordinated Loan, interest at 10% annually, due July, 2005 | | 300,000 |
| | $ | 600,000 |

The subordinated borrowings are available in computing net capital under the SEC's uniform net capital rule. To the extent that such borrowings are required for the Company's continued compliance with minimum net capital requirements, they may not be repaid.

F-10

**GLOBAL PARTNERS SECURITIES, INC.**
**NOTES TO THE FINANCIAL STATEMENTS**

**NOTE 7:    INCOME TAXES**

The Company has available at December 31, 2003, approximately $5,535,000 of unused operating loss carryforwards that may be applied against future taxable income and that expire between 2021 and 2023. Based upon these carryforwards, there is no current income tax liability at December 31, 2003.

The deferred portion of the income tax benefit included in the statement of operations net of a valuation allowance is $0 at December 31, 2003.

**NOTE 8:    RELATED PARTY TRANSACTIONS**

The company has various receivables due from related companies totaling $671,951. These receivables are non interest bearing and are due on demand. In addition, the company paid consulting fees to a company owned by one of the shareholders of its parent company. These fees amounted to $27,600.

**NOTE 9:    NET CAPITAL REQUIREMENTS**

The Company is subject to the Securities and Exchange Commission Uniform Net Capital Rule (SEC rule 15c3-1), which requires the maintenance of minimum net capital and requires that the ratio of aggregate indebtedness to net capital, both as defined, shall not exceed 15 to 1. At December 31, 2003, the Company had net capital of $404,384 which was $5,384 in excess of its required net capital of $399,000. The Company's net capital ratio was 2.19 to 1.

**NOTE 10:    OFF-BALANCE-SHEET RISK**

The Company's customers' securities transactions are introduced on a fully-disclosed basis with its clearing broker/dealers. The clearing broker/dealer is responsible for collection of and payment of funds, and receipt and delivery of securities relative to customer transactions. Off-balance-sheet risk exists with respect to these transactions due to the possibility that customers may be unable to fulfill their contractual commitments wherein the clearing broker/dealer may charge any losses it incurs to the Company. The Company seeks to minimize this risk through procedures designed to monitor the creditworthiness of its customers and proper executions of customer transactions by the clearing broker/dealer.

F-11

**GLOBAL PARTNERS SECURITIES, INC.**
**NOTES TO THE FINANCIAL STATEMENTS**

### NOTE 11:  CLOSELY HELD CORPORATIONS

The Company owns 99.75% of a company which owns 100% of another broker-dealer.  Pursuant to Rule 17a-5 of the Securities Exchange Act of 1934, consolidation of these entities into the financial statements of the Company is not required.  The assets, liabilities and equity of the entities which would otherwise be consolidated are as follows:

| | | |
|---|---|---|
| Assets | S | 215,607 |
| Liabilities | | 687,113 |
| Stockholder's Deficit | S | 471,506 |

As part of the consolidation, $607,000 of the assets of the Company would be eliminated along with $607,000 of liabilities of the entities to be consolidated.

### NOTE 12:  LITIGATION

A former employee of the Company filed a statement of claim with the NASD against the Company for commissions owed, wrongful termination and defamation related to a Form U-5 filed with the NASD.  In October 2003, after a final hearing, the panel entered an award against the Company for breach of implied contract in the sum of $218,833.  In December 2003, the Company filed a Petition to Vacate Arbitration Award.  The attorney is unable to opine on the likely outcome of the Petition to Vacate.  As a result, the Company has included $248,704 to cover the award and accrued interest in its accounts payable at December 31, 2003 and in other expenses for the year ended December 31, 2003.

The company is a co-defendant in a statement of claim filed with the NASD by one of its former customers for breach of fiduciary duty, negligence and respondeat superior related to investment losses suffered six years ago by the customer.  Claimant seeks an unspecified amount of damages.  The company has filed an answer to the claim and is vigorously defending itself against the claim.  A final arbitration hearing has yet to be scheduled and the attorney is unable to opine on the likely outcome of the claim.

The Company is a defendant in an action filed in New York State Court claiming breach of contract.  The complaint seeks approximately $50,000 in damages and other relief.  This matter is being vigorously defended and a counterclaim has been interposed.  The attorney has stated that based upon the facts and circumstances currently known, the underlying claim against the Company appears to be lacking in factual merit and otherwise overvalued.

The company is a co-defendant in a number of state law causes of action alleging that the market price of the plaintiff's stock was "fraudulently manipulated" as the result of purported "Naked Short Sales" of the plaintiff's securities.  The Company has not been served in the lawsuit but denies the plaintiff's allegations of wrongdoing and plans to vigorously defend itself.  The lawsuit has not been set for trial and the attorney is unable to opine on the likely outcome of the lawsuit.

F-12

**GLOBAL PARTNERS SECURITIES, INC.**
**NOTES TO THE FINANCIAL STATEMENTS**

**NOTE 13:  GOING CONCERN**

The accompanying financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America, which contemplates continuation of the company as a going concern.  However, the company has sustained substantial operating losses in recent years and has had negative cash flows from operating activities which has required the Company's shareholders to contribute substantial amounts of capital to fund the operating losses.  In addition, as of December 31, 2003, the company is in default on a SBA guaranteed loan payable.

In accordance with its 2003 business plan, the operating losses over the last six months of 2003 were reduced and in January of 2004 almost reached the breakeven point.  In addition, the company has prepared financial forecasts based upon current increased production and an improving environment for its emerging market bond trading division and has begun to more closely monitor productivity and expenditures.  The Company is also currently negotiating with the SBA for an extension of the term (3 years) and a reduction of the interest rate (8%) of the loan payable because they are not consistent with more favorable terms being offered at other lending institutions.   The shareholders are committed to providing operating capital as needed for the upcoming year in anticipation of a turnaround in profitability.  Management believes that the above actions presently being taken to revise the company's operations provide the opportunity for the company to continue as a going concern.

SHAVELL & COMPANY, P.A.

Certified Public Accountants and Consultants

7700 Congress Avenue, Suite 3105, Boca Raton, FL 33487
Ph (561) 997-7242  Fax (561) 997-7262
info@shavell.net

F-13

## INDEPENDENT AUDITOR'S REPORT ON SUPPLEMENTARY INFORMATION REQUIRED BY RULE 17a-5 OF THE SECURITIES AND EXCHANGE COMMISSION

To the Shareholder
Global Partners Securities, Inc.
Fort Lauderdale, Florida 33309

We have audited the accompanying financial statements of Global Partners Securities, Inc. as of December 31, 2003 and for the year then ended, and have issued our report thereon dated February 20, 2004. Our audit was conducted for the purpose of forming an opinion on the basic financial statements taken as a whole. The supplementary information is presented for purposes of additional analysis and is not a required part of the basic financial statements, but is supplementary information required by rule 17a-5 of the Securities and Exchange Commission. Such information has been subjected to the auditing procedures applied in the audit of the basic financial statements and, in our opinion, is fairly stated in all material respects in relation to the basic financial statements taken as a whole.

SHAVELL & COMPANY, P.A.

*Shavell & Company, P.A.*

Boca Raton, Florida
February 20, 2004

**GLOBAL PARTNERS SECURITIES, INC**
**COMPUTATION OF AGGREGATE INDEBTEDNESS AND**
**NET CAPITAL UNDER RULE 15c3-1**
**DECEMBER 31, 2003**

F-14

AGGREGATE INDEBTEDNESS

| | | |
|---|---|---|
| Accounts Payable | $ | 368,658 |
| Accrued Liabilities | | 29,405 |
| Commissions Payable | | 197,358 |
| Loan Payable | | 291,889 |
| | | |
| Total Aggregate Indebtedness | $ | 887,310 |

NET CAPITAL

| | | |
|---|---|---|
| Total Stockholder's Equity from | | |
| the Statement of Financial Condition | $ | 597,896 |
| Add: | | |
| Subordinated borrowings qualified for net capital | | 600,000 |
| Total capital and allowable subordinated borrowings | | 1,197,896 |
| Deductions: | | |
| Nonallowable Assets: | | |
| Due from Related Parties | | 671,951 |
| Property and Equipment, net | | 31,963 |
| Prepaid Expenses | | 1,165 |
| Advances to Employees | | 19,716 |
| Non Marketable Securities | | 24,400 |
| Receivable from Clearing Broker | | 9,656 |
| Deposits | | 17,262 |
| | | |
| | | 776,113 |
| Net Capital Before Haircuts on Securities Positions | | 421,783 |
| Haircuts on Securities Positions: | | |
| Corporate Stock | | 17,399 |
| Net Capital | $ | 404,384 |
| Minimum Required Net Capital | $ | 399,000 |
| Excess Net Capital at 1500% | $ | 5,384 |
| Excess Net Capital at 1000% | $ | 315,653 |
| Ratio of Aggregate Indebtedness to Net Capital | | 2.19 to 1 |

The Accompanying Notes are an Integral Part of These Financial Statements

**GLOBAL PARTNERS SECURITIES, INC.**
**STATEMENT PURSUANT TO RULE 17a-5(d)(4)**         F-15
**DECEMBER 31, 2003**

Reconciliation with Company's computation (included in Part II of Form X-17A-5 as of December 31, 2003).

| | | |
|---|---|---|
| Net Capital, as Reported in Company's Part II (unaudited) FOCUS Report | $ | 404,384 |
| Net Capital Per Above | $ | 404,384 |

## STATEMENT OF CHANGES IN LIABILITIES SUBORDINATED
## TO CLAIMS OF GENERAL CREDITORS

| | | |
|---|---|---|
| Subordinated Loans, January 1, 2003 | $ | 600,000 |
| Conversion of Subordinated Loans to Equity | | - |
| Subordinated Loans, December 31, 2003 | $ | 600,000 |

## STATEMENT PURSUANT TO EXEMPTIVE PROVISION
## UNDER RULE 15c-3-3

The Company is currently exempt from the requirement to maintain a "Special Reserve Account for the Exclusive Benefit of Customers" under provisions of SEC Rule 15c3-3 based upon Paragraph k(2)(ii) of the Rule.

**EquityStation, Inc.**

**Financial Statements**

**December 31, 2003**

EQUITYSTATION, INC.
TABLE OF CONTENTS
DECEMBER 31, 2003

|  | Page |
|---|---|
| INDEPENDENT AUDITOR'S REPORT | F-1 |
| Statement of Financial Condition | F-2 |
| Statement of Operations | F-3 |
| Statement of Changes in Stockholder's Equity | F-4 |
| Statement of Cash Flows | F-5 |
| Notes to Financial Statements | F-6 – F-8 |
| INDEPENDENT AUDITOR'S REPORT ON THE SUPPLEMENTARY INFORMATION | F-9 |
| SUPPLEMENTARY INFORMATION: |  |
| Computation of Aggregate Indebtedness and Net Capital Under Rule 15c3-1 | F-10 |
| Statement Pursuant to Rule 17a-5(d)(4) | F-11 |
| Statement of Changes in Liabilities Subordinated to Claims of General Creditors | F-11 |
| Statement Pursuant to Exemptive Provision Under Rule 15c3-3 | F-11 |

SHAVELL & COMPANY, P.A.

Certified Public Accountants and Consultants

7700 Congress Avenue, Suite 3105, Boca Raton, FL 33487
Ph (561) 997-7242  Fax (561) 997-7262
info@shavell.net

F-1

## INDEPENDENT AUDITOR'S REPORT

To the Stockholder
Equity Station, Inc.
Fort Lauderdale, Florida 33309

We have audited the accompanying statement of financial condition of Equity Station, Inc. as of December 31, 2003 and the related statements of operations, changes in stockholder's equity and cash flows for the year then ended, that you are filing pursuant to Rule 17a-5 under the Securities Exchange Act of 1934. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Equity Station, Inc. as of December 31, 2003 and the results of its operations and its cash flows for the year then ended, in conformity with accounting principles generally accepted in the United States of America.

SHAVELL & COMPANY, P.A.

*Shavell + Company, P.A.*

Boca Raton, Florida
February 20 , 2004

F-2

**EQUITYSTATION, INC.**
**STATEMENT OF FINANCIAL CONDITION**
**DECEMBER 31, 2003**

**ASSETS**

| | | |
|---|---|---:|
| Cash | $ | 13,982 |
| Receivable from broker-dealers and clearing organizations | | 189,970 |
| Due from Related Party | | 6,542 |
| Deposit and Other | | 5,113 |
| | $ | 215,607 |

**LIABILITIES AND STOCKHOLDER'S EQUITY**

LIABILITIES

| | | |
|---|---|---:|
| Accounts Payable | $ | 23,235 |
| Accrued Expenses | | 44,299 |
| Payable to broker-dealers and clearing organizations | | 307 |
| | | 67,841 |

Commitments

STOCKHOLDER'S EQUITY

| | |
|---|---:|
| Common Stock, Par Value $.01 Per Share; Authorized 10,000,000 Shares; Issued 1000 Shares | 10 |
| Additional Paid-in Capital | 1,081,490 |
| Accumulated Deficit | (933,734) |
| | 147,766 |
| $ | 215,607 |

The Accompanying Notes are an Integral Part of These Financial Statements

F-3

**EQUITYSTATION, INC.**
**STATEMENT OF OPERATIONS**
**DECEMBER 31, 2003**

| | | |
|---|---|---|
| REVENUE | | |
| Commission Income | $ | 880,274 |
| Interest Income | | 9,144 |
| Other Income | | 1,490 |
| | | 890,908 |
| | | |
| EXPENSES | | |
| Employee Compensation and Benefits | | 664,626 |
| Clearance Fees | | 287,905 |
| Communications and Data Processing | | 21,615 |
| Interest | | 3,664 |
| Occupancy | | 24,000 |
| Other Expenses | | 147,913 |
| | | 1,149,723 |
| | | |
| Net Loss | $ | (258,815) |

The Accompanying Notes are an Integral Part of These Financial Statements

F-4

**EQUITYSTATION, INC.**
**STATEMENT OF CHANGES IN STOCKHOLDER'S EQUITY**
**DECEMBER 31, 2003**

| | | Common Stock | | Additional Paid-In Capital | | Accumulated Deficit | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Balance, | December 31, 2002 | $ | 10 | $ | 861,490 | $ | (674,919) | $ | 186,581 |
| Net Loss | | | | | | | (258,815) | | (258,815) |
| Contributions | | | | | 220,000 | | | | 220,000 |
| Balance, | December 31, 2003 | $ | 10 | $ | 1,081,490 | $ | (933,734) | $ | 147,766 |

The Accompanying Notes are an Integral Part of These Financial Statements

F-5

**EQUITYSTATION, INC.**
**STATEMENT OF CASH FLOWS**
**DECEMBER 31, 2003**

| | | |
|---|---|---:|
| CASH FLOWS FROM OPERATING ACTIVITIES | | |
| Net Loss | $ | (258,815) |
| Adjustments to Reconcile Net Income to Net Cash | | |
| Provided By Operating Activities: | | |
| Change in Assets and Liabilities: | | |
| Decrease In: | | |
| Receivable from broker-dealers and clearing organizations | | 256,604 |
| Increase (Decrease) In: | | |
| Accounts Payable | | 14,660 |
| Accrued Expenses | | 17,999 |
| Payable from broker-dealers and clearing organizations | | (259,381) |
| Net Cash Used In Operating Activities | | (228,933) |
| | | |
| CASH FLOWS FROM INVESTING ACTIVITIES | | |
| Decrease in Deposits and Other | | (2,429) |
| | | |
| CASH FLOWS FROM FINANCING ACTIVITIES | | |
| Advances from Related Party | | (13,728) |
| Repayments to Related Party | | 21,480 |
| Capital Contributed by Shareholder | | 220,000 |
| Net Cash Provided By Financing Activities | | 227,752 |
| | | |
| Decrease in Cash | | (3,610) |
| | | |
| Cash: | | |
| Beginning | | 17,592 |
| Ending | $ | 13,982 |
| | | |
| SUPPLEMENTARY DISCLOSURES OF CASH FLOW INFORMATION | | |
| Cash Payments for Interest | $ | 3,664 |

The Accompanying Notes are an Integral Part of These Financial Statements

**EQUITYSTATION, INC.**                                            F-6
**NOTES TO FINANCIAL STATEMENTS**

### NOTE 1:   NATURE OF BUSINESS AND SIGNIFICANT ACCOUNTING POLICIES

#### Nature of Business

EquityStation, Inc. (the Company) is a broker-dealer registered with the Securities and Exchange
Commission (SEC) and is a member of the National Association of Securities Dealers (NASD). The
Company is a Florida Corporation incorporated July 22, 1999.

In connection with its activities as a broker-dealer, the Company does not hold customer funds or
securities, and promptly transmits all customer funds received to its clearing firm, ABN AMRO,
Incorporated. Although the company's clearing firm maintains all of the accounts of such customers and
preserves all required and customary records, the Company remains contingently liable for losses incurred
on these accounts.

#### Commissions

Commissions and related clearing expenses are recorded on a trade-date basis as securities transactions
occur.

#### Advertising

Costs of advertising are expensed as incurred and amounted to $59,129 for the year ended December 31,
2003.

#### Income Taxes

The Company files federal and state corporate income tax returns. The Company has not accrued any
federal and state income tax liability for the year ended December 31, 2003.

#### Use of Estimates

The preparation of financial statements in conformity with generally accepted accounting principles
requires management to make estimates and assumptions that affect the reported amounts of assets and
liabilities and disclosures of contingent assets and liabilities at the date of the financial statements. Actual
results could differ from those estimates.

#### Cash Equivalents

For purposes of the statement of cash flows, the Company has defined cash equivalents as highly liquid
investments, with original maturation of less than ninety days that are not held for sale in the ordinary
course of business.

EQUITYSTATION, INC.                                              F-7
NOTES TO FINANCIAL STATEMENTS

NOTE 2:   **RECEIVABLE FROM AND PAYABLE TO BROKER-DEALERS AND CLEARING ORGANIZATIONS**

Amounts receivable from and payable to broker-dealers and clearing organizations at December 31, 2003, consist of brokers receivable of $189,970 and brokers payable of $307.

The Company clears all of its commissioned transactions through another broker-dealer on a fully disclosed basis. The amount receivable from the clearing broker relates to the aforementioned transactions. Any payables to the broker-dealers are normally collateralized by amount receivable and by deposits held by the clearing organization.

NOTE 3:   **RELATED PARTY TRANSACTIONS**

As of December 31, 2003, the Company was due non-interest bearing advances made to a related entity of $6,542. The Company also paid an entity owned by a shareholder of its parent company consulting fees of $27,600.

NOTE 4:   **NET CAPITAL REQUIREMENTS**

The Company is subject to the Securities and Exchange Commission Uniform Net Capital Rule (SEC rule 15c3-1), which requires the maintenance of minimum net capital and requires that the ratio of aggregate indebtedness to net capital, both as defined, shall not exceed 15 to 1. At December 31, 2003, the Company had net capital of $125,594 which was $25,594 in excess of its required net capital of $100,000. The Company's net capital ratio was 1.85 to 1.

NOTE 5: INCOME TAXES

The Company has available at December 31, 2003, $932,000 of unused operating loss carryforwards that may be applied against future taxable income and that expire in various years from 2020 to 2023. Based upon these carryforwards, there is no current income tax liability at December 31, 2003.

The deferred portion of the income tax benefit included in the statement of operations net of a valuation allowance is $0 at December 31, 2003.

**EQUITYSTATION, INC.**
**NOTES TO FINANCIAL STATEMENTS**

**NOTE 6:  OFF-BALANCE-SHEET RISK**

The Company's customers' securities transactions are introduced on a fully-disclosed basis with its clearing broker/dealer, ABN AMRO, Incorporated.  The clearing broker dealer is responsible for collection of and payment of funds, and receipt and delivery of securities relative to customer transactions.  Off-balance-sheet risk exists with respect to these transactions due to the possibility that customers may be unable to fulfill their contractual commitments wherein the clearing broker/dealer may charge any losses it incurs to the Company.  The Company seeks to minimize this risk through procedures designed to monitor the creditworthiness of its customers and proper executions of customer transactions by the clearing broker/dealer.

# SHAVELL & COMPANY, P.A.

Certified Public Accountants and Consultants

7700 Congress Avenue, Suite 3105, Boca Raton, FL 33487
Ph (561) 997-7242  Fax (561) 997-7262
info@shavell.net

F-9

## INDEPENDENT AUDITOR'S REPORT ON SUPPLEMENTARY INFORMATION REQUIRED BY RULE 17a-5 OF THE SECURITIES AND EXCHANGE COMMISSION

To the Stockholder
EquityStation, Inc.
Fort Lauderdale, Florida 33309

We have audited the accompanying financial statements of EquityStation, Inc. as of December 31, 2003 and for the year then ended, and have issued our report thereon dated February 20, 2004. Our audit was conducted for the purpose of forming an opinion on the basic financial statements taken as a whole. The supplementary information is presented for purposes of additional analysis and is not a required part of the basic financial statements, but is supplementary information required by rule 17a-5 of the Securities and Exchange Commission. Such information has been subjected to the auditing procedures applied in the audit of the basic financial statements and, in our opinion, is fairly stated in all material respects in relation to the basic financial statements taken as a whole.

SHAVELL & COMPANY, P.A.

*Shavell + Company, P.A.*

Boca Raton, Florida
February 20, 2004

F-10

## EQUITYSTATION, INC.
## COMPUTATION OF AGGREGATE INDEBTEDNESS AND
## NET CAPITAL UNDER RULE 15c3-1
## AS OF DECEMBER 31, 2003

| | | |
|---|---|---:|
| **NET CAPITAL** | | |
| Total Stockholder's Equity from the Statement of Financial Condition | $ | 147,766 |
| Deductions: | | |
| Total Nonallowable Assets | | 22,172 |
| Net Capital | $ | 125,594 |
| | | |
| **AGGREGATE INDEBTEDNESS** | | |
| Accounts Payable | $ | 23,235 |
| Accrued Expenses | | 44,299 |
| Brokers Payable | | 307 |
| Aggregate Indebtedness | $ | 67,841 |
| | | |
| **COMPUTATION OF BASIC NET CAPITAL REQUIREMENT** | | |
| Minimum Required Net Capital | $ | 100,000 |
| Excess Net Capital at 1500% | $ | 25,594 |
| Excess Net Capital at 1000% | $ | 118,810 |
| Ratio of Aggregate Indebtedness to Net Capital | $ | 1.85 to 1 |

The Accompanying Notes are an Integral Part of These Financial Statements

F-11

**EQUITYSTATION, INC.**
**STATEMENT PURSUANT TO RULE 17a-5(d)(4)**
**DECEMBER 31, 2003**

Reconciliation with Company's computation (included in Part II of Form X-17A-5 as of December 31, 2003).

| | | |
|---|---|---|
| Net Capital, as Reported in Company's Part II (unaudited) FOCUS Report | $ | 125,594 |
| Net Capital Per Audited Financial Statement | $ | 125,594 |

## STATEMENT OF CHANGES IN LIABILITIES SUBORDINATED TO CLAIMS OF GENERAL CREDITORS

During the period from January 1, 2003 to December 31, 2003, there were no liabilities subordinated to claims of general creditors.

## STATEMENT PURSUANT TO EXEMPTIVE PROVISION UNDER RULE 15c-3-3

The Company is currently exempt from the requirement to maintain a "Special Reserve Account for the Exclusive Benefit of Customers" under provisions of SEC Rule 15c3-3 based upon Paragraph k(2)(ii) of the Rule.

**Global Partners Group, Inc.**

## APPENDIX C

**Summary of 2004 – 2008 Projected Financial Statements**

*Please note that the assumptions underlying the accompanying annual financial projections, as well as more detailed monthly financial projections, will be provided to the recipients of this Confidential Private Placement Memorandum at an appropriate time.*

CONFIDENTIAL

**Global Partners Group, Inc.**
**FINANCIAL PROJECTIONS**
**BALANCE SHEET FOR THE PERIODS ENDED DECEMBER 31, 2003 TO DECEMBER 31, 2008**

| | Actual Dec 03 | Proj. Dec 04 | Proj. Dec 05 | Proj. Dec 06 | Proj. Dec 07 | Proj. Dec 08 |
|---|---|---|---|---|---|---|
| **Current Assets** | | | | | | |
| Cash | $338,283 | $1,788,251 | $1,670,688 | $4,026,018 | $7,817,939 | $12,646,747 |
| Accounts Receivable | 874,980 | 848,513 | 1,376,234 | 2,073,320 | 3,024,573 | 3,900,580 |
| Notes Receivable | 250,000 | 188,107 | 188,107 | 188,107 | 188,107 | 186,107 |
| Marketable Securities | 114,244 | 42,369 | 42,369 | 42,369 | 42,369 | 42,369 |
| Prepaid Expenses | 26,552 | 28,581 | 28,581 | 28,581 | 28,581 | 28,581 |
| Subtotal Current Assets | 1,604,059 | 2,894,621 | 3,305,983 | 6,356,395 | 11,099,569 | 16,804,063 |
| **Fixed Assets** | | | | | | |
| Computer Equipment | 381,424 | 464,102 | 737,089 | 1,180,895 | 1,788,914 | 2,653,878 |
| Other Furniture & Fixtures | 70,148 | 80,876 | 148,923 | 264,524 | 412,129 | 628,570 |
| Accumulated Depreciation | (419,609) | (444,850) | (484,272) | (547,675) | (647,675) | (800,372) |
| Subtotal Fixed Assets | 31,963 | 99,928 | 401,740 | 897,845 | 1,554,068 | 2,481,374 |
| **Other Assets** | | | | | | |
| Investments | 23,400 | 23,400 | 23,400 | 23,400 | 23,400 | 23,400 |
| Deposits | 476,990 | 1,272,673 | 1,272,673 | 1,272,673 | 1,272,673 | 1,272,673 |
| Organizational Costs (Net) | | | | | | |
| Subtotal Other Assets | 500,060 | 1,296,073 | 1,296,073 | 1,296,073 | 1,296,073 | 1,296,073 |
| **Total Assets** | $1,936,112 | $4,260,822 | $5,003,796 | $8,520,113 | $13,949,410 | $20,581,510 |
| **Current Liabilities** | | | | | | |
| Accounts Payable | $827,698 | $866,166 | $766,160 | $1,044,378 | $1,539,643 | $1,971,574 |
| Loans Payable | 291,889 | - | - | - | - | - |
| Accrued Expenses | 33,405 | 15,980 | 15,980 | 15,980 | 15,980 | 15,980 |
| Other Liabilities | 25,439 | 5,378 | 5,378 | 5,378 | 5,378 | 5,378 |
| Subtotal Current Liabilities | 978,631 | 887,524 | 787,518 | 1,065,736 | 1,561,001 | 1,992,932 |
| **Long Term Liabilities** | | | | | | |
| Long Term Loans Payable | 757,000 | 757,000 | | | | |
| Subordinated Loan Payable | | | | | | |
| Total Liabilities | 1,735,631 | 1,344,524 | 787,518 | 1,065,736 | 1,561,001 | 1,992,932 |
| **Convertible Redeemable Preferred Stock** | 0 | 2,700,000 | 2,700,000 | 2,700,000 | 2,700,000 | 2,700,000 |
| **Stockholder Equity** | | | | | | |
| Common Stock | 1,510 | 1,543 | 1,543 | 1,543 | 1,543 | 1,543 |
| Preferred Stock | 0 | 400,000 | 400,000 | - | - | |
| Paid In Capital | 7,266,244 | 7,588,211 | 7,588,211 | 7,588,211 | 7,588,211 | 7,588,211 |
| YTD Profit & Loss | (7,067,273) | (874,182) | 1,269,879 | 3,598,099 | 4,974,032 | 6,200,169 |
| Retained Earnings | | (7,067,273) | (7,741,455) | (6,471,477) | (2,873,377) | 2,100,655 |
| Subtotal Stockholder Equity | 200,481 | 248,299 | 1,516,377 | 4,714,377 | 9,688,406 | 15,888,578 |
| **Total Liabilities, Pref. Stock, and Equity** | $1,936,112 | $4,260,822 | $5,003,796 | $8,520,113 | $13,949,410 | $20,581,510 |

Check

*The Company contemplates issuing $3,000,000 in Convertible Redeemable Preferred Stock. The $2,700,000 amount shown on the balance sheet is net of fees and expenses at issuance.

CONFIDENTIAL

## Global Partners Group, Inc.
### FINANCIAL PROJECTIONS
### STATEMENT OF OPERATIONS FOR THE PERIODS ENDED DECEMBER 31, 2003 – DECEMBER 31, 2008

| | 2003 | % | 2004 | % | 2005 | % | 2006 | % | 2007 | % | 2008 | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | |
| Equity Stallion | $898,217 | | $2,893,455 | | $5,358,730 | | $8,055,135 | | $10,927,623 | | $13,857,781 | |
| GP Funds & GPAM | 148,914 | | 284,419 | | 914,989 | | 2,510,169 | | 5,093,824 | | 8,696,174 | |
| NAIB | 1,671,012 | | 2,609,995 | | 5,216,264 | | 8,228,449 | | 13,137,994 | | 17,881,008 | |
| Emerging Markets | 1,609,302 | | 1,803,341 | | 2,101,370 | | 2,385,523 | | 2,701,724 | | 2,963,153 | |
| Subtotal Revenue | 4,328,445 | 100% | 7,591,210 | 100% | 13,646,361 | 100% | 21,193,295 | 100% | 31,460,984 | 100% | 43,108,095 | 100% |
| **Cost of Sales** | | | | | | | | | | | | |
| Equity Stallion | 535,086 | 13% | 1,085,906 | 25% | 3,411,992 | 25% | 5,038,702 | 24% | 6,320,106 | 20% | 8,523,254 | 20% |
| GP Funds | 74,611 | 2% | 151,775 | 2% | 400,163 | 3% | 1,048,463 | 5% | 2,078,138 | 7% | 3,482,888 | 8% |
| NAIB | 1,584,788 | 37% | 2,001,531 | 26% | 3,626,259 | 27% | 5,852,792 | 28% | 9,660,421 | 31% | 13,593,640 | 31% |
| Emerging Markets | 1,117,710 | 26% | 1,078,937 | 14% | 1,121,749 | 8% | 1,333,190 | 6% | 2,075,788 | 7% | 2,092,824 | 5% |
| Subtotal Direct Expenses | 3,333,097 | 77% | 5,118,149 | 67% | 8,563,161 | 63% | 13,273,148 | 63% | 20,144,514 | 64% | 27,691,607 | 64% |
| **Gross Profit** | 995,348 | 23% | 2,473,061 | 33% | 5,086,210 | 37% | 7,907,147 | 37% | 11,316,451 | 36% | 15,498,289 | 36% |
| *Gross Margin %* | 23.0% | | 32.6% | | 37.3% | | 37.3% | | 36.0% | | 35.9% | |
| **Corporate Expenses** | | | | | | | | | | | | |
| General & Administrative | 2,746,668 | 63% | 2,938,194 | 39% | 3,525,833 | 26% | 4,089,066 | 19% | 4,703,491 | 15% | 5,926,361 | 14% |
| Total Operating Expenses | 2,746,668 | 63% | 2,938,194 | 39% | 3,525,833 | 26% | 4,089,066 | 19% | 4,703,491 | 15% | 5,926,361 | 14% |
| **EBITDA** | (1,751,320) | | (465,127) | | 1,560,377 | | 3,817,161 | | 6,612,960 | | 9,599,928 | |
| *EBITDA %* | -40.5% | | -6.1% | | 11.4% | | 18.0% | | 21.0% | | 22.2% | |
| Depreciation & Amortization | 22,846 | 1% | 25,241 | 0% | 39,622 | 0% | 63,603 | 0% | 100,101 | 0% | 152,397 | 0% |
| **EBIT** | (1,773,566) | -41% | (490,368) | -6% | 1,520,855 | 11% | 3,753,578 | 18% | 6,512,859 | 21% | 9,417,531 | 22% |
| *EBIT %* | -41.0% | | -6.5% | | 11.1% | | 17.7% | | 20.7% | | 21.8% | |
| **Other Income & Expense** | | | | | | | | | | | | |
| Other Expense | 248,704 | 6% | 8,591 | 0% | - | 0% | - | 0% | - | 0% | - | 0% |
| Interest Income | 98,429 | 2% | (20,983) | 0% | (90,918) | 0% | (74,531) | 0% | (173,435) | -1% | (294,846) | -1% |
| Interest Expense | - | | 83,718 | 1% | 91,892 | 0% | - | 0% | - | 0% | - | 0% |
| Subtotal Other Inc & Exp | 347,133 | 8% | 79,646 | 1% | 976 | 0% | (74,531) | 0% | (173,435) | -1% | (294,846) | -1% |
| **Pretax Income** | (2,121,099) | -49% | (570,015) | -8% | 1,519,979 | 11% | 3,828,099 | 18% | 6,686,324 | 21% | 9,712,377 | 22% |
| *Pretax Income %* | -49.0% | | -7.5% | | 11.1% | | 18.1% | | 21.3% | | 22.5% | |
| Provision For Income Tax | - | | 104,167 | | 250,000 | | 238,000 | | 1,502,292 | | 3,302,208 | |
| **Net Income After Tax** | (2,121,099) | -49% | (674,182) | -9% | 1,269,979 | 11% | 3,590,099 | 17% | 5,184,032 | 16% | 6,410,169 | 15% |
| *Dividends Paid on Preferred Shares | - | | - | | - | | 210,000 | | 210,000 | | 210,000 | |
| **Net Income to Common Stockholders** | (2,121,099) | -49% | (674,182) | -9% | 1,269,979 | 9% | 3,380,099 | 16% | 4,974,032 | 16% | 6,200,169 | 14% |

*Assumes Minimum Dividend Rate of 10.0% per annum on Convertible VRPP Stock issued in June 2004.

Global/29

6/30/2004

CONFIDENTIAL

6/30/2004

**Global Partners Group, Inc.**
**FINANCIAL PROJECTIONS**
**STATEMENT OF CASH FLOWS FOR THE PERIODS ENDED DECEMBER 31, 2003 - DECEMBER 31, 2008**

| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|
| **Cash Flow From Operations:** | | | | | | |
| Net Profit (Loss) | (\$2,121,099) | (\$570,016) | \$1,516,979 | \$3,828,099 | \$5,184,032 | \$6,410,169 |
| Amortization and Depreciation | 11,648 | 25,241 | 39,422 | 83,603 | 100,101 | 152,397 |
| Change in Working Capital Items: | | | | | | |
| Accounts Receivable | 574,987 | (109,640) | (539,725) | (668,082) | (951,253) | (875,886) |
| Marketable Securities | (23,752) | 71,875 | - | - | - | - |
| Prepaid Expenses | 54,279 | (2,028) | - | - | - | - |
| Other Assets (Including Org. Costs) | (6,415) | (765,983) | - | - | - | - |
| Accounts Payable | 45,996 | (81,793) | 199,905 | 315,217 | 465,265 | 431,931 |
| Accrued Expenses | 33,405 | (17,425) | - | - | - | - |
| Deferred Revenue | - | - | - | - | - | - |
| **Net Cash Flow From Operations** | (1,430,951) | (1,479,770) | 1,229,671 | 3,515,837 | 4,788,145 | 6,119,810 |
| | | | | | | |
| **Cash Flows From Investing Activities:** | | | | | | |
| Computer Equipment | (1,194) | (82,678) | (272,987) | (423,606) | (624,219) | (863,762) |
| Computer Software | - | - | - | - | - | - |
| Office Furniture and Fixtures | (995) | (10,528) | (68,247) | (105,901) | (157,305) | (215,940) |
| **Net Cash Flows From Investing Activities** | (2,189) | (93,206) | (341,234) | (529,507) | (786,524) | (1,079,702) |
| | | | | | | |
| **Cash Flows From Financing Activities:** | | | | | | |
| Payments of Notes Payable to Stockholders | 10,050 | - | (757,000) | - | - | - |
| Proceeds (Repayments) of SBA Loan | 144,939 | (281,889) | - | - | - | - |
| Dividends Declared | - | (104,167) | (250,000) | (230,000) | (210,000) | (210,000) |
| Issuance of Stock | 1,424,541 | 3,409,000 | - | (400,000) | - | - |
| **Net Cash Flow From Financing Activities** | 1,579,530 | 3,023,944 | (1,007,000) | (630,000) | (210,000) | (210,000) |
| | | | | | | |
| **Net Increase (Decrease) in Cash** | 146,390 | 1,450,968 | (118,563) | 2,356,330 | 3,791,621 | 4,829,107 |
| | | | | | | |
| **Cash - Beginning of Period** | 191,893 | 338,283 | 1,789,251 | 1,670,688 | 4,026,018 | 7,817,639 |
| | | | | | | |
| **Cash - End of Period** | \$338,283 | \$1,789,251 | \$1,670,688 | \$4,026,018 | \$7,817,639 | \$12,646,747 |

Global\V29

SumFS

## <u>PREFERRED STOCK SUBSCRIPTION AGREEMENT</u>

June 17, 2004,

2004
Global Partners Group, Inc.
2101 West Commercial Blvd.
Suite 3500
Ft. Lauderdale, Florida 33309

Ladies and Gentlemen:

Global Partners Group, Inc., a Florida corporation (the "Company"), desires to sell to David Alcalay ("Subscriber") 80,000 shares (the "Shares") of its Convertible Variable Rate Participating Preferred Stock (the "Preferred Stock") at a price of $5.00 per share, subject to adjustment, and Subscriber desires to purchase the Shares on terms set forth in this Preferred Stock Subscription Agreement (this "Agreement").  The rights, preferences, powers and other terms of the Preferred Stock are set forth on Exhibit A attached hereto.  Accordingly, the Company and the Subscriber agree as follows:

1.     **Sale and Purchase.**  Subject to the terms and conditions set forth in the Agreement, the Company hereby sells the Shares to Subscriber and Subscriber hereby purchases the Shares tenders $400,000 to the Company for the purchase price of the Shares.

2.     **Representation, Warranties, and Agreements of Subscriber.**  In connection with his subscription, Subscriber hereby makes the following representations, warranties and agreements and confirms the following understandings:

(a)     **Investment Purpose.**  Subscriber is acquiring the Shares and the shares of the Company's common stock issuable up on conversion of the Shares (collectively, the "Securities") for Subscriber's own account and for investment purposes only with no intent to distribute.

(b)     **Information Regarding the Company.**  Subscriber is familiar with the Company's present and proposed operations.  Subscriber acknowledges that Subscriber has conducted, or been afforded the opportunity to conduct an investigation of the Company and has been offered the opportunity to ask representatives of the Company questions about the Company's present and proposed business.  Representatives of the Company have answered all inquiries that Subscriber has put to them concerning the Company and its present and proposed business, and the offering and sale of the Shares.

(c)     **Risks.**  Subscriber recognizes that the purchase of the Shares involves a high degree of risk, and is suitable only for persons of adequate financial means who have no need for liquidity in this investment in that (i) Subscriber may not be able to liquidate the investment in the event of an emergency; (ii) transferability is extremely limited; and (iii) in the event of a disposition, Subscriber could sustain a complete loss of the entire investment.

{W:\Transact\0110\0737\M0178221 v.1; 6/10/2004 04:23 PM}          1

**EXHIBIT**

B

ALL-STATE LEGAL®

 

(d)     **Accreditor Investor Status.**   Subscriber represents that he is an "accredited investor" as such term is defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933, amended (the "Securities Act").   Specifically, Subscriber is an individual having an individual net worth or joint net worth with spouse in excess of $1,000,000.

(e)     **Subscriber's Financial Experience.**   Subscriber is sufficiently experienced in financial and business matters to be capable of evaluating the merits and risks of an investment in the Company.

(f)     **Suitability of Investment.**  Subscriber has evaluated the merits and risks of Subscriber's proposed investment in the Company, including those risks particular to Subscriber's situation, and has determined that this investment is suitable for Subscriber. Subscriber has adequate financial resources for an investment of this character, and at this time Subscriber can bear a complete loss of Subscriber's investment.   Further, Subscriber will continue to have, after making an investment in the Company, adequate means of providing for its current needs, the needs of those dependent on it, and possible personal contingencies.

(g)     **Exempt Offering.**  Subscriber understands that the sale of the Securities is not being registered on the basis that this issuance is exempt from registration under the Securities Act and the applicable state securities laws, and the rules and regulations promulgated thereunder, and that reliance on such exemptions is predicated, in part, on Subscriber's representations and warranties contained in this Agreement.  In the view of the Securities and Exchange Commission (the "SEC") and various state securities regulatory commissions, the statutory basis for the exemptions claimed by the Company in connection with the offering would not be present if, notwithstanding Subscriber's representations and warranties, Subscriber has the intention of acquiring the Securities for distribution upon the occurrence or non-occurrence of some predetermined event.

(h)     **Limitations on Disposition.**   Subscriber understands that there are substantial restrictions on the transferability of the Securities pursuant to the Securities Act and applicable state securities laws; the Securities will not be, and Subscriber has no rights to require that the Securities be registered under the Securities Act or any applicable state securities laws; and, accordingly, Subscriber may have to hold the Securities for an indefinite period of time. Subscriber represents that Subscriber can afford to hold the Securities for an indefinite period of time.  In particular, the Subscriber agrees that no sale, assignment or transfer of any Securities shall be valid or effective, and the Company shall not be required to give any effect to such sale, assignment or transfer, unless (i) such sale, assignment or transfer is registered under the Securities Act and applicable state securities laws, (ii) such Securities are sold, assigned or transferred in accordance with all the requirements and limitations of Rule 144 under the Securities Act, it being understood that Rule 144 is not available at the present time and is not expected to be available in the future for the sale of the Securities, or (iii) such sale, assignment or transfer is otherwise exempt from the registration under the Securities Act applicable. Subscriber further understands that an opinion of counsel and other documents may be required to transfer the Securities. Subscriber acknowledges that the certificates evidencing the Securities shall bear the following, or a substantially similar legend, or such other legend as may appear on the forms of the Securities, and such other legends as may be required by applicable state securities laws:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS AND NEITHER SUCH SECURITIES NOR ANY INTEREST THEREIN MAY BE OFFERED, SOLD, PLEDGED, ASSIGNED OR OTHERWISE TRANSFERRED UNLESS (1) A REGISTRATION STATEMENT WITH RESPECT THERETO IS EFFECTIVE UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS, OR (2) THE COMPANY RECEIVES AN OPINION OF COUNSEL TO THE HOLDER OF SUCH SECURITIES, WHICH COUNSEL AND OPINION ARE REASONABLY SATISFACTORY TO THE COMPANY, THAT SUCH SECURITIES MAY BE OFFERED, SOLD, PLEDGED, ASSIGNED OR TRANSFERRED IN THE MANNER CONTEMPLATED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR APPLICABLE STATE SECURITIES LAWS.

(i)     **Absence of Official Evaluation.**  Subscriber understands that no federal or state agency has made any finding or determination as to the fairness of the terms of an investment in the Company, nor any recommendation for or endorsement of the Shares offered hereby.

(j)     **Additional Financing.**  Subscriber acknowledges that nothing hereunder shall preclude the Company from seeking and/or procuring additional equity and/or debt financing, Subscriber further acknowledges that the Company may offer additional shares of the Preferred Stock or other securities of the Company to third parties on similar or different terms.

(k)     **Nonreliance.**   Subscriber is not relying on the Company or any representation contained herein or in the documents referred to herein with respect to the tax and economic effect of Subscriber's investment in the Company.

(l)     **Prohibitions   on   Cancellation,   Termination,   Revocation, Transferability, and Assignment.**  Subscriber hereby acknowledges and agrees that, except as may be specifically provided herein or by applicable law, Subscriber is not entitled to cancel, terminate, or revoke this Agreement, and this Agreement shall survive Subscriber's death or disability or any assignment of the Shares.  Subscriber further agrees that Subscriber may not transfer or assign Subscriber's rights under this Agreement, and Subscriber understands that, if Subscriber's subscription is accepted, the transferability of the Securities will be restricted.

(m)     **Authority to Enter into Agreement.**  Subscriber has full right, power, and authority to execute and deliver this Agreement and perform Subscriber's obligations hereunder.

(n)     **Obligation.**  This Agreement constitutes a valid and legally binding obligation of Subscriber and neither the execution of this Agreement nor the consummation of the transactions contemplated hereby, will constitute a violation of or default under, or conflict with, any judgment, decree, statute or regulation of any governmental authority applicable to Subscriber or any contract, commitment, agreement or restriction of any kind to which

Subscriber is a party or by which its assets are bound. The execution and delivery of this Agreement does not, and the consummation of the transactions described herein will not, violate applicable law, or any mortgage, lien, agreement, indenture, lease or understanding (whether oral or written) of any kind outstanding relative to Subscriber.

(o)   **Approvals Required.**  No approval, authorization, consent, order or other action of, or filing with, any person, firm or corporation or any court, administrative agency or other governmental authority is required in connection with the execution and delivery of this Agreement by Subscriber or the consummation of the transactions described herein.

(p)   **No General Solicitation.**  Subscriber is not subscribing for the Shares because of or following any advertisement, article, notice or other communication published in any newspaper, magazine or similar media or broadcast over television or radio, or presented at any seminar, or any solicitation or a subscription by a person other than representative of the Company.

3.   **Representations, Warranties and Agreements of the Company.**  In connection with this subscription, the Company makes the following representations, warranties and agreements and confirms the following understandings:

(a)   **Company's Good Standing.**  The Company is a corporation organized and validly existing under the laws of the State of Florida, and it has all corporate authority and power to conduct its business and to own its properties.

(b)   **Compliance with Net Capital Requirements.**  Each of the Company's two broker-dealer subsidiaries, Global Partners Securities, Inc. and EquityStation, Inc., was in compliance with net capital requirements of Rule 15c3-1 under the Securities Exchange Act of 1934 at its most recent reporting date.

(c)   **Authorization; Conflict; Valid and Binding Obligation.**  This Agreement and the transactions contemplated hereby have been duly and validly authorized by all requisite corporate action of the Company. The Company has full right, power and capacity to execute, deliver and perform its obligations under this Agreement. No governmental license, permit or authorization and no registration or filings with any court, governmental authority or regulatory agency is required in connection with the Company's execution, delivery and/or performance of this Agreement, other than any filings required by applicable Federal and state securities laws. The execution, delivery and performance of this Agreement, the consummation of the transactions herein contemplated and the compliance with the terms of this Agreement by the Company will not violate or conflict with any provision of the Articles of Incorporation or By-laws of the Company, or any agreement, instrument, law or regulation to which the Company is a party or by which the Company may be bound. This Agreement, upon execution and delivery by the Company, will represent the valid and binding obligation of the Company enforceable in accordance with its terms.

(d)   **Upstream Dividends.**  The Company will receive from its subsidiary, Global Partners Securities, Inc. distributions to the extent necessary to meet its required dividend payments under the terms of the Preferred Stock.



{W:\Transact\0110\0737\M0178221 v.1; 6/10/2004 04:23 PM}        4

4.     **Survival of Representations, Warranties, Agreements and Acknowledgments.**  The representations, warranties, agreements and acknowledgments of the Company and Subscriber shall survive the offering and purchase of the Shares.

5.     **Right of First Refusal.**  In consideration of the Company agreeing to sell Subscriber the Shares, Subscriber agrees to grant the Company or any entity or person designated by the Company ("Designee") a right of first refusal to purchase the Shares now or hereafter owned by Subscriber in the event of any desired or attempted transfer of the Shares by Subscriber (including but not limited to the sale, assignment, transfer, exchange, conveyance, encumbrance, hypothecation, pledge, or other disposition, by operation of law, or otherwise) (collectively, a "Transfer").  Notwithstanding the foregoing, during Subscriber's lifetime or upon Subscriber's death, Subscriber may Transfer any or all of the Shares now or hereafter legally or beneficially owned by Subscriber to any spouse, child, or grandchild, or any trust created for the benefit of any of such persons, provided that:  (a) such person or entity agrees, in writing prior to such·Transfer, to comply with the terms and conditions of this Section; (b) the Transfer to such person or entity will not adversely effect the status of any subsidiary of the Company as a registered broker-dealer or investment advisor with any federal, state, or self-regulatory authority; and (c) such Transfer is in compliance with all applicable federal and state securities laws.

Before making any Transfer of any or all of the Shares in connection with a bona fide third party offer, Subscriber (or Subscriber's personal representative or any person or entity acting in a similar capacity) shall immediately upon receipt thereof give written notice of any such proposed Transfer to the Company at the address set forth above or any other address as may later be provided by the Company to Subscriber.  The Company or Designee shall have the later of: (i) 30 days from its receipt of such written notice or (ii) such period of time as set forth in such bona fide third party offer, to exercise its right of first refusal and/or to cause any other person(s) or entities(s) to purchase such number of Shares being offered on the terms and conditions (other than the time period if (i) is applicable) set forth in such bona fide third party offer.  If the Company fails or refuses to exercise such right of first refusal within the time period set forth above, Subscriber may then effect such Transfer on the terms and conditions set forth in such bona fide third party offer, provided such Transfer and the transferee complies with the conditions set forth in (a) through (c) above in the preceding paragraph.

6.     **Blue Sky Notices.**

(a)     THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OR THE SECURITIES LAWS OF ANY STATE AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS.  THE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SEC, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THE OFFERING OR THE ACCURACY OR ADEQUACY OF THE OFFERING DOCUMENTS.  ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

(b)    THE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTE UNDER THE SECURITIES ACT, AND APPLICABLE STATE SECURITIES LAW, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. SUBSCRIBERS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

7.    **Miscellaneous.**

(a)    **Entire Agreement.**  This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof.  This Agreement supersedes all prior negotiations, letters and understandings relating to the subject matter hereof.

(b)    **Amendment.**  This Agreement may not be amended, supplemented or modified in whole or in part except by an instrument in writing signed by the party or parties against whom enforcement of any such amendment, supplement or modification is sought.

(c)    **Choice of Law.**  This Agreement will be interpreted, construed and enforced in accordance with the laws of the State of Florida, without giving effect to the application of the principles pertaining to conflicts of laws.

(d)    **Effect of Waiver.**  The failure of any party at any time or times to require performance of any provision of this Agreement will in no manner affect the right to enforce the same.  The waiver by any party of any breach of any provision of this Agreement will not be construed to be a waiver by any such party of any succeeding breach of that provision or a waiver by such party of any breach of any other provision.

(e)    **Severability.**  The invalidity, illegality or unenforceability of any provision or provisions of this Agreement will not affect any other provision of this Agreement, which will remain in full force and effect, nor will the invalidity, illegality or unenforceability of a portion of any provision of this Agreement affect the balance of such provision.  In the event that any one or more of the provisions contained in this Agreement or any portion thereof shall for any reason be held to be invalid, illegal or unenforceable in any respect, this Agreement shall be reformed, construed and enforced as if such invalid, illegal or unenforceable provision had never been contained herein.

(f)    **Enforcement.**  Should it become necessary for any party to institute legal action to enforce the terms and conditions of this Agreement, the successful party will be awarded reasonable attorneys' fees at all trial and appellate levels, expenses and costs.

(g)    **Binding Nature.**  This Agreement will be binding upon and will inure to the benefit of any successor or successors of the parties hereto.

(h)    **Counterparts.**  This Agreement may be executed in one or more counterparts, each of which will be deemed an original and all of which together will constitute one and the same instrument.



**IN WITNESS WHEREOF,** Subscriber has caused this Agreement to be executed as of the date written on the first page of this Agreement.

SUBSCRIBER:

_____

David Alcalay

COMPANY:

By: _____

Name: MARCOS KONIG

Title: PRESIDENT

Exhibit A

## SUMMARY OF PREFERRED STOCK TERMS

**Issuer:**   **Global Partners Group, Inc.**, a Florida corporation ("GPG" or the "Company")

**Investor:**   David Alcalay ("Alcalay" or the "Investor")

**Security:**   Convertible Variable Rate Participating Preferred Stock ("Preferred Stock")

**Principal Amount:**   $400,000 (80,000 shares at $5.00 per share)

**Voting Rights:**   The Preferred Stock will have no voting rights.

**Use of Proceeds:**   **GPG** intends to use the proceeds to increase the net capital of its Global Partners Securities, Inc. ("GPSI") subsidiary and to expand principal trading opportunities at GPSI's NAIB division.

**Dividends:**   The Investor in the Preferred Stock will be entitled to receive Variable Rate Participating Preferred Dividends ("VRPP Dividends") calculated based on the Dividend Payment Formula as hereinafter defined.  In each month during which the Preferred Stock is outstanding and NAIB's trading revenues in connection with its principal trading business exceed $175,000, the Investor will receive VRPP Dividends equal to the amount of revenues in the given month minus $175,000 (the "Initial Excess Amount"), up to an Initial Excess Amount of $225,000, less a series of five (5) sequential Tiered Reductions as shown below ("Tiered Reductions"), where each reduction reduces the Initial Excess Amount by the percentage associated with the category of reduction (the "Dividend Payment Formula").

Although the Maximum VRPP that can be paid to the Investor on a *monthly* basis is $31,556.25 according to the limitations associated with the Initial Excess Amount, at the end of every 12 month period following issuance of the Preferred Stock, VRPP Dividends for the preceding 12 months will be recalculated for the entire period as if the cap on the Initial Excess Amount did not exist.  If there are any months in which the Initial Excess Amount *exceeds* $225,000, the amount by which the Initial Excess Amount exceeds $225,000 (the "Secondary Excess Amount") will be identified.[1]  Similarly, for months in which the Initial Excess Amount is *below* $225,000, the amount by which the Initial Excess Amount is below $225,000 (the "Below Cap Amount") will be identified, and then all such amount summed.[2]  The sum of monthly Below Cap Amounts for the year will be termed the "Annual Below Cap Amount."  In recalculating the VRRP Dividends for the prior 12 months, the Company

---

[1] For example, for any one month if the Initial Excess Amount is $250,000, then the Secondary Excess Amount for the month would equal $25,000.
[2] For example, for any one month if the Initial Excess Amount is $175,000, then the Below Cap Amount for the month would equal $50,000.

 

will be obligated to reapply the Dividend Payment Formula for each month in which a Secondary Excess Amount exists to the Secondary Excess Amount instead of the Initial Excess Amount up to the point where the sum of Secondary Excess Amounts equals 100% of the Annual Below Cap Amount.

Notwithstanding anything to the contrary contained herein, the Investor will receive a guaranteed minimum 10% annual cash return on the principal amount outstanding at the end of each calendar quarter (the "Minimum Dividend Amount"). The 10% annual Minimum Dividend Amount will be paid in cash on a monthly basis, beginning 120 days after the initial investment is made.  In months where no VRPP Dividends are generated, the Company will accrue the Minimum Dividend Amount.

Tiered Reductions

| | |
|---|---|
| Clearing | 15% |
| Trader + Supervisor Split | 45% |
| Trading Support | 20% |
| Overhead | 25% |
| Company / Investor Split | 50% |

Example

Initial Excess Amount above $175,000 $     100,000

| | Beginning Amt. | | Fee or Split | | Ending Amt. |
|---|---|---|---|---|---|
| Clearing Fees | $ | 100,000 | $ | 15,000 | $ | 85,000 |
| Trader + Supervisor Split | $ | 85,000 | $ | 38,250 | $ | 46,750 |
| Trading Support Fee | $ | 46,750 | $ | 9,350 | $ | 37,400 |
| Overhead Expense | $ | 37,400 | $ | 9,350 | $ | 28,050 |
| Company / Investor Split | $ | 28,050 | $ | 14,025 | $ | 14,025 |

For each month where a VRPP Dividend is due to the Investor (i.e., for which NAIB's principal trading revenue exceeds $175,000), the Investor will receive the VRPP Dividend and/or pro-rata Minimum Dividend Amount within fifteen (15) days following the end of the relevant month.

Optional
Redemption:

Following issuance, the Company may redeem the Preferred Stock in whole or in increments of $100,000 at any time by paying the Investor an amount equal to the principal balance of Preferred Stock then outstanding if redeemed in its entirety, or an amount that is a multiple of $100,000 but less than $400,000 if in part, plus any unpaid VRPP Dividends. Moreover, the redemption price of the Preferred Stock will be $5.00 per share.  This redemption will not affect in any way the dividend distribution requirements stated above.

 

| | |
|---|---|
| **Pre-Payment Penalty:** | If the Company redeems the Preferred Stock prior to the two year anniversary date after issuance, the Investor's Minimum Dividend Amount will be increased so that the Investor will receive a minimum 20% annual cash return on the principal amount outstanding at the end of each calendar quarter during which there is still Preferred Stock outstanding (the "Increased Minimum Dividend Amount"). All VRPP Dividends or Minimum Dividend Amounts paid to Investor prior to the redemption of the Preferred Stock by the Company will be credited toward the Increased Minimum Dividend Amount. |
| **Put Right:** | After the one (1) year anniversary date of the issuance of the Preferred Stock, the Investor may put the Preferred Stock to the Company in whole or in increments of $100,000 at any time, plus any unpaid VRPP Dividends (the "Put Right"). If the Investor exercises the Put Right, the Company will be obligated to redeem the amount of Preferred Stock put to it, subject to a minimum of 180 days notice (the "Notice Period"). Following the one (1) year anniversary date of the issuance of the Preferred Stock, the Put Right shall only be exercisable during the first fifteen (15) days of each ensuing three (3) month interval (the "Put Window"). Notwithstanding the foregoing, after the one (1) year anniversary date of the issuance of the Preferred Stock, if no VRPP Dividends are due to the Investor for any period of consecutive three (3) months, the Investor can exercise its Put Right without regard to any Put Window restrictions. Moreover, the redemption price of the Preferred Stock will be $5.00 per share. |
| **Liquidation Preference:** | In the event of any Liquidation Event (as defined below) prior to the redemption of the Preferred Stock referenced above, the Investor will be entitled to receive in preference to the holders of Common Stock an amount equal to the aggregate initial issuance amount of his Preferred Stock, plus all accrued and unpaid dividends on such Preferred Stock. Thereafter, the Company will distribute ratably all of its remaining funds and assets legally available for distribution to the holders of **GPG** Common Stock. For these purposes, "Liquidation Event" means any liquidation, dissolution or winding-up of the Company's business. |
| **Preferred Stock Purchase Agreement:** | The investment will be made pursuant to a Preferred Stock Purchase Agreement between the Investor and the Company. This agreement will contain, among other things, customary appropriate representations and warranties, indemnities, covenants reflecting the provisions set forth herein, and appropriate conditions of closing. |
| **Transfer Restriction:** | In addition to restrictions on transfer arising from state or federal securities laws, the Investor will agree not to sell his Preferred Stock without prior written approval of the Company. |
| **Right of First Refusal:** | In the event that the Investor wants to sell the Preferred Stock, the Company shall have a right of first refusal to purchase the Preferred Stock from the Investor at a price of $5.00 per share. |

 

**Convertibility:** In the event that the Company raises capital through the issuance of Common Stock or Convertible Preferred Stock to outside investors in an amount exceeding $1,000,000 within any three month period, the Investor will have the right to convert his Preferred Stock to Common Stock at a 10.0% discount to the price of the of Common Stock or Common Stock equivalent in such financing round, or $5.00 per share, whichever is less.

**Broker's Fee:** Neither the Company nor the Investor has done anything to incur any liability to any party for any broker's fee or the like in connection with the sale or issuance of the Preferred Stock.

Agreed: David Alcalay

DAVID ALCALAY

Agreed: Global Partners Group,

by

NAME: MARCOS KONIG

PRESIDENT.



**Certificate**

NUMBER
1

SHARES
*80,000*

SEE LEGEND ON REVERSE

## Global Partners Group, Inc.

Florida Corporation

500,000 Shares of Preferred Stock Authorized • Par value $.001 per share
80,000 Shares of Convertible Variable Rate Participating Preferred Stock

**This Certifies that**    DAVID ALCALAY

is hereby issued EIGHTY THOUSAND CONVERTIBLE VARIABLE RATE PARTICIPATING PREFERRED   fully paid and non-assessable Shares of the Capital Stock of the above named Corporation transferable only on the books of the Corporation by the holder hereof in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed.

**In Witness Whereof,** this Corporation has caused this Certificate to be signed by its duly authorized officer(s) this 12th day of August , 2004

President Marcos Konig

Secretary

# EXHIBIT 3

IN THE CIRCUIT COURT FOR THE 15TH JUDICIAL CIRCUIT,
IN AND FOR PALM BEACH COUNTY, FLORIDA

DAVID ALCALY, an individual,                    CASE NO: 05CA011966 AJ

     Plaintiff,

vs.

GLOBAL PARTNERS GROUP,
INC., a Florida corporation,
GLOBAL PARTNERS
SECURITIES, INC., a Florida
corporation, MARCOS KONIG, an
individual, VFINANCE, INC., a
Florida corporation, VFINANCE
INVESTMENTS HOLDINGS,
INC., a Florida corporation,
SHAVELL & CO., P.A., a Florida
professional association

     Defendants.

_____/

COPY
RECEIVED FOR FILING
MAR 2 0 2006
SHARON R. BOCK
CLERK & COMPTROLLER
CIRCUIT CIVIL DIVISION

## DEFENDANTS GLOBAL PARTNERS GROUP, INC., GLOBAL PARTNERS SECURITIES, INC., AND MARCOS KONIG'S MOTION TO DISMISS AND SUPPORTING MEMORANDUM OF LAW

The defendants Global Partners Group, Inc. (GPG), Global Partners Securities, Inc. (GPS), and Marcos Konig move this Court to dismiss the amended complaint under Florida Rules of Civil Procedure 1.140(b)(6) and 1.120(b) as well as the legal bar imposed by Florida's economic loss rule. In support thereof, the defendants state as follows:

1.     The amended complaint fails to allege all the elements necessary to state a breach of contract, conversion, and conspiracy cause of action against GPG, GPS, or Konig. Fla. R. Civ. Proc. 1.140(b)(6).

2.     With respect to Alcalay's fraud allegations, the amended complaint fails to satisfy Florida Rule of Civil Procedure 1.120(b) because the fraud acts alleged do not meet the heightened pleading requirements.

31

3.      Because the alleged breach of fiduciary duty cause of action seeks to redress harm to the corporation – not harm to Alcalay – such that any suit derives from the corporation, Alcalay lacks standing to bring this breach of fiduciary duty. *See Alario v. Miller & Miller*, 354 So. 2d 925, 926 (Fla. 2d DCA 1978).

4.      The documents that Alcalay appended to the amended complaint contradict the allegations he has asserted against GPG, GPS, and Konig. The documents govern when there is such a conflict, leaving the remaining allegations insufficient to support the alleged causes of action. *Hillcrest Pacific Corp. v. Yamamura*, 727 So. 2d 1053, 1055 (Fla. 4th DCA 1999).

5.      Florida's economic loss rule bars Alcalay's breach of fiduciary duty, fraud in the inducement, and fraud causes of action. *See Detwiler v. Bank of Central Fla.*, 736 So. 2d 757, 759 (Fla. 5th DCA 1999); *Samuels v. King Motor Co. of Fort Lauderdale*, 782 So. 2d 489, 498 (Fla. 4th DCA 2001); *Sarkis v. Pafford Oil Co., Inc.*, 697 So.2d 524, 527 (Fla. 1st DCA 1997).

6.      Stated simply, the beleaguered amended complaint demonstrates that Alcalay's claim for damages against these defendants is fatally flawed. Accordingly, this Court should dismiss the amended complaint with prejudice.

## MEMORANDUM OF LAW

### BACKGROUND

Alcalay decided to invest in GPG and GPS, a company managed by professionals (including Konig acting as president) having over 100 years of collective investment industry experience. Am. Compl., Ex. A, at 8. Once Alcalay decided to invest in GPG and GPS, he engaged in a substantial investigation to determine whether he thought that investing in these companies was a good decision. Am. Compl., Ex. B ¶ 2(b). Part of Alcalay's investigation was to review the Confidential Private Placement Memorandum (PPM) that Shavell & Co., P.A.

2

prepared. Am. Compl. ¶ 13. The PPM's 66 pages and 5 appendices contain legions of risk warnings and disclosures. *See, e.g.*, Am. Compl., Ex. A at 17, *see also* Ex. A i-vii, 18-21. Alcalay also had unfettered access to GPG, GPS, and their respective staffs, including the companies' officers and directors in order to complete his due diligence. Am. Compl., Ex. B ¶ 2(b).

On June 17, 2004, after completing his investigation, Alcalay entered into the Preferred Stock Subscription Agreement (the Subscriber Agreement). Am. Comp., Ex. B at 1. In that contract, Alcalay expressly stated that he recognized the high degree of risk associated with purchasing shares in GPG and GPS such that he could lose his entire investment. Am. Compl., Ex. B ¶ 2(c). Alcalay also expressly represented that he had evaluated the merits and risks associated with investing in GPG and GPS, but nevertheless decided that he could bear a complete loss of that investment. Am. Compl., Ex. B ¶ 2(f). Alcalay agreed to pay $400,000.00 to receive 80,000 shares of nonvoting stock (Am. Compl., Ex. B at Exhibit A) that also restricted his ability to dispose, cancel, terminate, revoke, transfer, or assign the shares (Am. Compl., Ex. B at 2-3).

On or about September 29, 2004, GPG sold some of its assets and subsidiaries to the defendants collectively referred to here as vFinance. Am. Compl. ¶ 24. Shareholders did not receive any distributions related to their equity holdings as a result of the sale. *See e.g.*, Am. Compl. ¶ 27. Alcalay sued GPG, GPS, and Konig, and on March 2, 2006, Alcalay voluntarily amended his complaint. Alcalay has now sued GPG, GPS, and Konig for the following causes of action: (1) Alcalay sued GPG for breach of contract, fraud in the inducement, fraud, monies lent, conversion, and conspiracy; (2) Alcalay sued GPS for monies lent, conversion, and

3

conspiracy; and (3) Alcalay sued Konig for breach of fiduciary duty, fraud in the inducement,

fraud; conversion, and conspiracy. All of these causes of action fail as a matter of law.

ARGUMENT

Courts will not permit a complaint to stand unless the allegations adequately state a cause

of action. *See* Fla. R. Civ. Proc. 1.140; *see also Rios v. McDermott, Will & Emery*, 613 So. 2d

544, 545 (Fla. 3d DCA 1993). Plaintiffs must "plead more than [a] naked legal conclusion . . . ."

*Id.* Although the court must accept the plaintiffs' allegations as true for the purposes of this

motion to dismiss, the court does not have to accept as true the plaintiffs' conclusory allegations

and unwarranted deductions of fact. *See id.* And when considering the legal adequacy of the

complaint, the court may consider documents relied upon by the plaintiffs as referenced in their

allegations as though the documents were, in fact, part of the allegations. *Hillcrest Pacific Corp.*

*v. Yamamura*, 727 So. 2d 1053, 1055 (Fla. 4th DCA 1999).

## I.     Alcalay Has Failed to State a Cause of Action upon Which this Court May Grant Relief.

Applying controlling Florida law to the plaintiff's allegations here underscores the

incurable defects in the amended complaint.

### A.     Alcalay's Breach of Contract Allegations Fail to State a Cause of Action.

To state a breach of contract cause of action, a plaintiff must allege three elements: (1)

that a valid contract exists; (2) that the defendant materially breached that contract; and (3) that

the breach was the proximate cause of the plaintiff's damages. *See Cibran Enterprises, Inc. v.*

*BP Products North America, Inc.*, 365 F. Supp. 2d 1241, 1253 (S.D. Fla. 2005). Florida courts

look to the Restatement Second of Contract section 241 to determine whether a breach is

material.  *See, e.g., Jenkins v. Eckerd Corp.*, 913 So. 2d 43, 54 (Fla. 1st DCA 2005).  The following 5 standards govern the court's analysis as to whether a breach is material:

> (1) the extent to which the injured party will be deprived of the benefit which can reasonably be expected;
>
> (2) the extent to which the injured party can be adequately compensated for the part of the benefit of which he will be deprived;
>
> (3) the extent to which the breaching party will suffer forfeiture;
>
> (4) the likelihood that the breaching party will cure; and
>
> (5) the extent to which the behavior of the breaching party comports with the standards of good faith and fair dealing.

*Bland v. Freightliner LLC*, 206 F. Supp. 2d 1202, 1210 (M.D. Fla. 2002) (citing Restatement (Second) of Contracts § 241 (1979)).

Here, Alcalay bases his entire breach of contract cause of action on two alleged failures to perform: (1) that GPG used the investment proceeds for some purpose other than net capital; and (2) that GPG failed to reimburse or distribute funds to Alcalay.  *See* Am. Compl. ¶ 32.  That is simply not enough.  Each of these allegations fails to satisfy the plaintiff's pleading burden to allege a material breach.

First, Alcalay alleges that "GPG breached the Subscription Agreement by utilizing the monies for other purposes and by failing to reimburse and/or distribute any monies, dividends or stock to Plaintiff."  Am. Compl. ¶ 32.  But in the amended complaint, there are no allegations that GPG failed to apply the investment proceeds to net capital, or any specifics regarding where GPG applied the investment proceeds.  The simple reason for the absence of any such allegations is that GPG could have applied, and in fact did apply, Alcalay's investment to net capital.  It would look something like this: GPG increased its net capital account by the amount Alcalay had invested and reflected that on one side of the balance sheet that corresponded with an increase to the cash account on the other side of the balance sheet (GPG could then use the cash in its best

interest for whatever that purpose ends up being). Without alleging that GPG failed to apply Alcalay's investment to net capital, he cannot allege that he has suffered a loss of the benefit he bargained for. Nothing alleged would otherwise justify this Court compensating Alcalay because, as alleged, he did not lose the benefit of his bargain.

Second, Alcalay alleges that GPG breached the Subscriber Agreement by failing to distribute funds to him, but failed to allege how that constituted a breach, much less a material breach. GPG and GPS owed no duty to distribute funds to Alcalay. Moreover, Alcalay has not alleged, and cannot allege, that he is getting substantially less than he negotiated for under the Subscription Agreement. Simply put, the amended complaint does not contain the fundamental allegation necessary to state a breach of contract cause of action; Alcalay has not alleged, and cannot allege, that GPG materially breached the Subscriber Agreement or that he suffered any damages.

### B.    Alcalay Has Failed to State a Conversion Cause of Action.

To state a conversion cause of action, a plaintiff must allege that the defendant has wrongfully exercised dominion or control of the plaintiff's property despite a demand to return the property. *See Thomas v. Hertz Corp.*, 890 So. 2d 448, 449 (3rd DCA 2004). But Alcalay has not alleged, and cannot allege any of the required elements. Once Alcalay invested his money under the Subscriber Agreement, he forfeited his ability to demand its return. *See generally* Am. Compl., Ex B. Alcalay had no voting rights and could not freely dispose, cancel, terminate, revoke, transfer, or assign the shares he purchased. Therefore, the funds under the conversion cause of action were properly within GPG's and GPS's dominion and control.

### 1)    Alcalay Cannot Allege a Conversion Cause of Action Against Konig.

Even if Alcalay was able to somehow allege around GPG's and GPS's contractual right to exercise dominion or control over the invested funds, the conversion cause of action would still fail as alleged against Konig because Alcalay has not alleged, and cannot allege, that Konig wrongfully exercised dominion or control of the invested funds. Alcalay wire-transferred the investment funds directly to GPG (Am. Compl. ¶ 18), where they were used for corporate purposes (Am. Compl. ¶¶ 21, 22). Accordingly, the conversion cause of action is fatally flawed, and this Court should therefore dismiss it with prejudice.

### C.    Alcalay Has Failed to State a Conspiracy Cause of Action.

Florida courts long ago set forth the elements necessary to state a civil conspiracy cause of action: (1) that there are two or more parties; (2) that acted in concert to do an unlawful act, or to do a lawful act by unlawful means; (3) that took some overt act to further the conspiracy; and (4) that caused damage to the plaintiff from the acts done under the conspiracy. *See Bond v. Koscot Interplanetary, Inc.*, 246 So. 2d 631, 635 (Fla. 4th DCA 1971). Alcalay has not alleged any one of these elements. Instead, Alcalay repeats the allegations interposed throughout the amended complaint and, with a broad brush, paints those allegations with the conspiracy label. That is not enough. Alcalay's failure to allege the elements required to state a conspiracy cause of action mandates dismissal. Fla. R. Civ. Proc. 1.140(b)(6). This Court should therefore dismiss the conspiracy cause of action.

### D.    The Allegations Set Forth in the Amended Complaint Fail to Meet the Heightened Particularity Pleading Requirements Set Forth under Florida Rule of Civil Procedure 1.120(b).

With regard to Alcalay's two fraud causes of action and his conspiracy cause of action, they fail as a matter of law because the alleged fraud does not satisfy the heightened pleading

requirements established by Florida Rule of Civil Procedure 1.120(b).  Rule 1.120(b) requires

that in all pleadings alleging fraud, the plaintiff must state the circumstances constituting such

fraud with particularity.  "Allegations contained in a pleading are insufficient if they are too

general, vague or conclusory."  *Meyers v. Meyers*, 652 So. 2d 1214, 1216 (Fla. 5th DCA 1995).

Failure to comply with the pleading standard required under Rule 1.120(b) necessitates dismissal

of the deficient complaint.  *See, e.g., Thibault v. Transact Realty & Investment*, 709 So. 2d 593,

594 (Fla. 5th DCA 1998); *Robertson v. PHF Life Ins. Co.*, 702 So. 2d 555, 556 (Fla. 1st DCA

1997); *Moudy v. Southland Distributing Co. of St. Petersburg, Inc.*, 452 So. 2d 1045, 1046 (Fla.

2d DCA 1984).

Among the circumstances the plaintiff must plead with particularity under Rule 1.120(b)

are the time, place, and contents of the false representations, as well as the identity of any person

making the misrepresentations, and how the representations were false.  *See Robertson*, 702 So.

2d at 556; *see also Gordon v. Etue, Wardlaw & Co., P.A.*, 511 So. 2d 384, 388 (Fla. 1st DCA

1987); *Strack v. Fred Rawn Const., Inc.*, 908 So. 2d 563, 565 (Fla. 4th DCA 2005).  In other

words, the complaint must state the who, what, when, where, and how of the purported fraud.

*See Robertson*, 702 So. 2d at 556; Gordon, 511 So. 2d at 388.  For example, in *Gordon*, the

plaintiff asserted more than one hundred allegations, but those allegations were insufficient

because, as is the case here, the plaintiff only pleaded "statements of ultimate fact, i.e., that false

statements were made . . . ."  *Gordon*, 511 So. 2d at 388.  Dismissing the complaint in *Gordon*

was proper because the plaintiff had not included any allegations that would tend to show why

the purported false or fraudulent statements were actually false or fraudulent.  *See id.*

The amended complaint in this case contains similar defects.  The allegations are too

vague and too indefinite to withstand scrutiny under Rule 1.120(b) because Alcalay has failed to

8

plead facts regarding the "who," "what," "when," "where," and "how" of the purported fraud. *See Meyers*, 652 So. 2d at 1216; *Robertson*, 702 So. 2d at 556; *Gordon*, 511 So. 2d at 388. For instance, the amended complaint contains only two fraud allegations: (1) that GPG and Konig misrepresented how they would use the proceeds from Alcalay's investment (Am. Compl. ¶ 46; and (2) that GPG, GPS and Konig misrepresented the companies' financial condition (Am. Compl. ¶¶ 52-53, 74). But these conclusory fact allegations fail to satisfy the particularity standard required under Rule 1.120(b).

With nothing more than the fraud allegations that Alcalay has already asserted, the amended complaint misses the mark for Rule 1.120(b) purposes. For instance, who made the purported misrepresentation and when and where was it made? How are the alleged misrepresentations false? How did Konig know that the purported misrepresentation was false? Where did GPG apply the funds? How did GPG account for Alcalay's investment on its balance sheet? How was that accounting fraudulent? Alcalay cannot allege facts to answer these questions because he does not have a proper basis for bringing these fraud-based causes of action.

But by alleging a conspiracy cause of action on top of the fraud allegations, Alcalay compounds the defects highlighted above because a conspiracy cause of action must also pass muster under Rule 1.120(b). For example, when did the alleged conspirators reach their purported agreement to commit the alleged fraud? What was their agreement? What was the overt act in furtherance of the alleged conspiracy? Where did they reach that agreement and commit the overt act. The amended complaint answers none of these questions. Simply put, every one of Alcalay's fraud allegations is woefully inadequate under Rule 1.120(b), such that this Court should dismiss the complaint with prejudice.

9

II.    **Alcalay Does Not Have Standing to Pursue a Breach of Fiduciary Duty Cause of Action Against Konig.**

Under narrow circumstances, Florida law permits a minority shareholder to sue corporate directors for breach of fiduciary duty. *See Hodges v. Buzzeo*, 193 F. Supp. 2d 1279, 1288 (M.D. Fla. 2002). But the court must first determine whether the plaintiff has standing to bring a direct suit against a corporate director, or whether he must pursue the same cause of action as a derivative suit. *See Alario v. Miller & Miller*, 354 So. 2d 925, 926 (Fla. 2d DCA 1978).

In *Alario*, the court distinguished between direct and derivative actions. *See id.* On the one hand, a stockholder's cause of action is derivative if the main thrust of the complaint is that the breach harmed the corporation, the stock body, or corporate property. *See id.* On the other hand, a direct or individual cause of action is a suit intended to redress the plaintiff's injury; it is a stockholder's suit to enforce his right of action. *See id.* The threshold inquiry is whether the stockholder sued in his own right to redress an injury he sustained as opposed to an injury to the corporation, or to the stockholders generally; then the cause of action is in the corporation, and the individual's right to bring it is derived from the corporation. *See id.*

Here, Alcalay alleges that Konig breached his fiduciary duty in three ways: (1) by failing to inform Alcalay that vFinance was in the process of acquiring GPS; (2) by failing to inform Alcalay about vFinance's purchase of GPS even after vFinance completed the acquisition; and (3) by using the invested money for purposes other than those set forth in the Subscription Agreement. None of these statements are true, but assuming for this motion that the alleged facts are true, each purported breach of the fiduciary duty relates to an injury to the corporation, despite Alcalay's artful pleading to make the purported breach sound like it harmed only Alcalay.

The first and second alleged breaches are no breach at all because Alcalay agreed that his shares would have no voting rights (Am. Compl., Ex. B at 8), and he also agreed that he could not freely dispose, cancel, terminate, revoke, transfer, or assign the shares he purchased. (Am. Compl., Ex. B at 2-3). Thus, even if Alcalay had not received the information regarding vFinance, it made no difference because he could do nothing about it. In other words, Alcalay had no say in the decisions GPG, GPS, and Konig made with respect to the vFinance transaction.

Because Alcalay had no influence on the corporate decision making, he could not have suffered any individual harm from Konig's decision to sell assets to vFinance. Thus, Alcalay has no standing to assert the breach of fiduciary claim against the Defendants. The amended complaint attempts to camouflage the fact that GPG and GPS would have suffered the harm stemming from the alleged breach of fiduciary duty – but there was no harm in the first place.

The third alleged breach of fiduciary duty also fails to qualify as an actual breach because, even if the alleged facts were true, Konig simply exercised his business judgment in using the corporate funds for business purposes without regard to personal gain. But assuming this act occurred and that it was a breach, the corporation – not Alcalay – suffered the injury because any harm resulting from financial decisions to allocate funds necessarily injures the corporation if it caused an injury at all. In sum, Alcalay does not have standing to pursue the breaches he has alleged because this cause of action derives from the corporation. Therefore, the Court should dismiss with prejudice Alcalay's breach of fiduciary duty cause of action.

**III.     The Amended Complaint Is Legally Infirmed Because Its Allegations Contradict the Express Terms Set Forth in the Documents Appended to the Amended Complaint.**

The amended complaint fails to state any cognizable causes of action because the express terms in the Subscription Agreement and express disclosures in the PPM clearly contradict the allegations in the complaint. *See Hillcrest*, 727 So. 2d at 1055 (holding that the contract terms

11

contradicted the allegations the plaintiff used to support its fraud in the inducement cause of action).  Inconsistencies between facts revealed in a complaint and an exhibit neutralize the general allegations, thereby making the complaint defective. *See Harry Pepper & Assocs. v. Lasseter*, 247 So. 2d 736, 736-37 (Fla. 3d DCA 1971).  Thus, the plain meaning of the instrument governs the court's decision regarding whether the plaintiff has any surviving allegations that are sufficient to sustain their cause of action. *See Hillcrest*, 727 So. 2d at 1055; *Harry Pepper*, 247 So. 2d at 736-37; *Striton Properties, Inc. v. City of Jacksonville Beach,*, 533 So. 2d 1174, 1179 (Fla. 1st DCA 1988).

### A.   The Subscriber Agreement Contradicts Alcalay's Allegations Relating to His Breach of Contract Cause of Action.

The breach of contract cause of action relies on allegations that directly contradict the express terms stated in the Subscriber Agreement.  For example, Alcalay alleges that he invested/loaned $400,000, but the Subscriber Agreement expressly states that he purchased 80,000 shares of nonvoting, highly risky stock. *See generally* Am. Compl., Ex. B.  And Alcalay alleges that he entered into the Subscriber Agreement with Konig, but the contract's express terms state that it is an agreement between Alcalay and GPG. Am. Compl., Ex. B. at 1.  Finally, Alcalay alleges that he did not know about GPG's litigation with a former employee, but in the PPM there is an entire section that discusses ongoing litigation, including one case by a former employee.  Am. Compl., Ex. A at 38-39.  The fundamental breach of contract allegations therefore contradict the Subscriber Agreement and the PPM.  Accordingly, this Court should dismiss the breach of contract cause of action with prejudice.

**B.      The Subscriber Agreement Contradicts Alcalay's Allegations that Support the Fraud and Fraudulent Inducement Causes of Action.**

In order to state a fraud cause of action, the plaintiff must allege the following: (1) that there is a false statement of fact; (2) that the defendant knew was false at the time made; (3) that the defendant made to induce the plaintiff to act in reliance on it; (4) that the plaintiff acted in reliance on the truth of the representation; and (5) that caused the plaintiff damage or injury. *National Ventures, Inc. v. Water Glades 300 Condominium Ass'n*, 847 So. 2d 1070, 1074 (Fla. 4th DCA 2003).   And for a fraudulent inducement cause of action, a plaintiff must similarly allege four elements: (1) that the defendant made a misrepresentation of a material fact, (2) that the defendant knew or should have known that the statement was false, (3) that the defendant intended for the statement to induce the plaintiff to rely and act on it, and (4) that the plaintiff suffered injury in justifiable reliance on the representation. *See Samuels v. King Motor Co. of Fort Lauderdale*, 782 So. 2d 489, 497 (Fla. 4th DCA 2001).

Here, Alcalay has failed to state a claim for fraud because the purported fraud in each cause of action contradicts the express contract terms.    Specifically, amended complaint paragraph 53 states as follows: "KONIG, GPG & SHAVELL materially misrepresented GPS's financial picture in an effort to induce Plaintiff to rely on same and invest in GPG."   And paragraph 46 states as follows: "Konig materially misrepresented GPG's intended use of Plaintiff's investment funds in an effort to induce Plaintiff to rely on same and invest in GPG."

But the Subscriber Agreement directly contradicts those allegations in the amended complaint, since it states in pertinent part that Alcalay is familiar with the Company's present and proposed operations.   Am. Compl., Ex. B ¶ 2(b).   The Subscriber Agreement further provides that Alcalay had already investigated, or had the opportunity to investigate GPG and GPS, including the opportunity to ask the companies' representatives questions about the present

13

and proposed business. *Id.* Alcalay also expressly stated that the companies' representatives had answered all his inquiries concerning GPG and GPS and the offering and sale of shares. *Id.*

Finally, the Subscriber Agreement contains an integration clause that extinguishes the parties' pre-contract representations. Am. Compl., Ex. B ¶ 7(a). That clause also limits the parties' agreement to the express terms set forth in it. *See id.* To survive the integration clause's negative impact on his fraud allegations, Alcalay would have to allege precisely how the representations contained in the Subscriber Agreement were fraudulent or false, while at the same time, not contradicting the express terms of the integration clause of the Subscriber Agreement. Alcalay cannot plead around the integration clause because at the time of contract, Alcalay agreed that the only representations governing the parties were merged into the Subscriber Agreement. Indeed, Alcalay is charged with executing the Subscriber Agreement with that express understanding.

Due to the Subscriber Agreement's comprehensive nature, Alcalay cannot fashion any allegations that would enable him to navigate around the Subscriber Agreement's terms and the agreed-upon integration clause. *See, e.g., Striton* 533 So. 2d at 1179. As it was in *Striton*, the Subscriber Agreement in this case embodies the final written form, setting forth the plans, agreements, duties, and rights of each of the parties to the contract. *Id.* For these reasons, the Court should grant this motion to dismiss Alcalay's fraud claims.

**C.      The Subscriber Agreement Contradicts Alcalay's Allegations that Support the Monies Lent Cause of Action.**

Alcalay also purports to assert a cause of action for monies lent. But in reality, this is Alcalay's attempt to re-characterize the Subscriber Agreement as a loan document. That allegation is specious because the Subscriber Agreement clearly identifies the nature of Alcalay's investment as an equity investment subject to high risk; Alcalay agreed that he could lose his

entire investment.   *See* Am. Compl., Ex B ¶ 2(c).   This Court should therefore dismiss the monies lent cause of action with prejudice.

## IV.   Florida's Economic Loss Rule Bars Each Tort Cause of Action Alleged in the Amended Complaint.

Florida's economic loss rule prohibits a plaintiff from recovering economic losses under a tort-based theory where a contract governs the parties' rights and obligations.   *See AFM Corp. v. Southern Bell Tele. & Tele Co.*, 515 So. 2d 180, 181-82 (Fla. 1987); *see also Premix-Marblette Mfg. Corp v. SKW Chemicals, Inc.*, 145 F. Supp. 2d 1348, 1357-58 (S.D. Fla. 2001). The economic loss rule provides that "without some conduct resulting in personal injury or property damage, there can be no independent tort flowing from a contractual breach which would justify a tort claim solely for economic losses."   *AFM*, 515 So. 2d at 181-82 *see also Moransais v. Heathman*, 744 So. 2d 973, 981-83 (Fla. 1999) (stating that the economic loss rule remains viable although it does not bar a claim for professional negligence independent from allegations establishing a breach of contract).   Recent case law has suggested that the economic loss rule will even bar a fraud in the inducement cause of action where the defendant's alleged fraud is inextricably intertwined with the acts that constitute a breach of contract.   *Medalie v. FSC Securities*, 87 F. Supp. 2d 1295, 1305 (S.D. Fla. 2000).   In other words, "one cannot avoid the economic loss rule by merely labeling a claim as fraud in the inducement, the fraud must be separate and distinct from the breaching party's performance of the contract."   *Id.*

In order to determine whether the economic loss rule applies here, the Court must look at the "interplay of (a) the contractual relationship of the parties, (b) the conduct complained of, and (c) the damage caused by the allegedly tortious conduct."   *Premix*, 145 F. Supp. 2d at 1358. Here, the contract between the parties specifically set forth how GPG and Konig were to use the investment proceeds.   Am. Compl. ¶ 17.   Alcalay's claim that GPG and Konig allegedly misused

the invested funds directly relates back to the contract between the parties. Similarly, Alcalay alleges that GPG and Konig misrepresented the financial condition of the company, despite Alcalay's contractual representation that he conducted his own investigation regarding GPG's and GPS's financial status. Am. Compl, Ex. B at ¶ 2(b). Each of the tort theory causes of action relies on the contract's express terms. It therefore follows that the damages, if any, must also flow from the contract.

Consequently, at least 3 of Alcalay's alleged causes of action fall within Florida's economic loss rule. First, Alcalay's breach of fiduciary duty allegations arise under the Subscriber Agreement, subjecting it to the bar imposed by the economic loss rule. *See Detwiler v. Bank of Central Fla.*, 736 So. 2d 757, 759 (Fla. 5th DCA 1999). Second, Alcalay's fraud in the inducement allegations are inextricably linked to the contract because alleging that a party did not do as promised under a contract does not give rise to fraud in the inducement, but actually constitutes an allegation of fraud in the performance (i.e., the purported misrepresentations relate to the defendants' performance under the contract). *See Samuels v. King Motor Co. of Fort Lauderdale*, 782 So. 2d 489, 498 (Fla. 4th DCA 2001). Therefore, the economic loss rule governs. *See id.* Third, absent some alleged property damage beyond his investment, Alcalay may not initiate a fraud cause of action so that he can recover an economic loss otherwise governed by a contract. *See Sarkis v. Pafford Oil Co., Inc.*, 697 So.2d 524, 527 (Fla. 1st DCA 1997). This Court should therefore dismiss these 3 causes of action based upon Florida's economic loss rule.

## CONCLUSION

Based on the foregoing, GPG, GPS, and Marcos Konig respectfully request that this Court dismiss the amended complaint in all respects and grant all other relief that this court deems just, fair, and equitable.

Respectfully submitted,

WASSERSTROM WEINREB & WEALCATCH PL
Attorneys for Defendants GPG, GPS and Konig
1909 Tyler Street – Penthouse
Wachovia Center
Hollywood, FL 33021
(954) 922-3240 (T)
(954) 922-3431 (F)

By:_____
   Jon Polenberg
   FBN (0653306)
   Christopher M. Cano
   FBN (0517240)

17

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served via facsimile and U.S. Mail on March 17th 2006, to Chad R. Laing, Esquire, counsel for Plaintiff, 3351 NW Boca Raton Boulevard, Boca Raton, Florida 33431; and Deborah P. Fitzgerald, Esquire, counsel for, Shavell & Company, P.A., 110 East Broward Blvd., Suite 2000, Fort Lauderdale, Florida 33301-3503; Gary A. Woodfield, Esquire, Counsel for vFinance Investments and vFinance, Inc., One North Celmatis Street, Suite 400, West Palm Beach, Florida 33401.

Jon Polenberg

# EXHIBIT 4

IN AND FOR THE CIRCUIT COURT FOR
THE FIFTEENTH JUDICIAL CIRCUIT
PALM BEACH COUNTY FLORIDA

DAVID ALCALAY,                                CASE NO:  2005 CA 011966 XXXX MB AJ

        Plaintiff,

vs.

GLOBAL PARTNERS GROUP, INC., a
Florida corporation, GLOBAL PARTNERS
SECURITIES, INC., a Florida corporation,
MARCOS KONIG, an individual
        Defendants.

_____/

## SECOND AMENDED COMPLAINT

Plaintiff, DAVID ALCALAY ("PLAINTIFF"), an individual, by and through his undersigned counsel, hereby files this Complaint against Defendants, GLOBAL PARTNERS GROUP, INC. ("GPG"), a Florida corporation, GLOBAL PARTNERS SECURITIES, INC. ("GPS"), a Florida corporation, and MARCOS KONIG ("KONIG"), an individual, and alleges as follows:

## JURISDICTION, VENUE & THE PARTIES

1.      This is an action for damages wherein the amount in controversy exceeds $15,000.00, exclusive of costs, interest and attorney's fees, and is therefore within the jurisdiction of this Court.

2.      At all times material hereto, Plaintiff was and is an individual over the age of eighteen (18) years, is otherwise *sui juris*, and is a resident of Palm Beach County, Florida.

3.      At all times material hereto, Defendant, GPG, was a Florida corporation with its principal place of business in Broward County, Florida.

4.       At all times material hereto, Defendant, GPS was a subsidiary of GPG, as that term is defined by the U.S. Internal Revenue Code, and was a Florida corporation with its principal place of business in Broward County, Florida.

5.       At all times material hereto, Defendant, KONIG was and is an individual over the age of eighteen (18) years, is otherwise *sui juris*, and is a resident of Broward County, Florida.

6.       All conditions precedent to the bringing of the various claims set forth herein have been satisfied, discharged or waived.

7.       Plaintiff is entitled to recover reasonable attorney's fees and the costs associated with the prosecution of this action pursuant to Florida Statute and the contract between the parties.

## GENERAL ALLEGATIONS

8.       In or about 2004, Plaintiff was approached and solicited by KONIG, to invest monies in GPG as an investment opportunity.

9.       KONIG is the Chief Executive Officer and President of GPG and Director/Officer of GPS.

10.      KONIG, at the time, had ownership interest (outstanding Common Shares and Share Equivalents) of approximately 20.9% in GPG.

11.      GPG, through its subsidiaries, including GPS, operates a securities business.

12.      KONIG and Plaintiff met on several occasions at the office of GPG, from April 2004 up until the time that a Preferred Stock Subscription Agreement (the "Subscription Agreement") was executed. A copy of said Subscription Agreement is attached hereto and incorporated herein as Exhibit "A".

13.     In order to induce Plaintiff to enter into the Preferred Stock Subscription Agreement, KONIG on behalf of GPG prepared an agreement with the Plaintiff, dated June 17, 2004, whereby he states in relevant part:

"In order to induce you to enter into and perform the agreement the Company hereby agrees that in any month in which it fails to pay a VRPP Dividend on the Preferred Stock as provided in the Agreement, the Company shall pay to you a consulting fee in an amount equal to such dividend." Said agreement was executed by both KONIG on behalf of GPG and the Plaintiff (the "Letter Agreement"). A copy of said Agreement is attached hereto and incorporated herein as Exhibit "B".

14.     In negotiating funds from Plaintiff, KONIG both on behalf of GPG, as well as in his individual capacity represented to Plaintiff that GPG was in the business of trading, and that their most profitable department was what he called the "market makers", known as, North American Institutional Brokers ("NAIB"), and the company sought to expand this department.

15.     NAIB had the authority to execute trades with certain select stocks. With Plaintiff's investment, GPG and KONIG represented that they would be able to obtain the authority to execute trades with other stocks, therefore increasing their inventory of stocks that they were able to execute trades for, and hence, increase profits.

16.     Konig and GPG guaranteed Plaintiff a return on his investment during the several meetings they had from April to June of 2004.

17.     KONIG and GPG agreed in writing that, at a minimum, would pay Plaintiff consulting fees in lieu of dividends. See Exhibit "B".

18.     Exhibit "A" of the Subscription Agreement attached hereto as Exhibit "A" states in relevant part:

Notwithstanding anything to the contrary contained herein, the Investor will receive a guaranteed minimum 10% annual cash return on

3

the principal amount outstanding at the end of each calendar quarter (the "minimum Dividend Amount"). The 10% annual Minimum Dividend Amount will be paid in cash on a monthly basis, beginning 120 days after the initial investment is made.

19.     KONIG, on behalf of GPG and in his individual capacity, in addition to the prior allegations stated above, represented to Plaintiff that the "market makers" department was earning monthly profits in the range of $60,000 to $100,000, and with Plaintiff's investment, the "market makers" (also known as NAIB) would double their profits.

20.     In all of his meetings with Defendants, Plaintiff made it very clear that he was only interested in investing his money in the "market makers" (also known as NAIB). The Subscription Agreement attached hereto as Exhibit "A" specifically stated this intended use of Plaintiff's investment.

21.     The Subscription Agreement, attached hereto as Exhibit "A", addresses the purported use of the funds invested by Plaintiff. It states, in relevant part:

> **Use of Proceeds: GPG** intends to use the proceeds to increase the net capital of its Global Partners Securities, Inc. ("GPSI") subsidiary and to expand principal trading opportunities at GPSI's NAIB division.

22.     Under the Subscription Agreement, attached hereto as Exhibit "A", Defendants represented that the sale of the Securities was not being registered. This was on the basis that the issuance was exempt from registration under the Securities Act and the applicable state securities laws, and the rules and regulations promulgated thereunder.

23.     Under the Subscription Agreement, attached hereto as Exhibit "A", Defendants made representations and warranties that each of GPG's two broker-dealer subsidiaries, GPS and EquityStation were in compliance with net capital requirements of Rule 15c3-1 under the Securities Exchange Act of 1934.

24.     Under the Subscription Agreement, attached hereto as Exhibit "A", Defendants made representations and warranties that GPG would receive from GPS distributions to the

4

extent necessary to meet their required dividend payments under the terms of the Preferred Stock, or, at least, the same amount in consulting fees under Exhibit "B".

25.     Based upon Defendant's disclosures, representations and warranties stated in the Subscription Agreement and their oral representations as stated above, on or about June 17, 2004, Plaintiff entered into a Preferred Stock Subscription Agreement with KONIG, on behalf of GPG, for the purchase of stock (the "Subscription Agreement").   A copy of said Subscription Agreement is attached hereto and incorporated herein as Exhibit "A."

26.     Plaintiff relied on Defendants' written and oral representations, and would never had invested his monies in GPG if he knew that his monies were not to be used as specified in the "intended use" paragraph of the Subscription Agreement, and that Defendants representations and warranties were not truthful and accurate.

27.     Pursuant to the Subscription Agreement, attached hereto as Exhibit "A", Plaintiff invested Four Hundred Thousand Dollars ($400,000.00) with GPG, and in return, Plaintiff received Eighty Thousand (80,000) shares of GPG's convertible variable rate participating preferred stock (the "Stock") where the stock's price was held out by Defendant's to be Five Dollars ($5.00) per share.

28.     In or about June 24, 2004, Plaintiff wire-transferred GPG the four hundred thousand dollars ($400,000.00) requested by GPG under the Subscription Agreement.

29.     At the time Plaintiff transferred funds to GPG, GPG without disclosure to Plaintiff was defending a lawsuit filed against one of its subsidiaries, National American Institutional Brokers, Inc., ("NAIB") by a former employee for alleged failure to pay commissions (the "Lawsuit").

30.     In or about October 2003 an arbitration panel concluded in favor of the former employee; and issued an award in the amount of two hundred and forty eight thousand one

hundred and four dollars, ($248,104.00).  An appeal of the arbitration decision was pending as of May 15, 2004.  KONIG and GPG never disclosed to Plaintiff that there were no monies in the Company reserved for this judgment.

31.     KONIG as chief executive officer of GPG knew that GPG was defending a lawsuit filed against NAIB by a former employee for alleged failure to pay commissions.

32.     KONIG as chief executive officer of GPG knew there were no monies to pay the award granted to the former employee and that there were no monies to place a bond for purposes of an appeal to said Judgment.

33.     KONIG and GPG intentionally failed to disclose to Plaintiff that his monies would be needed to pay the Judgment in their pending lawsuit with a former employee or that Plaintiff's monies would be needed to post a bond pending appeal of the Judgment.

34.     On or about August 27, 2004, a Final Judgment was entered in the Lawsuit in favor of the Plaintiff in that case.

35.     GPG appealed same on behalf of  NAIB and, upon information and belief, NAIB used Two Hundred Seventy Three Thousand One Hundred Dollars ($273,100.00) of Plaintiff's monies to place a bond for purposes of said appeal ("Appeal Bond"), rather than its agreed upon use  as stated in the Subscription Agreement, attached hereto as Exhibit "A".

36.      NAIB, a division of GPG, contracted with Accredited Surety and Casualty Company, Inc. to post the Appeal Bond on NAIB's behalf.

37.     Upon information and belief, the remaining One Hundred Twenty Six Thousand Nine Hundred Dollars ($126,900.00) of Plaintiff's investment was utilized for debt service of GPG and its subsidiaries, rather than its agreed upon use in accordance with the executed Subscription Agreement, attached hereto as  Exhibit "A".

38.     In or about September 2004, GPG entered negotiation for the acquisition of its business.

39.     On or about November 2, 2004, VFINANCE INVESTMENTS HOLDINGS, INC. completed its acquisition of GPS's business.

40.     Upon information and belief, KONIG and GPG were negotiating an acquisition of GPS with VFINANCE INVESTMENTS HOLDINGS, INC. At the time KONIG, in his individual capacity and on behalf of GPG, was meeting with the Plaintiff to discuss investing in securities trading with GPG, with the intent of satisfying the outstanding legal claim before the acquisition was completed.

41.     Upon information and belief, KONIG and GPG were negotiating a purchase and or acquisition of GPS with VFINANCE INVESTMENTS HOLDINGS, INC. at the time KONIG executed the GPG Subscription Agreement on June 17, 2004.

42.     KONIG and GPG failed to disclose to the Plaintiff, prior to his investment, that negotiations were taking place as to the purchase and or acquisition of GPS.

43.     After Plaintiffs investment in GPG, neither KONIG nor GPG informed Plaintiff that GPG intended to sell  GPS's business to VFINANCE INVESTMENTS HOLDINGS, INC.

44.     After Plaintiffs investment in GPG, neither KONIG nor GPG informed Plaintiff that in fact GPG sold  GPS's business to VFINANCE INVESTMENTS HOLDINGS, INC.

45.     Upon information and belief, none of the sales proceeds from the sale of GPS's business went to GPG, but rather to KONIG.

46.     Upon information and belief, KONIG received, without making any payments to GPG all other intangible assets from GPG's subsidiaries leaving GPG with an "empty shell".

47.     Plaintiff has not received the promised return on his investment, nor any stock in VFINANCE or VFINANCE INVESTMENTS HOLDINGS, INC.  pursuant to the acquisition.

Likewise, Plaintiff never received any consideration for his investment under the Subscription Agreement under Exhibit "A", or Agreement under Exhibit "B", stock or otherwise.

## COUNT I:  BREACH OF CONTRACT AS TO DEFENDANT GPG

48.     Plaintiff realleges and reavers the allegations set forth in paragraphs one (1) through forty-seven (47) as if fully set forth herein.

49.     On or about June 17, 2004, Plaintiff entered into the Subscription Agreement with KONIG, on behalf of GPG, for the purchase of stock,  see Exhibit "A", and on the same day entered into a subsequent Agreement attached hereto as Exhibit "B".

50.     Prior to and at the time the parties entered into said Subscription Agreement, KONIG, on behalf of GPG, represented to Plaintiff that NAIB had the authority to execute trades with certain select stocks.  He represented orally and in writing that Plaintiff's investment would be used solely for NAIB to obtain the authority to execute trades with other stocks, therefore increasing their inventory of stocks that they were able to execute trades for, and hence increase GPG's profits.

51.     Pursuant to the Subscription Agreement, Plaintiff invested Four Hundred Thousand Dollars ($400,000.00) and acquired Eighty Thousand (80,000) shares of preferred Stock in return.  See Exhibit "A".

52.     Pursuant to Exhibit A of the Subscription Agreement, the "use of Proceeds" section stated GPG intends to use the proceeds to increase the net capital of its GPS subsidiary and to expand principal trading opportunities at GPS's NAIB division.  See Exhibit "A".

53.     Pursuant to Exhibit A of the Subscription Agreement, Plaintiff was guaranteed a minimum of 10% annual cash return on the principal amount outstanding at the end of each calendar quarter.  See Exhibit "A".

54.     Pursuant to Exhibit "B" attached hereto, at a minimum, Plaintiff was to get his return in the form of consulting fees.

55.     GPG has materially breached the Subscription Agreement under Exhibit "A" and Agreement under Exhibit "B" by utilizing the monies for other purposes then its "intended use" and by failing to reimburse and/or distribute any monies, dividends or stock to Plaintiff.

56.     As a direct result of said material breach, Plaintiff has been damaged in the amount of $400,000.00, loss of interest, costs and attorney's fees.

WHEREFORE, Plaintiff demands judgment against GPG for damages, interest, costs, attorney's fees pursuant to the Subscription Agreement and any further relief this Court deems just and proper.

## COUNT II:  FRAUD IN THE INDUCEMENT AS TO DEFENDANT GPG

57.     Plaintiff realleges and reavers the allegations set forth in paragraphs one (1) through forty-seven (47) as if fully set forth herein.

58.     On or about June 17, 2004, Plaintiff entered into the Subscription Agreement with GPG for the purchase of stock,  see Exhibit "A", and on the same day entered into a subsequent Agreement attached hereto as Exhibit "B".

59.     Prior to and at the time the parties entered into said Subscription Agreement, KONIG,  on behalf of GPG, represented to Plaintiff that NAIB had the authority to execute trades with certain select stocks.  He represented that Plaintiff's investment would be used for NAIB to obtain the authority to execute trades with other stocks, therefore increasing their inventory of stocks that they were able to execute trades for, and hence increase GPG's profits.

60.     Pursuant to Exhibit A of the Subscription Agreement the "use of Proceeds" section stated GPG intends to use the proceeds to increase the net capital of its GPS subsidiary and to expand principal trading opportunities at GPS's NAIB division. See Exhibit "A".

61.     Pursuant to Exhibit A of the Subscription Agreement, Plaintiff was guaranteed a minimum of 10% annual cash return on the principal amount outstanding at the end of each calendar quarter, to be paid in cash on a monthly basis. See Exhibit "A".

62.     In making said representations to Plaintiff, GPG, knew that their representations were false regarding a material fact. GPG knew that they would use Plaintiff's investment for other purposes and would not reimburse and/or distribute any monies, dividends or stock to Plaintiff.

63.     GPG misrepresented several material facts to Plaintiff in an effort to induce Plaintiff to rely on same, and invest in GPG.

64.     GPG intentionally failed to disclose to Plaintiff that his monies would be needed to pay the judgment in their pending law suit with a former employee, or that Plaintiffs' monies would be needed to post a bond pending appeal of the judgment. GPG knew that this omission was a material fact. GPG knew that if this information was disclosed to Plaintiff, that he would not have entered into their Subscription Agreement.

65.     GPG intentionally failed to disclose to the Plaintiff prior to his investment, that negotiations were taking place with VFINANCE INVESTMENTS HOLDINGS, INC. as to the acquisition of GPS's business and that, if this acquisition occurred, there would be no dividends on his investment or consulting fees under Exhibit "B" for that matter. GPG knew that this information was a material fact.

66.     GPG intended that this omission would induce Plaintiff to invest in GPG.

67.     GPG knew that if the above stated information was disclosed to Plaintiff, that he would not have entered into their Subscription Agreement.

68.     GPG was privy to all acquisition negotiations that were taking place between GPG, GPS and VFINANCE INVESTMENTS.

69.     Plaintiff justifiably relied on all misrepresentations and omissions as stated above from GPG, and as a result, Plaintiff has been damaged.

WHEREFORE, Plaintiff demands judgment against GPG for damages, costs of this action, interest, attorney's fees pursuant to Florida Statutes § 57.105 and any further relief this Court deems just and proper. Further, Plaintiff reserves the right to move this Court, pursuant to Chapter 768, Florida Statutes, for leave to amend this complaint by adding a claim for punitive damages.

## COUNT III: FRAUD IN THE INDUCEMENT AS TO DEFENDANT KONIG AS OFFICER AND DIRECTOR

70.     Plaintiff realleges and reavers the allegations set forth in paragraphs one (1) through forty-seven (47) as if fully set forth herein.

71.     On or about June 17, 2004, Plaintiff entered into the Subscription Agreement with KONIG on behalf of GPG for the purchase of stock, see Exhibit "A", and on the same day entered into a subsequent Agreement attached hereto as Exhibit "B".

72.     Subsequent to June 17, 2004 Plaintiff became a Shareholder in GPG.

73.     Prior to and at the time the parties entered into said Subscription Agreement, KONIG, on behalf of GPG, represented to Plaintiff that NAIB had the authority to execute trades with certain select stocks. He represented that Plaintiff's investment would be used for NAIB to obtain the authority to execute trades with other stocks, therefore increasing their inventory of stocks that they were able to execute trades for, and hence increase GPG's profits.

74.     Pursuant to Exhibit A of the Subscription Agreement the "use of Proceeds" section stated GPG intends to use the proceeds to increase the net capital of its GPS subsidiary and to expand principal trading opportunities at GPS's NAIB division. See Exhibit "A".

11

75.     Pursuant to Exhibit A of the Subscription Agreement, Plaintiff was guaranteed a minimum of 10% annual cash return on the principal amount outstanding at the end of each calendar quarter, to be paid in cash on a monthly basis.  See Exhibit "A".  And, pursuant to Exhibit "B", Plaintiff was at a minimum to receive consulting fees.

76.     In making said representations to Plaintiff, KONIG knew that his representations were false regarding a material fact.  KONIG knew GPG would use Plaintiffs investment for other purposes and would not be used to reimburse and/or distribute any monies, dividends or stock to Plaintiff.

77.     KONIG misrepresented several material facts to Plaintiff in an effort to induce Plaintiff to rely on same and invest in GPG, at which KONIG was an Officer, Director and individual Shareholder.

78.     KONIG, as chief executive officer of GPG knew that GPG was defending a lawsuit filed against NAIB by a former employee for alleged failure to pay commissions. KONIG knew there were no monies to pay the award granted to the former employee and that there were no monies to place a bond for purposes of an appeal to said judgment.

79.     KONIG intentionally failed to disclose to Plaintiff that his monies would be needed to pay the judgment in their pending law suit with a former employee, or that Plaintiffs' monies would be needed to post a bond pending appeal of the judgment.  KONIG knew that this omission was a material fact.

80.     KONIG knew that if this information was disclosed to Plaintiff that he would not have entered into the Subscription Agreement.

81.     KONIG intentionally failed to disclose to the Plaintiff, prior to his investment, that negotiations were taking place  with VFINANCE INVESTMENTS HOLDINGS, INC. for

12

the acquisition of GPS's business and that, if this acquisition occurred, there would be no dividends on his investment. KONIG knew that this information was a material fact.

82.     KONIG knew that if above stated information was disclosed to Plaintiff, that he would not have entered into GPG's Subscription Agreement.

83.     KONIG, as chief executive officer of GPG, was privy to all acquisition negotiations that were taking place between GPG, GPS and VFINANCE INVESTMENTS.

84.     Plaintiff justifiably relied on all misrepresentations and omissions as stated above from KONIG, and as a result, Plaintiff has been damaged.

WHEREFORE, Plaintiff demands judgment against KONIG AS DIRECTOR AND OFFICER for damages, costs of this action, interest, attorney's fees pursuant to Florida Statutes § 57.105 and any further relief this Court deems just and proper. Further, Plaintiff reserves the right to move this Court, pursuant to Chapter 768, Florida Statutes, for leave to amend this complaint by adding a claim for punitive damages.

### COUNT IV: FRAUD IN THE INDUCEMENT AS TO DEFENDANT KONIG, INDIVIDUALLY

85.     Plaintiff realleges and reavers the allegations set forth in paragraphs one (1) through forty-seven (47) as if fully set forth herein.

86.     On or about June 17, 2004, Plaintiff entered into the Subscription Agreement with KONIG on behalf of GPG for the purchase of stock, see Exhibit "A", and on the same day entered into a subsequent Agreement attached hereto as Exhibit "B".

87.     Prior to and at the time the parties entered into said Subscription Agreement, KONIG, in his individual capacity and on behalf of GPG, represented to Plaintiff that NAIB had the authority to execute trades with certain select stocks. He represented that Plaintiff's investment would be used for NAIB to obtain the authority to execute trades with other stocks,

13

therefore increasing their inventory of stocks that they were able to execute trades for, and hence increase GPG's profits.

88.     Prior to entering into said Subscription Agreement, KONIG, in his individual capacity and on behalf of GPG, represented to Plaintiff that GPG was going to use the proceeds of Plaintiff's investment to increase the net capital of GPG and to expand principal trading opportunities at NAIB and, under Exhibit "B", Plaintiff, at a minimum, was to receive consulting fees.

89.     In making said representations to Plaintiff, KONIG, knew or should have known that his representations were false regarding a material fact.  KONIG knew that GPG would use Plaintiffs investment for other purposes and would not reimburse and or distribute any monies, dividends or stock to the Plaintiff.

90.     KONIG misrepresented several material facts to Plaintiff in an effort to induce Plaintiff to rely on same and invest in GPG.  KONIG, a shareholder and officer of GPG, knew that he would personally benefit if Plaintiff made the investment in GPG.

91.     KONIG, in his individual capacity knew that if he did not misrepresent material facts and fail to disclose material information to the Plaintiff, Plaintiff would not have entered into GPG's Subscription Agreement, and accordingly KONIG  Would not personally profit from same.

92.     KONIG, in his individual capacity intentionally failed to disclose to the Plaintiff prior to his investment that negotiations were taking place as to the acquisition of GPS's business and that if this acquisition occurred there would be no dividends on his investment.  KONIG knew that this information was a material fact.

93.     KONIG knew that, if this information was disclosed to Plaintiff, that he would not have entered into GPG's Subscription Agreement.  KONIG knew that by Plaintiff entering into the Subscription Agreement with GPG, he would personally profit from same.

94.     KONIG, in his individual capacity was privy to all acquisition negotiations that were taking place between GPG, GPS and VFINANCE INVESTMENTS.

95.     Plaintiff justifiably relied on all misrepresentations and omissions from KONIG, and as a result, Plaintiff has been damaged.

WHEREFORE, Plaintiff demands judgment against KONIG INDIVIDUALLY  for damages, costs of this action, interest, attorney's fees pursuant to Florida Statutes § 57.105 and any further relief this Court deems just and proper.  Further, Plaintiff reserves the right to move this Court, pursuant to Chapter 768, Florida Statutes, for leave to amend this complaint by adding a claim for punitive damages.

## COUNT V: SECURITIES FRAUD AS TO DEFENDANT GPG,

96.     Plaintiff realleges and reavers the allegations set forth in paragraphs one (1) through Forty-seven (47) as if fully set forth herein.

97.     On or about June 17, 2004, Plaintiff entered into the Subscription Agreement with KONIG on behalf of GPG and GPG for the purchase of GPG stock,  see Exhibit "A",  and on the same day entered into a subsequent Agreement attached hereto as Exhibit "B".

98.     Prior to and at the time the parties entered into said Subscription Agreement, KONIG, on behalf of GPG, represented to Plaintiff that NAIB had the authority to execute trades with certain select stocks.  He represented that Plaintiff's investment would be used for NAIB to obtain the authority to execute trades with other stocks, therefore increasing their inventory of stocks that they were able to execute trades for, and hence increase GPG's profits.

15

99.     Pursuant to Exhibit A of the Subscription Agreement the "use of Proceeds" section stated GPG intends to use the proceeds to increase the net capital of its GPS subsidiary and to expand principal trading opportunities at GPS's NAIB division,  see Exhibit "A", and that, at a minimum, Plaintiff was to receive consulting fees under Exhibit "B".

100.     GPG knew that their oral and written representations as to the intended use of Plaintiff's investment were a false statement of fact, and that they had no intent to perform it, and would use said funds for other purposes.   These representations were made to deceive, manipulate or defraud the Plaintiff into executing the Subscription Agreement.

101.     GPG knew that they had no monies put aside to pay a Judgment which was awarded to a former employee of NAIB.  In addition, GPG knew that if they decided to appeal the judgment they had no monies to post a bond pending appeal of the judgment.  Therefore, GPG knew that as soon as they received Plaintiff's investment, it would be used to either pay the judgment or post the bond.

102.     GPG, had knowledge of the acquisition negotiations between GPG and VFINANCE which were taking place prior to Plaintiff entering into the Subscription Agreement. GPG intentionally failed to disclose same to Plaintiff.  This intentional omission was done to deceive, manipulate or defraud the Plaintiff to enter into the Subscription Agreement.

103.     GPG guaranteed in its Subscription Agreement that GPG will receive from GPS distributions to the extent necessary to meet its required dividend payments under the terms of the Preferred Stock, or, otherwise, consulting fees under Exhibit "B".

104.     Pursuant to Exhibit A of the Subscription Agreement, Plaintiff was guaranteed a minimum of 10% annual cash return on the principal amount outstanding at the end of each calendar quarter, to be paid in cash on a monthly basis. See Exhibit "A".

105.     GPG made the promise to pay Plaintiff his required dividend payments under Exhibit "A" or consulting fees under Exhibit "B", with no intent to perform under either agreement.

106.     In all of his meetings with Defendants, Plaintiff made it very clear that he was only interested in investing his money in the "market makers" (also known as NAIB).

107.     Plaintiff would not have purchased stock in GPG if GPG did not make the above representations and omissions.

108.     Plaintiff entered into the Subscription Agreement based on reasonable reliance of GPG's oral and written representations.

109.     Plaintiff relied on said representation and, as a result, Plaintiff has been damaged

WHEREFORE, Plaintiff demands judgment against GPG  for damages, costs of this action, interest, attorney's fees pursuant to Florida Statutes § 57.105 and any further relief this Court deems just and proper.  Further, Plaintiff reserves the right to move this Court, pursuant to Chapter 768, Florida Statutes, for leave to amend this complaint by adding a claim for punitive damages.

## COUNT VI: SECURITIES FRAUD AS TO DEFENDANT KONIG,

110.     Plaintiff realleges and reavers the allegations set forth in paragraphs one (1) through forty-seven (47) as if fully set forth herein.

111.     On or about June 17, 2004, Plaintiff entered into the Subscription Agreement with KONIG on behalf of GPG and GPG for the purchase of GPG stock, see Exhibit "A", and on the same day entered into a subsequent Agreement attached hereto as Exhibit "B".

112.     Prior to and at the time the parties entered into said Subscription Agreement, KONIG, in his individual capacity and on behalf of GPG, represented to Plaintiff that NAIB had

the authority to execute trades with certain select stocks.  He represented that Plaintiff's investment would be used for NAIB to obtain the authority to execute trades with other stocks, therefore increasing their inventory of stocks that they were able to execute trades for, and hence increase GPG's profits.

113.    Pursuant to Exhibit A of the Subscription Agreement the "use of Proceeds" section stated GPG intends to use the proceeds to increase the net capital of its GPS subsidiary and to expand principal trading opportunities at GPS's NAIB division.  See Exhibit "A".

114.    GPG knew that their oral and written representations as to the intended use of Plaintiff's investment were a false statement of fact, and that they had no intent to perform it, and would use said funds for other purposes.   These representations were made to deceive, manipulate or defraud the Plaintiff into executing the Subscription Agreement.

115.    KONIG, as Chief Executive Officer of GPG, knew that GPG had no monies put aside to pay a Judgment which was awarded to a former employee of NAIB.  In addition, KONIG knew that if GPG decided to appeal the judgment they had no monies to post a bond pending appeal of the judgment. Therefore KONIG knew, or had reason to know, that as soon as GPG received Plaintiff's investment, it would be used to either pay the judgment or post the bond.

116.    KONIG, as Chief Executive Officer of GPG had knowledge of the acquisition negotiations between GPG and VFINANCE which were taking place prior to Plaintiff entering into the Subscription Agreement.  KONIG intentionally failed to disclose same to Plaintiff. This intentional omission was done to deceive, manipulate or defraud the Plaintiff to enter into the Subscription Agreement.

117.    KONIG, on behalf of GPG, guaranteed in its Subscription Agreement that GPG will receive from GPS distributions to the extent necessary to meet its required dividend

payments under the terms of the Preferred Stock, or, alternatively, the consulting fees promised in Exhibit "B".

118.     Pursuant to Exhibit A of the Subscription Agreement, Plaintiff was guaranteed a minimum of 10% annual cash return on the principal amount outstanding at the end of each calendar quarter, to be paid in cash on a monthly basis. <u>See</u> Exhibit "A".

119.     KONIG, on behalf of GPG, made the promise to pay Plaintiff his required dividend payments or consulting fees with no intent to perform it.

120.     Plaintiff at all relevant times made it very clear to Konig and GPG that he only wanted to invest his monies in their "market makers" department. He wanted his investment to be used only for expanding NAIB's authority to sell other stocks. The Subscription Agreement stated clearly this intended use. <u>See</u> Exhibit "A".

121.     Plaintiff would not have purchased stock in GPG if KONIG did not make the above representations and omissions.

122.     Plaintiff entered into the Subscription Agreement based on reasonable reliance on KONIG'S oral and written representations.

123.     Plaintiff relied on said representation and, as a result, Plaintiff has been damaged

WHEREFORE, Plaintiff demands judgment against KONIG for damages, costs of this action, interest, attorney's fees pursuant to Florida Statutes § 57.105 and any further relief this Court deems just and proper. Further, Plaintiff reserves the right to move this Court, pursuant to Chapter 768, Florida Statutes, for leave to amend this complaint by adding a claim for punitive damages.

## COUNT VII –BREACH OF FIDUCIARY DUTY AS TO DEFENDANT KONIG

124.     Plaintiff realleges and reavers the allegations set forth in paragraphs one (1) through forty-seven (47) as if fully set forth herein.

125.     KONIG was an Officer and Director of GPG and an Officer and Director of GPS.

126.     On or about June 17, 2004, Plaintiff entered into the Subscription Agreement with KONIG, on behalf of GPG, for the purchase of stock, see Exhibit "A", and on the same day entered into a subsequent Agreement attached hereto as Exhibit "B".

127.     As a result of said investment, Plaintiff became a shareholder of GPG, and as such entered into a fiduciary relationship with KONIG.

128.     On or about November 2, 2004 VFINANCE INVESTMENTS HOLDINGS, INC. acquired the business of GPS.

129.     KONIG breached his fiduciary duty of loyalty and care to Plaintiff by failing to inform Plaintiff, and or by concealing from Plaintiff the fact that GPS's business was in the process of being acquired by VFINANCE INVESTMENTS HOLDINGS, INC.

130.     KONIG breached his fiduciary duty of loyalty and care to Plaintiff by failing to inform Plaintiff of the sale and purchase by VFINANCE INVESTMENTS HOLDINGS, INC. subsequent to the completion date of the acquisition.

131.     KONIG breached his fiduciary duty of loyalty and care to Plaintiff by utilizing monies invested by Plaintiff for other purposes than those designated in the Subscription Agreement, in order to make GPS desirable for acquisition, and by failing to reimburse and/or distribute any monies or stock to Plaintiff upon Plaintiff's demand.

132.    KONIG breached his fiduciary duty by not transferring the sale proceeds received from VFINANCE to GPG, and by personally authorizing said proceeds and/or benefits from said acquisition to be preferentially transferred and distributed to him.

133.    KONIG approved of and caused these transfers to be made knowing that after the transfers were made, GPG would be unable to pay its debts as they became due, including its financial obligations under its Agreement with Plaintiff.

134.    KONIG'S approval for these transfers and distributions of the corporate assets of GPS was in bad faith and lacked the care an ordinarily prudent person in a like position would exercise under similar circumstances.

135.    As a direct and proximate result of KONIG's breach of fiduciary duty, Plaintiff has been damaged.

WHEREFORE, Plaintiff demands judgment against KONIG for damages, costs of this action, interest, attorney's fees pursuant to Florida Statutes and any further relief this Court deems just and proper.  Further, Plaintiff reserves the right to move this Court, pursuant to Chapter 768, Florida Statutes, for leave to amend this complaint by adding a claim for punitive Damages.

## COUNT VIII – BREACH OF REPRESENTATIONS AND WARRANTIES AGAINST GPG

136.    Plaintiff realleges and reavers the allegations set forth in paragraphs one (1) through forty-seven (47) as if fully set forth herein.

137.    On or about June 17, 2004, Plaintiff entered into the Subscription Agreement with KONIG, on behalf of GPG, for the purchase of stock, see Exhibit "A", and on the same day entered into a subsequent Agreement attached hereto as Exhibit "B".

21

138.     GPG represented in the Subscription Agreement that the sale of the Securities to the Plaintiff does not have to be registered on the basis that the issuance was exempt from registration under the Securities Act.

139.     GPG knew or should have had reason to know that the offering to the Plaintiff was not exempt from registration under the Securities Act.

140.     GPG represented in the Subscription Agreement that each of GPG's two broker-dealer subsidiaries, GPS and EquityStation, was in compliance with net capital requirements of Rule 15c3-1 under the Securities exchange Act of 1934.

141.     GPG knew or should have had reason to know that GPS and/or EquityStation was not in compliance with net capital requirements of Rule 15c3-1 under the Securities Exchange Act of 1934 as of the date the Subscription Agreement was entered into.

142.     GPG knew prior to Plaintiff entering into the Subscription Agreement that a judgment against NAIB in the sum of Two Hundred Seventy Three Thousand One Hundred Dollars (237,100.00) had to be paid or an appeal bond in the same amount had to be paid. GPG knew that this additional debt incurred by GPG, GPS, would put GPS not in compliance with the net capital requirements of Rule 15c3-1 under the Securities exchange Act of 1934.

143.     Plaintiff relied on said representations and warranties and, as a result, Plaintiff has been damaged.

WHEREFORE, Plaintiff demands judgment against GPG for damages, costs of this action, interest, and any further relief this Court deems just and proper.

## COUNT IX –AIDING AND ABETTING AGAINST DEFENDANT GPS

144.     Plaintiff realleges and reavers the allegations set forth in paragraphs one (1) through forty-seven (47) as if fully set forth herein.

22

145.    KONIG and GPG knew that they committed a fraud against the Plaintiff as stated in the counts above.

146.    GPS had knowledge of this fraud.

147.    On or about November 2, 2004, GPS sold its business to VFINANCE INVESTMENTS HOLDINGS, INC. and VFINANCE, as the parent of VFINANCE INVESTMENTS HOLDINGS, INC.

148.    Defendant, GPS, counseled, caused, procured, encouraged, assisted, aided and abetted GPG and KONIG'S fraud and breach of fiduciary duty by selling its business to the detriment of the Plaintiff.

149.    As a direct and proximate result of GPS's actions in aiding and abetting the fraud against the Plaintiff, the Plaintiff has been damaged.

WHEREFORE, Plaintiff demands judgment against GPS for damages, costs of this action, interest, attorney's fees pursuant to Florida Statutes and any further relief this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury against all Defendants on all issues so triable.

Dated: August 2 __, 2006

LIBOW & SHAHEEN LLP

By:_____
   Allen H. Libow, Esq.
   Florida Bar No.: 899135
   3351 N.W. Boca Raton Boulevard
   Boca Raton, FL 33431
   (561) 367.7300 – Telephone
   (561) 391.2566 – Facsimile

23

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via U.S. Mail this ___ day of August 2006 to:

WASSERSTROM WEINREB & WEALCATCH PL
1909 Tyler Street – Penthouse
Wachovia Center
Hollywood  FL  33021
Attn.:  Jon Polenberg, Esq.

Allen H. Libow, Esq.

## PREFERRED STOCK SUBSCRIPTION AGREEMENT

June 17, 2004,

2004
Global Partners Group, Inc.
2101 West Commercial Blvd.
Suite 3500
Ft. Lauderdale, Florida 33309

Ladies and Gentlemen:

Global Partners Group, Inc., a Florida corporation (the "Company"), desires to sell to David Alcalay ("Subscriber") 80,000 shares (the "Shares") of its Convertible Variable Rate Participating Preferred Stock (the "Preferred Stock") at a price of $5.00 per share, subject to adjustment, and Subscriber desires to purchase the Shares on terms set forth in this Preferred Stock Subscription Agreement (this "Agreement"). The rights, preferences, powers and other terms of the Preferred Stock are set forth on Exhibit A attached hereto. Accordingly, the Company and the Subscriber agree as follows:

1.  **Sale and Purchase.** Subject to the terms and conditions set forth in the Agreement, the Company hereby sells the Shares to Subscriber and Subscriber hereby purchases the Shares tenders $400,000 to the Company for the purchase price of the Shares.

2.  **Representation, Warranties, and Agreements of Subscriber.** In connection with his subscription, Subscriber hereby makes the following representations, warranties and agreements and confirms the following understandings:

(a)  **Investment Purpose.** Subscriber is acquiring the Shares and the shares of the Company's common stock issuable up on conversion of the Shares (collectively, the "Securities") for Subscriber's own account and for investment purposes only with no intent to distribute.

(b)  **Information Regarding the Company.** Subscriber is familiar with the Company's present and proposed operations. Subscriber acknowledges that Subscriber has conducted, or been afforded the opportunity to conduct an investigation of the Company and has been offered the opportunity to ask representatives of the Company questions about the Company's present and proposed business. Representatives of the Company have answered all inquiries that Subscriber has put to them concerning the Company and its present and proposed business, and the offering and sale of the Shares.

(c)  **Risks.** Subscriber recognizes that the purchase of the Shares involves a high degree of risk, and is suitable only for persons of adequate financial means who have no need for liquidity in this investment in that (i) Subscriber may not be able to liquidate the investment in the event of an emergency; (ii) transferability is extremely limited; and (iii) in the event of a disposition, Subscriber could sustain a complete loss of the entire investment.



(d)     **Accreditor Investor Status.**   Subscriber represents that he is an "accredited investor" as such term is defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933, amended (the "Securities Act").   Specifically, Subscriber is an individual having an individual net worth or joint net worth with spouse in excess of $1,000,000.

(e)     **Subscriber's Financial Experience.**   Subscriber is sufficiently experienced in financial and business matters to be capable of evaluating the merits and risks of an investment in the Company.

(f)     **Suitability of Investment.**   Subscriber has evaluated the merits and risks of Subscriber's proposed investment in the Company, including those risks particular to Subscriber's situation, and has determined that this investment is suitable for Subscriber. Subscriber has adequate financial resources for an investment of this character, and at this time Subscriber can bear a complete loss of Subscriber's investment.   Further, Subscriber will continue to have, after making an investment in the Company, adequate means of providing for its current needs, the needs of those dependent on it, and possible personal contingencies.

(g)     **Exempt Offering.**  Subscriber understands that the sale of the Securities is not being registered on the basis that this issuance is exempt from registration under the Securities Act and the applicable state securities laws, and the rules and regulations promulgated thereunder, and that reliance on such exemptions is predicated, in part, on Subscriber's representations and warranties contained in this Agreement.  In the view of the Securities and Exchange Commission (the "SEC") and various state securities regulatory commissions, the statutory basis for the exemptions claimed by the Company in connection with the offering would not be present if, notwithstanding Subscriber's representations and warranties, Subscriber has the intention of acquiring the Securities for distribution upon the occurrence or non-occurrence of some predetermined event.

(h)     **Limitations on Disposition.**   Subscriber understands that there are substantial restrictions on the transferability of the Securities pursuant to the Securities Act and applicable state securities laws; the Securities will not be, and Subscriber has no rights to require that the Securities be registered under the Securities Act or any applicable state securities laws; and, accordingly, Subscriber may have to hold the Securities for an indefinite period of time. Subscriber represents that Subscriber can afford to hold the Securities for an indefinite period of time.  In particular, the Subscriber agrees that no sale, assignment or transfer of any Securities shall be valid or effective, and the Company shall not be required to give any effect to such sale, assignment or transfer, unless (i) such sale, assignment or transfer is registered under the Securities Act and applicable state securities laws, (ii) such Securities are sold, assigned or transferred in accordance with all the requirements and limitations of Rule 144 under the Securities Act, it being understood that Rule 144 is not available at the present time and is not expected to be available in the future for the sale of the Securities, or (iii) such sale, assignment or transfer is otherwise exempt from the registration under the Securities Act applicable. Subscriber further understands that an opinion of counsel and other documents may be required to transfer the Securities.  Subscriber acknowledges that the certificates evidencing the Securities shall bear the following, or a substantially similar legend, or such other legend as may appear on the forms of the Securities, and such other legends as may be required by applicable state securities laws:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS AND NEITHER SUCH SECURITIES NOR ANY INTEREST THEREIN MAY BE OFFERED, SOLD, PLEDGED, ASSIGNED OR OTHERWISE TRANSFERRED UNLESS (1) A REGISTRATION STATEMENT WITH RESPECT THERETO IS EFFECTIVE UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS, OR (2) THE COMPANY RECEIVES AN OPINION OF COUNSEL TO THE HOLDER OF SUCH SECURITIES, WHICH COUNSEL AND OPINION ARE REASONABLY SATISFACTORY TO THE COMPANY, THAT SUCH SECURITIES MAY BE OFFERED, SOLD, PLEDGED, ASSIGNED OR TRANSFERRED IN THE MANNER CONTEMPLATED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR APPLICABLE STATE SECURITIES LAWS.

(i)     **Absence of Official Evaluation.**  Subscriber understands that no federal or state agency has made any finding or determination as to the fairness of the terms of an investment in the Company, nor any recommendation for or endorsement of the Shares offered hereby.

(j)     **Additional Financing.**  Subscriber acknowledges that nothing hereunder shall preclude the Company from seeking and/or procuring additional equity and/or debt financing, Subscriber further acknowledges that the Company may offer additional shares of the Preferred Stock or other securities of the Company to third parties on similar or different terms.

(k)     **Nonreliance.**  Subscriber is not relying on the Company or any representation contained herein or in the documents referred to herein with respect to the tax and economic effect of Subscriber's investment in the Company.

(l)     **Prohibitions on Cancellation, Termination, Revocation, Transferability, and Assignment.**  Subscriber hereby acknowledges and agrees that, except as may be specifically provided herein or by applicable law, Subscriber is not entitled to cancel, terminate, or revoke this Agreement, and this Agreement shall survive Subscriber's death or disability or any assignment of the Shares.  Subscriber further agrees that Subscriber may not transfer or assign Subscriber's rights under this Agreement, and Subscriber understands that, if Subscriber's subscription is accepted, the transferability of the Securities will be restricted.

(m)     **Authority to Enter into Agreement.**  Subscriber has full right, power, and authority to execute and deliver this Agreement and perform Subscriber's obligations hereunder.

(n)     **Obligation.**  This Agreement constitutes a valid and legally binding obligation of Subscriber and neither the execution of this Agreement nor the consummation of the transactions contemplated hereby, will constitute a violation of or default under, or conflict with, any judgment, decree, statute or regulation of any governmental authority applicable to Subscriber or any contract, commitment, agreement or restriction of any kind to which

Subscriber is a party or by which its assets are bound. The execution and delivery of this Agreement does not, and the consummation of the transactions described herein will not, violate applicable law, or any mortgage, lien, agreement, indenture, lease or understanding (whether oral or written) of any kind outstanding relative to Subscriber.

(o)   **Approvals Required.** No approval, authorization, consent, order or other action of, or filing with, any person, firm or corporation or any court, administrative agency or other governmental authority is required in connection with the execution and delivery of this Agreement by Subscriber or the consummation of the transactions described herein.

(p)   **No General Solicitation.** Subscriber is not subscribing for the Shares because of or following any advertisement, article, notice or other communication published in any newspaper, magazine or similar media or broadcast over television or radio, or presented at any seminar, or any solicitation or a subscription by a person other than representative of the Company.

3.   **Representations, Warranties and Agreements of the Company.** In connection with this subscription, the Company makes the following representations, warranties and agreements and confirms the following understandings:

(a)   **Company's Good Standing.** The Company is a corporation organized and validly existing under the laws of the State of Florida, and it has all corporate authority and power to conduct its business and to own its properties.

(b)   **Compliance with Net Capital Requirements.** Each of the Company's two broker-dealer subsidiaries, Global Partners Securities, Inc. and EquityStation, Inc., was in compliance with net capital requirements of Rule 15c3-1 under the Securities Exchange Act of 1934 at its most recent reporting date.

(c)   **Authorization; Conflict; Valid and Binding Obligation.** This Agreement and the transactions contemplated hereby have been duly and validly authorized by all requisite corporate action of the Company. The Company has full right, power and capacity to execute, deliver and perform its obligations under this Agreement. No governmental license, permit or authorization and no registration or filings with any court, governmental authority or regulatory agency is required in connection with the Company's execution, delivery and/or performance of this Agreement, other than any filings required by applicable Federal and state securities laws. The execution, delivery and performance of this Agreement, the consummation of the transactions herein contemplated and the compliance with the terms of this Agreement by the Company will not violate or conflict with any provision of the Articles of Incorporation or By-laws of the Company, or any agreement, instrument, law or regulation to which the Company is a party or by which the Company may be bound. This Agreement, upon execution and delivery by the Company, will represent the valid and binding obligation of the Company enforceable in accordance with its terms.

(d)   **Upstream Dividends.** The Company will receive from its subsidiary, Global Partners Securities, Inc. distributions to the extent necessary to meet its required dividend payments under the terms of the Preferred Stock.

{W:\Transact\0110\0737\M0178221 v.1; 6/10/2004 04:23 PM}   4

4.     **Survival    of    Representations,    Warranties,    Agreements    and Acknowledgments.**  The representations, warranties, agreements and acknowledgments of the Company and Subscriber shall survive the offering and purchase of the Shares.

5.     **Right of First Refusal.**   In consideration of the Company agreeing to sell Subscriber the Shares, Subscriber agrees to grant the Company or any entity or person designated by the Company ("Designee") a right of first refusal to purchase the Shares now or hereafter owned by Subscriber in the event of any desired or attempted transfer of the Shares by Subscriber (including but not limited to the sale, assignment, transfer, exchange, conveyance, encumbrance, hypothecation, pledge, or other disposition, by operation of law, or otherwise) (collectively, a "Transfer").  Notwithstanding the foregoing, during Subscriber's lifetime or upon Subscriber's death, Subscriber may Transfer any or all of the Shares now or hereafter legally or beneficially owned by Subscriber to any spouse, child, or grandchild, or any trust created for the benefit of any of such persons, provided that: (a) such person or entity agrees, in writing prior to such Transfer, to comply with the terms and conditions of this Section; (b) the Transfer to such person or entity will not adversely effect the status of any subsidiary of the Company as a registered broker-dealer or investment advisor with any federal, state, or self-regulatory authority; and (c) such Transfer is in compliance with all applicable federal and state securities laws.

Before making any Transfer of any or all of the Shares in connection with a bona fide third party offer, Subscriber (or Subscriber's personal representative or any person or entity acting in a similar capacity) shall immediately upon receipt thereof give written notice of any such proposed Transfer to the Company at the address set forth above or any other address as may later be provided by the Company to Subscriber.  The Company or Designee shall have the later of: (i) 30 days from its receipt of such written notice or (ii) such period of time as set forth in such bona fide third party offer, to exercise its right of first refusal and/or to cause any other person(s) or entities(s) to purchase such number of Shares being offered on the terms and conditions (other than the time period if (i) is applicable) set forth in such bona fide third party offer.  If the Company fails or refuses to exercise such right of first refusal within the time period set forth above, Subscriber may then effect such Transfer on the terms and conditions set forth in such bona fide third party offer, provided such Transfer and the transferee complies with the conditions set forth in (a) through (c) above in the preceding paragraph.

6.     **Blue Sky Notices.**

(a)     THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OR THE SECURITIES LAWS OF ANY STATE AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS.   THE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SEC, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THE OFFERING OR THE ACCURACY OR ADEQUACY OF THE OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

(b)  THE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTE UNDER THE SECURITIES ACT, AND APPLICABLE STATE SECURITIES LAW, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. SUBSCRIBERS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

7.  **Miscellaneous.**

(a)  **Entire Agreement.**  This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof.  This Agreement supersedes all prior negotiations, letters and understandings relating to the subject matter hereof.

(b)  **Amendment.**  This Agreement may not be amended, supplemented or modified in whole or in part except by an instrument in writing signed by the party or parties against whom enforcement of any such amendment, supplement or modification is sought.

(c)  **Choice of Law.**  This Agreement will be interpreted, construed and enforced in accordance with the laws of the State of Florida, without giving effect to the application of the principles pertaining to conflicts of laws.

(d)  **Effect of Waiver.**  The failure of any party at any time or times to require performance of any provision of this Agreement will in no manner affect the right to enforce the same.  The waiver by any party of any breach of any provision of this Agreement will not be construed to be a waiver by any such party of any succeeding breach of that provision or a waiver by such party of any breach of any other provision.

(e)  **Severability.**  The invalidity, illegality or unenforceability of any provision or provisions of this Agreement will not affect any other provision of this Agreement, which will remain in full force and effect, nor will the invalidity, illegality or unenforceability of a portion of any provision of this Agreement affect the balance of such provision.  In the event that any one or more of the provisions contained in this Agreement or any portion thereof shall for any reason be held to be invalid, illegal or unenforceable in any respect, this Agreement shall be reformed, construed and enforced as if such invalid, illegal or unenforceable provision had never been contained herein.

(f)  **Enforcement.**  Should it become necessary for any party to institute legal action to enforce the terms and conditions of this Agreement, the successful party will be awarded reasonable attorneys' fees at all trial and appellate levels, expenses and costs.

(g)  **Binding Nature.**  This Agreement will be binding upon and will inure to the benefit of any successor or successors of the parties hereto.

(h)  **Counterparts.**  This Agreement may be executed in one or more counterparts, each of which will be deemed an original and all of which together will constitute one and the same instrument.



**IN WITNESS WHEREOF,** Subscriber has caused this Agreement to be executed as of the date written on the first page of this Agreement.

SUBSCRIBER:

_____

David Alcalay

COMPANY:

By: _____

Name: MARCOS KONIG

Title: PRESIDENT

Exhibit A

SUMMARY OF PREFERRED STOCK TERMS

| | |
|---|---|
| **Issuer:** | **Global Partners Group, Inc.**, a Florida corporation ("GPG" or the "Company") |
| **Investor:** | David Alcalay ("Alcalay" or the "Investor") |
| **Security:** | Convertible Variable Rate Participating Preferred Stock ("Preferred Stock") |
| **Principal Amount:** | $400,000 (80,000 shares at $5.00 per share) |
| **Voting Rights:** | The Preferred Stock will have no voting rights. |
| **Use of Proceeds:** | GPG intends to use the proceeds to increase the net capital of its Global Partners Securities, Inc. ("GPSI") subsidiary and to expand principal trading opportunities at GPSI's NAIB division. |
| **Dividends:** | The Investor in the Preferred Stock will be entitled to receive Variable Rate Participating Preferred Dividends ("VRPP Dividends") calculated based on the Dividend Payment Formula as hereinafter defined.  In each month during which the Preferred Stock is outstanding and NAIB's trading revenues in connection with its principal trading business exceed $175,000, the Investor will receive VRPP Dividends equal to the amount of revenues in the given month minus $175,000 (the "Initial Excess Amount"), up to an Initial Excess Amount of $225,000, less a series of five (5) sequential Tiered Reductions as shown below ("Tiered Reductions"), where each reduction reduces the Initial Excess Amount by the percentage associated with the category of reduction (the "Dividend Payment Formula"). |

Although the Maximum VRPP that can be paid to the Investor on a *monthly* basis is $31,556.25 according to the limitations associated with the Initial Excess Amount, at the end of every 12 month period following issuance of the Preferred Stock, VRPP Dividends for the preceding 12 months will be recalculated for the entire period as if the cap on the Initial Excess Amount did not exist.  If there are any months in which the Initial Excess Amount *exceeds* $225,000, the amount by which the Initial Excess Amount exceeds $225,000 (the "Secondary Excess Amount") will be identified.[1]  Similarly, for months in which the Initial Excess Amount is *below* $225,000, the amount by which the Initial Excess Amount is below $225,000 (the "Below Cap Amount") will be identified, and then all such amount summed.[2]  The sum of monthly Below Cap Amounts for the year will be termed the "Annual Below Cap Amount."  In recalculating the VRRP Dividends for the prior 12 months, the Company

---

[1] For example, for any one month if the Initial Excess Amount is $250,000, then the Secondary Excess Amount for the month would equal $25,000.
[2] For example, for any one month if the Initial Excess Amount is $175,000, then the Below Cap Amount for the month would equal $50,000.

 

will be obligated to reapply the Dividend Payment Formula for each month in which a Secondary Excess Amount exists to the Secondary Excess Amount instead of the Initial Excess Amount up to the point where the sum of Secondary Excess Amounts equals 100% of the Annual Below Cap Amount.

Notwithstanding anything to the contrary contained herein, the Investor will receive a guaranteed minimum 10% annual cash return on the principal amount outstanding at the end of each calendar quarter (the "Minimum Dividend Amount"). The 10% annual Minimum Dividend Amount will be paid in cash on a monthly basis, beginning 120 days after the initial investment is made. In months where no VRPP Dividends are generated, the Company will accrue the Minimum Dividend Amount.

Tiered Reductions

| | |
|---|---|
| Clearing | 15% |
| Trader + Supervisor Split | 45% |
| Trading Support | 20% |
| Overhead | 25% |
| Company / Investor Split | 50% |

Example

Initial Excess Amount above $175,000 $   100,000

| | Beginning Amt. | | Fee or Split | | Ending Amt. |
|---|---|---|---|---|---|
| Clearing Fees | $ | 100,000 | $ | 15,000 | $ | 85,000 |
| Trader + Supervisor Split | $ | 85,000 | $ | 38,250 | $ | 46,750 |
| Trading Support Fee | $ | 46,750 | $ | 9,350 | $ | 37,400 |
| Overhead Expense | $ | 37,400 | $ | 9,350 | $ | 28,050 |
| Company / Investor Split | $ | 28,050 | $ | 14,025 | $ | 14,025 |

For each month where a VRPP Dividend is due to the Investor (i.e., for which NAIB's principal trading revenue exceeds $175,000), the Investor will receive the VRPP Dividend and/or pro-rata Minimum Dividend Amount within fifteen (15) days following the end of the relevant month.

**Optional. Redemption:**  Following issuance, the Company may redeem the Preferred Stock in whole or in increments of $100,000 at any time by paying the Investor an amount equal to the principal balance of Preferred Stock then outstanding if redeemed in its entirety, or an amount that is a multiple of $100,000 but less than $400,000 if in part, plus any unpaid VRPP Dividends. Moreover, the redemption price of the Preferred Stock will be $5.00 per share. This redemption will not affect in any way the dividend distribution requirements stated above.

 

| | |
|---|---|
| **Pre-Payment Penalty:** | If the Company redeems the Preferred Stock prior to the two year anniversary date after issuance, the Investor's Minimum Dividend Amount will be increased so that the Investor will receive a minimum 20% annual cash return on the principal amount outstanding at the end of each calendar quarter during which there is still Preferred Stock outstanding (the "Increased Minimum Dividend Amount"). All VRPP Dividends or Minimum Dividend Amounts paid to Investor prior to the redemption of the Preferred Stock by the Company will be credited toward the Increased Minimum Dividend Amount. |
| **Put Right:** | After the one (1) year anniversary date of the issuance of the Preferred Stock, the Investor may put the Preferred Stock to the Company in whole or in increments of $100,000 at any time, plus any unpaid VRPP Dividends (the "Put Right"). If the Investor exercises the Put Right, the Company will be obligated to redeem the amount of Preferred Stock put to it, subject to a minimum of 180 days notice (the "Notice Period"). Following the one (1) year anniversary date of the issuance of the Preferred Stock, the Put Right shall only be exercisable during the first fifteen (15) days of each ensuing three (3) month interval (the "Put Window"). Notwithstanding the foregoing, after the one (1) year anniversary date of the issuance of the Preferred Stock, if no VRPP Dividends are due to the Investor for any period of consecutive three (3) months, the Investor can exercise its Put Right without regard to any Put Window restrictions. Moreover, the redemption price of the Preferred Stock will be $5.00 per share. |
| **Liquidation Preference:** | In the event of any Liquidation Event (as defined below) prior to the redemption of the Preferred Stock referenced above, the Investor will be entitled to receive in preference to the holders of Common Stock an amount equal to the aggregate initial issuance amount of his Preferred Stock, plus all accrued and unpaid dividends on such Preferred Stock. Thereafter, the Company will distribute ratably all of its remaining funds and assets legally available for distribution to the holders of **GPG** Common Stock. For these purposes, "Liquidation Event" means any liquidation, dissolution or winding-up of the Company's business. |
| **Preferred Stock Purchase Agreement:** | The investment will be made pursuant to a Preferred Stock Purchase Agreement between the Investor and the Company. This agreement will contain, among other things, customary appropriate representations and warranties, indemnities, covenants reflecting the provisions set forth herein, and appropriate conditions of closing. |
| **Transfer Restriction:** | In addition to restrictions on transfer arising from state or federal securities laws, the Investor will agree not to sell his Preferred Stock without prior written approval of the Company. |
| **Right of First Refusal:** | In the event that the Investor wants to sell the Preferred Stock, the Company shall have a right of first refusal to purchase the Preferred Stock from the Investor at a price of $5.00 per share. |



**Convertibility:** In the event that the Company raises capital through the issuance of Common Stock or Convertible Preferred Stock to outside investors in an amount exceeding $1,000,000 within any three month period, the Investor will have the right to convert his Preferred Stock to Common Stock at a 10.0% discount to the price of the of Common Stock or Common Stock equivalent in such financing round, or $5.00 per share, whichever is less.

**Broker's Fee:** Neither the Company nor the Investor has done anything to incur any liability to any party for any broker's fee or the like in connection with the sale or issuance of the Preferred Stock.

Agreed:

DAVID ALCALAY

Agreed: Global Partners Geo

by

Name: MARCOS KONIG
PRESIDENT.

NUMBER
1

*80,000*
SHARES

# Certificate

SEE LEGEND ON REVERSE

## Global Partners Group, Inc.

Florida Corporation

500,000 Shares of Preferred Stock Authorized • Par Value $.001 per share
80,000 Shares of Convertible Variable Rate Participating Preferred Stock

**This Certifies that** DAVID ALCALAY

is hereby issued EIGHTY THOUSAND CONVERTIBLE VARIABLE RATE PARTICIPATING PREFERRED *fully-paid* and non-assessable Shares of the Capital Stock of the above named Corporation transferable only on the books of the Corporation by the holder hereof in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed.

**In Witness Whereof,** this Corporation has caused this Certificate to be signed by its duly authorized officer(s) this 12th day of August 2004

President Marcos Konig

Secretary

This Document Contains Security Features See back For Details

## Global Partners Group

Miami · New York

June 17, 2004

Mr. David Alcalay
7800 Congress Avenue, Ste 206
Boca Raton, FL 33487

Dear Mr. Alcalay,

Reference is made to that certain Preferred Stock Subscription Agreement dated June 17, 2004 (the "Agreement") between you and Global Partners Group, Inc. (the "Company"), pursuant to which you agreed to purchase 80,000 shares of its Convertible Variable Rate Participating Preferred Stock (the "Preferred Stock").

In order to induce you to enter into and perform the agreement the Company hereby agrees that in any month in which it fails to pay a VRPP Dividend on the Preferred Stock as provided in the Agreement, the Company shall pay to you a consulting fee in an amount equal to such dividend.  Any amounts so paid to you will be credited against cumulative but unpaid VRPP Dividends.

All terms not otherwise defined hereunder shall have the same meaning as set forth in the Agreement.

Very truly yours,

Global Partners Group, Inc.

By: _____
Name Marcos König
Title President

Accepted and Agreed To:

_____
David Alcaly

2101 West Commercial Blvd. Suite 3500
Fort Lauderdale, FL 33309
954-484-2618
954-484-3933 (fax)

546 Fifth Avenue, 5th Floor
New York, NY 10036
212-391-2122
212-391-2906 (fax)

IN AND FOR THE CIRCUIT COURT FOR
THE FIFTEENTH JUDICIAL CIRCUIT
PALM BEACH COUNTY FLORIDA

DAVID ALCALAY,

  Plaintiff,

vs.

CASE NO: 2005 CA 011966 XXXX MB AJ

GLOBAL PARTNERS GROUP, INC., a
Florida corporation, GLOBAL PARTNERS
SECURITIES, INC., a Florida corporation,
MARCOS KONIG, an individual,

  Defendants.

_____/

## AGREED ORDER ON MOTION TO SET ASIDE ORDER
## SPECIALLY SETTING HEARING

**THIS MATTER** having come upon the Court on Plaintiff's Motion to Set Aside

Order Specially Setting Hearing, and the Court having been advised the parties have

reached an agreement, and being otherwise duly advised in the premises, it is hereby,

  **ORDERED and ADJUGED** that Plaintiff's Motion to Set Aside Order Specially

Setting Hearing is **granted.**

  **DONE and ORDERED** in Chambers, West Palm Beach, Florida this 22nd day

of _Aug_, 2006.

          HONORABLE THOMAS H. BARKDULL, III
          Circuit Court Judge

Copies furnished to:

LIBOW & SHAHEEN, LLP, 3351 N.W. Boca Raton Blvd., Boca Raton, FL 33431 Attn.: Allen H. Libow, Esq.
WASSERSTROM WEINREB & WEALCATCH PL, 1909 Tyler Street – Penthouse, Wachovia Center, Hollywood FL
33021 Attn.: Jon Polenberg, Esq.

JS 44 (Rev. 11/05)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)   **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

## I. (a) PLAINTIFFS
DAVID ALCALAY

### DEFENDANTS
Global Partners Group, Inc., Global Partners Securities, Inc., et al

**CIV-DIMITROULEAS**
**MAGISTRATE JUDGE**
**SELTZER**

**06-61363**

(b) County of Residence of First Listed Plaintiff
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Broward County, Florida
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT
LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Allen H. Libow, Esquire
3351 NW Boca Raton Blvd.
Boca Raton, Florida 33431
561-367-7300

Attorneys (If Known)
Wasserstrom, Weinreb & Wealcatch, PL.

0:06CV 61363- WPD- Seltzer

(d) Check County Where Action Arose:  ☐ MIAMI- DADE  ☐ MONROE  ☒ BROWARD  ☐ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
☒ 3  Federal Question (U.S. Government Not a Party)
☐ 2  U.S. Government Defendant
☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☐ 1 Original Proceeding
☒ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).
(See instructions second page):

a) Re-filed Case ☐ YES ☐ NO     b) Related Cases ☐ YES ☐ NO

JUDGE                                    DOCKET NUMBER

## VII. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. s 78aa et seq.

LENGTH OF TRIAL via 4 days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23     DEMAND $     CHECK YES only if demanded in complaint.
JURY DEMAND: ☒ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE     SIGNATURE OF ATTORNEY OF RECORD     DATE  9/8/06

FOR OFFICE USE ONLY

AMOUNT  350.00     RECEIPT # 538137